IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GSE ENVIRONMENTAL, INC., *et al.*,[1] | ) | Case No. 14-11126 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION
CLAIMS OF CRITICAL VENDORS AND (B) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (the "Motion") for entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) authorizing the Debtors to pay

prepetition claims held by Critical Vendors (as defined herein) (the "Critical Vendor Claims") in

an amount not to exceed $2.6 million on an interim basis and $4.1 million on a final basis (with

respect to both interim and final periods, the "Critical Vendor Cap"), and (b) granting related

relief. In support of this Motion, the Debtors respectfully state as follows.[2]

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference from the United States District Court for the District of Delaware,*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: GSE Environmental, Inc. (1074); GSE Environmental, LLC (1539); GSE Holding, Inc. (9069); and SynTec, LLC (2133). The location of the Debtors' service address is: 19103 Gundle Road, Houston, Texas 77073.

[2]    The facts and circumstances supporting this Motion are set forth in the *Declaration of Dean Swick in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a) and 363 of title 11 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1(m).

## Relief Requested

4. By this Motion, the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively: (a) authorizing the Debtors to pay Critical Vendor Claims in an amount not to exceed the applicable Critical Vendor Cap; and (b) granting related relief.[3] In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

---

[3] Contemporaneously herewith, the Debtors have sought authority to pay certain claims held by shippers and other lien holders pursuant to the *Debtors' Motion for Entry an Order (I) Authorizing the Debtors to (A) Pay Prepetition Claims of Shippers and Other Lien Claimants, (B) Pay Section 503(B)(9) Claims, and (C) Grant Administrative Expense Priority to All Undisputed Obligations for Goods and Raw Materials Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business and (II) Granting Related Relief* (the "Shippers and Lienholders Motion"). By this Motion, the Debtors do not seek authority to pay prepetition claims that may be paid pursuant to the relief requested pursuant to the Shippers and Lienholders Motion.

## Background

5.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## Preliminary Statement

6.     As described in the First Day Declaration, the Debtors are a leading global provider of highly engineered geosynthetic containment solutions for environmental protection and confinement applications.  The Debtors rely on a wide range of vital raw materials, chemical additives, proprietary goods, equipment components, and services that are necessary to manufacture their geosynthetic systems.  While the Debtors have broadened their supplier base in recent years, certain of their key supplies and equipment are only available from a limited number of vendors, and in some cases, only one.  Moreover, the Debtors—and their customers— place a high value on the quality of the Debtors' products.  Even when replacing certain vendors is possible, the Debtors must quality-test any new ingredient in their products, a process that lasts a minimum of 60 days.  The Debtors' exacting standards and rigorous testing methods are an essential component of their ability to consistently produce high-quality products, which is in turn what lead to the Debtors' market-leading position.

7.    The vendors and suppliers critical to the Debtors' operations (collectively, the "Critical Vendors") generally fall into the following categories:

- **Primary Raw Material Suppliers**. This category generally includes suppliers of high-grade resins, fibers, and specialized clay materials that serve as the primary components of the Debtors' geosynthetic products;

- **Chemical Additive and Proprietary Goods Suppliers**. This category generally includes suppliers of additives which enable the Debtors' geosynthetics to resist weathering, ultraviolet degradation, and chemical exposure for extended periods of time, as well as proprietary adhesives that necessary to manufacturing certain of the Debtors' products; and

- **Critical Equipment Suppliers and Servicers**. This category generally includes vendors who supply goods or services necessary to operate the Debtors' equipment or ship the Debtors' products.

8.    In many instances, the Critical Vendors are the sole or limited-source providers of raw materials, chemical additives, parts, and services specific to the Debtors' operations and infrastructure. For instance, the Debtors rely on high volumes of specially formulated high-grade polyethylene resins, polypropylene fibers, and bentonite clays which are the foundation for the Debtors' geosynthetic systems. Further, the quality of the Debtors' products would be materially diminished if the Debtors could not treat their geosynthetics with certain chemical additives and proprietary adhesives supplied by certain of the Critical Vendors. In addition to supplying the materials that constitute the Debtors' products, certain of the Critical Vendors supply parts necessary for the Debtors' manufacturing equipment and their packaging operations, or provide services necessary to keep the Debtors' manufacturing plants functioning. The Debtors depend on a select group of Critical Vendors who can supply the necessary quality and quantity of these types of materials and services in a timely fashion.

