## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| GSE ENVIRONMENTAL, INC., *et al.*,[1] | ) ) | Case No. 14-11126 (___) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY
PREPETITION WAGES, SALARIES, OTHER COMPENSATION,
AND REIMBURSABLE EXPENSES, (B) CONTINUE ORDINARY COURSE
INCENTIVE PROGRAMS FOR NON-INSIDERS, AND (C) CONTINUE
EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (the "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and "Final Order," respectively), (I) authorizing the Debtors to (a) pay prepetition wages, salaries, commissions, other compensation, reimbursable expenses, director obligations, and severance obligations; (b) continue ordinary course incentive programs for non-insiders (subject to entry of the Final Order), (c) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, and (II) granting related relief. In support of this Motion, the Debtors respectfully state as follows.[2]

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: GSE Environmental, Inc. (1074); GSE Environmental, LLC (1539); GSE Holding, Inc. (9069); and SynTec, LLC (2133). The location of the Debtors' service address is: 19103 Gundle Road, Houston, Texas 77073.

[2]  The facts and circumstances supporting this Motion are set forth in the *Declaration of Dean Swick in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

1.  The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.  The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1(m).

**Relief Requested**

4.  By this Motion, the Debtors seek entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**: (I) authorizing the Debtors to (a) pay prepetition wages, salaries, commissions, other compensation, reimbursable expenses, director obligations, and severance obligations, (b) pursuant to the Debtors' proposed Final Order, continue ordinary course incentive programs for non-insiders, and (c) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; (II) scheduling a final hearing (the "Final Hearing") to

2

consider entry of the Final Order within approximately 25 days of the commencement of these chapter 11 cases; and (III) granting related relief.

5.    Although the Debtors believe that all Employee Compensation and Benefits are vital to the Debtors' businesses, pursuant to the Interim Order the Debtors seek authority to maintain and make payments on account of those Employee Compensation and Benefits that the Debtors believe are necessary to prevent immediate and irreparable harm to the Debtors' businesses during the first 21 days of these chapter 11 cases. Notably, the Debtors will seek authority, solely upon entry of the Final Order, to honor, pay, satisfy, or remit all claims and prepetition obligations related to Employee Incentive Programs, Severance Payments, and Postpetition Director Obligations (each as defined and discussed herein).

## Background

6.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Workforce

7.    The Debtors' employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' employees include highly trained personnel who cannot be easily replaced. Without the continued,

3

uninterrupted services of their employees, effective reorganization of the Debtors will be materially impaired.

8.     At the same time, the vast majority of employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their employees compensation, providing their employees benefits, and maintaining certain programs benefiting their employees.   Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

9.     The Debtors' operations consist primarily of manufacturing highly engineered geosynthetic containment solutions for environmental protection and confinement applications. The   Debtors   employ   approximately   240   individuals   on   a   full-time   basis (the "Full-Time Employees").  Approximately 140 of the Full-Time Employees are paid on an hourly basis (the "Hourly Employees") and approximately 100 receive a salary.  In addition to the Full-Time Employees, the Debtors' workforce includes approximately 15 individuals that are currently working part-time or are employed through temporary staffing agencies (collectively, the "Other Employees," and together with the Full-Time Employees, the "Employees").  The Other Employees are not eligible for the Debtors' Health and Welfare Programs, as described herein, except to the extent required by law.  The Employees are not represented by a collective bargaining unit.

<u>**Employee Compensation and Benefits**</u>

10.     The Debtors seek to minimize the personal hardship the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected.  Thus, by this Motion, the Debtors are seeking authority to pay and honor certain prepetition claims relating to,

4

among other things, wages, salaries, commissions, incentive programs, expense reimbursements, director obligations, severance obligations, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, vacation time, bereavement leave, life insurance, voluntary life insurance, short- and long-term disability coverage, education assistance, relocation assistance, fitness program reimbursement, employee assistance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business (collectively, the "Employee Compensation and Benefits"). In addition, the Debtors also are seeking to pay all costs incident to the Employee Compensation and Benefits.

11.    By this Motion, the Debtors seek authority to honor prepetition ordinary course employment practices on an interim and final basis, as summarized below:

| Relief Sought[3] | Interim Amount | Final Amount |
|---|---|---|
| **Employee Compensation and Withholding Obligations** | | |
| Unpaid Wages | $291,000 | $291,000 |
| Unpaid Sales Commission | $0 | $35,000 |
| Withholding Obligations | $152,500 | $152,500 |
| Unpaid Payroll Fees | $0 | $17,000 |
| Payroll Taxes | $131,000 | $131,000 |
| Expense Reimbursements | $60,000 | $60,000 |
| **Incentive Programs (non-insiders)** | | |
| Short-Term Incentive Program | $0 | $0 |
| Hourly Incentive Program | $0 | $7,000 |
| Valued Employee Incentive Program | $0 | $0 |
| Collections Incentive Program | $0 | $500 |
| **Employee Benefit Programs** | | |
| Health Insurance Programs | $165,500 | $165,500 |
| Life & AD&D Insurance | $1,000 | $1,000 |
| Voluntary Life & AD&D Insurance | $0 | $0 |
| Disability Benefits | $2,000 | $2,000 |
| Workers' Compensation Programs | $0 | $0 |
| 401(k) Plan | $0 | $0 |
| Employee Assistance Program | $0 | $0 |
| Education Assistance Program | $0 | $0 |
| Fitness Program | $0 | $0 |

---

[3]    Capitalized terms in this chart shall have the meanings as ascribed to them in this Motion.

| Relief Sought[3] | Interim Amount | Final Amount |
|---|---|---|
| Relocation Assistance Program | $0 | $3,000 |
| Paid Time Off | $0 | $0 |
| Unpaid Severance | $0 | $0 |
| Director Obligations | $0 | $0 |
| **Total** | **$803,000** | **$865,500** |

12.     Subject to the Court's approval of the relief requested in this Motion, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

**I.     Employee Compensation and Withholding Obligations**

13.     In the ordinary course of business, the Debtors pay Employees wages, salaries, commissions, sales incentives, and other compensation (collectively, the "Employee Compensation").

