**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GSE ENVIRONMENTAL, INC., *et al.*,[1] | ) | Case No. 14-11126 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF DEAN SWICK IN SUPPORT OF FIRST DAY MOTIONS

I, Dean Swick, hereby declare under penalty of perjury:

1.      I am the Vice President, Finance of the above-captioned debtors and debtors in possession (collectively, the "Debtors," and together with their non-Debtor affiliates, the "Company"). I have served the Debtors as Vice President, Finance since January 10, 2014. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age and I am competent to testify.

2.      I am authorized to submit this Declaration on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: GSE Environmental, Inc. (1074); GSE Environmental, LLC (1539); GSE Holding, Inc. (9069); and SynTec, LLC (2133). The location of the Debtors' service address is: 19103 Gundle Road, Houston, Texas 77073.

**Preliminary Statement**

3.    The Company is a leading provider of highly engineered geosynthetic containment solutions for environmental protection and confinement applications.    The Company owns eight manufacturing facilities across five continents and is headquartered in Houston, Texas.    As of the Petition Date, the Company had approximately 625 employees worldwide.

4.    Continued effects of the European recession, increasingly aggressive pricing by competitors globally, a downturn in the global mining industry, an almost 33 percent capacity increase by domestic competitors, and escalated operational expenditures and employee spending under prior management have put a strain on the Debtors' financial condition.    For example, revenue and adjusted EBITDA declined from $477 million and $46 million, respectively, in 2012 to $418 million and $16 million in 2013.    At the same time, the Company invested over $40 million in scheduled growth capital expenditures.    Specifically, the Company added additional manufacturing lines at four of their facilities and constructed a new Chinese manufacturing facility.    While the Company believes these capital improvements should ultimately improve their industry-leading position, this combination of an unanticipated downturn in financial performance coupled with the Company's large investments in its infrastructure led to a decrease in the Company's operating cash flows from $42 million in 2012 to $17 million in 2013.    Consequently, the Company became excessively leveraged.

5.    The Company's current management has taken a series of operational and financial measures to respond to the challenging market conditions facing the Company and to capitalize on the Company's significant operational enhancements, including retaining a new Chief Executive Officer in July 2013.    The Company anticipates significant growth opportunities in its industry, which it expects will grow approximately 9.4 percent annually through 2022.

Moreover, the Company believes its recent investments will position it to realize growth and improve profitability.    Nevertheless, given the severity of the Debtors' current cash flow situation, the Debtors are suffering from the effects of excess leverage and have been unable to maintain profitability through business improvements, cost-cutting, and self-help measures alone.

6.    Additionally, in September 2013, the Debtors embarked on a process to raise additional junior capital and/or refinance their existing senior secured debt with the assistance of Moelis & Company LLC ("Moelis").    During this process, the Debtors contacted over 70 potential capital parties.    The Debtors entered into non-disclosure agreements with 50 interested parties, seven of which submitted term sheets or proposals.    However, such efforts were ultimately unsuccessful.

7.    Despite their best efforts, the Debtors can no longer afford to maintain their current capital structure.    As of the Petition Date,[2] the Debtors had approximately $193.1 million in principal amount of funded debt, including approximately $18 million of Super Priority Credit Facility (as defined herein) obligations, approximately $173.4 million of First Lien Credit Facility (as defined herein) obligations, and approximately $1.7 million of capital lease obligations.    The Company's consolidated adjusted EBITDA for the 12 months ending March 31, 2014 was approximately $14.3 million; measured against total consolidated indebtedness of approximately $224.0 million, the Debtors are nearly 16 times.

8.    Earlier this year, the Debtors' high leverage ratio put them at risk of triggering a default under the First Lien Credit Agreement.    Moreover, at that time the Debtors' liquidity

---

[2]    Many of the financial figures presented in this Declaration are unaudited and potentially subject to change, but reflect the Company's most recent review of its businesses.    The Company reserves all rights to revise and supplement the figures presented herein.

position left them unable to appropriately fund the seasonal working capital needs of their businesses.  On January 10, 2014, following negotiations with their first lien lenders, the Debtors entered into a waiver agreement regarding potential leverage and interest coverage ratio defaults. In addition, certain of the first lien lenders agreed to provide the Debtors with additional funds pursuant to the $15 million Super Priority Credit Facility to ensure the Debtors were properly capitalized to continue to operate in the ordinary course.  As part of the agreement, the Debtors agreed to commence a sale process.

9.      With the assistance of Moelis and the Debtors' other advisors, the Debtors contacted approximately 120 prospective buyers.  Fifty of those parties executed non-disclosure agreements, and nine of those parties submitted non-binding indications of interest.  After several rounds of due diligence inquiries and management presentations, the Debtors ultimately received four non-binding letters of intent.  The Debtors engaged in extensive negotiations with the four interested parties, ultimately yielding a range of bids which provided insufficient value to repay the Company's current and projected funded indebtedness.  Indeed, Moelis determined that the high side of the bid range would have resulted in a recovery to first lien holders of less than 70 percent of their claims.

10.     Nevertheless, the Debtors continued to engage in negotiations with the interested parties, hoping to capitalize on competitive bidding dynamics.  To that end, the Debtors executed a letter of intent with one of the potential buyers and facilitated a robust due diligence process pursuant to which additional site visits were scheduled, interviews were scheduled with Company personnel, and the Debtors agreed to limited expense reimbursement.  At the conclusion of this process, however, the Debtors, in consultation with their advisors, determined that a sale process would not maximize stakeholder recoveries.

11.     Simultaneously with the sale process, the Debtors engaged in negotiations with an ad hoc group of first lien lenders regarding a potential debt-for-equity chapter 11 restructuring that would substantially deleverage the Debtors' balance sheets and provide a meaningful recovery for unsecured creditors.  After considerable arm's-length negotiations, the Debtors and all lenders holding first lien claims—namely, Littlejohn Opportunities Master Fund LP, Tennenbaum Opportunities Partners V, LP, and Strategic Value Partners, LLC (the "First Lien Lenders")—reached an agreement, which was memorialized in a restructuring support agreement (attached hereto as **Exhibit A**, the "RSA").  Pursuant to the RSA, the Debtors and the First Lien Lenders have committed to seek to restructure the Debtors' balance sheets pursuant to a prearranged chapter 11 plan (the "Plan").  The Debtors commenced these chapter 11 cases in connection therewith.  Notably, the RSA contemplates that only the Company's North American entities commence these chapter 11 cases, and the Plan does not effect a recapitalization of the Debtors' international affiliates or their debt.  The Debtors intend to emerge from chapter 11 pursuant to the Plan within three to four months following the Petition Date.

12.     The Plan generally provides for the following treatment of claims and interests:

- administrative expense claims (including debtor-in-possession financing claims) and prepetition priority claims (including tax claims) will be paid in full upon emergence (or, in the case of priority tax claims, treated in accordance with section 1129(a)(9)(C));

- claims arising under the First Lien Credit Agreement will receive their pro rata share of  100% of the equity of reorganized GSE Holding, Inc.;

- other secured claims will be treated in such a manner that they are unimpaired;

- holders of trade vendor claims that agree in writing to return to market trade terms and provide such terms for at least a year following these chapter 11 cases will receive payment in full on account of their trade claims to the extent not previously satisfied;

- other holders of general unsecured claims against each of the Debtors will receive their pro rata share of $1.0 million in cash; and

- existing equity interests in GSE Holding, Inc. will be cancelled without any distribution to the holders of such interests.

