## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GSE ENVIRONMENTAL, INC., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

The above-captioned debtors (collectively, the "Debtors") file this motion (this "Motion")[2] for entry of an interim order (the "Interim DIP Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"), (a) authorizing the Debtors to obtain postpetition secured financing pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and in accordance with Rules 2002, 4001, and 9014, of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2002-1(b) and 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (b) granting liens and super-priority claims with respect to such postpetition financing, (c) authorizing the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: GSE Environmental, Inc. (1074); GSE Environmental, LLC (1539); GSE Holding, Inc. (9069); and SynTec, LLC (2133). The location of the Debtors' service address is: 19103 Gundle Road, Houston, Texas 77073.

[2] Unless otherwise noted herein, all capitalized terms used in this Motion shall have the meanings ascribed to such terms herein, regardless of whether the definitions of such terms appear later in this Motion than the first use of such term. Capitalized terms used in this Motion but not otherwise defined herein shall have the meanings ascribed to them in the Interim DIP Order or the DIP Credit Agreement, as applicable.

Debtors to use Cash Collateral, on an interim basis, pending a final hearing on this Motion, (d) approving the form of adequate protection to be provided by the Debtors to the Pre-Petition First-Lien Lenders, (e) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim DIP Order, (f) prescribing the form and manner of notice and setting the time for the final hearing on this Motion (the "Final Hearing") to consider entry of the Final DIP Order, and (g) granting related relief. In support of this Motion, the Debtors have filed contemporaneously herewith the *Declaration of Adam Waldman in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Waldman Declaration"). In further support of this Motion, the Debtors respectfully state as follows.[3]

## Jurisdiction and Venue

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties,

---

[3]     The facts and circumstances supporting this Motion are set forth in the Waldman Declaration and the *Declaration of Dean Swick in Support of First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.

KE 29221339

cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.	Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.	The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

## Preliminary Statement

4.	The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest. To that end, the Debtors have secured a $45.0 million DIP Facility to ensure that ongoing business operations—and overall enterprise value—can be preserved. Among other things, the DIP Facility proceeds will be used to honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund certain operational expenses as set forth in the Budget, maintain ordinary course relationships with vendors, suppliers, and customers, and satisfy working capital needs in the ordinary course.

5.	As discussed below and in the Waldman Declaration, the Debtors' decision to proceed with the DIP Facility comes after a dedicated and diligent search for other available and better financing alternatives. Moreover, the DIP Facility represents the best source of appropriately-sized financing available to the Debtors under the circumstances, and was negotiated vigorously at arms' length over the course of several weeks, resulting in terms that the Debtors submit are reasonable and appropriate to meet the Debtors' financing needs during these chapter 11 cases. The DIP Facility is an essential component of the broader restructuring transaction contemplated by the Plan, which has the support from holders of 100 percent of the

3

Debtors' first lien claims. Through this process, the Debtors have successfully negotiated a delayed-draw term loan facility that generally provides:

- approximately $45,000,000 secured by consensual, first priority priming liens on substantially all the Debtors' assets, subject only to liens that were senior to the liens of the Pre-Petition Secured Parties as of the Petition Date;

- borrowings and disbursements to be made pursuant to the terms of an agreed 13-week budget, a copy of which is attached as **Exhibit 1** to the Interim DIP Order (as the same may be modified in accordance with the DIP Credit Agreement, the "Budget");

- an initial interim advance of up to $35,000,000 to be available upon entry of the Interim DIP Order and satisfaction of other conditions under the DIP Credit Agreement (the "Interim Advance"), followed by periodic borrowings after entry of the Final DIP Order; and

- a scheduled maturity date of the earlier of six (6) months after the Petition Date or consummation of the Plan, with additional, customary termination events.

6.      Absent interim approval of the DIP Facility, there is a significant risk that the Debtors would be forced to cease operations or otherwise stop paying their obligations as they become due, thereby threatening the Debtors' value as a going concern to the detriment of the Debtors' estates and their creditors. The Debtors have extremely limited cash on hand and do not expect to generate sufficient levels of operating cash flow in the ordinary course to fund operations. In addition, and as discussed more fully below, substantially all the Debtors' assets are encumbered by liens arising under their prepetition lending facilities, and the Debtors believe the Pre-Petition First-Lien Lenders are materially undersecured. As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably available and have determined that their proposed DIP Facility provides the best path forward under the circumstances to address their immediate liquidity needs, fund these chapter 11 cases, and provide a clear path toward the confirmation and consummation of the Plan.

KE 29221339

## Terms and Conditions of the DIP Facility

## I.    Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2

7.    The following chart contains a summary of the essential terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2.[4]

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Borrower** <br> Bankruptcy Rule 4001(c)(1)(B) | GSE Environmental, Inc. <br><br> *See* DIP Agt. at 1; Interim DIP Order Preamble. |
| **Guarantors** <br> Bankruptcy Rule 4001(c)(1)(B) | GSE Holding, Inc., GSE Environmental, LLC, and SynTec, LLC <br><br> *See* DIP Agt. at 1. |
| **DIP Lenders** <br> Bankruptcy Rule 4001(c)(1)(B) | Funds affiliated with Littlejohn & Co., LLC, Tennenbaum Capital, Partners, LLC, and Strategic Value Partners, LLC <br><br> *See* DIP Agt. at 1. |
| **Commitment** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(ii) | The total DIP Facility shall include loans to be advanced and made available to the Borrower in the aggregate maximum principal amount of $45.0 million. <br><br> An amount of up to approximately $35.0 million shall be made available on the Effective Date and before the entry of the Final DIP Order by the Court. <br><br> *See* DIP Agt. at 1-2; Interim DIP Order ¶¶ I, XI, 4(g), 5. |
| **Term** <br> Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) <br> Local 4001-2(a)(ii) | The term of the DIP Facility shall mature six (6) months after the Petition Date, subject to certain termination events. <br><br> *See* DIP Agt. at 1, 83. |

---

4    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined shall have the meanings ascribed to them in the DIP Documents or the Interim DIP Order, as applicable.