9.    Further, the Debtors rely on goods and services supplied by their Critical Vendors on a frequent basis. In many instances, the Debtors require weekly or monthly shipments to

replenish their supplies. Any interruption in this supply—however brief—would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' businesses, goodwill, employees, customer base, and market share. Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.

10.     Moreover, several Critical Vendors currently refuse to take on risk and demand favorable trade terms, such as cash on delivery or cash in advance. The Debtors believe many of these vendors may be unfamiliar with reorganization under chapter 11 (as opposed to liquidation under chapter 7) and may be unwilling to do business even on these vendor-favorable terms if their prepetition claims are not honored. The Debtors cannot afford to lose the goods and services provided by the Critical Vendors at this juncture.

11.     Importantly, the Debtors typically conduct business with their Critical Vendors on an invoice-by-invoice basis without long-term contracts. Accordingly, the Debtors do not seek to honor prepetition obligations arising under long-term contractual relationships by this Motion.

### Customary Trade Terms

12.     Subject to the Court's approval, the Debtors intend to pay the Critical Vendor Claims only to the extent necessary to preserve their businesses. To that end, in return for paying the Critical Vendors Claims either in full or in part, the Debtors propose that they be authorized to require that the Critical Vendors provide favorable trade terms for the postpetition delivery of goods and services. Specifically, the Debtors propose to condition the payment of the Critical Vendor Claims upon each Critical Vendors' agreement to continue—or recommence—supplying goods and services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, timing of payments, availability, and other terms) in place 12 months prior to the Petition Date,

or such other trade terms that are acceptable to the Debtors (the "Customary Trade Terms"). The Debtors may require certain Critical Vendors to enter into a contractual agreement evidencing such Customary Trade Terms.

13.    In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then: (a) the Debtors may then take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Critical Vendor; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## The Critical Vendors

14.    With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationships and/or suppliers of goods and services—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and/or impair going-concern viability. In this process, the Debtors considered a variety of factors, including:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

As noted above, the Debtors do not, by this Motion, seek to honor prepetition obligations arising under enforceable, long-term contractual relationships.[4]

15.    Following this analysis, the Debtors identified approximately 20 vendors as Critical Vendor candidates for purposes of the relief requested herein.[5]  As of the Petition Date,

---

[4]    The Debtors reserve the right to make payments to Critical Vendors, in an amount not to exceed the applicable Critical Vendor Cap, under any long-term contracts that may exist if the Debtors determine, in their reasonable business judgment, that such party asserts or could reasonably assert the right to terminate such contract on account of the Debtors' bankruptcy filing, notwithstanding the imposition of the automatic stay.

[5]    The Debtors have supplied information to the United States Trustee regarding the identity of such vendors, the type of product or service they supply, their claim amounts, whether they are party to contracts with the Debtors, and whether the Debtors are seeking relief to pay non-Critical Vendor claims of such vendors under the Shippers and Lienholders Motion.

the Debtors believe they owe the Critical Vendor candidates approximately $4.1 million.[6] As such, the $4.1 million of requested relief is approximately 22 percent of the Debtors' accrued trade payables of approximately $18.2 million. The Debtors are only seeking relief to pay $2.6 million of the Critical Vendor Claims during the first 21 days of their chapter 11 cases. The Debtors' Critical Vendors are discussed in more detailed below.

## I.     Primary Raw Material Suppliers

16.     The Debtors' geosynthetic products are produced primarily from high-grade polyethylene resins, polypropylene fibers, and bentonite clay. In order to make their products, the Debtors must procure large quantities of these primary raw materials. There is a limited supply of vendors who can meet the Debtors' volume requirements for certain of these these materials on a timely, cost-efficient basis. And certain of the Debtors' raw materials are only available from a single Critical Vendor.