**A.     Wages**

14.     As previously noted, the Debtors pay their Employees' wage and salary obligations (the "Wages") on either a salaried or hourly basis. The Employees are paid bi-weekly. Because the majority of Employees are paid in arrears, certain Employees will be owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things: (a) potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; and (b) the delay between the date when some payroll checks are issued and the date when such checks are presented to an Employee's bank for payment.

6

15.     As of the Petition Date, the Debtors estimate that Employees are owed an aggregate of approximately $291,000 on account of accrued wages, salaries, overtime, and other compensation (excluding reimbursable expenses) earned prior to the Petition Date ("Unpaid Wages"). By this Motion, the Debtors seek authority to pay their Employees any Unpaid Wages in the ordinary course of business and consistent with past practice, and to continue the Wages practices on a postpetition basis in the ordinary course of the Debtors' business. For the avoidance of doubt, the Debtors do not believe any employee is owed Unpaid Wages in excess of the priority caps set forth in sections 507(a)(4)–(5) of the Bankruptcy Code and, by this Motion, are not seeking to pay Unpaid Wages to any Employee in excess of such cap.

**B.     Sales Commissions**

16.     The Debtors pay their sales personnel through a combination of salary and sales commissions (the "Sales Commissions"). Like Wages, Sales Commissions are the primary source of income for certain of the Debtors' sales representatives. Moreover the Sales Commissions align incentives of the sales representatives with those of the Debtors, thereby encouraging the sales personnel to maximize sales, benefiting the business as a whole.

17.     Sales Commissions are deemed earned if and when the Debtors ship the product, invoice the product, and collect the receivable with respect to the sale. Sales Commissions are paid in the second pay period of the month following the month in which the Sales Commissions are earned. In the event an eligible Employee's employment with the Debtors is terminated by the Employee voluntarily or by the Debtors without cause, such Employee will be entitled to receive Sales Commissions for all sales made and contracts signed by the Debtors for which the Employee would otherwise have received Sales Commissions if such employment had not

7

terminated; *provided, however*, that the Sales Commissions are earned on or prior to the date that is 90 days after the date of the Employee's termination of employment with the Debtors.

18. In 2013, the Debtors paid approximately $1.3 million on account of Sales Commissions. For 2014, the Debtors have budgeted approximately $2.5 million on account of Sales Commissions. By this Motion, the Debtors seek authority to pay and honor approximately $35,000 of unpaid prepetition Sales Commission (the "Unpaid Sales Commissions") in the ordinary course of business and consistent with past practice, and to continue the Sales Commissions practices postpetition in the ordinary course of the Debtors' business. As previously stated, the Debtors are not seeking to pay Unpaid Sales Commissions to any Employee in excess of the $12,475 priority caps imposed by sections 507(a)(4)–(5) of the Bankruptcy Code. The various types of Sales Commissions are described in detail below.

### 1. Sales Team Commission Program

19. The Debtors' sales personnel work in teams (each, a "Sales Team") comprised of one sales representative, one technical sales representative,[4] and one supporting sales representative[5] (each, a "Sales Team Member"). Sales Team Members are entitled to Sales Commissions related to the Debtors' sales team commission program (the "Sales Team Commission Program"). The Sales Team Commission Program provides that for each item sold by a sales representative in the Sales Team's territory, an amount between 0.25 percent and 3.0 percent of the gross profit from the product sold is awarded to each Sales Team Member.

---

[4] Technical sales representatives support the regional sales representatives in their selling efforts. The technical sales representatives recommend technical solutions to client needs to sales representatives, as well as to the sales representatives' clients. Additionally, technical sales representatives meet consulting engineers and clients to promote the Debtors' products and solutions.

[5] Supporting sales representatives are the Employees responsible for managing customer relationships through the project bid process, pricing and quoting products as well as providing routine technical support for customers within the representative's assigned territories. Additionally, supporting sales representatives focus on identifying new customers and opportunities to meet projections.

DOCS_DE:193051.1

The applicable percentage is determined by the Sales Team Member's sales role, seniority, and the type of product sold. Additionally, for each item sold by a sales representative outside the Sales Team's territory, an amount between 0.25 percent and 0.5 percent of the gross profit from the product sold is awarded to each Sales Team Member.

## 2. Territory Commission Program

20. Employees who are sales representatives are entitled to additional compensation related to the Debtors' territory gross profit commission program (the "Territory Commission Program"). The Territory Commission Program provides for both quarterly profit growth targets and an annual profit growth target. If a quarterly growth target is achieved, the sales representative assigned to that territory is awarded $1,500 (a "Quarterly Territory Commission"). If the annual growth target is achieved, the sales representative assigned to that territory is awarded all four Quarterly Territory Commissions, even if he or she failed to earn one or more Quarterly Territory Commissions during the applicable year.

## 3. Target Commission Program

21. Employees who are technical sales representatives are entitled to additional compensation related to the Debtors' target commission program (the "Target Commission Program"). The Target Commission Program provides for both quarterly targets and an annual target regarding the number of sales presentations a technical sales representative makes to potential new customers. If a quarterly presentation target is achieved, the technical sales representative is awarded $2,500 (a "Quarterly Target Commission"). If the annual presentation target is achieved, the technical sales representative is awarded all four Quarterly Target Commissions, even if he or she failed to earn one or more Quarterly Target Commissions during the applicable year. The Target Commission Program is designed to further align the interests of the Debtors and the technical sales representatives by incenting technical sales representatives to

9

meet with and present to potential new customers with the goal of expanding the Debtors' business and increasing the Debtors' revenue.