13.    Claims arising under the Super Priority Credit Agreement will not be treated under the Plan.  Instead, those claims will be satisfied pursuant to the proposed DIP financing.

14.    Importantly, the RSA does not restrict the Debtors' ability to solicit potential alternative restructuring transactions and consider any such proposals from third parties.  In addition, the RSA expressly reserves the Debtors' ability to take any action in accordance with their fiduciary duties.

15.    To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized in three sections.  The first section provides background information with respect to the Debtors' businesses and corporate history, as well as their prepetition capital structure.  The second section describes the circumstances surrounding the commencement of these chapter 11 cases.  The last section sets forth the relevant facts in support of each of the pleadings filed in connection with these chapter 11 cases (collectively, the "First Day Motions").

## General Background

### I.    The Company's Businesses

16.    As discussed above, the Company is a leading global provider of highly engineered geosynthetic containment solutions for environmental protection and confinement applications.  The majority of the Company's products serve as barriers that prevent the transmission of undesirable fluids and solids that could contaminate ground water or otherwise pollute the environment, and the Company's products are utilized across a broad spectrum of end markets, including:   (a) waste management; (b) mining; (c) liquid containment; (d) coal ash containment; and (e) oil and gas.   The Company's containment solutions prevent common

6

environmental problems associated with these end markets through a wide range of geosynthetic products.

17.    The Company's lining solutions are manufactured primarily from polyethylene resins (a type of plastic) and proprietary additives.  Because the Company's products play a mission-critical role in the safe containment of materials and groundwater protection across a wide range of applications, the Company's products must meet a broad array of exacting quality standards, including with respect to impermeability, structural integrity, resistance to weathering and ultraviolet degradation, and usefulness after extended chemical exposure.

18.    Given its broad geographic presence and diversified product line, the Company is as one of only a few geosynthetic lining solution manufacturers capable of meeting the specific performance and regulatory standards required to supply large, complex projects on a global basis.  Moreover, the Company is the technological leader in its industry, and its global network of engineers often collaborate with international standards organizations to develop regional specifications and standards for existing and new product applications.

19.    Not surprisingly, the demand for geosynthetics is heavily influenced by environmental regulations.  As such, the Company's collaboration with these international standards organizations helps to ensure that newly promulgated environmental regulations are geared around the specifications of the Company's product line.  Consequently, the Company is well-positioned to capture new opportunities from the implementation and enforcement of more stringent environmental regulations driven by increasing environmental awareness globally, especially in emerging markets.

DOCS_DE:193054.1 30106/001

A.    **End Markets and Applications**

20.    The Company focuses primarily on providing containment products for global waste management, mining, liquid containment, coal ash containment, and oil and gas end markets.  As set forth in more detail below, the Company's products are used in a variety of material containment and environmental protection applications by end-users in these industries, including some of the largest mining, waste management, power, and other civil and industrial infrastructure companies in the world.

**Illustrative Application Sites**



1.  **Waste Management**

21.    Geosynthetics are used in the construction of landfill liner systems for solid waste containment to prevent landfill runoff from entering the surrounding soil and groundwater. These geosynthetic liners are also used as caps to prevent the escape of greenhouse gases, control

odors, and limit rainwater infiltration of landfills.  Sales to waste management end market users accounted for approximately 35 percent of the Company's 2013 revenue.

### 2.  Mining

22.  Geosynthetics are used in the heap leach mining process, which involves pouring acid leachate over mined ore to separate the targeted metals and minerals from the ore. Geosynthetic liners also provide protection in other mining processes which result in water that is contaminated with materials left over from separating the valuable fraction from the uneconomic fraction of an ore, also known as "water-borne tailings."  In the heap leach extraction process, geosynthetic systems prevent the leakage of the leachate into which metals are dissolved, protect the ground and soil from contamination, and provide drainage solutions. In other mining processes, geosynthetics are used as containment solutions for the tailing ponds in which water-borne tailings are stored in order to allow the separation of solid particles from water.  This end market is driven by the demand for metals such as copper, gold, and lithium, and minerals such as phosphate, as well as by the need for new mining infrastructure to satisfy that demand.  Sales to mining end market users accounted for approximately 25 percent of the Company's 2013 revenue.

### 3.  Liquid Containment

23.  Geosynthetic products are used to prevent water leakage in a wide variety of civil engineering and water infrastructure applications, such as water treatment facilities, reservoirs, canals, and dams.  In addition to preventing water leakage, geosynthetics are also used in agriculture and aquaculture applications—such as irrigation waterways and fish farming ponds— to reinforce structural integrity, as well as to protect against soil erosion and weed growth.  Sales to liquid containment end market users accounted for approximately 17 percent of the Company's 2013 revenue.

DOCS_DE:193054.1 30106/001

### 4. Coal Ash Containment

24.    The Company's geosynthetic products are used in connection with coal-burning power plants to prevent the runoff of coal ash—a byproduct thereof—which can contaminate soil and groundwater.  These lining solutions also are used by electric utilities and other non-utility, industrial coal burning sites.  Recent events such as the 2008 coal ash spill at the Tennessee Valley Authority's coal-burning power plant in Kingston, Tennessee have highlighted the importance of liners in this end market.

**Tennessee Valley Spill**



25.    The Tennessee Valley Authority had no lining solutions at the site, but the Debtors estimate that approximately $1.5 million of geosynthetic liner would have prevented the release of approximately 5.4 million cubic yards of coal ash whose clean-up costs were in excess of $1.2 billion.  Sales to coal ash containment end market users accounted for approximately 5 percent of the Company's 2013 revenue.

### 5. Oil and Gas

26.    The Company's products are used in a number of applications in the drilling and production of oil and gas, including the fracking industry.  Geosynthetics are used to line storage and disposal ponds holding freshwater required for hydraulic fracking, fracking chemicals, and flowback water, by-products containing high levels of the salt, down-well chemicals, and metals

used in the fracking process, brine ponds, and mud pits.  Sales to oil and gas end market users accounted for approximately 7 percent of the Company's 2013 revenue.

**B.      Products**

27.      The Company's primary product lines include geomembranes, drainage products, geosynthetic clay liners, nonwoven geotextiles, and specialty products.  The Company's products can be used on stand-alone bases or packaged together multifaceted, custom solutions designed to meet unique containment requirements of the Company's customers.

**1.  Geomembranes**

28.      Geomembranes are geosynthetic lining materials which are used as barriers for both fluids and solids in the waste management, mining, and liquid containment markets. Geomembranes are manufactured from polyethylene and polypropylene resins with additives designed to resist weathering, ultraviolet degradation, and chemical exposure for extended periods of time.  The Company is by far the largest global provider of geomembrane solutions, with a market share of nearly 25 percent.  Sales for geomembranes accounted for approximately 75 percent of the Company's 2013 revenue.

**2.  Drainage Products**

29.      The Company's drainage products include geonets and geocomposites, which are products designed to complement or replace sand, stone, and gravel in applications such as erosion control, foundation wall damage, and pavement drainage.  These products are typically installed along with geomembranes in a liner system to keep liquids from accumulating on the liners.  The Company's drainage solutions also include geogrids, another form of geosythetics used in the mining, transportation, waste management, and oil and gas markets to improve the structural integrity of soils, slopes, and walls.  Sales for drainage products accounted for approximately 10 percent of the Company's 2013 revenue.

**Illustrative Geogrid**



### 3. Geosynthetic Clay Liners

30.    Geosynthetic clay liners are typically installed as the bottom layer of a liner system and are used in the Company's waste management, liquid containment, and coal ash end markets.  The Company combines geosynthetics with sodium bentonite clay to form a highly impermeable barrier that can replace thick layers of expensive compacted clay.  Sales for geosynthetic clay liners accounted for approximately 8 percent of the Company's 2013 revenue.