KE 29221339

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) Local Rule 4001-2(a)(ii) | The DIP Facility shall be used (a) to repay all obligations outstanding under the Pre-Petition Priming Secured Facility, (b) for working capital (excluding capital expenditures) to the extent set forth in the Budget, subject to permitted variances, (c) capital expenditures to the extent set forth in the Budget and permitted by the financial covenants, and (d) for payment of (i) costs of administration of these chapter 11 cases to the extent set forth in the Budget, (ii) certain fees and expenses, and (iii) such prepetition obligations as the Court shall approve, in each case in a manner consistent with the terms and conditions contained in the DIP Credit Agreement. *See* DIP Agt. at 30; Interim DIP Order ¶¶ 13, 20. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The Pre-Petition First-Lien Lenders and the Pre-Petition Priming Lenders (collectively, the "<u>Pre-Petition Secured Parties</u>"). *See* Interim DIP Order ¶ 3. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The Borrower shall pay to the DIP Agent on the Effective Date an upfront fee of two percent of each DIP Lender's commitment, and an unused commitment fee of three-quarters of one percent. *See* DIP Agt. at 5-6. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | LIBOR <u>plus</u> 9.5 percent, with a LIBOR floor of 1.5 percent (plus 2.0 percent upon default). *See* DIP Agt. at 2-3. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The obligation of each DIP Lender to make its initial Loans is subject to customary borrowing and cash collateral use conditions, as well as the following: (i) all obligations and other amounts due under the Pre-Petition Priming Secured Facility shall have been, or substantially simultaneously with the Effective Date shall be, repaid in full in cash with the proceeds of the Loans; (ii) the DIP Agent shall have received the Initial Budget (it being understood that the Initial Budget delivered to the DIP Agent on the Closing Date shall satisfy this condition); (iii) the Borrower shall have paid all fees then due and payable under the DIP Credit Agreement on or prior to the Effective Date; and (iv) the Interim DIP Order shall have been entered by the Court, shall be in full force and effect and shall not have been vacated, stayed, reversed, modified, or amended. The obligation of each DIP Lender to make Loans (including Loans made on the Effective Date) are subject to, after giving effect to any Loan and the contemporaneous uses of the proceeds thereof, the Credit Parties' cash and Cash Equivalents not exceeding $15,000,000 and other customary conditions. *See* DIP Agt. at 11-14. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) Local Rule 4001-2(a)(ii) | The use of cash and proceeds from the DIP Loans is subject to a customary budget, attached to the Interim DIP Order as <u>Exhibit 1</u>. *See* DIP Agt. at 12, 25; Interim DIP Order ¶ 10, <u>Exhibit 1</u>. |

KE 29221339

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | Standard reporting requirements that largely conform to the Debtors' prepetition reporting obligations, including a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Borrower and the Guarantors for the prior week and setting forth all the variances, on a cumulative basis from the Closing Date and (if delivered during or after the fourth week after the Closing Date) on a rolling four week basis, from the amounts set forth for each line item for such periods as compared to the Initial Budget and the most recent Updated Budget (as applicable).<br><br>*See* DIP Agt. at 25; Interim DIP Order ¶¶ 10, 22. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | The Credit Parties shall not permit the aggregate amount paid by the Debtors in respect of any:<br><br>(i) Disbursement Item to exceed the amount set forth for such line item in the Budget by more than 20%, on a cumulative basis from the Closing Date and (starting four weeks after the Closing Date) on a rolling four week basis, excluding amounts payable to the DIP Lenders under the DIP Credit Agreement; provided, however, that notwithstanding the foregoing, if a Disbursement Item exceeds the Permitted Disbursement Variance for such Disbursement Item, it shall not constitute a default or Event of Default unless the total amount by which all Disbursement Items exceed all Permitted Disbursement Variances exceeds $200,000, on a cumulative basis from the Closing Date or (starting four weeks after the Closing Date) on a rolling four week basis; and<br><br>(ii) Professional Fees to exceed the amount set forth for such line item in the Budget by more than 10%, on a cumulative basis from the Closing Date and (starting four weeks after the Closing Date) on a rolling four week basis.<br><br>*See* DIP Agt. at 45; Interim DIP Order ¶ 10(b). |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The Borrower shall achieve each of the following milestones:<br><br>(i) the Interim DIP Order shall be entered within three (3) Business Days of the Petition Date; (ii) the Plan and related disclosure statement shall be filed with the Court within three (3) days of the Petition Date; (iii) the Final DIP Order shall be entered within twenty-eight (28) days after the entry of the Interim DIP Order; (iv) the order (the "Solicitation Order") approving the disclosure statement and solicitation materials related thereto and setting a hearing to confirm the Plan shall be entered by the Court within forty-five (45) days of the Petition Date and such Confirmation Order is in form and substance satisfactory to the Required Lenders in their sole discretion; (v) the order (the "Confirmation Order") confirming the Plan shall be entered by the Court within forty-five (45) days of the Court's entry of the Solicitation Order and such Confirmation Order is in form and substance satisfactory to the Administrative Agent in its sole discretion; and (vi) the effective date of the Plan shall have occurred within twenty-one (21) days of the Confirmation Order.<br><br>*See* DIP Agt. at 33. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i)<br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | Subject and subordinate to the Carve Out in all respects, all obligations of the Debtors under the DIP Facility shall be (i) pursuant to section 364(c)(1) of the Bankruptcy Code, joint and several superpriority allowed administrative expense claim status in these chapter 11 cases; (ii) secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien on all of the Debtors' assets, subject to certain exceptions; and (iii) secured, pursuant to section 364(d) of the Bankruptcy Code, a first priority, senior priming lien on and security interest in all of the Debtors' assets (subject to Permitted Liens) other than the Pre-Petition Liens, subject to certain exceptions.<br><br>*See* DIP Agt. at 21; Interim DIP Order ¶¶ IV, 6, 8. |

KE 29221339

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(f) | The claims and liens granted to the Pre-Petition Lenders and DIP Lenders under the DIP Credit Agreement shall each be subject to:<br><br>(i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below);<br><br>(ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below);<br><br>(iii) (A) any and all accrued and unpaid fees, disbursements, costs, and expenses (the "Debtors' Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtors' Professional Persons") and at any time before or on the day of delivery of a Carve Out Trigger Notice (as defined below) that remain unpaid after application of any retainers and solely to the extent allowed by the Bankruptcy Court (whether by interim order, procedural order, or otherwise prior to or after delivery of a Carve Out Trigger Notice) (the "Pre-Trigger Notice Debtors' Professional Fees"), and (B) any and all accrued and unpaid fees, disbursements, costs, and expenses (the "Committee's Professional Fees", and together with the Debtors' Professional Fees, the "Professional Fees") in an aggregate amount not to exceed $250,000, incurred by persons or firms retained by the Committee (if any) pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Committee's Professional Persons", and together with the Debtors' Professional Persons, the "Professional Persons") and at any time before or on the day of delivery of a Carve Out Trigger Notice (as defined below) that remain unpaid after application of any retainers, to the extent allowed by the Bankruptcy Court (whether by interim order, procedural order, or otherwise prior to or after delivery of a Carve Out Trigger Notice) (the "Pre-Trigger Notice Committee's Professional Fees", and together with the Pre-Trigger Notice Debtors' Professional Fees, the "Pre-Trigger Notice Professional Fees"); and<br><br>(iv) Professional Fees of Debtors' Professional Persons in an aggregate amount not to exceed $500,000 and of the Committee's Professional persons in an aggregate amount not to exceed $50,000, incurred after the day of delivery of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").<br><br>For purposes of the Interim DIP Order, "Carve Out Trigger Notice" shall mean a written notice delivered by email by the DIP Agent or the DIP Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>*See* Interim DIP Order ¶ 7. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br>Local Rule 4001-2(a)(i)(C) | Subject to the entry of the Final DIP Order, no expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of each DIP Lender or Pre-Petition Secured Party adversely affected thereby.<br><br>*See* Interim DIP Order ¶ 11. |
| **Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001- | Subject to the entry of the Final DIP Order, no expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the Collateral under section 552(b) of |