17.     Moreover, the materials the Debtors use are not fungible, as each vendor's supply varies in quality. Thus, even where alternative vendors could supply sufficient quantities of the Debtors' raw materials, the Debtors cannot incorporate untested materials into their production stream. To ensure they can continue to properly operate their machinery and deliver the highest quality products to their customers, the Debtors conduct a three-stage review of each new component of their products. This quality-testing process takes between 60 to 90 days to complete, and prevents the Debtors from easily replacing certain Critical Vendors. Nor do the Debtors maintain an on-site inventory of these primary raw materials at volumes sufficient to meet their operational needs. Accordingly, any delay in supply of quality-tested materials could

---

[6]     This figure does not include claims held by Critical Vendors that may be entitled to priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). The Debtors have requested separate relief to pay 503(b)(9) Claims pursuant to the Shippers and Lienholders Motion.

deprive the Debtors of ingredients necessary for producing their lining solutions, causing a shut-down in operations to the detriment of these chapter 11 estates.

## II.    Chemical Additive and Proprietary Goods Suppliers

18.    The Debtors incorporate certain chemical additives and adhesives into their geosynthetic products which enable the Debtors' geotextiles to resist weathering, ultraviolet degradation, and chemical exposure for extended periods of time.  Certain of these additives and adhesives are proprietary blends that only certain Critical Vendors produce.  Even when possible, replacing the Critical Vendors that supply these additives and adhesives could result in substantially higher costs for the Debtors and their estates.  Moreover, as with their primary raw materials, the Debtors must put all new additive and adhesive materials through a rigorous three-stage quality test.  Again, the Debtors do not maintain an on-site inventory of these materials in sufficient supply to meet their operational needs.  Forcing the Debtors to wait between 60 and 90 days for new suppliers, even where available, would shut down the Debtors' operations and jeopardize their going-concern value.

## III.    Critical Equipment Suppliers and Servicers

19.    The Debtors' manufacturing and packaging operations require a steady stream of fuel and replacement parts that are critical to their operations.  For example, the Debtors use large quantities of propane to operate their forklifts, which are vital to properly handle raw materials and finished products.  It would take the Debtors at least 30 days to find alternative propane suppliers, negotiate trade terms, and install new storage tanks, during which time the Debtors' manufacturing facilities could not operate.  In their day-to-day operations, the Debtors also use highly specialized tools to extrude resins and process fibers.  The Debtors' equipment is unique because it has been developed for their proprietary manufacturing processes, and the

available pool of experienced and reliable vendors who can provide the necessary supplies required to replace worn parts is extremely limited. In many instances, such parts are available from a single supplier. Additionally, the Debtors package their products using highly specialized bindings. Even where alternative vendors for fuel, replacement parts, or binding materials exist, they would require a very long lead time before they could deliver their products in sufficient volume to support the Debtors' requirements.

20. Moreover, the Debtors' manufacturing facilities often produce byproducts that must be treated to comply with applicable environmental laws and regulations. For example, under the terms of the Debtors' wastewater discharge permits, certain of the Debtors' facilities produce wastewater that cannot be discharged into municipal sewer systems before being tested and treated. In some instances, the Debtors have no available alternatives and must rely on a single Critical Vendor to treat certain manufacturing waste products.

21. Without access to certain fuel, replacement parts, packaging materials, and treatment services, the Debtors cannot continue to operate their manufacturing facilities or ship products to their customers in the ordinary course of business postpetition. Preserving the Debtors' access to these goods and services is therefore critically important to the Debtors' business operations and restructuring efforts.

22. For the reasons discussed above, the Debtors request authority to pay Critical Vendor Claims in an amount not to exceed the applicable Critical Vendor Cap.