### 4. New Customer Commission Program

22. Employees who are supporting sales representatives are entitled to additional compensation related to the Debtors' new customer commission program (the "New Customer Commission Program"). Pursuant to the New Customer Commission Program, supporting sales representatives are provided a list of new or dormant accounts on which to focus (the "New Customer Accounts"), and are also provided quarterly targets and an annual target for increases in gross profits for the New Customer Accounts. If a quarterly growth target is achieved, the supporting sales representative is awarded $1,500 (a "Quarterly New Customer Commission"). If the annual presentation target is achieved, the supporting sales representative is awarded all four Quarterly New Customer Commissions, even if such representative failed to earn one or more Quarterly New Customer Commissions during the applicable year. The New Customer Commission Program is designed to further align the interests of the Debtors and the supporting sales representatives by incenting the supporting sales representatives to expand the Debtors' business by developing new customers or reviving accounts of existing customers who have not recently purchased products from the Debtors.

### 5. Inventory Commission Program

23. Employees who are customer service representatives are entitled to additional compensation related to the Debtors' inventory commission program (the "Inventory Commission Program"). From time to time, the Debtors write down certain slow-moving inventory on their books (the "Specified Inventory"). The Inventory Commission Program provides that if Specified Inventory is sold, an amount between one percent and five percent of revenue derived from the Specified Inventory sold is awarded to the sales

10

representative responsible for the sale and an amount equal to one percent of the revenue derived from the Specified Inventory sold is awarded to the customer service representative involved in the sale. The Inventory Commission Program promotes the sale of Specified Inventory to reduce the length of time finished products remain with the Debtors after production is complete.

### 6. Referral Commission Program

24. Employees who are sales representatives are entitled to additional compensation related to the Debtors' AEG referral commission program (the "Referral Commission Program"). From time to time, the Debtors refer American Environmental Group, Ltd. ("AEG"), an installer and reseller of geosynthetic lining products, to customers to install the Debtors' products. For each referral, the Debtors' receive four percent of the gross revenue AEG earns on account of the contract for services AEG enters into as a result of such referral (an "AEG Commission Payment"). The Debtors, in turn, pass on one percent of the AEG Commission Payment to the sales representative responsible for making the referral. The Referral Commission Program promotes the ongoing relationship between the Debtors' and AEG and the additional revenue stream derived from that relationship.

### C. Withholding Obligations

25. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, child support, and other pre-tax deductions payable pursuant to certain of the Health and Welfare Programs and the 401(k) Plan (each as defined below) (collectively, the "Deductions"), and forward those amounts to various third-party recipients. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing

11

authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Payroll Taxes is approximately $131,000.

26.     As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $152,500. By this Motion, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of business during the administration of these chapter 11 cases.

### D.     Payroll Processing

27.     The Debtors utilize Automatic Data Processing, Inc. ("ADP"), a third-party payroll service, to process and administer their Employee Compensation and Withholding Obligations. The Debtors' payroll is paid either by direct deposit through electronic funds transfer to the Employees' bank accounts or by physical check, at the Employee's election. In the ordinary course of business, approximately two to three days before each payroll issuance, the Debtors advance funds to ADP along with payment schedules outlining the payments to be made to the Employees. On each applicable pay day, ADP makes direct deposit disbursements and issues payroll checks to the Employees.   As of the Petition Date, the Debtors estimate that they owe ADP approximately $17,000 on account of payroll processing fees (the "Payroll Fees" and outstanding obligations related thereto, the "Unpaid Payroll Fees"). Failure to pay the

12

Unpaid Payroll Fees could lead to delayed disbursement of Employee Compensation to the Employees and Withholding Obligations to the appropriate third-parties to the detriment of the Employees and the Debtors' business. As a result, the Debtors seek to pay the Unpaid Payroll Fees outstanding as of the Petition Date and continue administering payroll in the ordinary course of business.

### E. Reimbursement Obligations

28. Prior to the Petition Date and in the ordinary course of their business, the Debtors reimburse Employees for certain expenses that such Employees incur in the scope of their employment (the "Expense Reimbursements"). Expense Reimbursements typically include expenses for travel, lodging, relocation, ground transportation, meals, and other business-related expenses related to the discharge of an Employee's duties. Expense Reimbursements are generally incurred by Employees through the use of personal funds, and the Employee may be held personally liable for any unpaid obligations. Thus, the Debtors' inability to reimburse such expenses to these Employees could impose severe hardship on such individuals where such individuals otherwise incurred obligations for the Debtors' benefit.

29. As of the Petition Date, the Debtors estimate that the outstanding Expense Reimbursements do not exceed approximately $60,000. By this Motion, the Debtors seek authority to pay the Employees' Expense Reimbursements and to continue the Expense Reimbursements in the ordinary course of the Debtors' business.

## II. Employee Incentive Programs

30. By this Motion, pursuant to the proposed Final Order, the Debtors seek authority to continue the Short-Term Incentive Program, the Hourly Incentive Program, the Valued Employee Incentive Program, and the Collections Incentive Program (collectively, the "Employee Incentive Programs") (each as defined herein) and to honor their obligations to

13

non-insider Employees thereunder. Notably, "insiders" of the Debtors (as that term is defined in section 101(31) of the Bankruptcy Code) (the "Insiders") are excluded from the relief requested herein. To the extent the Debtors propose to make an incentive payment to, or implement an incentive plan for, any insiders, the Debtors will seek separate approval from the Court with respect to such program.[6]

## A.     Short-Term Incentive Program

31.     As described more fully below, the Debtors offer a short-term incentive program (the "Short-Term Incentive Program") as an additional component of overall Employee Compensation.[7] The Short-Term Incentive Program is an annual program that consists of financial targets for the Debtors' business and non-financial targets for individual Employees. The Debtors must achieve certain financial results in the applicable year (the "Threshold Financial Target") before any payments become due under the Short-Term Incentive Program. If the Debtors fail to achieve those results, no Employee is eligible to receive any payments on account of the Short-Term Incentive Program, even if an individual Employee achieves his or her Financial Goals or Personal Goals (as discussed and defined below). The Debtors believe the Short-Term Incentive Program is integral to the operation of the Debtors' business. In particular, the Short-Term Incentive Program drives Employees' performance, aligns Employees' interests with those of the Debtors generally by linking payments under the

---

[6]   Notwithstanding anything herein to the contrary, the Debtors reserve all rights with respect to the "insider" status of such parties with respect to any further relief that the Debtors may seek from the Court by separate motion.