### 4. Nonwoven Geotextiles

31.    Nonwoven geotextiles are synthetic, staple fiber, nonwoven needle-punched fabrics used in environmental and other industrial applications that include filtration, soil stabilization, separation, drainage, and gas transmission, cushion, and liner protection applications.  The Company's customers often include these products as protective layers underneath geomembrane liners, shielding such geomembrane liners from rocks or other protrusions.  The Company also uses nonwoven geotextiles for the construction of roadways, although they are primarily used internally to manufacture drainage products and geosynthetic clay liners.  Sales for nonwoven geotextiles accounted for approximately 2 percent of the Company's 2013 revenue.

DOCS_DE:193054.1 30106/001

### 5.  Specialty Products

32.     In addition to its main product lines, the Company also manufactures products tailored and custom-made to meet unique customer needs.  For example, the Company produces tanks, pipe boots, corners, sumps, and other ancillary parts that are fit to the Company's liners in order to reduce installation time.  The Company also offers vertical barrier systems that block the lateral migration of subsurface fluids and studded geomembranes which protect against corrosion and deterioration of concrete structures, including tanks, pipes, and drainage channels.  The Company offers its specialty products in a wide range of markets, including environmental, aquaculture, and civil applications.  Sales for specialty and other products accounted for approximately 6 percent of the Company's 2013 revenue.

### C.     Raw Materials and Supply Chain Management

33.     The Company's principal products are manufactured primarily from specially formulated high grade polyethylene resins with chemical additives.  These resin-based materials, derived from crude petroleum and natural gas, represent approximately 80 percent of the Company's cost of goods sold.  Because raw materials account for such a large part of the Company's expenditures, the Company has taken steps in recent years to reduce the risk of volatility in resin costs to its profitability.  Where possible, the Company maintains at least two suppliers for most of their raw materials at each manufacturing location in order to protect against potential supply shortages and to avoid reliance on a single supplier.  Internally, the Company has taken several steps to improve its ability to forecast resin pricing and price its bids for resins accordingly.  These steps include retaining a highly experienced polyethylene pricing expert, as well as improving bid approval procedures and creating a sales managers' commission program that is tied to the Company's gross profit.

34.     In general, the Company's raw material orders are flexible and do not contain minimum purchase volumes or fixed prices.  Only about ten percent of the Company's sales relate to long-term contracts, which are tied to published resin price indexes.  The remaining 90 percent of sales relate to contracts that contain re-pricing provisions after 30 days at the Company's option.  The Company passes fluctuations in the cost of raw materials through to its clients, but, as described above, proactively manages the cost of resin purchases to both limit the need to re-price projects already under contract and better manage customer relationships.

**D.     Customers**

35.     The Company maintains a strongly diversified customer base, with approximately 1,300 customers worldwide.  The Company's engineering and technical sales personnel primarily target national or regional waste management companies, independent installers of geosynthetic liners, and mining, power, and industrial companies.  In 2013, the Company's top ten customers represented approximately 21 percent of its total sales, and no single customer represented more than ten percent of the Company's total sales.  Additionally, the Company's customer base is geographically diverse, with the Company selling its products in approximately 100 countries.  This diverse customer base across a range of end markets and geographies helps support a stable demand for the Company's products; indeed, in its highly competitive industry, the Company is the only industry participant with both (a) the ability to supply its customers with complete geosynthetic lining solutions and (b) the geographic reach to effectively serve a global market and respond to demand internationally.

**E.     Competition**

36.     The Company maintains leading positions in its various markets due to the superior performance and quality of its lining systems combined with competitive pricing.  The Company is one of the few businesses to offer multiple types of geosynthetic products.  With

14

sales of approximately $419 million in 2013, the Company controls nearly 25 percent of the geomembrane market share, while the remaining landscape is fragmented with small- and medium-sized companies that offer only one or a few product types or lack global reach.  The Company leverages its global presence by centralizing purchasing to ensure raw materials are purchased at the most economical prices, thereby taking advantage of economies of scale to which smaller competitors do not have access.

### F.    Employees

37.    The Company employs approximately 625 employees worldwide, with the Debtors employing approximately 240 employees on a full-time basis.  Approximately 140 of the Debtors' full time employees are paid on an hourly basis and approximately 100 receive a salary.  The Debtors' workforce also includes approximately 15 individuals who are currently working part-time or are employed through temporary staffing agencies.   The Debtors' highly-skilled employees occupy a variety of positions, including manufacturing, engineering, and sales.  None of the Debtors' workers are subject to a collective bargaining agreement.

### G.    Working Capital

38.    Because a significant amount of the Company's customers have projects in the northern hemisphere, a majority of the Company's products are delivered during the summer and fall of each year, when weather is milder.  As a result, the Company's sales in the first and fourth quarters of each calendar year have historically been lower than sales in the second and third quarters.   The impact of this seasonality is partially offset by the Company's mining and liquid containment end markets, which are primarily located in the southern hemisphere.  As the Company's mining end market becomes a greater source of sales, the Company expects seasonality to be further mitigated.

DOCS_DE:193054.1 30106/001

### H.    Intellectual Property

39.    The Company owns and controls a number of trade secrets, trademarks, patents, and other intellectual property rights that, in the aggregate, are important to the Company's businesses.  The Company's intellectual property portfolio protects the Company's trademark, logo, and certain key components of their products.  The Company's superior products and associated intellectual property portfolio provide the primary means by which the Company maintains its competitive advantage.

## II.    The Company's Corporate History and Organizational Structure

40.    In 1981, the Company was founded under the name Gundle Corporation, the first company to utilize high-density polyethylene products in environmental protection barrier and lining systems.  For the next five years, the Company's business rapidly expanded.  By 1986, with business continuing to grow, the Company completed an initial public offering and was listed on the New York Stock Exchange.  Over the next two decades, the Company continued to develop new lining products, added manufacturing capabilities, and expanded its distribution network.  As part of this growth process, Gundle Corporation merged with SLT Environmental, Inc. in 1995 to create GSE Lining Technology, Inc., and in 2002, GSE Lining Technology, Inc. acquired Serrot International, Inc., which significantly improved the Company's global scale and established the Company as a global leader in geosynthetic containment solutions.

41.    In May 2004, GSE Holding, Inc.'s principal stockholder, CHS Capital LLC, acquired a majority ownership interest in GSE Holding, Inc. and took the Company private as part of its acquisition.  Subsequent to this acquisition, the Company continued to diversify its end market and geographic exposure.  For example, in 2005, the Company acquired SL Limitada, which improved its penetration of the South American and mining markets.  Further, the Company saw opportunities to streamline its business from within, and in 2009 and 2010, the

Company consolidated manufacturing capacities in North American and the United Kingdom, optimized its supply chain, and focused on product innovation.

42.    On February 15, 2012, GSE Holding, Inc. completed another initial public offering.  The Company used the proceeds from this offering to repay portions of its outstanding debt and to fund working capital and other general corporate purposes.  Subsequently, the Company continued to expand its business and, in 2013, acquired the equity interests of SynTec, LLC, which gave the Company access to the civil engineering market, brought geogrid applications to existing end markets, and gave the Company exclusive access to certain patents which will increase the depth of the Company's product offerings.  Most recently, the Company expanded its world-wide presence in 2014 by opening a new manufacturing plant in Suzhou, China, which is well-positioned in a key emerging market.  The Company's corporate organization is depicted on the chart attached hereto as **Exhibit B**.