KE 29221339

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| 2(a)(i)(h) | the Bankruptcy Code, without the prior written consent of each DIP Lender or Pre-Petition Secured Party adversely affected thereby.<br><br>*See* Interim DIP Order ¶ 11. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br>Local Rule 4001-2(a)(i)(B) | The Debtors stipulate and acknowledge (i) to the amount, validity, priority, and enforceability of the Obligations under the Pre-Petition Secured Facilities, and (ii) that the Pre-Petition Secured Parties have a valid, enforceable and fully perfected first priority liens in all of the Prepetition Collateral, including the Cash Collateral.<br><br>*See* Interim DIP Order ¶ 3. |
| **Adequate Protection**<br>Bankruptcy Rule 4001(b)(l)(B)(iv),4001(c)(1)(B)(ii) | Subject in all respects to the Carve Out and the DIP Liens, the Pre-Petition First-Lien Agent, the Pre-Petition First-Lien Collateral Agent, and the Pre-Petition First-Lien Lenders shall receive the following as adequate protection:<br><br>(i) a valid and perfected postpetition replacement security interests in and liens upon the Post-Petition Collateral (other than the DIP Cash Collateral Account) (the "<u>Adequate Protection Liens</u>"), which liens shall be subject and subordinate to (a) the Carve Out, (b) the DIP Liens and any liens on the Collateral that are senior to, or *pari passu* with, the DIP Liens, and (c) any Permitted Liens; (ii) a superpriority claim under section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or after arising, subject and subordinate to the payment of the Carve Out and DIP Claims; and (iii) the Debtors are authorized and directed to pay on an ongoing basis, from time to time after the Petition Date, the Pre-Petition First-Lien Professional Fees; *provided*, *however*, that the adequate protection claims and liens described in the preceding clauses (i) and (ii) shall be granted only to the extent of any diminution in the value of any Cash Collateral or other collateral arising as a result of (A) the use, sale, or lease of Cash Collateral or other collateral, (B) the granting of priming liens to secure the DIP Facility, or (C) the imposition of the automatic stay.<br><br>*See* Interim DIP Order ¶ 14. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | <u>Events of Default</u>.  Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest, and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, incurrence of certain ERISA liability, change of control, and relief from automatic stay. The DIP Credit Agreement contains case milestones, the failure of which to satisfy would constitute an Event of Default thereunder, including, milestones relating to filing a plan of reorganization (a "<u>Plan</u>"), a disclosure statement, and seeking approval thereof. Additionally, certain actions, if taken, or pleadings, if filed, would constitute an Event of Default, including the departure of certain officers, the filing of a Plan other than in accordance with the Restructuring Support Agreement, and entry of an order without the prior consent of the Required Lenders amending, supplementing or otherwise modifying the DIP Orders.<br><br><u>Remedies</u>.  Upon the occurrence and during the continuance of any Event of Default, the Agent, upon the direction of the Required Lenders, shall: (a) declare all or any portion of the Commitment of each DIP Lender to make Loans terminated, whereupon such Commitments shall forthwith be terminated; (b) declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Credit Agreement or under any other Loan Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party; and/or (c) exercise on behalf of itself and the DIP Lenders all rights and remedies |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | available to it and the DIP Lenders under the Loan Documents or applicable law.<br><br>*See* DIP Agt. at 45-49. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lenders to exercise rights and remedies under the DIP Documents against the Debtors and/or the Collateral. In the absence of a further order of the Court, and notwithstanding anything herein or in the DIP Documents to the contrary, the Debtors' rights to use the Pre-Petition Collateral shall terminate upon the earlier to occur of (i) five (5) Business Days' written notice by email provided by the DIP Lenders of the occurrence and continuance of any Event of Default under the DIP Facility or (ii) repayment by the Debtors of all Obligations under the DIP Facility in full in cash. In any hearing regarding the exercise of rights or remedies by the DIP Agent or the DIP Lenders, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.<br><br>*See* Interim DIP Order ¶ 9. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Lenders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them under the DIP Credit Agreement. Whether or not any DIP Lender chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it DIP Credit Agreement, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination immediately upon entry of the Interim DIP Order, but subject and subordinate to the Carve Out in all respects.<br><br>*See* Interim DIP Order ¶ 17. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Each Credit Party agrees to indemnify, hold harmless and defend the DIP Agent, each DIP Lender, and each of their respective Related Persons (each such Person being an "Indemnitee") from and against all Liabilities (including brokerage commissions, fees and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee in any matter relating to or arising out of, in connection with or as a result of (i) the Transactions, any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan or any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including attorneys' fees in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "Indemnified Matters"); *provided*, *however*, that no Credit Party shall have any liability under Section 9.6(i) of the DIP Credit Agreement to the extent arising from a dispute solely among Indemnitees other than claims against Agent or its respective Related Persons in its capacity or in fulfilling its role as Agent and other than any claims |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | arising out of any act or omission on the part of Holdings or any of its Subsidiaries or Affiliates or (ii) to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its officers, directors or employees, as determined by a court of competent jurisdiction in a final non-appealable judgment or order or (y) a material breach of its material obligations under the Loan Documents by such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee as determined by the final non-appealable judgment of a court of competent jurisdiction. Furthermore, each of the Borrower and each other Credit Party executing the DIP Credit Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person of such Indemnitee to the extent that such Liabilities did not result from the gross negligence, bad faith or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. <br><br> *See* DIP Agt. at 61-62. |
| **Liens on Avoidance Actions** <br> Bankruptcy Rule 4001(c)(l)(B)(xi) <br> Local Rule 4001-2(a)(i)(D) | Subject to the entry of the Final DIP Order, all obligations of the Debtors under the DIP Facility shall be secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens on the proceeds of the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action, whether now existing or hereafter acquired or arising, subject to certain exceptions and the Carve Out. <br><br> *See* Interim DIP Order ¶¶ VI, 8. |
| **Challenge Period** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(i)(B) | In the case of (i) the Committee, if appointed, within sixty (60) days of the formation of the Committee, or (ii) all other parties in interest, within seventy-five (75) days of the entry of the Interim DIP Order, is the time by which the Committee or party in interest (in any case, which has obtained the requisite standing) is required to commence a proceeding against the Pre-Petition Secured Parties to assert claims in connection with any matter related to the Pre-Petition Credit Agreements or the Pre-Petition Collateral (a "<u>Challenge Proceeding</u>"). <br><br> If no such Challenge Proceeding is timely commenced, then (x) to the extent not theretofore repaid, the Pre-Petition Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in these Cases and any subsequent chapter 7 case, (y) the Pre-Petition Collateral Agents' liens on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3 hereof, not subject to defense, counterclaim, recharacterization, subordination or avoidance, and (z) the Obligations under the Pre-Petition Credit Agreements and the liens of the Pre-Petition Collateral Agents on the Pre-Petition Collateral shall not be subject to any other or further challenge by any party in interest, subject to certain contingencies. <br><br> *See* Interim DIP Order ¶ 19. |
| **No Priming or Pari Passu Liens** <br> Bankruptcy Rule 4001(c)(1)(B) | Except as otherwise set forth in the DIP Orders or the DIP Credit Agreement, no order shall be entered authorizing or approving any liens or encumbrances on the Collateral senior to or *pari passu* with the DIP Liens. |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(ii) | *See* Interim DIP Order ¶ 18(a). |