## Basis for Relief

I.   **The Debtors Should be Authorized to Pay Critical Vendor Claims Under Sections 105(a) and 363(b) of the Bankruptcy Code**

23. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating

business's going-concern value. *See, e.g., In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

24. Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

25. In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses. *See Just for Feet*, 242 B.R. at 825. Specifically, the Court may use its

power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *Ionosphere Clubs*, 98 B.R. at 176.

26.     Indeed, the United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *Just for Feet*, 242 B.R. at 824–25 (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

27.     This flexible approach is particularly critical where, as here, prepetition creditors are crucial to a debtor's reorganization. In *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court recognized that "a bankruptcy court may exercise its equity powers under section 105(a) of the Bankruptcy Code to authorize payment of prepetition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" *Id.* (citations omitted). The court explained that "a *per se* rule proscribing the payment of prepetition

indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the [Bankruptcy] Code." *Id.* at 932.

28.     Allowing the Debtors to pay Critical Vendor Claims, pursuant to all or some of the above-referenced provisions, is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999). Indeed, reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's ability to preserve going-concerns and maximize creditor recovery—thereby increasing prospects for a successful reorganization—courts in this district regularly grant relief consistent with that which the Debtors are seeking in this Motion. *See, e.g., In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 24, 2013); *In re Ormet Corp.*, No. 13-10334 (MFW) (Bankr. D. Del. Mar. 20, 2013); *In re DDMG Estate f/k/a Digital Domain Media Grp., Inc.*, No. 12-12568 (BLS) (Bankr. D. Del. Sept. 12, 2012); *In re Blitz U.S.A., Inc.*, No. 11-13603 (PJW) (Bankr. D. Del. Dec. 5, 2011); *In re Amicus Wind Down Corp. f/k/a Friendly Ice Cream Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011).[7]

29.     As described above, the Debtors require a steady stream of goods and services from their Critical Vendors to ensure they have sufficient supplies of high-quality raw materials and can maintain operational stability as they transition into chapter 11.   Without the Critical Vendors' supplies and services, the Debtors would be forced to halt production immediately while they searched for substitute vendors, which could in turn jeopardize

---

[7]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

numerous customer relationships and significantly impair the value of the Debtors' businesses. Needless to say, creditors could be materially, if not irreparably, harmed in this scenario, and the Debtors' chapter 11 cases could be ground to a halt before they have even begun.

### Processing of Checks and Electronic Fund Transfers Should be Authorized

30. The Debtors have sufficient funds to pay any amounts related to the Critical Vendor Claims in the ordinary course of business. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Critical Vendor Claims. The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Thus, the Debtors request that the Court authorize all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Critical Vendor Claims.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

31. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtors are only seeking relief to pay $2.6 million of the Critical Vendor Claims during the first 21 days of their chapter 11 cases. For the reasons discussed above, authorizing the Debtors to pay Critical Vendor Claims and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the

value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

<strong><u>Reservation of Rights</u></strong>

32.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their right to contest any claim related to the relief sought herein. Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

<strong><u>Waiver of Bankruptcy Rule 6004(a) and 6004(h)</u></strong>

33.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

<strong><u>Notice</u></strong>

34.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 25 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' first lien credit facility; (d) counsel to the administrative agent; (e) local counsel to the administrative agent; (f) the first lien credit facility lenders; (g) counsel to the first lien credit facility lenders;

(h) local counsel to the first lien credit facility lenders; (i) the United States Environmental Protection Agency; (j) the United States Attorney's Office for the District of Delaware; (k) the Internal Revenue Service; (l) the office of the attorneys general for the states in which the Debtors operate; (m) the Securities and Exchange Commission; (n) the Critical Vendors; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

35.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B,** respectively, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Wilmington, Delaware
Dated: May 4, 2014

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:      ljones@pszjlaw.com
            tcairns@pszjlaw.com

- and -

Patrick J. Nash, Jr., P.C. (*pro hac vice* admission pending)
Jeffrey D. Pawlitz (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:      patrick.nash@kirkland.com
            jeffrey.pawlitz@kirkland.com
            bradley.giordano@kirkland.com

*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*