[7]   Although the Short-Term Incentive Program is offered to both Insiders and non-Insiders, the Debtors are not seeking to include Insiders in the relief requested herein. To the extent the Debtors propose to make any payments under the Short-Term Incentive Program to insiders, the Debtors will seek separate approval from the Court.

Short-Term Incentive Program to overall business performance, and promotes the overall efficiency of the Debtors' operations.

32.     As previously mentioned, the Short-Term Incentive Program has two components, a financial component and a non-financial component.  The financial component consists of a series of financial goals related to either the Debtors' overall business or a specific department, measured on an annual basis, including EBITDA growth, gross margin growth, and working capital improvement (collectively, the "Financial Goals").  The non-financial component consists of individual management goals that are approved by senior management (the "Personal Goals").[8]

33.     Each eligible Employee is assigned Financial Goals, Personal Goals, and a range of potential incentive payments (an "Incentive Pool") that he or she may earn in a given year pursuant to the Short-Term Incentive Program.  Each Financial Goal and Personal Goal is assigned a value and calculated as a specified percentage of the Incentive Pool.  As a result, assuming the Threshold Financial Target has been met, achieving a Financial Goal or Personal Goal will result in payment of the corresponding percentage of the Employee's Incentive Pool.

34.     Payments on account of the Short-Term Incentive Program are paid in the year following the year in which the Financial Goals or Personal Goals were fulfilled.  The Debtors did not achieve the 2013 Threshold Financial Target.  Therefore, the Debtors do not currently have any obligations outstanding on account of the Short-Term Incentive Program.  With respect to 2014, the Debtors have approved a $2 million budget for the Short-Term Incentive Program (which would be paid in 2015 if the 2014 Threshold Financial Target is achieved).  Although the

---

[8]     Personal Goals include, among other things, participating in topical conferences and seminars, field visits, training personnel, supporting the launch of new products, preparing specified reports, and the creation and implementation of company-wide standards and procedures.

Debtors do not anticipate any obligations on account of the Short-Term Incentive Program in 2014 or during the pendency of these chapter 11 cases, out of an abundance of caution, the Debtors request authority (on a final basis only) to honor obligations arising under the Short-Term Incentive Program, in the ordinary course of business.

**B.      Hourly Incentive Program**

35.     The Debtors offer an incentive program to Hourly Employees (the "Hourly Incentive Program") as an additional component of Hourly Employees' overall Employee Compensation. In the event an Employee who is senior to an Hourly Employee ceases to be employed by the Debtors, an Hourly Employee who takes over some or all of the responsibilities of the departed senior Employee is eligible to earn incentive payments pursuant to the Hourly Incentive Program (each, an "Hourly Incentive Payment"). The Hourly Incentive Program aligns the interests of the Debtors and the Hourly Employees by encouraging Hourly Employees to take on additional responsibilities, reducing the need to immediately replace departed Employees and limiting the decrease in productivity that could result from such a vacancy.

36.     As of the Petition date, the Debtors owe approximately $7,000 on account of accrued and unpaid Hourly Incentive Payments. By this Motion, the Debtors seek authority to pay the Hourly Incentive Payments and to continue the Hourly Incentive Program postpetition in the ordinary course of the Debtors' business.

**C.      Valued Employee Incentive Program**

37.     The Debtors offer an incentive program to certain non-Insider Employees who make extraordinary contributions to the Debtors (the "Valued Employee Incentive Program") as an additional component of Employee Compensation. Qualification for the Valued Employee Incentive Program is determined on a case-by-case basis and those Employees who qualify for

16

the Valued Employee Incentive Program receive a one-time payment (a "Valued Employee Incentive Payment") in recognition of their contribution. During 2013, the Debtors made Valued Employee Incentive Payments to seven Employees, totaling $350. The Valued Employee Incentive Program aligns the interests of the Debtors and the Employees by encouraging Employees to accept responsibility in excess of their job description that results in a significant benefit to the Debtors, fulfill an important staffing need, or remain in the Debtors' employ in circumstances in which the Employee's departure would have a significant negative impact on the Debtors' businesses.

38.    The Debtors do not have any Valued Employee Incentive Payments outstanding as of the Petition Date. By this Motion, the Debtors seek authority to pay the Valued Employee Incentive Payments and to continue the Valued Employee Incentive Program in the ordinary course of the Debtors' business.

### D.    Collections Incentive Program

39.    The Debtors offer an incentive program to certain non-Insider Employees in the finance department who meet established accounts receivable collections targets (the "Collections Incentive Program"). In the event a qualified Employee meets his or her quarterly collections target, the qualified Employee will receive approximately $1,500 (a "Collections Incentive Payment"). In 2013, the Debtors paid a total of $4,454 on account of Collections Incentive Payments to one Employee. The Collections Incentive Program aligns the interests of the Debtors and Employees by encouraging Employees to collect amounts owed to the Debtors that are overdue.

40.    As of the Petition Date, the Debtors owe approximately $500 on account of accrued and unpaid Collections Incentive Payments. By this Motion, the Debtors seek authority

17

to pay the Collections Incentive Payments and to continue the Collections Incentive Program in the ordinary course of the Debtors' business.