### III.    The Debtors' Prepetition Capital Structure

43.    As of March 31, 2014, the Company reported approximately $269.5 million in total assets and approximately $261.9 million in total liabilities.  As described in greater detail below, as of the Petition Date, the principal amount of the Debtors' consolidated funded debt obligations totaled approximately $193.1 million and comprised:  (a) $18 million of obligations under the Super Priority Credit Facility; (b) $173.4 million of obligations under the First Lien Credit Facility; and (c) $1.7 million of obligations under certain capital leases (collectively, the "Prepetition Debt Obligations").  As set forth on **Exhibit B**, approximately 54 percent of the equity interests in GSE Holding, Inc. are held by CHS Capital LLC and its affiliates, with the remainder owned by certain current and former directors and officers and other public shareholders.  The Prepetition Debt Obligations are described in greater detail herein.

17

A.    **The Super Priority Agreement**

44.    GSE Environmental, Inc. is the borrower under that certain First Lien Revolving Credit Agreement, dated as of January 10, 2014 (as amended from time to time and with all supplements and exhibits thereto, the "Super Priority Credit Agreement"), by and between the Debtors, Cantor Fitzgerald Securities, as successor administrative and collateral agent, and the lenders party thereto.  The Super Priority Credit Agreement provides the Debtors with a revolving credit facility, subject to the terms and conditions set forth therein (the "Super Priority Credit Facility"), which was intended to provide the Debtors liquidity to support their operations while simultaneously pursuing a sale process, as described in greater detail below.  Thus, the Super Priority Credit Agreement contains certain milestones that required (a) the Debtors to distribute an information memorandum to prospective buyers by January 17, 2014, and (b) interested bidders to submit letters of intent by February 21, 2014, and further require the Debtors to consummate a sale by April 30, 2014.  The Super Priority Credit Facility matures on April 30, 2014, subject to certain extensions allowed by its terms.

45.    The Super Priority Credit Agreement was amended four times between January 16 and April 11, 2014, to change certain of the Debtors' reporting requirements, clarify the scope and terms of potential employee compensation plans, remove a minimum liquidity requirement, and extend the deadline by which the Debtors have to complete the sale process until April 30, 2014.  On April 17, 2014, the Debtors amended the Super Priority Credit Agreement to increase the amount available under the Super Priority Credit Facility to $18 million.

46.    Obligations arising under the Super Priority Credit Facility are guaranteed on a super priority senior secured basis by each of the Debtors.  The obligations arising under the Super Priority Credit Facility are also secured by liens on substantially all of the Debtors' assets,

18

subject to certain exceptions, as well as the pledged stock of the Debtors and non-Debtor affiliates GSE International, Inc. and GSE Lining Technology Chile S.A.[3]

### B.    The First Lien Credit Agreement

47.    GSE Environmental, Inc. is the borrower under that certain First Lien Credit Agreement, dated as of May 27, 2011 (as amended from time to time and with all supplements and exhibits thereto, the "First Lien Credit Agreement"), by and between Debtors, Cantor Fitzgerald Securities, as successor administrative and collateral agent, and the lenders party thereto.    The First Lien Credit Agreement provides the Debtors with a term loan (the "Term Loan") and a revolving credit facility (the "Revolver" and together with the Term Loan, the "First Lien Credit Facility") subject to the terms and conditions set forth therein.    The Debtors use approximately $2 million of the Revolver in the form of letters of credit. Obligations arising under the First Lien Credit Facility are guaranteed on a senior secured basis by each of the Debtors.    The obligations arising under the First Lien Credit Facility are also secured by liens on substantially all of the Debtors' assets, subject to certain exceptions, as well as the pledged stock of the Debtors and non-Debtor affiliates GSE International, Inc. and GSE Lining Technology Chile S.A.[4]

48.    I understand that in October 2011, the Debtors amended the First Lien Credit Agreement to increase the amount available under the Revolver from $25 million to $35 million. In December 2011, in anticipation of the GSE Holding, Inc.'s 2012 public offering, the Debtors

---

[3]    GSE Environmental, Inc. owns 100 percent of non-Debtor GSE International, Inc.'s stock and 0.01 percent of non-Debtor GSE Lining Technology Chile S.A.'s stock.  Only 65 percent of GSE Environmental, Inc.'s stock in non-Debtors GSE International, Inc. and GSE Lining Technology Chile S.A. is pledged in support of the Super Priority Credit Agreement.

[4]    GSE Environmental, Inc. owns 100 percent of non-Debtor GSE International, Inc.'s stock and 0.01 percent of non-Debtor GSE Lining Technology Chile S.A.'s stock.  Only 65 percent of GSE Environmental, Inc.'s stock in non-Debtors GSE International, Inc. and GSE Lining Technology Chile S.A. is pledged in support of the First Lien Credit Agreement.

amended the First Lien Credit Agreement definition of "Change of Control" to reduce Code Hennessy & Simmons LLP's specified ownership percentage from 35 to 20 percent.

49.    In April 2012, the Debtors further amended the First Lien Credit Agreement to increase the Term Loan from $135 million to $157 million.  In September 2012, the Debtors amended the First Lien Credit Agreement to increase the covenant for capital expenditure limitations from $17.5 million to $21.7 million.  And, in January 2013, the Debtors entered into a fifth amendment to the First Lien Credit Agreement to provide for more efficient capacity to move funds between foreign entities, as well as clarify and correct certain technical provisions contained therein.

50.    On July 30, 2013, recognizing that they would not be able to comply with the First Lien Credit Agreement's financial covenants, the Debtors entered into a waiver and sixth amendment to the First Lien Credit Agreement (the "Sixth Amendment") to provide for the following terms and conditions, among others:

> (a)    the waiver of a default in respect to compliance with the maximum total leverage ratio, and modification of the agreement's total leverage ratios through March 31, 2014;
>
> (b)    increasing the margin on loans by 200 basis points; and
>
> (c)    reducing the Debtors' borrowing capacity under the Revolver from $35 million to approximately $21.5 million.

51.    On January 10, 2014, contemporaneously with entering into the Super Priority Credit Agreement, the Debtors entered into a waiver and seventh amendment (the "Seventh Amendment") to the First Lien Credit Agreement.  Pursuant to the Seventh Amendment, the lenders under the First Lien Credit Agreement agreed to waive certain loan covenants through March 30, 2014, in exchange for the Debtors' promise to (a) retain me as Vice

President, Finance and (b) conduct a sale process and use the proceeds to repay their indebtedness under the First Lien Credit Agreement.

52.    On January 16, 2014, the Debtors amended the First Lien Credit Agreement to extend the date by which the Debtors had to furnish certain financial information related to the sale process to the administrative agent.  On March 5, 2014, the Debtors amended the First Lien Credit Agreement to clarify the scope and terms of potential employee compensation plans. And, on March 14, 2014, the Debtors entered into a tenth amendment to the First Lien Credit Facility extending the deadline by which they had to complete the sale process until April 21, 2014.  The sale deadline was further extended to April 30, 2014, pursuant to the eleventh amendment to the First Lien Credit Facility, which the Debtors entered into on April 17, 2014.

### C.    The Intercreditor Agreement

53.    The Debtors and Cantor Fitzgerald Securities, as successor administrative agent under the First Lien Credit Agreement and Super Priority Credit Agreement, are parties to that certain Intercreditor Agreement, dated as of January 10, 2014 (as amended from time to time and with all supplements and exhibits thereto, the "Intercreditor Agreement").  The Intercreditor Agreement governs certain of the respective rights and interests of lenders under the First Lien Credit Agreement and Super Priority Credit Agreement relating to, among other things, their rights with respect to the exercise of remedies in connection with any Event of Default (as defined in the Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions.