## Relief Requested

8. The Debtors seek entry of the Interim DIP Order and, pending the Final Hearing, the Final DIP Order, in each case:

a. Authorizing the Debtors to enter into a senior secured, first-priority DIP facility (the "DIP Facility"), which shall include loans (the "DIP Loans") to be advanced and made available to GSE Environmental, Inc. (the "Borrower") in the aggregate maximum principal amount of $45,000,000, with up to $35,000,000 to be available upon entry of the Interim DIP Order and satisfaction of other conditions to borrowing, pursuant to the terms and conditions of that certain Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement"), a copy of which is attached hereto as **Exhibit B**, among the Borrower, GSE Holding, Inc., GSE Environmental, LLC, and SynTec, LLC, as guarantors (collectively, the "Guarantors"), the DIP Lenders,[5] and Cantor Fitzgerald Securities, as agent (the "DIP Agent").

b. ordering that, subject to the Carve Out in all respects, all obligations of the Borrower under the DIP Facility (collectively, the "DIP Obligations") shall be:

(i) entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code (the "DIP Superpriority Claim") with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code;

(ii) secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable, first priority, fully perfected security interests in and liens upon all of the Debtors' rights in property of the Debtors' estates as of the Petition Date, and all of the Debtors' rights in property acquired postpetition, including, without limitation, pursuant to the Final DIP Order, proceeds of estate causes of action under Chapter 5 of the Bankruptcy Code, together with the proceeds thereof and property received thereby (collectively, the "Avoidance Actions"), whether now existing or hereafter acquired

---

[5] As used herein, the term "DIP Lenders" shall have the meaning ascribed to the term "Lenders" in the DIP Credit Agreement.

KE 29221339

or arising (collectively, the "DIP Collateral"), subject and subordinate only to those liens that, under applicable law, are senior to, and have not been subordinated to, the liens of the Pre-Petition First-Lien Lenders under the Pre-Petition First-Lien Credit Documents, but only to the extent that such liens are valid, enforceable, and nonavoidable liens as of the Petition Date and liens permitted under the DIP Facility (collectively, "Permitted Priority Liens"); and

(iii)    secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority, perfected lien on all of the Debtors' rights in property of the Debtors' estates as of the Petition Date that, as of the Petition Date, were unencumbered (the liens granted in subparagraphs (ii) and (iii), the "DIP Liens, and, together with the DIP Superpriority Claim, the "DIP Protections").

c.    authorizing the Debtors to use all cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all collateral pledged to the DIP Lenders and/or the Pre-Petition Secured Parties, which shall constitute cash collateral, as contemplated by section 363 of the Bankruptcy Code ("Cash Collateral");

d.    ordering that, subject in all respects to the Carve Out and the DIP Liens, the Pre-Petition First-Lien Lenders shall receive the following as adequate protection (collectively, the "Adequate Protection") to the extent of any diminution in the value of any Cash Collateral or other collateral arising as a result of (i) the use, sale, or lease of Cash Collateral or other collateral, (ii) the granting of priming liens to secure the DIP Facility, or (iii) the imposition of the automatic stay:

(i)    a superpriority claim under section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or hereafter arising, subject and subordinate to the payment of the Carve Out and the DIP Obligations;

(ii)    a valid, enforceable, fully perfected security interest in and postpetition replacement lien on the Post-Petition Collateral (other than the DIP Cash Collateral Account), subject and subordinate to (a) the Carve Out, (b) the DIP Liens and any liens on the Collateral that are senior to, or *pari passu* with, the DIP Liens and that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (c) any Permitted Liens; and

(iii)    payment to the Pre-Petition First-Lien Agent, the Pre-Petition First-Lien Collateral Agent, and the Pre-Petition First-Lien Lenders of all fees and expenses payable under the Pre-Petition First-Lien Credit Documents.

13

e.   modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order or the Final DIP Order, as applicable;

f.   scheduling the Final Hearing to consider entry of the Final DIP Order and approving the form of notice with respect to the Final Hearing; and

g.   granting related relief.