**III.     Employee Benefit Programs**

      **A.     Health and Welfare Programs**

41.     The Debtors offer several insurance policies to eligible Employees for medical, dental, and vision care coverage and certain other benefits, including the Health Insurance Programs, the Life and AD&D Insurance, the Voluntary Life and AD&D Insurance, the Disability Benefits, the Workers' Compensation Program, the 401(k) Plan, the Employee Assistance Program, the Educational Assistance Program, the Fitness Program, and the Relocation Assistance Program (each as defined herein, and collectively, the "Health and Welfare Programs"). The following chart summarizes the Debtors' estimated aggregate amount of accrued, but unpaid, obligations with respect to the Health and Welfare Programs as of the Petition Date.

| Health and Welfare Programs | Accrued and Unpaid Obligations |
|---|---|
| Health Insurance Programs | $165,500 |
| Life & AD&D Insurance | $1,000 |
| Voluntary Life and AD&D Insurance | $0 |
| Disability Benefits | $2,000 |
| Workers' Compensation Programs | $0 |
| 401(k) Plan | $0 |
| Employee Assistance Program | $0 |
| Educational Assistance Program | $0 |
| Fitness Program | $0 |
| Relocation Assistance Program | $3,000 |
| **Total** | **$171,500** |

42.     By this Motion, the Debtors seek authority to pay any unpaid amounts due with respect to the Health and Welfare Programs and continue to provide the Health and Welfare Programs postpetition in the ordinary course of business during the administration of these chapter 11 cases.

18

## 1.    Health Insurance Programs

43.    The Debtors offer complete medical coverage to the Full-Time Employees through a preferred provider organization plan (the "PPO Plan") and a high-deductible health plan (the "HD Plan" and, together with the PPO Plan, the "Medical Plans"), both of which are administered by Aetna Medical ("Aetna"). Medical Plan coverage for Full-Time Employees begins the first of the month coincident with or following one full month of full-time employment from the date of hire. The Debtors are self-insured. The Debtors maintain a stop loss insurance policy that covers medical claims.[9] Employees pay bi-weekly premiums with respect to the Medical Plans.[10]

44.    Under the PPO Plan, Aetna covers (a) 100 percent of in-network preventative care services claims and up to 80 percent of all other in-network claims above the deductible,[11] and (b) up to 50 percent of all out-of-network claims above the deductible. Under the HD Plan, Aetna covers (a) 100 percent of in-network preventative services claims and up to 80 percent of all other in-network claims above the deductible,[12] and (b) up to 60 percent of all out-of-network claims above the deductible. Additionally, Employees enrolled in the HD Plan have access to a flexible spending account and health savings account administered by Aetna, which can be used to cover incidental medical costs and also dependent child care (the "FSA"). Currently,

---

[9]    The stop loss insurance policy is described and relief is requested with respect thereto in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition, (B) Enter into New Insurance Policies, (C) Honor Their Prepetition Insurance Premium Financing Agreement, and (D) Renew Their Premium Financing Agreement in the Ordinary Course of Business, and (II) Granting Related Relief*, filed contemporaneously herewith.

[10]    Depending on the number of dependents enrolled in the Medical Plans, Employees enrolled in the PPO Plan pay a bi-weekly premium between $90 and $250 and Employees enrolled in the HD Plan pay a bi-weekly premium between $58 and $162.

[11]    Employees enrolled in the PPO Plan have an individual deductible of $700 per calendar year or a family deductible of $1,400 per calendar year.

[12]    Employees enrolled in the HD Plan have an individual deductible of $1,500 per calendar year or a family deductible of $3,000 per calendar year.

19

approximately 32 Employees use the FSA, for which the Debtors pay approximately $250 per month. As of the Petition Date, the Debtors do not have any obligations accrued but unpaid on account of the FSA.

45.    The Debtors also provide prescription and dental insurance through Aetna Dental (the "Dental Plan")[13] and vision insurance through Eye Med (the "Vision Plan," and together with the Medical Plan, the Dental Plan, and the FSA, the "Health Insurance Programs"). Enrolled Employees pay bi-weekly premiums of between $5 and $20 on account of the Dental Plan and between $4 and $14 on account of the Vision Plan. The Debtors pay bi-weekly premiums of approximately $4,000 on account of the Dental Plan. The Vision Plan is 100 percent Employee funded, and, as a result, the Debtors do not pay premiums on account of the Vision Plan.

46.    The Debtors pay approximately $50,000 per month in the aggregate for the premium payments for the Health Insurance Programs, and also incur claims of approximately $250,000[14] per month (paid in arrears) to cover the costs of medical benefits received by Full-Time Employees at health care facilities, such as clinics and hospitals. As of the Petition Date, the Debtors do not have any accrued, unpaid premium obligations outstanding with respect to the Health Insurance Programs and estimate that they owe approximately $165,500 to cover the claims submitted by Full-Time Employees for health care costs.

---

[13]    Dental Plan coverage for Full-Time Employees begins the first of the month coincident with or following one full month of full-time employment from the date of hire.

[14]    This amount reflects the 12-month average for calendar year 2013. The amount of claims actually incurred on a monthly basis for calendar year 2013 ranged from approximately $50,000 to approximately $985,000.

## 2. Insurance, Disability, and Workers' Compensation Programs

### a. Life Insurance Programs

47. The Debtors provide life and accidental death and dismemberment insurance coverage (the "Life and AD&D Insurance") to the Full-Time Employees through Prudential Financial, Inc. ("Prudential"), which provides maximum coverage of $400,000 in the event of a Full-Time Employee's death or dismemberment. Full-Time Employees may also purchase voluntary Life and AD&D Insurance (the "Voluntary Life and AD&D Insurance") through Prudential, which provides maximum coverage of $500,000 in the event of death or dismemberment, for aggregate coverage up to $900,000. The Debtors pay approximately $6,000 per month in premiums with respect to their Life and AD&D Insurance and Voluntary Life and AD&D Insurance. Full-Time Employees are not eligible for Life and AD&D Insurance or Voluntary Life and AD&D Insurance until the first of the month coincident with or following one full month of full-time employment from the date of hire.