### D.    The Debtors' Other Obligations

#### 1.  Capital Leases

54.    During 2012, Debtor GSE Environmental, LLC entered into three equipment financing agreements.  The first lease is with Susquehanna Commercial Finance, Inc. for equipment used to transport railcars and matures on April 19, 2015.  As of April 30, 2014, there was approximately $63,000 outstanding under this lease arrangement at an implied interest rate of 8.72 percent.  The second lease is with CapitalSource Bank for geosynthetic clay liner production equipment and matures on July 31, 2015.  As of April 30, 2014, there was approximately $1.6 million outstanding under this lease arrangement at an implied interest rate of 7.09 percent.  The third lease is with NMHG Financial Services for a truck and matures on May 5, 2016.  As of April 30, 2014, there was approximately $19,000 outstanding under this lease arrangement at an implied interest rate of 5.42 percent.  Each of the Debtors' capital leases are secured by a first lien on the financed equipment.

#### 2.    Other Secured Claims

55.    In the ordinary course of business, the Debtors routinely transact business with a number of third-party contractors and vendors who may be able to assert liens against the Debtors and their property (such as equipment) if the Debtors fail to pay for the goods delivered or services rendered.  These parties perform various services for the Debtors, including manufacturing and repairing equipment and component parts necessary for the Debtors' manufacturing facilities, as well as shipping the Debtors' products.

### Events Leading to these Chapter 11 Cases

### I.    Economic Recession and Prepetition Investments

56.    As described above, the ongoing European recession, the downturn in the global mining industry, increased competition domestically and internationally, and escalated

operational expenditures and employee spending under prior management have have put a strain on the Company's financial condition.  Additionally, at the same time that revenue declined in recent years, the Company made significant investments in growth capital expenditures.  While the Company expects that these investments will play an important role in their future success, this spending unfortunately coincided with an unanticipated downturn in the Company's financial performance.

57.    The Company's current management has taken a series of operational and financial measures in an attempt to respond to challenging market conditions.  These include attempting to broaden their supplier base and thereby increasing price competition, finding alternative sources of resins, and focusing on higher margin products.  The Company's efforts to broaden and improve supplier support have been hampered by the deterioration in its businesses and the uncertain future regarding its recapitalization and sale process.  The Company has also started implementing measures which are expected to result in $14 million in annual cost savings, including trimming professional fees and employee headcount.  Nevertheless, given the severity of their current cash flow situation, the Company has been unable to maintain profitability through cost-cutting and self-help measures alone.

## II.    First Lien Credit Facility Amendments, the Super Priority Credit Agreement, and Sale Efforts

58.    Upon recognizing that they would have trouble meeting their First Lien Credit Agreement financial covenants, the Debtors entered into the Sixth Amendment in July 2013.  In addition to waiving any default caused by the Debtors' failure to be in compliance with their total leverage ratios as of June 30, 2013, and modifying the maximum total leverage ratios under the First Lien Credit Agreement, the Sixth Amendment required the Debtors to use their best efforts to raise $30 million of unsecured mezzanine debt or other subordinated capital on or

before October 31, 2013.  In July 2013, the Debtors engaged Moelis to assist them with seeking to raise these funds, the first $20 million of which was to be applied to pay down the First Lien Credit Facility.  Despite these efforts, the Debtors were unable to secure such financing as of the October 31, 2013, deadline.  Beginning in September 2013, the Debtors also sought to secure a complete refinancing of their First Lien Credit Facility.  To that end, the Debtors conducted a three-month financing process, which involved contacting 71 potential investors.  Such efforts were ultimately unsuccessful.

59.    In January 2014, in danger of failing to comply with certain covenants in the First Lien Credit Agreement, the Debtors entered into the Seventh Amendment and the Super Priority Credit Agreement.  The First Lien Credit Agreement lenders required that the Debtors consummate a sale process by March 30, 2014—later extended to April 30, 2014—using the proceeds from any sale to repay their indebtedness.

60.    As set forth above, with the assistance of Moelis, the Debtors contacted approximately 120 buyers in early January 2014.  Of those prospective buyers, nine submitted indications of interest.  After careful analysis and discussion with their advisors, the Debtors invited three of these prospective buyers to management presentations and granted them access to the Debtors' dataroom.  After completing their initial due diligence, all three prospective buyers submitted letters of intent by February 21, 2014, the milestone set forth in the Seventh Amendment.  Additionally, the Company received a letter of intent from one prospective buyer after February 21, 2014.  The initial bids proposed in these letters were within a range which did not provide sufficient value to repay the Company's current and projected funded indebtedness. Although the Debtors pursued multiple prospective buyers in an effort to capitalize on bidding dynamics, the final range of bids was likewise insufficient.  Indeed, Moelis determined that even

the highest final bid would have resulted in a recovery to first lien holders of less than 70 percent of their claims.  The Company made every effort to attract high bids, including signing a letter of intent with a prospective buyer and sharing access to a dataroom of its operational and financial information, arranging site visits, scheduling meetings with Company personnel, and providing limited expense reimbursement.  At the same time, in order to pursue all available options, the Debtors worked with their lenders on structuring alternative restructuring transactions.

## III.    The Restructuring Support Agreement

61.    Simultaneously with the sale process, the Debtors entered into negotiations with the First Lien Lenders to identify alternative transaction structures if the sale process did not result in an acceptable offer.  As it became clear that a sale process would not yield a bid that cleared the par value of the Debtors' prepetition funded debt, negotiations with the First Lien Lenders intensified.

62.    After extensive arms-length negotiations, the Debtors, in consultation with their advisors, entered into the RSA.  The RSA sets forth the parameters of a financial restructuring to be implemented pursuant to a plan of reorganization.  Specifically, the RSA contemplates a quick emergence from chapter 11 with the following key terms:

- claims arising under the Super Priority Credit Facility will be refinanced through a DIP loan;

- administrative expense claims (including DIP financing claims) and prepetition priority claims (including tax claims) will be paid in full upon emergence (or, in the case of priority tax claims, treated in accordance with section 1129(a)(9)(C))

- holders of claims arising under the First Lien Credit Agreement will receive, subject to dilution by management equity and/or options, their pro rata share of  100% of the equity of reorganized GSE Holding, Inc., which shall be the top-tiered holding company of the Debtors as reorganized;

- other secured claims will be treated in such a manner that they are unimpaired;

- holders of trade vendor claims that agree in writing to provide payment terms no less advantageous than those terms provided as 12 months prior to the Petition Date for at least 12 months following the effective date of a plan of reorganization will receive payment on such terms on the later of the date the Debtors' plan of reorganization becomes effective and the dates upon which such claims become due in the ordinary course of business;

- other holders of general unsecured claims against each of the Debtors will receive their pro rata share of $1.0 million in cash, which amount was determined to be sufficient to pay general unsecured creditors 100 percent of their claims if the allowed amount of such claims is consistent with the Debtors' projections;

- holders of existing equity interests in GSE Holding, Inc. will receive no distribution and such interests will be canceled;

- the reorganized Debtors will enter into an exit facility sufficient to fund ongoing operations and obligations under the Plan; and

- the Debtors will confirm a plan of reorganization within 90 days of the Petition Date.