## Background

9.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## The Debtors' Prepetition Capital Structure

10.     As of the Petition Date, the Debtors had approximately $193.6 million of funded indebtedness and related obligations outstanding, consisting of the Pre-Petition Priming Secured Facility, the Pre-Petition First-Lien Secured Facilities, and Capital Leases.  As of the Petition Date, the obligations outstanding under these facilities, excluding accrued interest, are estimated at the following amounts:

|  | $ millions |
|---|---|
| Pre-Petition Priming Secured Facility | $18.1 |
| Pre-Petition First-Lien Secured Facilities | $173.8 |
| Capital Leases | $1.7 |
| **Total** | **$193.6** |

14

## I.     The Pre-Petition Priming Secured Facility

11.     GSE Environmental, Inc. is the borrower under that certain First Lien Revolving Credit Agreement, dated as of January 10, 2014 (as amended from time to time and with all supplements and exhibits thereto, the "Pre-Petition Priming Credit Agreement"), by and between the Debtors, Cantor Fitzgerald Securities, as successor administrative and collateral agent, and the lenders party thereto (the "Pre-Prepetition Priming Lenders").   The Pre-Petition Priming Credit Agreement provides the Debtors with a revolving credit facility, subject to the terms and conditions set forth therein (the "Pre-Petition Priming Secured Facility"), which was intended to provide the Debtors liquidity to support their operations while simultaneously pursuing a sale process, as described in greater detail below.   Thus, the Pre-Petition Priming Credit Agreement contains certain milestones that required (a) the Debtors to distribute an information memorandum to prospective buyers by January 17, 2014, and (b) interested bidders to submit letters of intent by February 21, 2014, and further require the Debtors to consummate a sale by April 30, 2014.  The Pre-Petition Priming Secured Facility matures on April 30, 2014, subject to certain extensions allowed by its terms.

12.     The Pre-Petition Priming Credit Agreement was amended four times between January 16 and April 11, 2014, to change certain of the Debtors' reporting requirements, clarify the scope and terms of potential employee compensation plans, remove a minimum liquidity requirement, and extend the deadline by which the Debtors have to complete the sale process until April 30, 2014.  On April 17, 2014, the Debtors amended the Pre-Petition Priming Credit Agreement to increase the amount available under the Pre-Petition Priming Secured Facility to $18 million.

13.     Obligations arising under the Pre-Petition Priming Secured Facility are guaranteed on a super priority senior secured basis by each of the Debtors.  The obligations

arising under the Pre-Petition Priming Secured Facility are also secured by liens on substantially all of the Debtors' assets, subject to certain exceptions, as well as the pledged stock of the Debtors and non-Debtor affiliates GSE International, Inc. and GSE Lining Technology Chile S.A.[6]

## II.    The Pre-Petition First-Lien Secured Facilities

14.    GSE Environmental, Inc. is the borrower under that certain First Lien Credit Agreement, dated as of May 27, 2011 (as amended from time to time and with all supplements and exhibits thereto, the "Pre-Petition First-Lien Credit Agreement"), by and between Debtors, Cantor Fitzgerald Securities, as successor administrative and collateral agent, and the lenders party thereto (the "Pre-Petition First-Lien Lenders").    The Pre-Petition First-Lien Credit Agreement provides the Debtors with a term loan (the "Term Loan") and a revolving credit facility (the "Revolver" and together with the Term Loan, the "Pre-Petition First-Lien Secured Facilities") subject to the terms and conditions set forth therein.    The Debtors use approximately $2 million of the Revolver in the form of letters of credit.    Obligations arising under the Pre-Petition First-Lien Secured Facilities are guaranteed on a senior secured basis by each of the Debtors.    The obligations arising under the Pre-Petition First-Lien Secured Facilities are also secured by liens on substantially all of the Debtors' assets, subject to certain exceptions, as well as the pledged stock of the Debtors and non-Debtor affiliates GSE International, Inc. and GSE Lining Technology Chile S.A.[7]

---

[6]    GSE Environmental, Inc. owns 100 percent of non-Debtor GSE International, Inc.'s stock and 0.01 percent of non-Debtor GSE Lining Technology Chile S.A.'s stock.  Only 65 percent of GSE Environmental, Inc.'s stock in non-Debtors GSE International, Inc. and GSE Lining Technology Chile S.A. is pledged in support of the Super Priority Credit Agreement.

[7]    GSE Environmental, Inc. owns 100 percent of non-Debtor GSE International, Inc.'s stock and 0.01 percent of non-Debtor GSE Lining Technology Chile S.A.'s stock.  Only 65 percent of GSE Environmental, Inc.'s stock in non-Debtors GSE International, Inc. and GSE Lining Technology Chile S.A. is pledged in support of the First Lien Credit Agreement.

15.    In October 2011, the Debtors amended the Pre-Petition First-Lien Credit Agreement to increase the amount available under the Revolver from $25 million to $35 million. In December 2011, in anticipation of the GSE Holding, Inc.'s 2012 public offering, the Debtors amended the Pre-Petition First-Lien Credit Agreement definition of "Change of Control" to reduce Code Hennessy & Simmons LLP's specified ownership percentage from 35 to 20 percent.

16.    In April 2012, the Debtors further amended the Pre-Petition First-Lien Credit Agreement to increase the Term Loan from $135 million to $157 million.  In September 2012, the Debtors amended the Pre-Petition First-Lien Credit Agreement to increase the covenant for capital expenditure limitations from $17.5 million to $21.7 million.  And, in January 2013, the Debtors entered into a fifth amendment to the Pre-Petition First-Lien Credit Agreement to provide for more efficient capacity to move funds between foreign entities, as well as clarify and correct certain technical provisions contained therein.

17.    On July 30, 2013, recognizing that they would not be able to comply with the Pre-Petition First-Lien Credit Agreement's financial covenants, the Debtors entered into a waiver and sixth amendment to the Pre-Petition First-Lien Credit Agreement (the "Sixth Amendment") to provide for the following terms and conditions, among others:

  a.    the waiver of a default in respect to compliance with the maximum total leverage ratio, and modification of the agreement's total leverage ratios through March 31, 2014;

  b.    increasing the margin on loans by 200 basis points; and

  c.    reducing the Debtors' borrowing capacity under the Revolver from $35 million to approximately $21.5 million.

18.    On January 10, 2014, contemporaneously with entering into the Pre-Petition Priming Credit Agreement, the Debtors entered into a waiver and seventh amendment (the "Seventh Amendment") to the Pre-Petition First-Lien Credit Agreement.    Pursuant to the

Seventh Amendment, the lenders under the Pre-Petition First-Lien Credit Agreement agreed to waive certain loan covenants through March 30, 2014, in exchange for the Debtors' promise to conduct a sale process and use the proceeds to repay their indebtedness under the Pre-Petition First-Lien Credit Agreement.

19.     On January 16, 2014, the Debtors amended the Pre-Petition First-Lien Credit Agreement to extend the date by which the Debtors had to furnish certain financial information related to the sale process to the administrative agent.  On March 5, 2014, the Debtors amended the Pre-Petition First-Lien Credit Agreement to clarify the scope and terms of potential employee compensation plans.  And, on March 14, 2014, the Debtors entered into a tenth amendment to the Pre-Petition First-Lien Secured Facilities extending the deadline by which they had to complete the sale process until April 21, 2014.  The sale deadline was further extended to April 30, 2014, pursuant to the eleventh amendment to the Pre-Petition First-Lien Secured Facilities, which the Debtors entered into on April 17, 2014.