48. As of the Petition Date, the Debtors estimate that the aggregate amount of unpaid obligations with respect to the Life and AD&D Insurance is approximately $1,000. The Debtors do not have any obligations outstanding with respect to the Voluntary Life and AD&D Insurance as of the Petition Date.

### b. Disability Benefits

49. The Debtors provide certain of the Full-Time Employees with short-term and long-term disability benefits (the "Disability Benefits"). Full-Time Employees are not eligible for Disability Benefits until the first of the month following six months of full-time employment. Under the short-term disability benefits program, the Full-Time Employees are entitled to, among other things, continuation of all or a portion of their base wages in the event of a short-term medical disability due to an illness, injury, or pregnancy related condition

21

(the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees and Salaried Employees are entitled to, among other things, continuation of a portion of their wages in the event of a long-term medical disability due to illness or injury (the "Long-Term Disability Benefits"). Employees become eligible for Long-Term Disability Benefits after the Employee's Short-Term Disability Benefits terminate.

50.     For the Full-Time Employees, the Short-Term Disability Benefits begin after an employee is absent from work for one week and continue for up to 11 weeks of any disability thereafter. Depending on length of an Employee's employment, Full-Time Employees will receive Short-Term Disability Benefits equaling either 100 percent salary, 80 percent salary, or 60 percent salary, according to the following schedule:

| Years of Service | Weeks at 100% Salary | Weeks at 80% Salary | Weeks at 60% Salary |
|---|---|---|---|
| 6 months - 1 year | 0 | 1 | 10 |
| 1 - 2 years | 1 | 2 | 8 |
| 2 - 4 years | 2 | 3 | 6 |
| 4 - 6 years | 3 | 4 | 4 |
| 6 - 8 years | 4 | 5 | 2 |
| 8 - 10 years | 5 | 5 | 1 |
| 10 - 15 years | 7 | 4 | 0 |
| 15 - 20 years | 9 | 2 | 0 |
| 20 + years | 11 | 0 | 0 |

51.     After 12 weeks, the Full-Time Employees are entitled to Long-Term Disability Benefits totaling 60 percent of their wages with a maximum monthly benefit of $8,500. The Short-Term Disability Benefits are self-insured and the Long-Term Disability Benefits are administered by Prudential. The Debtors pay Prudential approximately $5,800 per month in premiums with respect to the Long-Term Disability Benefits.

22

52.     Two Full-Time Employees are currently receiving the Short-Term Disability Benefits, and one Full-Time Employee is currently receiving the Long-Term Disability Benefits. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Disability Benefits is approximately $2,000.

### c.     Workers' Compensation Programs

53.     The Debtors maintain workers' compensation insurance for Employees at the statutorily required level in Texas, South Carolina, and South Dakota, the states where the Debtors conduct business (collectively, the "Workers' Compensation Program"). The Full-Time Employees and Other Employees are each entitled to participate in the Debtors' Workers' Compensation program. The Debtors' Workers' Compensation Program is fully insured, so the Debtors do not incur any additional costs on account of claims brought against such insurance. The Debtors' Workers' Compensation Program is maintained through American International Group, Inc. ("AIG") and runs through December 31, 2014. The Debtors pay approximately $350,990 annually to AIG for maintaining the Workers' Compensation Program. The Debtors do not have any obligations outstanding to AIG on account of the Workers' Compensation Program as of the Petition Date.

54.     The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[15] There are currently three existing workers' compensation claims outstanding against the Debtors. The Debtors do not have any

---

[15]   The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

DOCS_DE:193051.1

obligations outstanding on account of administrative fees and loss payments on account of the Workers' Compensation Program as of the Petition Date.

### 3. 401(k) Plan

55. The Debtors provide all Full-Time Employees with the ability to participate in a 401(k) program (the "401(k) Plan"). Full-Time Employees are not eligible for the 401(k) Plan until the first of the month following six months of full-time employment. The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. Each Employee's 401(k) contributions are deducted automatically from each paycheck. The Debtors do not match the Employees' 401(k) Plan contributions. The 401(k) Plan with respect to the Employees is provided by ADP. Each month, the Debtors withhold approximately $30,000 from Employee paychecks on account of the 401(k) Plan.

56. As of the Petition Date, the Debtors do not have unpaid obligations to ADP on account of the 401(k) Plan.

### 4. Employee Assistance Program

57. The Debtors provide the Full-Time Employees with an employee assistance program (the "Employee Assistance Program") at no cost to the Full-Time Employees. The Employee Assistance Program is a confidential counseling and referral service that can assist Full-Time Employees with a range of personal and health related problems. The Employee Assistance Program for the Full-Time Employees is provided by Guidance Resources, who the Debtors pay approximately $180 per month, paid a month in arrears. The Debtors do not have any outstanding obligations with respect to the Employee Assistance Program as of the Petition Date.

### 5. Education Assistance Program

58. Full-Time Employees who have been continuously employed for one year are eligible for the Debtors' education assistance program (the "Education Assistance Program"). The Education Assistance Program applies only to certain educational opportunities. To be approved, courses must relate to the Employees' current job duties or foreseeable future position in the organization, be approved prior to enrollment, and be taught at an accredited college, university, or technical school. Pursuant to the Education Assistance Program, the Debtors will reimburse Full-Time Employees 75 percent of the tuition, books, and fees associated with the successful completion of approved courses. Successful completion of a course means that the Employee has passed the course with a grade of "C" or better, or its equivalent. Currently, four Employees participate in the Education Assistance Program. As of the Petition Date, the Debtors do not have any obligations outstanding with respect to the Education Assistance Program.[16]

### 6. Fitness Program

59. The Debtors reimburse Employees up to 50 percent of monthly individual member dues charged by physical fitness facilities, karate, Tae Kwon Do, aerobics, pilates, or similar exercise programs, up to an annual maximum of $300. Additionally, the Debtors offer a one-time reimbursement of the initial enrollment fees up to $50 (collectively, the "Fitness Program"). The Fitness Program promotes the health and wellness of the Employees, increasing job satisfaction and performance, which accrues to the benefit of the Debtors. Reimbursements on account of the Fitness Program are made quarterly, and Employees must complete an expense report and provide proof of fees paid for each month in the quarter.