63.    The RSA sets forth a clear pathway to emergence, and the Debtors believe the transaction embodied in the Plan will leave the reorganized enterprise substantially deleveraged and well-positioned to capitalize on the projected geosynthetic market growth in the years to come.  Importantly, however, the RSA protects the Debtors' rights to continue to solicit and consider alternative restructuring constructs and preserves the Debtors' ability to take any actions in accordance with their fiduciary duties.

64.    Because the transaction contemplated under the RSA is based on a consensual deal with the Debtors' key stakeholders and provides more value to creditors than would have been possible under a sale of the Debtors' businesses—including a potential full recovery to holders of trade claims—the Debtors anticipate confirming a plan of reorganization within a relatively short timeframe.  The Debtors believe that the quick emergence contemplated under the RSA will enhance the Debtors' capital position and allow the Debtors to continue to focus on providing key environmental-barrier solutions to the market.

## Relief Sought in the Debtors' First Day Motions

65.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions[5] in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

## I.     Administrative and Procedural Pleadings

### A.     Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("Joint Administration Motion")

66.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing the joint administration of these cases, for procedural purposes only.  The Debtors believe that many, if not most, of the motions, applications, and other pleadings filed in these chapter 11 cases will relate to relief sought jointly by all of the Debtors.  For example, virtually all of the relief sought by the Debtors in the First Day Pleadings is sought on behalf of all of the Debtors.  Joint administration of the Debtors' chapter 11 cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of four independent chapter 11 cases.

67.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

---

[5]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

      **B.**    **Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor ("<u>Creditor Matrix Motion</u>")**

      68.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor.  The Debtors propose to retain Prime Clerk LLC as notice and claims agent in connection with the Debtors' chapter 11 cases to assist the Debtors in preparing creditor lists and mailing initial notices.  With such assistance, the Debtors will be prepared to file a computer-readable, consolidated list of creditors upon request and will be capable of undertaking all necessary mailings.  Indeed, because the Debtors have hundreds of creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

      69.    I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit Prime Clerk LLC to promptly notice those parties.  Maintaining electronic-format lists of creditors rather than preparing and filing separate matrices will maximize efficiency and accuracy and reduce costs.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be granted.

**C.     Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent ("Notice and Claims Agent Application")**

70.     Pursuant to the Notice and Claims Agent Application, the Debtors are seeking authority to retain Prime Clerk LLC as their Claims and Noticing Agent. The Debtors have evaluated several potential candidates to serve as their Claims and Noticing Agent.  Following that review, and in consideration of the number of anticipated claimants and parties in interest, the nature of the Debtors' business, and the scope of tasks for which the Debtors will require the assistance of a Claims and Noticing Agent, the Debtors submit that the appointment of Prime Clerk as Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates.

71.     Based on Prime Clerk's experience in providing similar services in large chapter 11 cases, the Debtors believe that Prime Clerk is eminently qualified to serve as Claims and Noticing Agent in these chapter 11 cases.  A detailed description of the services that Prime Clerk has agreed to render and the compensation and other terms of the engagement are provided in the Notice and Claims Agent Application. I have reviewed the terms of the engagement and believe that the Debtors' estates, creditors, parties in interest, and this Court will benefit as a result of Prime Clerk's experience and cost-effective methods.

72.     I believe that the relief requested in the Notice and Claims Agent Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Notice and Claims Agent Application should be approved.

DOCS_DE:193054.1 30106/001

## II.    Operational Motions Requesting Immediate Relief

**A.    Debtors' Motion for Entry of Order (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Bank Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief ("Cash Management Motion")**

73.    Pursuant to the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue to operate the Cash Management System, (b) honor certain prepetition obligations related thereto, (c) maintain existing business forms, and (d) continue to perform intercompany transactions consistent with historical practice.

74.    I believe that the Cash Management System is comparable to the centralized cash management system used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with intercompany transactions.    Additionally, the Debtors' corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

75.    The Cash Management System is comprised of a total of nine bank accounts. Eight of the Bank Accounts reside at Bank of America, N.A. and the remaining Bank Account is at U.S. Bank, N.A.  The Debtors maintain a centralized funding account, a payroll account, a merchant credit card account, a collateral account, a flexible spending account, and a health savings account.  The Debtors also maintain two accounts—a master operational account and a money market account—that are generally dormant and maintain a zero balance.

76.     The Debtors and certain non-Debtor affiliates maintain business relationships with each other resulting in intercompany loans, receivables, and payables in the ordinary course of business.  Such Intercompany Transactions are frequently conducted (a) among the Debtors, and (b) between the Debtors and certain non-Debtor affiliates, including foreign affiliates, pursuant to prepetition shared services and intercompany trade arrangements, among others.  Most of the Intercompany Transactions result in book value adjustments in respect of such transfers rather than an actual transfer of funds.  With respect to the Intercompany Transactions wherein funds are transferred among the Debtors and their non-Debtor affiliates, including foreign affiliates, such affiliates transfer cash to the Debtors on an as needed basis in the Debtors' sole discretion.  The Debtors do not intend to, and will not during these chapter 11 cases, transfer funds to their non-Debtor affiliates, including foreign affiliates, without further order from the Court and notice to the U.S. Trustee and any official committee appointed in these chapter 11 cases.[6]

77.     In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between the Debtors and certain non-Debtor affiliates, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor or between a Debtor and a

---

[6]     The Debtors have obtained a letter of credit in the amount of approximately $1,025,00.00 for the benefit of a Chilean customer in respect of a foreign purchase order being processed by a non-Debtor foreign affiliate.  The Project L/C is secured by funds available through the Debtors' revolving credit facility under that certain first lien credit agreement, dated as of May 27, 2011, as amended from time to time.  The Project is substantially complete, and the Project L/C expires by its own terms on July 31, 2014.  The Chilean customer has not drawn on the Project L/C as of the Petition Date, and the Debtors submit that the Chilean customer has no legal basis to do so during these chapter 11 cases.  Nonetheless, for the avoidance of doubt, in the event the Chilean customer attempts to draw on the Project L/C prior to July 31, 2014, such transaction, if consummated, would create an intercompany receivable owing from the applicable non-Debtor foreign affiliate in favor of the Debtors.  To the extent the Chilean customer draws on the Project L/C during these chapter 11 cases, the Debtors shall provide notice of such event to the Office of the United States Trustee for the District of Delaware and counsel to any official committee appointed in these chapter 11 cases (subsequent to its appointment) within 15 days of becoming aware of such event.

non-Debtor affiliate.  As previously indicated, certain Intercompany Claims are settled in cash while others are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.

78.    The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors, with the assistance of personnel of Alvarez & Marsal North America, LLC, have also put in place monitoring systems to be able to track postpetition intercompany transfers.  If the Intercompany Transactions were to be discontinued, I believe that the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

79.    The Debtors pay Bank of America approximately $11,100 per month, on the 15th day of each month, on account of fees incurred in connection with the Bank Accounts. Therefore, the Debtors estimate that they owe Bank of America approximately $11,100 as of the Petition Date, the entirety of which will become due and payable within 21 days of the Petition Date.

80.    As part of the Cash Management System, the Debtors utilize numerous preprinted business forms in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, I believe that the Court should authorize the continued use of all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in

possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

81.      I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**B.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, and Other Compensation, and Reimbursable Expenses, (B) Continue Ordinary Course Incentive Programs for Non-Insiders, and (C) Continue Employee Benefits Programs and (II) Granting Related Relief ("<u>Wages Motion</u>")**

82.      Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (I) authorizing the Debtors to (a) pay prepetition wages, salaries, commissions, other compensation, reimbursable expenses, director obligations, and severance obligations, (b) pursuant to the Debtors' proposed final order, continue ordinary course incentive programs for non-insiders, and (c) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, and (II) scheduling a final hearing to consider entry of the final order, to the extent necessary.