**III.     The Intercreditor Agreement**

20.     The Debtors and Cantor Fitzgerald Securities, as successor administrative agent under the Pre-Petition First-Lien Credit Agreement and Pre-Petition Priming Credit Agreement, are parties to that certain Intercreditor Agreement, dated as of January 10, 2014 (as amended from time to time and with all supplements and exhibits thereto, the "Intercreditor Agreement"). The Intercreditor Agreement governs certain of the respective rights and interests of lenders under the Pre-Petition First-Lien Credit Agreement and Pre-Petition Priming Credit Agreement relating to, among other things, their rights with respect to the exercise of remedies in connection with any Event of Default (as defined in the Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions.  The Intercreditor

Agreement terminates if and when the Debtors repay all of the outstanding obligations under the Pre-Petition Priming Secured Facility.

**IV.    Capital Leases**

21.    During 2012, Debtor GSE Environmental, LLC entered into three equipment financing agreements.    The first lease is with Susquehanna Commercial Finance, Inc. for equipment used to transport railcars and matures on April 19, 2015.  As of April 30, 2014, there was approximately $63,000 outstanding under this lease arrangement at an implied interest rate of 8.72 percent.    The second lease is with CapitalSource Bank for geosynthetic clay liner production equipment and matures on July 31, 2015.    As of April 30, 2014, there was approximately $1.6 million outstanding under this lease arrangement at an implied interest rate of 7.09 percent.    The third lease is with NMHG Financial Services for a truck and matures on May 5, 2016.  As of April 30, 2014, there was approximately $19,000 outstanding under this lease arrangement at an implied interest rate of 5.42 percent.  Each of the Debtors' capital leases are secured by a first lien on the financed equipment.

<u>**The Debtors Have an Immediate Need for Cash**</u>

22.    As noted above, the Debtors propose to use the DIP Loans and Cash Collateral to satisfy employee wages, employee benefits, certain other limited operational expenses as set forth in the Budget, and to fund administration of these chapter 11 estates.  Without access to the DIP Loans and Cash Collateral to satisfy these obligations, the Debtors will have insufficient funds to pay wages for their employees, preserve and maximize the value of their estates, and administer these chapter 11 cases.  Thus, the Debtors' access to the DIP Loans and Cash Collateral will facilitate their efforts to maximize value for their stakeholders through the proposed restructuring transaction.  Absent approval of the Interim DIP Order, the Debtors will not have access to the DIP Loans or the Cash Collateral necessary to fund administration of these

19

chapter 11 estates, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders and other parties in interest.

<b><u>Alternative Sources of Financing Are Not Readily Available</u></b>

23.     The Debtors do not believe that alternative sources of financing are readily available.  Additionally, the Debtors do not believe it would prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis.  As noted above, without access to the DIP Facility, the Debtors have extremely limited cash on hand, and do not expect to be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases.  In addition, substantially all of the Debtors' assets are encumbered by liens arising under the Pre-Petition Credit Agreements.  As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably available given the realities imposed by the Debtors' existing capital structure.

24.     Indeed, Moelis & Company LLC, the Debtors' financial advisors, reached out to seven potential sources of financing (outside of the Debtors' prepetition lenders) that routinely provide debtor-in-possession financing to gauge their interest in providing such financing.  All but one declined interest in providing indicative financial proposals due to the evident necessity to prime the Pre-Petition Secured Parties.  The Debtors and their advisors carefully considered the merits of the alternative proposal.  The alternative proposal, however, was not a feasible financing option because it was predicated upon the nonconsensual priming of the Pre-Petition Liens and what would likely be a costly, extended, and contested hearing, including a demonstration of adequate protection.  Moreover, with the alternative proposal, the Debtors would incur the execution risk associated with a new lender transaction, including material

20

timing and due diligence constraints, necessarily involving the payment of additional professional fees.

25.     In contrast, the proposed DIP Facility offered by the Pre-Petition First-Lien Lenders (*i.e.*, the DIP Lenders) allow the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases.  Accordingly, and as discussed above, the Debtors believe that the DIP Facility represents the best option available to address their immediate liquidity needs.  It is the product of extensive arms' length negotiations with the DIP Lenders and is an essential component of a broader restructuring transaction contemplated by the Restructuring Support Agreement and the Plan, which were themselves heavily negotiated over the course of several weeks before the Petition Date.  Moreover, the DIP Facility represents the only viable financing available that would not require the Debtors to seek to prime the Pre-Petition Liens on a nonconsensual basis.

**Provisions to be Highlighted Pursuant to Local Rule 4001-2**

26.     In accordance with Local Rule 4001-2, the following provisions of the DIP Facility are highlighted below.  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

a.     **Local Rule 4001-2(a)(i)(A) — *Cross-Collateralization Protection***.  The DIP Orders do not provide for cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors.

b.     **Local Rule 4001-2(a)(i)(B) — *Challenge Period***.  The Interim DIP Order affords the Committee (if any) or any other party in interest an opportunity to assert claims against the Pre-Petition Secured Parties in connection with any matter related to the Pre-Petition Credit Agreements or the Pre-Petition Collateral by no later than (a) with respect to the Committee, if appointed, sixty (60) days from the date of formation of the Committee,

and (b) with respect to all other parties-in-interest, seventy-five (75) days after the entry of the Interim DIP Order. *See* Interim DIP Order ¶¶ 3, 19.

c.   **Local Rule 4001-2(a)(i)(C) — *506(c) Waiver***. Subject to the entry of the Final DIP Order, the Collateral shall not be subject to surcharge pursuant to section 506(c) of the Bankruptcy Code. *See* Interim DIP Order ¶ 11.

d.   **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions***. DIP Liens will not be granted on Avoidance Actions or the proceeds thereof; *provided* that upon entry of the Final DIP Order, the proceeds of Avoidance Actions will constitute the Collateral. *See* Interim DIP Order ¶ 8(a).

e.   **Local Rule 4001-2(a)(i)(E) — *Repayment Features***. The DIP Credit Agreement and the DIP Orders contemplate the repayment in full of the Pre-Petition Priming Indebtedness on the Effective Date. *See* DIP Credit Agt. at 12. Certain of the DIP Lenders, in the aggregate, hold a majority of the Pre-Petition Priming Indebtedness. This payment of approximately $18.1 million in respect of the Pre-Petition Priming Indebtedness is both a reasonable and bargained-for term under the DIP Facility, without which the Debtors would have been unable to obtain the Financing. Moreover, the DIP Facility is an essential component of the broader restructuring transaction contemplated by the Restructuring Support Agreement and the Plan, which were themselves heavily negotiated at arms' length in good faith for several weeks before the Petition Date. The Pre-Petition Priming Lenders also are substantially oversecured such that satisfaction of the Pre-Petition Priming Indebtedness in full in cash is merely a question of timing. Accordingly, the Debtors submit the payment is reasonable, appropriate, and a sound exercise of their business judgment under the circumstances.