---

[16] The Debtors pre-approved reimbursements related to the Education Assistance Program in the aggregate of approximately $29,000. The Debtors do not incur obligations on account of the Education Assistance Program until the Employee has submitted his or her expense report and all required documentation. As a result, the Debtors do not have any obligations outstanding on account of the Education Assistance Program as of the Petition Date.

The Debtors do not have any obligations outstanding with respect to the Fitness Program as of the Petition Date.

### 7.  Relocation Assistance Program

60.  The Debtors reimburse Employees that relocate at the Debtors' request for the reasonable and necessary expenses associated with such relocation.  Additionally, the Debtors reimburse certain new hires that relocate to begin employment with the Debtors.  Employee relocation requires the full approval by the Debtors' President & Chief Executive Officer or Chief Executive Officer.  Relocating Employees with nominal expenses may be offered a lump-sum relocation payment calculated to compensate the Employee for the major portion, if not all, of the expenses to ship household goods, travel to the new location, and assist with temporary living expenses (the "Lump Sum Relocation Program").  Alternately, relocating Employees may be offered a standard relocation assistance plan, pursuant to which Employees must submit an expense report for all expenses incurred in connection with the relocation, including all relevant receipts (the "Standard Relocation Program" and, together with the Lump Sum Relocation Program, the "Relocation Assistance Program").  The Debtors do not incur obligations on account of the Standard Relocation Program until the Employee has submitted his or her expense report and all related receipts.

61.  As of the Petition Date, the Debtors owe approximately $3,000 on account of unpaid obligations related to the Relocation Assistance Program.  By this Motion, the Debtors seek authority to continue the Relocation Assistance Program in the ordinary course of the Debtors' business.

DOCS_DE:193051.1

**B.     Vacation Time and Bereavement Leave.**

62.     The Debtors maintain several paid time-off benefit programs for Full-Time Employees, providing paid time off for Vacation Time and Bereavement Leave (each as defined below, and together, the "Paid Time Off").

63.     In the ordinary course of business, the Debtors provide vacation time ("Vacation Time") to the Full-Time Employees as a Paid Time Off benefit.  Vacation Time accrues at a specified rate based on the Employee's years of service and date of hire.  There are different accrual rates for the Full-Time Employees hired prior to August 1, 2013 and the Full-Time Employees hired after August 1, 2013.  Full-Time Employees hired prior to August 1, 2013 accrue between 16 and 26 days of Vacation Time each year and Full-Time Employees hired after August 1, 2013 accrue between ten and 20 days of Vacation Time each year.  Vacation Time begins accruing upon the date of hire; however, Full-Time Employees hired after August 1, 2013 must complete 120 days of full-time employment before any Vacation Time may be taken.  Full-Time Employees may not carry over any Vacation Time into the next calendar year but they are entitled to a cash payment in lieu of accrued but unused Vacation Time at the time of resignation.  Full-Time Employees who are terminated are also entitled to a cash payment in lieu of the accrued but unused Vacation Time.

64.     In the ordinary course of business, the Debtors provide bereavement leave ("Bereavement Leave") to the Full-Time Employees as a Paid Time Off benefit.  The Employees receive three days of Bereavement Leave each year.  Employees are not allowed to carry over any days of Bereavement Leave into the next calendar year.  Unused Bereavement Leave is not converted to cash or paid out to Employees, including upon termination.  By this Motion, the Debtors seek authority to continue the Paid Time Off policies in the ordinary course of the Debtors' business.

DOCS_DE:193051.1

## C.    Severance

65.    In the ordinary course of business, the Debtors maintain a severance program, which offers severance payments to certain non-Insider Employees who have been involuntarily terminated in connection with a business decision or other restructuring initiative (the "Severance Program").

66.    The Severance Program applies to U.S. employees of the Debtors not covered by any other severance policy.  The Severance Program does not apply if the Employee is covered by an enforceable written employment agreement that provides for severance pay or benefits, the Employee voluntarily resigns, or the Employee is terminated for cause.  Pursuant to the Severance Program, Employees receive semi-monthly severance payments (the "Severance Payments") for a specified period of time based on the Employee's length of service with the Debtors, which is equal to two weeks plus an additional week for each full year of service.  Employees who have been employed by the Debtors for less than a year are not guaranteed to receive any Severance Payments.

67.    The Debtors believe that the Severance Program is critical to maintaining Employee morale and loyalty.  Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success.  Permitting the Debtors to pay the unpaid Severance Payments will help minimize the adverse effect of the commencement of these chapter 11 cases on their ongoing business operations.  Additionally, implementing such a program is not without tangible benefits.  As a condition to receiving Severance Payments, each Employee must execute a release agreement, whereby the Employee releases any claims held against the Debtors.  The Debtors believe that the Severance Program will help reduce the time

28

and expense that could arise in the absence of the Severance Program to defend the assertion of claims by severed Employees.