83.      As of the Petition Date, the Debtors employ approximately 240 individuals on a full-time basis.   Approximately 140 of these Employees are paid on an hourly basis and approximately 100 receive a salary.    Additionally, the Debtors' workforce includes approximately 15 individuals that are currently working part-time or are employed through temporary staffing agencies.

84.      The Debtors' Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' successful reorganization.  Their skills,

knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  In many instances, the Debtors' Employees include highly trained personnel who cannot be easily replaced.  Without the continued, uninterrupted services of their employees, I believe that an effective reorganization of the Debtors will be materially impaired.

85.     At the same time, the vast majority of Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, Employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their Employees compensation, providing their Employees benefits, and maintaining certain programs benefiting their Employees.

86.     The Debtors seek to minimize the personal hardship the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected.  Thus, by the Wages Motion, the Debtors seek authority to:  (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, commissions, incentive programs, expense reimbursements, director obligations, severance obligations, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, vacation time, bereavement leave, life insurance, voluntary life insurance, short- and long-term disability coverage, education assistance, relocation assistance, fitness program reimbursement, employee assistance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business; and (b) pay all costs incident to the Employee Compensation and Benefits.

87.     I believe that paying prepetition Employee Compensation and Benefits will

benefit the Debtors' estates and their stakeholders by allowing the Debtors' business operations

to continue without interruption.  Indeed, I believe that without the requested relief, the Debtors'

Employees may seek alternative opportunities, perhaps with the Debtors' competitors. Such a

development would deplete the Debtors' workforce, hindering the Debtors' ability to

successfully reorganize.  The loss of valuable Employees and the resulting need to recruit new

personnel to replenish the Debtors' workforce would be distracting and counterproductive at this

critical time in chapter 11.  Further, if the Debtors lose valuable Employees, they will incur

recruiting expenses in locating replacements.  Accordingly, there can be no doubt that the

Debtors must do their utmost to retain their workforce by, among other things, continuing to

honor the Employee Compensation and Benefits that accrued prepetition.

**C.      Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and (B) Granting Related Relief ("<u>Critical Vendors Motion</u>")**

88.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and

final orders authorizing the Debtors to pay prepetition claims held by Critical Vendors in an

amount not to exceed $2.6 million on an interim basis and $4.1 million on a final basis.  For the

reasons set forth below, I believe that the relief requested in the Critical Vendors Motion is in the

best interests of the Debtors' estates, their creditors, and all other parties in interest, and will

enable the Debtors to continue to operate their businesses in the ordinary course without

disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors

Motion should be approved.

89.     In the ordinary course of business, the Debtors rely on a wide range of vital raw

materials, chemical additives, proprietary goods, equipment components, and services that are

necessary to manufacture their geosynthetic systems.  Certain of the Debtors' key supplies and

DOCS_DE:193054.1 30106/001

equipment are only available from a limited number of vendors, and in some cases, only one. Even when replacing certain vendors is possible, the Debtors must quality-test any new ingredient in their products, a process that lasts a minimum of 60 days.

90.    With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationships and/or suppliers of goods and services—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and/or impair going-concern viability.

91.    The Debtors seek to pay all or part of the Critical Vendor Claims up to the applicable Critical Vendor Cap to ensure that the Critical Vendors provide necessary goods and services to the Debtors on a postpetition basis.  The Debtors do not, however, seek to pay any prepetition obligations of the Critical Vendors arising under enforceable, long-term contractual relationships.  Moreover, the Debtors propose to condition the payment of the Critical Vendor Claims upon each Critical Vendors' agreement to continue supplying goods and services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those practices and programs (including credit limits, pricing, timing of payments, availability, and other terms) in place 12 months prior to the Petition Date, or such other trade terms that are acceptable to the Debtors.  The Debtors may require certain Critical Vendors to enter into a contractual agreement evidencing such Customary Trade Terms.

92.    Accordingly, the relief requested in the Critical Vendors Motion is narrowly tailored to facilitate the Debtors' restructuring efforts.  By contrast, any interruption in the goods or services supplied by the Critical Vendors—however brief—would disrupt the Debtors'

operations and could cause irreparable harm to the Debtors' businesses, goodwill, employees, customer base, and market share.  Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.  Therefore, I submit that payment of the Critical Vendor Claims is a sound exercise of business judgment and necessary to preserve the value of the Debtors' businesses.

**D.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Claims of Shippers and Other Lien Claimants, (B) Pay Section 503(B)(9) Claims, and (C) Grant Administrative Expense Priority to All Undisputed Obligations for Goods and Raw Materials Ordered Prepetition and Delivered Postpetition and Satisfy Such Obligations in the Ordinary Course of Business and (II) Granting Related Relief ("Shippers and Lien Claimants Motion")**

93.     Pursuant to the Shippers and Lien Claimants Motion, the Debtors seek entry of an order authorizing the Debtors to (a) pay the Shipper Claims in an amount not to exceed $1.5 million and Lien Claimants in an amount not to exceed $1.8 million, absent further order of the Court, (b) pay Section 503(b)(9) Claims in an amount not to exceed $7 million absent further order of the Court, and (c) grant administrative expense priority to all undisputed obligations for goods and raw materials ordered prepetition and delivered postpetition and satisfy such obligations in the ordinary course of business.

94.     I believe that the critical need for the continued receipt and distribution of goods and raw materials that Shippers may hold on the Petition Date justifies the grant of the relief sought in the Shippers and Lien Claimants Motion.  The prompt payment to Shippers, which may be necessary to obtain delivery of the goods in their possession, is crucial for the orderly and efficient operation of the Debtors' business.  Unless the Debtors have the authority to pay for these essential services, their business will suffer irreparable harm.  Indeed, the Shippers may be unwilling to release the Debtors' goods in their possession on which, I am advised, they may be entitled to assert liens, since the surrender of possession may result in the loss of an otherwise

37

secured claim.  It is therefore highly unlikely the Debtors will be able to ensure the timely delivery of their property currently in transit unless the Debtors are authorized to pay the Shippers and Warehousemen as provided in the Shippers and Lien Claimants Motion.

95.     Additionally, payment of the Lien Claims is necessary to facilitate the uninterrupted operation of the Debtors' businesses.  Absent payments of the Lien Claims, the Lien Claimants may stop providing essential services. I am advised that the Lien Claimants may also assert various mechanics liens against the Debtors' or their customers' property, notwithstanding the automatic stay under section 362 of the Bankruptcy Code.  The cessation of the services provided by the Lien Claimants and/or the assertion of mechanics liens would materially disrupt the Debtors' businesses.

96.     I believe that the Debtors' ongoing ability to obtain goods from their suppliers is critical to their survival, necessary to preserve the value of their estates, and justifies the Debtors' decision to pay the Section 503(b)(9) Claims early in the Debtors' chapter 11 cases.  Absent payment of the Section 503(b)(9) Claims—which I am advised will likely only accelerate the timing of payment and not improve the ultimate treatment of such claims—the Debtors could be denied access to the crucial parts and components necessary to continue operations. Such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.  For these reasons, I believe the relief requested in the Shippers and Lien Claimants Motion is vitally necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders in the chapter 11 cases.