f.   **Local Rule 4001-2(a)(i)(F) — *Disparate Carve Out Treatment***. There is disparate treatment between the Debtors' professionals and those of a Committee with respect to the professional fee Carve Out. For example, professional fees incurred by professionals retained by a Committee shall benefit from the Carve Out in an amount not to exceed $50,000 for the period following receipt of a Carve Out Trigger Notice, whereas professional fees incurred by professionals retained by the Debtors during such period shall benefit from the Carve-Out in an amount not to exceed $500,000. The Debtors respectfully submit this treatment is appropriate under the facts of these chapter 11 cases. The Debtors intend to consummate their chapter 11 plan as quickly as reasonably possible. The Debtors do not intend that these chapter 11 cases will have an extended duration and that professional fees incurred by Committee professionals will therefore be adequately provided-for by the terms of the Budget. Finally, the disparate treatment is a necessary condition to the DIP Lenders funding the DIP Facility. *See* Interim DIP Order ¶ 7.

g.     **Local Rule 4001-2(a)(i)(G) — *Nonconsensual Priming*.**  The Pre-Petition First-Lien Lenders have consented to the "self-priming" of the Pre-Petition Liens and the Adequate Protection Liens through their execution of the Restructuring Support Agreement.  Interim DIP Order ¶ 8(b).  The Pre-Petition Priming Lenders will be paid in full upon the Effective Date.  *See* DIP Credit Agt. at 12.

h.     **Local Rule 4001-2(a)(i)(H) — *Section 552(b)(1)*.**  The proposed waiver of "equities of the case" claims under section 552(b) of the Bankruptcy Code will only be effective after entry of the Final DIP Order.  In connection with committing to provide postpetition financing, lenders commonly request a waiver of the "equities of the case" claims.  Here, the DIP Lenders are providing the Debtors with critical funds to administer these chapter 11 cases and preserve and maximize the value of their estates and, as a result, are providing a substantial benefit to the Debtors' estates.  The Debtors therefore submit that this waiver is appropriate under the circumstances.  *See* Interim DIP Order ¶ 11.

## Basis for Relief

I.     **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents**

    A.     **Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment**

27.     The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the

lender.”); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (“Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.”).

28.     Specifically, to determine whether the business judgment standard is met, a court need only “examine whether a reasonable business person would make a similar decision under similar circumstances.” *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves “a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code”).

29.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into “hard bargains” to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features*

> *of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

30.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms' length process and careful evaluation of alternatives.  Specifically, and in the face of extremely limited cash on hand, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities.  Further, while the Debtors' vendors historically have allowed the Debtors to purchase goods on credit, the Debtors' ability to continue this practice is dependent upon their having access to sufficient liquidity to assure business counterparties that the Debtors are not a credit risk.  Accordingly, the Debtors negotiated the DIP Credit Agreement and other DIP Documents with the DIP Lenders in good faith, at arms' length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.

**B.      The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

31.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp.,*

*Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

32.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

      a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

      b.    the credit transaction is necessary to preserve the assets of the estate; and

      c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

33.     As described above, prior to negotiating the DIP Facility, the Debtors, together with their advisors, considered other sources of postpetition financing to determine whether the Debtors could obtain debtor in possession financing on better terms. Based on current capital market conditions, after consultation with their advisors, the Debtors determined that postpetition financing on an unsecured basis would be unobtainable. Without postpetition financing, the Debtors will not be able to preserve and maximize the value of their estates. Absent sufficient financing to operate the businesses during these chapter 11 cases and consummate the proposed restructuring transaction, the value of the Debtors' estates would be significantly impaired to the determent of all stakeholders. Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Credit Agreement, are fair, reasonable, and adequate, all as more fully set forth below.

34.     In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an

administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving the Superpriority Claim in favor of the DIP Lenders is reasonable and appropriate. Further, section 364(c)(2) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by lien on property of the estate that is not otherwise subject to a lien. The DIP Liens sought herein are senior only with respect to the Debtors' unencumbered property. As the Debtors are unable to obtain the critical financing they need to administer their chapter 11 cases from any other source, they respectfully represent that granting DIP Liens to the DIP Lenders is warranted under the circumstances.

### C. The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens

35. In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Pre-Petition Secured Parties have consented or (b) the Pre-Petition Secured Parties' interests in collateral are adequately protected.

27

36.     Here, the Debtors seek authority to enter into the DIP Facility, which will provide the DIP Lenders priming liens on the Collateral currently secured by the existing liens of the Pre-Petition Secured Parties.  Importantly, the Pre-Petition First-Lien Lenders have consented to the DIP Facility and the priming liens granted thereunder, and the Pre-Petition Priming Lenders will be paid in full in cash under the DIP Facility.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**D.     No Comparable Alternative to the DIP Facility Is Reasonably Available**

37.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

38.     As noted above, the Debtors do not believe that alternative sources of financing are reasonably available.  Substantially all the Debtors' assets are encumbered by liens arising

28

under their prepetition lending facilities, and the Debtors believe the Pre-Petition First-Lien Lenders are materially undersecured.  Moreover, as discussed above, the alternative DIP proposal was not a feasible financing option.  As a result, the Debtors do not believe third-party debtor-in-possession financing is reasonably available given the realities imposed by the Debtors' existing capital structure.  Thus, the Debtors have determined that the DIP Facility provides the best path forward under the circumstances to both fund these chapter 11 cases and provide a clear path toward the confirmation and consummation of the Plan.  Therefore, in addition to evidence to be introduced at the hearing on the Interim DIP Order if necessary, the Debtors submit that the requirements of sections 364 of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

### E.     The Repayment Feature of the DIP Facility Is Appropriate

39.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

40.     The repayment of the Pre-Petition Indebtedness with proceeds from the DIP Loans is a sound exercise of the Debtors' business judgment.  Under the proposed DIP Facility, the Pre-Petition Priming Indebtedness will be repaid in full in cash from DIP Loan proceeds on