68.     The Debtors currently do not have any Severance Payments outstanding on account of non-Insider Employees who have been severed from the Debtors prior to the Petition Date.  The Debtors seek the authority to continue to maintain the Severance Program on a postpetition basis pursuant to the Final Order, in the ordinary course of business for any non-Insider Employees that may be severed following the Petition Date.[17]

### D.     Postpetition Director Obligations

69.     The Debtors maintain a board of directors comprised of various Employees, equity holders, and four independent directors (each, a "Director").   The Directors are compensated approximately $55,000 annually, paid in cash on a quarterly basis in advance, and are entitled to expense reimbursement for reasonable out-of-pocket expenses in connection with travel related to their Director duties (the "Director Compensation").  Additionally, the chairman of the board receives an additional $55,000, annually, the head of the audit committee receives an additional $10,000, annually, and the heads of the other committees, including the compensation and corporate governance committees, each receive an additional $7,500 in compensation, annually (together with the Director Compensation, the "Director Obligations").

70.     The Debtors do not believe any Director Obligations are owed as of the Petition Date; however, out of an abundance of caution, the Debtors request the authority, solely pursuant to the Final Order, to pay postpetition Director Obligations as they come due in the ordinary course of business.

---

[17]   For the avoidance of doubt, the Debtors do not seek to make any payments to Insiders under the Severance Program.

**Basis for Relief**

I.  **Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits**

    A.  **Certain Employee Compensation and Benefits are Entitled to Priority Treatment**

    71.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

    B.  **Payment of Certain Employee Compensation and Benefits is Required by Law**

    72.    The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell*

30

*v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

73.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all workers' compensation amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II.     Payment of the Employee Compensation and Benefits is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity

74.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

31

generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

75.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of a bankruptcy court, empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Court may use its power under section 105(a) to authorize payment of the Employee Compensation and Benefits under the "necessity of payment" rule (also referred to as the "doctrine of necessity").

76.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment").

77.     The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a

debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process").

78.     Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, the Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits.

79.     Moreover, the Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition

obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

80.     Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here. *See, e.g., In re Dolan Co.*, No. 14-10614 (BLS) (Bankr. D. Del. Apr. 15, 2014) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Sorenson Commc'ns, Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. Mar. 4, 2014) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 6, 2013) (same); *In re FAH Liquidating Corp. f/k/a Fisker Auto. Holdings, Inc.*, No. 13-13087 (KG) (Bankr. D. Del. Nov. 26, 2013) (same); *In re Longview Power, LLC*, No 13-12211 (BLS) (Bankr. D. Del. Sept. 24, 2013) (same); *In re Maxcom Telecomunicaciones, S.A.B. de C.V.*, No. 13-11839 (PJW) (Bankr. D. Del. July 25, 2013) (same).[18]  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice.

**III.     The Employee Incentive Programs are Reasonable and a Sound Exercise of Business Judgment**

81.     The Debtors further request that they be allowed to continue to honor the Employee Incentive Programs in the ordinary course of business.  The Debtors submit that the Employee Incentive Programs should be reviewed under section 363(c)(1) of the Bankruptcy

---

[18]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Code rather than section 503(c) of the Bankruptcy Code because the Employee Incentive Programs are simply preexisting programs that the Debtors have maintained in the ordinary course, and seek to continue on a postpetition basis. *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012). Importantly, the Debtors do not seek authority to continue the Employee Incentive Programs as to Insiders.

82.     The Debtors submit that continuing to maintain the Employee Incentive Programs for non-Insiders is a sound exercise of their business judgment and in the best interests of the estates. Importantly, the Employee Incentive Programs are a long-standing component of the Debtors' overall Employee Compensation and Benefits package and are intended to incentivize the Employees in the ordinary operations of the Debtors' manufacturing facilities. The payments under the Employee Incentive Programs are only made if the applicable Employees attain the required operational and/or personal performance goals. The Debtors believe that continuing to incentivize performance goals is beneficial for the Debtors' businesses and creditors, as it will help maximize the value of the Debtors' estates. The Debtors therefore believe that it is necessary to continue these programs for non-Insiders on a postpetition basis in order to ensure that the non-Insider Employees are not exposed to significant financial constraints due to these chapter 11 cases. Accordingly, pursuant to the proposed Final Order, the Debtors respectfully request that the Court authorize the Debtors to continue the Employee Incentive Programs in the ordinary course of business, including payment of prepetition obligations related thereto, if any.

## IV.     A Limited Waiver of the Automatic Stay for Workers' Compensation Programs is Appropriate in this Case

83.     Section 362(a)(1) of the Bankruptcy Code operates to stay:

[T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the

case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

84.     The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Programs in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Programs, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Programs to proceed.

**Processing of Checks and Electronic Fund Transfers Should be Authorized**

85.     The Debtors have sufficient funds to pay any amounts related to the Employee Compensation and Benefits in the ordinary course of business. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefits, as applicable. The Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made. Thus, the Debtors request that the Court authorize all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Employee Compensation and Benefits.

36

### The Requirements of Bankruptcy Rule 6003 are Satisfied

86. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to pay the Employee Compensation and Benefits and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Reservation of Rights

87. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their right to contest any claim related to the relief sought herein. Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

DOCS_DE:193051.1

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

88.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

89.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 25 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' first lien credit facility; (d) counsel to the administrative agent; (e) local counsel to the administrative agent; (f) the first lien credit facility lenders; (g) counsel to the first lien credit facility lenders; (h) local counsel to the first lien credit facility lenders; (i) the United States Environmental Protection Agency; (j) the United States Attorney's Office for the District of Delaware; (k) the Internal Revenue Service; (l) the office of the attorneys general for the states in which the Debtors operate; (m) the Securities and Exchange Commission; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

90.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Wilmington, Delaware
Dated: May 4, 2014

_Laura Davis Jones_
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:      ljones@pszjlaw.com
            tcairns@pszjlaw.com

- and -

Patrick J. Nash, Jr., P.C. (*pro hac vice* admission pending)
Jeffrey D. Pawlitz (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      patrick.nash@kirkland.com
            jeffrey.pawlitz@kirkland.com
            bradley.giordano@kirkland.com

*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*