    **E.**    **Debtors' Motion for the Entry of an Order (A) Authorizing the Payment of Certain Prepetition Taxes and Fees and (B) Granting Related Relief ("Taxes and Fees Motion")**

97.     Pursuant to the Taxes and Fees Motion, the Debtors seek the authority for the Debtors to make payment and remittance of Taxes and Fees that accrued prior to the Petition

Date and that will become payable during the pendency of these chapter 11 cases in an aggregate amount not to exceed $673,000.  The Debtors also request that the Court authorize and direct applicable financial institutions, when the Debtors in their sole discretion so request, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the Taxes and Fees.

98.    In the ordinary course of business, the Debtors collect, withhold, and incur income, sales, use, franchise, business, environmental and safety, and property taxes, as well as other fees and assessments described in the Taxes and Fees Motion, and occasionally are the subject of audit investigations on account of prior year tax returns.  The Debtors estimate that approximately $673,000 in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities after the Petition Date.  Payment of the Taxes and Fees is critical to the Debtors' continued and uninterrupted operations.  The Debtors' failure to pay prepetition Taxes and Fees may cause the Governmental Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, seeking to lift the automatic stay, or pursuing payment of the Taxes and Fees from the Debtors' officers and directors, all of which would greatly disrupt the Debtors' operations and ability to focus on their reorganization efforts.

99.    I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

DOCS_DE:193054.1 30106/001

**F.    Debtors' Motion for Entry of Interim and Final Orders (A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (B) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (C) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (D) Granting Related Relief ("Utilities Motion")**

100.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders, (a) approving the Debtors' Proposed Adequate Assurance of payment for future utility services, (b) prohibiting Utility Companies from altering, refusing, or discontinuing services, and (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests.

101.    In the ordinary course of their businesses, the Debtors incur utility expenses for electricity, natural gas, telephone, water, waste disposal, and other similar services from a number of utility companies or brokers.  On average, the Debtors pay approximately $390,426 each month for third party Utility Services, calculated as a historical average for the twelve-month period ended December 31, 2013.

102.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations and manufacture their products.  I believe this disruption would adversely impact customer relationships and result in a decline in the Debtors' revenues and profits.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that Utility Services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

DOCS_DE:193054.1 30106/001

**G.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition, (B) Enter Into New Insurance Policies, (C) Honor Their Prepetition Insurance Premium Financing Agreement, and (D) Renew Their Prepetition Financing Agreement in the Ordinary Course of Business, and (II) Granting Related Relief ("Insurance Motion")**

103.    Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue insurance coverage entered into prepetition, (b) enter into new Insurance Policies and arrangements, (c) honor their prepetition insurance Premium Financing Agreement in an amount not to exceed $650,000, and (d) renew their Premium Financing Agreement in the ordinary course of business.

104.    In the ordinary court of business, the Debtors maintain approximately 19 insurance policies that are administered by multiple third-party insurance carriers.  These policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, marine liability, terrorism, pollution liability, umbrella coverage, excess liability, and stop loss coverage.

105.    Continuation of the Insurance Policies is essential to the preservation of the value of the Debtors' businesses, properties, and assets.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee.

106.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

DOCS_DE:193054.1 30106/001

H.     **Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Programs the Ordinary Course of Business ("Customer Programs Motion")**

107.    Pursuant to the Customer Programs Motion, the Debtors seek entry of a final order authorizing the Debtors to maintain and administer the Customer Programs and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice in an amount not to exceed $1,140,000.  I am familiar with the Customer Programs, which include, but are not limited to, warranty programs, credits, deposits and prepayments, and customer cargo claims.  The Customer Programs are integral to the Debtors' efforts to stabilize their business, restore profitability, and ultimately deliver the most value to all stakeholders in these chapter 11 cases.

108.    Operating in a competitive industry, the Debtors rely on their customers' satisfaction, which leads to repeat business, and enhances the Debtors' reputation for reliability.  Maintaining the loyalty, support, and goodwill of their customers is critical to the Debtors' reorganization efforts.  In addition, the Debtors must maintain positive customer relationships and their reputation for reliability to assure that their customers continue to purchase the Debtors' products.  Achieving these goals will be particularly important while operating in chapter 11.  Accordingly, the Debtors seek the relief requested in the Customer Programs Motion to ease any anxieties that customers may have that the chapter 11 cases will interfere with the Debtors' ability to fully meet customer needs and expectations.

109.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

    **I.**    **Debtors' Motion for Entry of an Order Approving Continuation of Surety Bond Program ("<u>Surety Bond Motion</u>")**

110.    Pursuant to the Surety Bond Motion, the Debtors seek entry of an order authorizing the Debtors to continue and renew their Surety Bond Program on an uninterrupted basis, including paying insurance premiums as they come due, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their business, and execution of other agreements in connection with the Surety Bond Program.

111.    In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies.  These include, among others: (a) workers' compensation obligations; (b) obligations relating to obtaining and maintaining permits or licenses; and (c) obligations related to Canadian and U.S. customs.  Often, statutes or ordinances require the Debtors to post surety bonds to secure such obligations.  As such, failure to provide, maintain, or timely replace their surety bonds may prevent the Debtors from undertaking essential functions related to their operations.  As of the Petition Date, the Debtors have approximately $820,000 in outstanding surety bonds.

112.    To continue their business operations during the reorganization, the Debtors must be able to provide financial assurances to local governments, regulatory agencies, and other third parties.  This in turn requires the Debtors to maintain the existing Surety Bond Program and potentially to acquire additional bonding capacity as needed in the ordinary course of the Debtors' businesses.

113.    Continuing the Surety Bond Program is thus necessary in order to maintain the Debtors' current terms and existing relationships with their Sureties. Based on the Debtors' current circumstances, I do not believe that it is likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the Sureties. The process of establishing a new surety bond program, moreover, would be burdensome to the Debtors, and it is doubtful that the Debtors could replace all of the surety bonds in time to avoid defaults or other consequences of the applicable obligations.

114.    I believe that the relief requested in the Surety Bond Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Surety Bond Motion should be granted.

**J.      Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Securities ("Equity Trading Motion")**

115.    Pursuant to the Equity Trading Motion, the Debtors seek entry of orders (a) approving the Procedures, without prejudice to the Debtors' right to waive the Procedures, or any term thereof, with respect to any purchase, sale, or other transfer of, or declaration of worthlessness with respect to, the Equity Securities, (b) directing that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to, the Equity Securities in violation of the Procedures is null and void *ab initio*, and (c) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of the Equity Trading Motion on a final basis.

116.    As of December 31, 2013, the Debtors had NOLs in an amount of approximately $33.4 million and Tax Credits in an amount of approximately $16.3 million.  I understand that utilization of the Tax Attributes in future tax years may generate up to approximately $29.7 million in cash savings from reduced taxes considering an assumed effective tax rate of 40 percent for the post-emergence company.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

117.    The Tax Attributes are substantial and I believe that any loss of the Tax Attributes, including during the first month of these chapter 11 cases, could cause significant and irreparable damage to the Debtors' estates and stakeholders.  The Procedures are the mechanism by which the Debtors will monitor, and object to, certain transfers of, and declarations of worthlessness with respect to, the Equity Securities to ensure preservation of the Tax Attributes.  I further believe that the Procedures and other relief requested are critical for maximizing estate value and will help to ensure a meaningful recovery of creditors.  If no restrictions on trading or worthlessness deductions are imposed as requested in the Equity Trading Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the Tax Attributes.  I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, the Debtors' stakeholders, and the overall reorganization process.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Equity Trading Motion should be granted.

*[Remainder of page intentionally left blank]*

45

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  May 4, 2014

Dean Swick
GSE Environmental, Inc.
Vice President, Finance