KE 29221339

the Effective Date such that approximately two-thirds of the Pre-Petition Priming Secured Facility will be "rolled-up" into the DIP Facility.  The repayment of the Pre-Petition Priming Secured Facility is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing. Importantly, the Pre-Petition Priming Lenders, with approximately $18.1 million of first lien, first priority claims, are substantially oversecured.  Where, as here, a prepetition secured creditor is oversecured, repaying such creditor that stands to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors.  In contrast, absent the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.  The DIP Facility's proposed repayment feature merely affects the timing, not the amount, of the Pre-Petition Priming Lenders' recovery.  And the only holders of undersecured funded debt — the Pre-Petition First-Lien Lenders — support the relief requested as DIP Lenders.  Given these circumstances, repayment of the Pre-Petition Priming Indebtedness is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

41.    Repayment of prepetition debt (often referred to as "roll-ups") is a common feature in debtor-in-possession financing arrangements.   Courts in this jurisdiction have approved similar DIP features on the first day of the case.  *See, e.g.*, *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013) (authorizing approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing approximately $140 million DIP that

KE 29221339

included roll-up of approximately $48 million prepetition debt pursuant to interim order); *In re Source Interlink Cos. Inc.*, No. 09-11424 (KG) (Bankr. D. Del. Apr. 29, 2009) (authorizing approximately $139 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing approximately $165 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order).[8]

## II.  The Debtors Should Be Authorized to Use the Cash Collateral

42.  Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the Pre-Petition First-Lien Lenders consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.

43.  Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394

---

[8]  Because of the voluminous nature of the orders cited herein, they are not attached to this Motion. Copies of these orders are available on request of the Debtors' proposed counsel.

(Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

44.     As described more fully above and in the Interim DIP Order, the Debtors propose to provide the Pre-Petition First-Lien Lenders with two primary forms of adequate protection to protect against the postpetition diminution in value of the Cash Collateral in respect of the Carve Out and the DIP Obligations, and resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Provisions"):

   a.   Adequate Protection Claim: a superpriority claim under section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or after arising, subject and subordinate to the payment of the Carve Out and the DIP Claims; and

   b.   Adequate Protection Liens: a valid, enforceable, fully perfected security interest in and replacement lien on all of the Debtors' assets subject and subordinate to (i) the Carve Out, (ii) the DIP Liens and any liens on the Collateral that are senior to, or *pari passu* with, the DIP Liens, and (iii) any Permitted Liens.

45.     Therefore, the proposed Adequate Protection Provisions are sufficient to protect the Pre-Petition First-Lien Lenders from any diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors submit, and the Pre-Petition First-Lien Lenders agree, that the proposed Adequate Protection Provisions to be provided for the benefit of the Pre-Petition First-Lien Lenders are appropriate.   Thus, the Debtors' provision of the Adequate Protection Provisions is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and their estates.

KE 29221339

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents**

46.    Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

      a.    an upfront fee of two percent of each DIP Lender's commitment under the DIP Facility; and

      b.    an unused commitment fee of three-quarters of one percent.

47.    The fees associated with obtaining the DIP Facility are usual and customary and well within the range of reasonableness.  Indeed, courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtor's estate.[9]  *See, e.g.*, *In re Sea Launch Co., L.L.C.*, No. 09-12153 (BLS) (Bankr. D. Del. May 12, 2010) (approving 3.75 percent DIP break-up fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009) (approving 3.5 percent exit fee and 3.5 percent front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Jan. 30, 2008) (approving 2.5 percent fee related to refinancing and extending a postpetition financing facility); *see also In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3 percent letter of credit fee); *In re InSight Health Servs. Holdings Corp.*, No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5 percent DIP closing fee); *In re Neff Corp.*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1 percent DIP and exit facility fee); *In re Movie Gallery, Inc.*, No. 07-33849 (DOT) (Bankr. E.D. Va. Oct. 16, 2007) (approving 0.5 percent commitment fee and 3.5 percent letter of credit fee); *In re Reader's*

---

[9]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion.  Copies of these orders are available upon request of the Debtors' proposed counsel.

*Digest Ass'n*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3.1 percent exit fee); *In re Lear Corp.*, No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0 percent upfront fee and 1.0 percent exit/conversion fee); *In re Gen. Growth Props., Inc.*, No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75 percent exit fee); *In re Tronox Inc.*, No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 9, 2009) (approving 3 percent upfront facility fee). Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

**IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders under Section 364(e)**

48.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

49.    As explained herein, in the Waldman Declaration, and in the First Day Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arms' length, good-faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being

34

provided to any party to the DIP Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.     The Automatic Stay Should Be Modified on a Limited Basis**

50.     The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of Liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim DIP Order. The proposed Interim DIP Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim DIP Order. Finally, the proposed Interim DIP Order provides that, following the occurrence of an Event of Default (as defined in the DIP Credit Agreement), the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents, or applicable law.

51.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

35

**VI.** **Failure to Obtain the Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm**

52.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.   Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

53.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors from and after entry of the Interim DIP Order until the Final Hearing to receive the Interim Advance contemplated by the DIP Facility.   The Debtors require the Interim Advance prior to the Final Hearing and entry of the Final DIP Order to be able to continue to operate and pay their administrative expenses.   The payment of the Pre-Petition Priming Indebtedness is a condition precedent to the Interim Advance and a bargained-for term under the DIP Facility, without which the Debtors would have been unable to obtain the Financing.   Additionally, as noted above, the Pre-Petition Priming Lenders are substantially oversecured such that satisfaction of the Pre-Petition Priming Indebtedness in full in cash is simply a question of timing.   This relief will enable the Debtors to operate their business in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

KE 29221339

## Request for Final Hearing

54.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

55.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

56.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 25 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' first lien credit facility; (d) counsel to the administrative agent; (e) local counsel to the administrative agent (f) the first lien credit facility lenders; (g) counsel to the first lien credit facility lenders; (h) local counsel to the first lien credit facility lenders; (i) the United States Environmental Protection Agency; (j) the United States Attorney's Office for the District of Delaware; (k) the Internal Revenue Service; (l) the office of the attorneys general for the states in which the Debtors operate; (m) the Securities and Exchange Commission; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

KE 29221339

## **No Prior Request**

57.     No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

KE 29221339

WHEREFORE, the Debtors respectfully request entry of the Interim DIP Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Wilmington, Delaware
Dated: May 4, 2014

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:           ljones@pszjlaw.com
                     tcairns@pszjlaw.com

- and -

Patrick J. Nash, Jr., P.C. (*pro hac vice* admission pending)
Jeffrey D. Pawlitz (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                     jeffrey.pawlitz@kirkland.com
                     bradley.giordano@kirkland.com

*Proposed Co-Counsel for the*
*Debtors and Debtors in Possession*