**<u>EXHIBIT A</u>**

**Proposed Interim DIP Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GSE ENVIRONMENTAL, INC., *et al.*,[1] | ) | Case No. 14-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364 AND 507 (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507, (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 2002, 4001 AND 9014; (IV) ESTABLISHING RELATED NOTICE REQUIREMENTS; AND (V) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion"), dated May __, 2014, of GSE Environmental, Inc. ("GSE" or the "Borrower") and its affiliated debtors as debtors and debtors-in-possession (collectively, with GSE, the "Debtors") in the above-captioned chapter 11 cases (these "Cases"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), Rules 2002-1, 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure (as amended, the "Local Bankruptcy Rules") of the United States Bankruptcy Court for the District of Delaware (this "Court"), seeking, among other things:

(I)        authorization for the Debtors to obtain post-petition financing (the "Financing") of up to $45,000,000 (the "DIP Facility" and the loans made thereunder, the "DIP

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: GSE Environmental, Inc. (1074); GSE Environmental, LLC (1539); GSE Holding, Inc. (9069); and SynTec, LLC (2133). The location of the Debtors' service address is: 19103 Gundle Road, Houston, Texas 77073.

Loans") on the terms and conditions set forth in this Interim Order and the Debtor-in-Possession Credit Agreement (substantially in the form attached to the Motion as **Exhibit B**, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement,"[2] and together with all agreements, documents, certificates, and instruments delivered or executed from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, including the Loan Documents as defined in the DIP Credit Agreement, collectively, the "DIP Documents"), between GSE, the other Debtors, Cantor Fitzgerald Securities as agent (the "DIP Agent"), and the lenders party thereto (the "DIP Lenders"), secured by the Collateral (as defined below), and authorization for each Debtor other than the Borrower to guarantee Borrower's obligations under the DIP Facility and to grant security interests in the Collateral;

(II)     authorization to use the proceeds of the DIP Facility as provided in the DIP Documents and consistent with the Budget (as defined below) to:  (A) repay the Pre-Petition Priming Indebtedness in full on the Effective Date (as defined in the DIP Credit Agreement); (B) pay costs, fees, and expenses of the DIP Lenders and the DIP Agent as provided for in this Interim Order and the DIP Documents; (C) provide working capital and for other general corporate purposes of the Debtors; and (D) pay administration costs of these Cases and claims or amounts approved by this Court;

(III)     authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents and to perform such other and further acts as may be

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion or the DIP Credit Agreement, as applicable.

necessary or appropriate in connection therewith, including the creation of the DIP Cash Collateral Account (as defined below);

(IV)     that this Court grant to the DIP Lenders and the DIP Agent, in accordance with the relative priorities as set forth more fully below, and subject and subordinate to the Carve Out (as defined below) in all respects, the following:

(a) pursuant to section 364(c)(1) of the Bankruptcy Code, joint and several superpriority allowed administrative expense claim status in these Cases;

(b) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on all assets of the Debtors, including all property of their respective estates in these Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired other than Excluded Property (as defined in the Guaranty and Security Agreement related to the DIP Facility), and all proceeds, profits, rents, accessions and substitutes thereof, that is not subject to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date, or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code;

(c) pursuant to section 364(d) of the Bankruptcy Code, a first priority, senior priming lien on and security interest in all of the Debtors' assets (subject to Permitted Liens (as defined in the DIP Documents) (other than the Pre-Petition Liens (as defined below) and Excluded Property), including all property of their respective estates in these Cases, whether real or personal, tangible or intangible, now owned or hereafter acquired, and all proceeds,

profits, rents, accessions and substitutions thereof, that is subject to (i) valid, perfected, and non-avoidable liens in existence as of the Petition Date, or (ii) valid liens in existence as of the Petition Date that are perfected thereafter to the extent permitted by section 546(b) of the Bankruptcy Code;

(V)     authorization for the DIP Lenders to terminate the DIP Credit Agreement and to terminate the Debtors' use of Cash Collateral upon the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement) on terms specified herein and in the DIP Credit Agreement;

(VI)    subject to entry of the Final Order (as defined below), authorization to grant liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (collectively, the "Avoidance Actions");

(VII)   authorization for the Debtors to use, among other things, consistent with the Budget, any cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code and described below) (the "Cash Collateral") in which the Pre-Petition Secured Parties (as defined below) may have an interest and the granting of adequate protection to the Pre-Petition Secured Parties with respect to any diminution in value of their interests in the Pre-Petition Collateral (as defined below) arising from, *inter alia*, the Debtors' use of the Pre-Petition Collateral (including the Cash Collateral) and the priming of the liens of the Pre-Petition Secured Parties by the DIP Liens;

(VIII)  subject to and only effective upon the entry of a Final Order granting such relief, the waiver by the Debtors of any right to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(IX)   this Court's modification of the automatic stay imposed section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(X)   this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(XI)   authorization that during the period (the "Interim Period") commencing on the date of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order, and (b) the occurrence of the Maturity Date, a portion of the Commitments may be borrowed by the Borrower, subject to compliance with the terms, conditions, and covenants contained in the DIP Documents, in an amount equal to $35,000,000;

(XII)   the scheduling of a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") granting the relief requested in the Motion on a final basis and authorizing the balance of the borrowings under the DIP Documents on a final basis, as set forth in the Motion and the DIP Documents filed with this Court and approving the Debtors' notice with respect to the Motion.

The hearing on the Motion (the "Interim Hearing") having been held by this Court on _____, 2014, pursuant to Bankruptcy Rules 2002, 4001(b)(2), and 4001(c)(2), and Local Bankruptcy Rules 2002-1, 4001-2, and 9013-1(m); and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing by the Debtors and the entire record herein; and this Court having heard and resolved or overruled any objections to the

interim relief requested in the Motion; and this Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors, and necessary to avoid immediate and irreparable harm to the Debtors' estates; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given under the circumstances; and after due deliberation and consideration, and sufficient cause appearing therefor:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      <u>Jurisdiction</u>.  This Court has jurisdiction over these Cases, the Motion, the parties, and the Debtors' property pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D).  Venue of these Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Bankruptcy Rules 2002-1, 4001-2, and 9013-1(m).

2.      <u>Notice</u>.  The notice given by the Debtors of the Motion and the Interim Hearing was the best available under the circumstances.  Such notice constitutes due and sufficient notice of the Debtors' request for the interim relief granted herein and of the Interim Hearing under the circumstances and complies with Bankruptcy Rules 4001(b) and (c), such that no other or further notice is necessary or required.

3.      <u>Debtors' Stipulations</u>.  Subject to the limitations thereon contained in paragraph 19 below, the Debtors admit, stipulate and agree that:

(a)    The Pre-Petition Secured Facilities.

(i)    GSE and the other Debtors are party to that certain First Lien Revolving Credit Agreement, dated as of January 10, 2014, among GSE, the other Debtors, General Electric Capital Corporation, as agent (together with its successors, the "Priming Agent"), the lenders and other secured parties party thereto from time to time (the "Pre-Petition Priming Lenders"), and the other agents and credit parties party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition Priming Credit Agreement"), which provides for a senior secured revolving credit facility (the "Pre-Petition Priming Secured Facility"), including a letter of credit subfacility and a swingline subfacility. As of the Petition Date, the aggregate principal amount and related obligations outstanding under the Pre-Petition Priming Secured Facility was approximately $18,100,000 (together with all other outstanding Obligations, as defined in the Pre-Petition Priming Credit Agreement, including interest, fees and expenses, the "Pre-Petition Priming Indebtedness").

(ii)    GSE and the other Debtors are also party to that certain First Lien Credit Agreement, dated as of May 27, 2011, among GSE, the other Debtors, General Electric Capital Corporation, as agent (together with its successors, the "First-Lien Agent"), the lenders and other secured parties party thereto from time to time (the "Pre-Petition First-Lien Lenders", and together with the Pre-Petition Priming Lenders, the "Pre-Petition Secured Parties"), and the other agents and credit parties party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Pre-Petition First-Lien Credit Agreement"; and together with the Pre-Petition Priming Credit Agreement, the "Pre-Petition Credit Agreements"), which provides for a senior secured revolving credit facility, including a letter of credit subfacility and a swingline subfacility, and a senior secured term loan credit facilities (the "Pre-Petition First-

Lien Secured Facilities" and together with the Pre-Petition Priming Credit Agreement, the "<u>Pre-Petition Secured Facilities</u>").    As of the Petition Date, the aggregate principal amount outstanding and related obligations under the Pre-Petition First-Lien Secured Facilities was approximately $173,800,000 (together with all other outstanding Obligations, as defined in the Pre-Petition First-Lien Credit Agreement, including interest, fees and expenses, the "<u>Pre-Petition First-Lien Indebtedness</u>"; and the Pre-Petition First-Lien Indebtedness together with the Pre-Petition Priming Indebtedness, the "<u>Pre-Petition Indebtedness</u>").

(iii)    On May 2, 2014, General Electric Capital Corporation was succeeded by Cantor Fitzgerald Securities as Priming Agent and as First-Lien Agent.  GSE is the borrower under each of the Pre-Petition Secured Facilities and each of the other Debtors has guaranteed the Pre-Petition Indebtedness.

(b)    <u>Pre-Petition Collateral</u>.

(i)    To secure the Pre-Petition Priming Indebtedness, the Debtors and the Priming Agent, as agent (in such capacity, the "<u>Priming Collateral Agent</u>"), entered into that certain First Lien Guaranty and Security Agreement, dated as of January 10, 2014 (as amended, restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "<u>Pre-Petition Priming Collateral Agreement</u>").    Pursuant to the Pre-Petition Priming Collateral Agreement and other security documents, the Debtors granted to the Pre-Petition Priming Collateral Agent, for the ratable benefit of the Pre-Petition Priming Lenders, valid, binding, enforceable, and perfected security interests in (the "<u>Pre-Petition Priming Liens</u>") substantially all of the Debtors' property and assets, including, without limitation, (a) all of the personal property then owned or at any time thereafter acquired by any Debtor party to the Pre-

Petition Priming Collateral Agreement or in which any such Debtor then had or at any time thereafter acquired any right, title or interest, (b) certain equity interests of direct subsidiaries of the Debtors, (c) all books and records pertaining to any of the foregoing, (d) all proceeds and products of any of the foregoing, and (e) all collateral security and guaranties given by any Person with respect to any of the foregoing (collectively, the "<u>Pre-Petition Priming Collateral</u>").

(ii)     To secure the Pre-Petition First-Lien Indebtedness, the Debtors and the First-Lien Agent, as agent (in such capacity, the "<u>First-Lien Collateral Agent</u>", and together with the Priming Collateral Agent, the "<u>Pre-Petition Collateral Agents</u>"), entered into that certain First Lien Guaranty and Security Agreement, dated as of May 27, 2011 (as amended, restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "<u>Pre-Petition First-Lien Collateral Agreement</u>", and together with the Pre-Petition Priming Collateral Agreement, the "<u>Pre-Petition Collateral Agreements</u>").  Pursuant to the Pre-Petition First-Lien Collateral Agreement and other security documents, the Debtors granted to the Pre-Petition First-Lien Collateral Agent, for the ratable benefit of the Pre-Petition First-Lien Lenders, valid, binding, enforceable, and perfected security interests in (the "<u>Pre-Petition First-Lien Liens</u>", and together with the Pre-Petition Priming Liens, the "<u>Pre-Petition Liens</u>") substantially all of the Debtors' property and assets, including, without limitation, (a) all of the personal property then owned or at any time thereafter acquired by any Debtor party to the Pre-Petition First-Lien Collateral Agreement or in which any such Debtor then had or at any time thereafter acquired any right, title or interest, (b) certain equity interests of direct subsidiaries of the Debtors, (c) all books and records pertaining to any of the foregoing, (d) all proceeds and products of any of the foregoing, and (e) all collateral security and guaranties given by any

Person with respect to any of the foregoing (collectively, the "<u>Pre-Petition First-Lien Collateral</u>", and together with the Pre-Petition Priming Collateral, the "<u>Pre-Petition Collateral</u>").

(iii)     The relative priority of the Pre-Petition Priming Liens and the Pre-Petition First-Lien Liens, and the relative rights and obligations of the Pre-Petition Priming Lenders and the Pre-Petition First-Lien Lenders are subject to that certain Intercreditor Agreement, dated as of January 10, 2014, among the First-Lien Agent and the Priming Agent (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Intercreditor Agreement</u>"), which provides, *inter alia*, that (a) the Pre-Petition First-Lien Liens are junior and subordinate to the Pre-Petition Priming Liens (Section 2.1); and (b) the Pre-Petition First-Lien Lenders consent to the use of any "cash collateral" constituting Pre-Petition Collateral and to the Borrower obtaining the DIP Facility on the terms set forth in this order and the DIP Credit Agreement (Section 5.3).

(c)     The Pre-Petition Indebtedness constitutes the legal, valid, and binding obligations of the Loan Parties, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Pre-Petition Indebtedness is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity.  The Debtors are jointly and severally liable to the Pre-Petition Priming Lenders on account of the Pre-Petition Priming Indebtedness and to the Pre-Petition First-Lien Lenders on account of the Pre-Petition First-Lien Indebtedness.

(d)     The Pre-Petition Liens constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests and liens on the Pre-Petition Collateral, were granted to, or for the benefit of, the applicable Pre-Petition Secured Parties for fair consideration and reasonably equivalent value and are not subject to defense, counterclaim, recharacterization, subordination, or avoidance pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity.

4.     <u>Findings Regarding the Financing and Use of Cash Collateral</u>.

(a)     Good cause has been shown for the entry of this Interim Order.

(b)     The Debtors have an immediate and critical need to obtain the Financing and to use Cash Collateral as well as other Collateral to continue the operation of their businesses.  Without such funds, the Debtors will not be able to meet their payroll obligations or to pay operating and other expenses during this critical period.  The ability of the Debtors to finance their operations through the incurrence of new indebtedness is vital to the preservation and maintenance of the going concern value of the Debtors' estates and necessary to avoid immediate and irreparable harm to the estates.

(c)     The Debtors are unable to obtain sufficient financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code.

(d)     The DIP Lenders are willing to provide the Financing, and the Pre-Petition Secured Parties are willing to consent to the use of the Pre-Petition Collateral, including,

without limitation, the Cash Collateral, subject to the terms and conditions set forth in the DIP Documents and the provisions of this Interim Order, as applicable, and provided that the DIP Liens (as defined below), the Superpriority Claims and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, approved by this Interim Order. The DIP Lenders have acted in good faith in agreeing to provide the Financing approved by this Interim Order and to be further evidenced by the DIP Documents, and the Pre-Petition Secured Parties have acted in good faith in consenting (including pursuant to the Intercreditor Agreement) to the Debtors' use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral pursuant to the terms of this Interim Order, and their reliance on the assurances referred to above is in good faith.

(e)     Among other things, entry of this Interim Order will minimize disruption of the Debtors' businesses and operations by enabling them to meet payroll and other critical expenses. The Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, as set forth herein are vital to avoid immediate and irreparable loss or harm to the Debtors' estates, which will otherwise occur if immediate access to the Financing and to the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, is not obtained. Consummation of the Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, pursuant to the terms of this Interim Order therefore are in the best interests of the Debtors' estates.

(f)     The DIP Documents and the Financing contemplated thereunder, and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, each as authorized hereunder, have been negotiated in good faith and at arms' length among the Debtors, the DIP Lenders, and the Pre-Petition Secured Parties holding in excess of 80 percent of the Pre-Petition Indebtedness (the "Designated Pre-Petition Secured Parties"), among others, and the terms of the Financing and the use of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, respectively, are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  All of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the Financing and the DIP Documents, including the Obligations (as defined in the DIP Credit Agreement, collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g)     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Bankruptcy Rule 4001-2(b).  The authorization granted herein on an interim basis to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral, to enter into the DIP Documents, and to borrow up to an aggregate principal amount of $35,000,000 in the Interim Period is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  This Court concludes that

entry of this Interim Order is in the best interests of the Debtors and their estates and creditors as its implementation will, among other things, allow the Debtors to maximize the value of their assets.

(h)     To the extent necessary, the Pre-Petition Secured Parties have consented to the Financing and the Debtors' use of the Pre-Petition Collateral, including the Cash Collateral, including pursuant to the Intercreditor Agreement.  This Court concludes that the adequate protection provided to the Pre-Petition Secured Parties hereunder for any diminution in value of the security interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral due to the Debtors' use of the Pre-Petition Collateral, including the Cash Collateral, is consistent with and authorized by sections 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code.

5.     <u>Authorization of the Financing and the DIP Documents</u>.

(a)     The Debtors are hereby authorized to execute, issue, deliver, enter into, and adopt, as the case may be, the DIP Credit Agreement and the other DIP Documents to be delivered pursuant hereto or thereto or in connection herewith or therewith.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, control agreements, and financing statements), and, without further application to this Court, to pay all fees referred to in this Interim Order, the DIP Credit Agreement and DIP Documents, including, without limitation, all reasonable and documented fees and expenses paid, payable or incurred prior to the date hereof and/or the Petition Date, and the reasonable and documented fees and expenses of (i) Wachtell, Lipton, Rosen & Katz, counsel to the DIP Lenders, and

Richards, Layton & Finger, P.A., local Delaware counsel to the DIP Lenders (the "DIP Lenders' Professional Fees and Expenses"), and (ii) Shipman & Goodwin LLP, counsel to the DIP Agent and Richards, Layton & Finger, P.A., local Delaware counsel to the DIP Agent (the "DIP Agent's Professional Fees and Expenses").  None of the DIP Lenders' Professional Fees and Expenses or the DIP Agent's Professional Fees and Expenses shall be subject to further Court approval and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; *provided*, *however*, that the DIP Lenders' Professional Fees and Expenses and the DIP Agent's Professional Fees and Expenses shall be payable in the same manner and subject to the same procedures as the payment of the Pre-Petition First-Lien Professional Fees and Expenses as set forth in paragraph 14(c) hereof, including, without limitation, the delivery of invoices to the U.S. Trustee and counsel to the Committee (if any), and the related ten (10) Business Days' objection period.

(c)     Upon the execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms subject to the terms of this Interim Order.  No obligation, payment, transfer, or grant of a security or other interest to the DIP Lenders under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, set-off, recoupment, or counterclaim, except as otherwise set forth in the DIP Documents.

6.     Superpriority Claims.

(a)     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all

administrative expenses, diminution claims (including all Adequate Protection Provisions (defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof, subject and subordinate in all respects only to the Carve Out; *provided*, *however*, that the Superpriority Claim shall apply with respect to the proceeds of Avoidance Actions only upon entry of the Final Order.

      7.     <u>Carve Out</u>.

      (a)     As used in this Interim Order, the "<u>Carve Out</u>" means the sum of the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii)(A) any and all accrued and unpaid fees, disbursements, costs, and expenses (the "<u>Debtors' Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtors' Professional Persons</u>") and at any time before or on the day of delivery of a Carve Out Trigger Notice (as defined below) that remain unpaid after application of any

retainers and solely to the extent allowed by the Bankruptcy Court (whether by interim order, procedural order, or otherwise prior to or after delivery of a Carve Out Trigger Notice) (the "Pre-Trigger Notice Debtors' Professional Fees"), and (B) any and all accrued and unpaid fees, disbursements, costs, and expenses (the "Committee's Professional Fees", and together with the Debtors' Professional Fees, the "Professional Fees") in an aggregate amount not to exceed $250,000, incurred by persons or firms retained by the Committee (if any) pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Committee's Professional Persons", and together with the Debtors' Professional Persons, the "Professional Persons") and at any time before or on the day of delivery of a Carve Out Trigger Notice (as defined below) that remain unpaid after application of any retainers, to the extent allowed by the Bankruptcy Court (whether by interim order, procedural order, or otherwise prior to or after delivery of a Carve Out Trigger Notice) (the "Pre-Trigger Notice Committee's Professional Fees", and together with the Pre-Trigger Notice Debtors' Professional Fees, the "Pre-Trigger Notice Professional Fees"); and (iv) Professional Fees of Debtors' Professional Persons in an aggregate amount not to exceed $500,000 and of the Committee's Professional persons in an aggregate amount not to exceed $50,000, incurred after the day of delivery of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of this Interim Order, "Carve Out Trigger Notice" shall mean a written notice delivered by email by the DIP Agent or the DIP Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     On the day on which a Carve Out Trigger Notice is delivered to the Debtors, the Carve Out Trigger Notice shall (x) be deemed a draw request and notice of borrowing by the Debtors for loans under the DIP Facility in an amount equal to the then unpaid amounts of the Pre-Trigger Notice Professional Fees plus the Post-Carve Out Trigger Notice Cap minus the amount of any unused retainers of Professional Persons and minus the full amount of the Debtors cash on hand as of such date (*provided*, that the Debtors shall notify the DIP Agent of the amount deemed requested as promptly as possible following delivery of the Carve Out Trigger Notice and in no event later than the following day; and, *provided*, *further*, that the DIP Lenders shall not be required to fund the borrowing deemed requested pursuant hereto until the Debtors have notified the DIP Agent of such amount), and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such date to fund such reserve (the "Carve Out Reserves"); for the avoidance of doubt, in no event shall the aggregate amount deemed request under the DIP Facility pursuant to clause (x) exceed the then unpaid amounts of the Pre-Trigger Notice Professional Fees plus the Post-Carve Out Trigger Notice Cap minus the amount of any unused retainers of Professional Persons.  In full satisfaction of the Carve Out, the Debtors shall deposit and hold the Carve Out Reserves in a segregated account in trust to pay such then unpaid Pre-Trigger Notice Professional Fees prior to any and all other claims, and thereafter to pay Professional Fees incurred after the day of delivery of the Carve Out Trigger Notice and allowed by an appropriate order of this Court up to the amount of the Post-Carve Out Trigger Notice Cap prior to any and all other claims.  On the first business day following delivery of the Carve Out Trigger Notice, notwithstanding the existence of a default or Event of Default or the failure of the Debtors to satisfy any or all of the conditions precedent for loans under the DIP Facility, each DIP Lender shall make available to the DIP Agent such DIP

Lender's pro rata share of the borrowing described in clause (x) of the first sentence of this paragraph in accordance with the terms hereof and of the DIP Facility; *provided*, for the avoidance of doubt, that no DIP Lender shall be required to fund any such borrowing to the extent that the aggregate principal amount of all outstanding DIP Loans would, after giving effect to such borrowing, exceed the Maximum Loan Balance (as defined in the DIP Credit Agreement). Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, the Pre-Petition Agents, the DIP Lenders, and the Pre-Petition Lenders shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been funded in accordance with the first sentence of this paragraph, and shall have a security interest in any surplus amounts remaining in the Carve Out Reserves after payment of allowed Professional Fees (whether or not out of the Carve Out Reserves) up to the amount of the Carve Out. Further, notwithstanding anything to the contrary herein (including the fact that no funds shall be disbursed from the Carve Out Reserves to pay Professional Fees until approved by the Bankruptcy Court), (i) the Professional Persons shall return to the Carve Out Reserves any amounts they receive from the Carve Out Reserves for Professional Fees that are not allowed by the Bankruptcy Court (whether by interim order, procedural order, or otherwise prior to or after delivery of a Carve Out Trigger Notice) or are otherwise required by the Bankruptcy Court to be disgorged or returned, and (ii) any surplus amounts remaining in the Carve Out Reserves after payment of allowed Professional Fees up to the amount of the Carve Out (whether or not paid out of the Carve Out Reserves) shall be paid to the DIP Agent for application in accordance with the DIP Documents.

(c)     The DIP Agent and DIP Lenders shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent or the DIP Lenders in any way to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice in respect of any Debtors' Professional Fees shall not reduce the Carve Out.

(e)     Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Notice in respect of any Professional Fees (whether out of the Carve Out Reserves or otherwise) shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall otherwise be entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

8.      DIP Liens.

(a)     As security for the DIP Obligations, effective and perfected automatically upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by any DIP Lender of any Collateral (as defined below), security interests and liens in the following property (all such liens and security interests granted to the DIP Lenders pursuant to this Interim Order and the DIP Documents, the "DIP Liens") are hereby granted to the DIP Lenders (subject

and subordinate to the Carve Out): (i) all of the Debtors' right, title, and interest in and to (but not any of the obligations, liabilities or indemnifications of the Debtors under) any tangible, intangible, real, personal, or mixed assets other than the Excluded Property; (ii) all property of any Debtor held by any DIP Lender, including all property of every description, in the custody of or in transit to a DIP Lender for any purpose, including safekeeping, collection or pledge, for the account of such Debtor or as to which such Debtor may have any right or power, including, but not limited to cash; (iii) all other goods (including, but not limited to fixtures) and personal property of the Debtors, whether tangible or intangible and wherever located; (iv) all owned or leased real estate and real property leaseholds; (v) all books and records pertaining to the foregoing; and (vi) all Proceeds (as defined in the DIP Credit Agreement) of the foregoing (the "Post-Petition Collateral"), including, subject to entry of the Final Order, proceeds of Avoidance Actions of any type, plus all Pre-Petition Collateral (collectively, the "Collateral"). Subject to and effective only upon entry of the Final Order, the Post-Petition Collateral shall include the proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise.

(b)     The DIP Liens on the Pre-Petition Collateral securing the Pre-Petition Obligations shall be senior in all respects to the interests in such property of the Pre-Petition Secured Parties arising from current or future liens of the Pre-Petition Secured Parties (including, without limitation, any Adequate Protection Liens (as defined below) thereon), but shall not be senior to any valid, perfected and unavoidable interests and liens of other parties existing as of the Petition Date to which the Pre-Petition Liens were subject on the Petition Date or become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. The DIP Liens shall be subject and subordinate to the Carve Out.

9.     Remedies.  The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lenders to exercise, upon not less than five (5) Business Days' prior written notice by email to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, if any, following the occurrence and continuance of an Event of Default (as defined in the DIP Credit Agreement), all rights and remedies hereunder and under the DIP Documents against the Debtors and/or the Collateral (including, without limitation, the right to set off monies of the Debtors in accounts maintained or controlled by the DIP Lenders or the DIP Agent).  In the absence of a further order of this Court, and notwithstanding anything herein or in the DIP Documents to the contrary, the Debtors' rights to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral, pursuant to this Interim Order, including the Debtors' ability to withdraw funds from the DIP Cash Collateral Account (as defined below), shall terminate upon the earlier to occur of (i) five (5) Business Days' written notice by email provided by the DIP Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, if any, or provided by the Debtors to the DIP Lenders, the U.S. Trustee, and counsel to the Committee, if any, of the occurrence and continuance of any Event of Default under the DIP Facility, or (ii) repayment by the Debtors of all Obligations under the DIP Facility in full in cash.  In any hearing regarding the exercise of rights or remedies by the DIP Agent or the DIP Lenders, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.  The Debtors or any party in interest may seek a determination from this Court that no Event of Default has occurred and is continuing, and appropriate relief from this Court in the event is should so determine that no Event of Default has occurred and is continuing.

10. <u>Budget; Permitted Variances</u>.

(a) For purposes of this Interim Order, the term "<u>Budget</u>" means the budget, attached hereto as <u>Exhibit 1</u>, the "<u>Initial Budget</u>," as such Initial Budget shall be amended, supplemented, and/or extended in the manner set forth herein and in the DIP Documents.

(b) Every week (beginning with the first full week after the Closing Date), on each Tuesday of such week, the Debtors shall deliver to the advisors of the DIP Agent a variance report (the "<u>Budget Variance Report</u>") setting forth actual cash receipts and disbursements of the Debtors for the prior week and setting forth all the variances, on a cumulative basis from the Closing Date and (if delivered during or after the fourth week after the Closing Date) on a rolling four week basis, from the amounts set forth for each line item for such periods as compared to the Initial Budget and the most recent Updated Budget (as applicable) delivered by the Borrower. The Debtors shall ensure that at no time shall the aggregate amount paid by the Debtors in respect of any Disbursement Item exceed the amount set forth for such line item in the Budget by more than 20 percent, on a cumulative basis from the Closing Date and (if starting four weeks after the Closing Date) on a rolling four week basis, excluding amounts payable to the DIP Lenders under the DIP Documents (each, a "<u>Permitted Disbursement Variance</u>"); *provided*, *however*, that notwithstanding the foregoing, if a Disbursement Item exceeds the Permitted Disbursement Variance for such Disbursement Item, it shall not constitute a default or Event of Default unless the total amount by which all Disbursement Items exceed all Permitted Disbursement Variances exceeds $200,000, on a cumulative basis from the Closing Date or (starting four weeks after the Closing Date) on a rolling four week basis. The Debtors shall ensure that at no time shall the aggregate amount paid by the Debtors in respect of any Professional Fees exceed the amount set forth for such line

23

item in the Budget by more than 10 percent, on a cumulative basis from the Closing Date and (if starting four weeks after the Closing Date) on a rolling four week basis, excluding amounts payable to the DIP Lenders under the DIP Documents (each, a "Permitted Fee Variance," and together with the Permitted Disbursement Variances, the "Permitted Variances").

(c)        Notwithstanding anything to the contrary contained herein, any reference in this Interim Order to being "in compliance with the Budget," "subject to the Budget," "in accordance with the Budget," "consistent with the Budget," or other similar phrase or term, shall in all cases mean the Budget plus the Permitted Variances for the applicable period after the Closing Date.

11.        <u>Limitation on Charging Expenses Against Collateral</u>.   Subject to and effective only upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of these Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of each DIP Lender adversely effected thereby, and no consent shall be implied from any action, inaction, or acquiescence by any DIP Lender or the Pre-Petition Secured Parties.   Subject to entry of the Final Order, in no event shall any DIP Lender or the Pre-Petition Secured Parties be subject to (a) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code, or (b) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

12. <u>Collateral</u>. Subject to the terms of the DIP Documents, this Interim Order, and the Final Order, and consistent with the Budget (including any Permitted Variances), the Debtors are hereby authorized to use the Pre-Petition Collateral, including, without limitation, the Cash Collateral in which the Pre-Petition Collateral Agents or any other Pre-Petition Secured Party has a perfected security interest as of the Petition Date or at any time thereafter, including any cash on deposit in any deposit account or other account over which a Pre-Petition Collateral Agent has control, and including any cash proceeds of the Pre-Petition Collateral.

13. <u>The DIP Cash Collateral Account</u>. Subject in all respects to the Carve Out and the Carve Out Reserves, the Debtors are authorized to create an account or designate an existing account (the "<u>DIP Cash Collateral Account</u>") held at a bank designated by the DIP Lenders, which shall be used solely to hold (x) the proceeds of the DIP Loans, and (y) all collections occurring through the operation of the Debtors' business. The terms of the DIP Cash Collateral Account shall conform to the requirements of any order approving the Debtors' cash management system. The DIP Cash Collateral Account shall be deemed to be under the sole dominion and control of the DIP Lenders. To the extent requested by the DIP Lenders on not less than five (5) Business Days' prior written notice by email to the Debtors and their lead restructuring counsel, the Debtors are authorized to enter into and execute a deposit account control agreement (if such an agreement has not already been entered into) reasonably acceptable to the Debtors, the DIP Agent, and the DIP Lenders concerning the DIP Cash Collateral Account in accordance with the DIP Credit Agreement and the DIP Documents. After entry of this Interim Order, the Debtors may make withdrawals from the DIP Cash Collateral Account for general corporate purposes, working capital, and as otherwise contemplated herein (including, without limitation, the payment of administrative expenses,

including professional fees and expenses); *provided* that such withdrawals and uses must be consistent with the Budget (including any Permitted Variances) and this Interim Order.

14.    <u>Pre-Petition First-Lien Lenders' Adequate Protection</u>.  The Pre-Petition First-Lien Agent, the Pre-Petition First-Lien Collateral Agent, and the Pre-Petition First-Lien Lenders are entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Pre-Petition Collateral, including the Cash Collateral, for any diminution in the value of such interests on account of, among other things, the priming of the Pre-Petition First-Lien Agent's, the Pre-Petition First-Lien Collateral Agent's, and the Pre-Petition First-Lien Lenders' interests in the Pre-Petition Collateral in respect of the Carve Out and the DIP Obligations, the Debtors' use of the Pre-Petition Collateral (each, a "<u>Diminution Claim</u>").   As security for and solely to the extent of any Diminution Claim, the Pre-Petition First-Lien Agent and the Pre-Petition First-Lien Collateral Agent, are granted, for the benefit of themselves and the Pre-Petition First-Lien Lenders, *nunc pro tunc* to the Petition Date, the following adequate protection (collectively, the "<u>Adequate Protection Provisions</u>"):

(a)    <u>Adequate Protection Liens</u>.  The Pre-Petition First-Lien Collateral Agent, for itself and for the benefit of the Pre-Petition First-Lien Lenders, is hereby granted valid and perfected postpetition replacement security interests in and liens upon the Post-Petition Collateral (other than the DIP Cash Collateral Account) (the "<u>Adequate Protection Liens</u>"), which liens shall be subject and subordinate to (i) the Carve Out, (ii) the DIP Liens and any liens on the Collateral that are senior to, or *pari passu* with, the DIP Liens, and (iii) any Permitted Liens.

(b)     Section 507(b) Claim.   The Pre-Petition First-Lien Lenders are hereby granted, subject and subordinate to the payment of the Carve Out and DIP Claims, a Superpriority Claim.

(c)     Fees and Expenses.   Without further application to this Court, the Debtors are authorized and directed to pay on an ongoing basis, from time to time after the Petition Date, and without duplication, pursuant to the procedures set forth in this paragraph 14, all reasonable and documented fees and expenses incurred by the Pre-Petition First-Lien Agent and the Pre-Petition First-Lien Collateral Agent (acting in such capacities) during and in connection with these Cases and required to be paid by the Debtors under the Pre-Petition First-Lien Credit Agreement, and the reasonable and documented fees and expenses of (i) Shipman & Goodwin, LLP, counsel to the Pre-Petition First-Lien Agent and the Pre-Petition First-Lien Collateral Agent, (ii) Richards, Layton & Finger, P.A., local Delaware counsel to the Pre-Petition First-Lien Agent and to the Pre-Petition First-Lien Collateral Agent, and (iii) Wachtell, Lipton, Rosen & Katz, counsel to the Pre-Petition First-Lien Lenders (collectively, the "Pre-Petition First-Lien Professional Fees and Expenses").   The Debtors shall pay the Pre-Petition First-Lien Professional Fees and Expenses within ten (10) Business Days (if no written objection is received within such ten (10) Business Days' period) after such professional has delivered an invoice to the Debtors describing such fees and expenses (but in any event providing reasonable detail with respect to the fees and expenses incurred), with a copy of such invoices delivered simultaneously to the DIP Lenders, the U.S. Trustee, and counsel to the Committee, if any; *provided*, *however*, that any such invoice may be redacted to protect privileged, confidential, or proprietary information.   Parties in interest may deliver written objections to payment of the Pre-Petition First-Lien Professional Fees and Expenses within ten (10) Business Days following

receipt of an invoice for Pre-Petition First-Lien Professional Fees and Expenses. None of the Pre-Petition First-Lien Professional Fees and Expenses shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; *provided*, *however*, if an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

15. <u>Credit Bid</u>. Subject to entry of the Final Order, the DIP Lenders and the Pre-Petition Secured Parties shall have the right to credit bid, subject to and in accordance with the provisions of the Intercreditor Agreement and section 363(k) of the Bankruptcy Code, up to the full amount of the DIP Facility and the Pre-Petition Indebtedness, as applicable.

16. <u>Reservation of Rights of Pre-Petition Secured Parties</u>. Under the circumstances, the Court finds that the adequate protection provided herein protects the interests of the Pre-Petition Secured Parties. Notwithstanding any other provision hereof, the grant of adequate protection to the Pre-Petition Secured Parties in the form of the Adequate Protection Provisions pursuant hereto is without prejudice to the right of any of the Pre-Petition Secured Parties to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest such modification.

17. <u>Perfection of DIP Liens</u>.

(a) The DIP Lenders and the DIP Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices

of lien or similar instruments in any jurisdiction, take possession or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not any DIP Lender or the DIP Agent chooses to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of this Interim Order, but subject in all respects to the provisions of paragraph 7 of this Interim Order.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Lenders, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     The Debtors shall execute and deliver to the DIP Lenders and the DIP Agent all such agreements, financing statements, instruments and other documents as the DIP Lenders may reasonably request to evidence, confirm, validate, or perfect the DIP Liens or the Adequate Protection Liens

(d)     Subject to entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Subject to entry of

the Final Order, any such provision shall have no force and effect with respect to the granting of postpetition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders or the Pre-Petition Collateral Agent in accordance with the terms of the DIP Documents or this Interim Order.

18.     <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)     Except as expressly provided herein or in the DIP Credit Agreement, no claim or lien having a priority senior to or *pari passu* with that granted by this Interim Order to the DIP Lenders shall be granted or allowed while any portion of the DIP Obligations remains outstanding, and the DIP Liens shall not be subject to or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinate to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Unless all DIP Obligations shall have been paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Credit Agreement if any of the Debtors seek, or if there is entered (i) any stay, vacatur, rescission or modification of this Interim Order without the prior written consent of the DIP Lenders, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lenders, (ii) an order converting these Cases to cases under chapter 7 of the Bankruptcy Code or dismissing any of these Cases, or (iii) unless otherwise approved by the DIP Lenders, an order granting a change of venue with respect to these Cases or any related adversary proceeding.  If an order dismissing any of these Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims and other administrative claims granted under this

Interim Order, the DIP Liens, and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and all Diminution Claims shall have been paid and satisfied in full (and that such Superpriority Claims, the other administrative claims granted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), and (y) this Court shall retain jurisdiction notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

        (c)      If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection Provisions incurred prior to the actual receipt of written notice by the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Collateral Agents, as applicable, of the effective date of such reversal, stay, modification or vacatur, or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, stay, modification or vacatur, any use of Collateral (including, without limitation, Cash Collateral), any DIP Obligations, or any Adequate Protection Provisions incurred by the Debtors to the DIP Lenders and/or the Pre-Petition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Lenders, the Pre-Petition Agents and/or the Pre-Petition Collateral Agents, as the case may be, of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders and the Pre-Petition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Documents with

respect to all such uses of Collateral (including, without limitation, the Cash Collateral), all DIP Obligations, and all Adequate Protection Provisions.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Provisions, and all other rights and remedies of the DIP Lenders or the Pre-Petition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of these Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of these Cases, or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of these Cases or approving a sale of any or all the assets of the Debtors.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Superpriority Claims, and all other administrative claims granted pursuant to this Interim Order, and all other rights and remedies of the DIP Lenders and the Pre-Petition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until all DIP Obligations, all Diminution Claims, and all allowed claims payable in cash arising from the Adequate Protection Provisions are paid in full in cash.

19.     Effect of Stipulations on Third Parties.  The stipulations and admissions contained in paragraph 3 of this Interim Order (the "Debtors' Stipulations") shall be binding on the Debtors in all circumstances.   Nothing in this Interim Order or the DIP Documents shall prejudice the rights of the Committee (if any) or any other party in interest to assert claims against the Pre-Petition Secured Parties in connection with any matter related to the Pre-Petition

Credit Agreements or the Pre-Petition Collateral (a "Challenge Proceeding") by no later than (a) with respect to the Committee, if appointed, sixty (60) days from the date of formation of the Committee, and (b) with respect to all other parties-in-interest, seventy-five (75) days after the entry of this Interim Order (the "Challenge Period"). If no such Challenge Proceeding is timely commenced, then (x) to the extent not theretofore repaid, the Pre-Petition Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in these Cases and any subsequent chapter 7 case, (y) the Pre-Petition Collateral Agents' liens on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3 hereof, not subject to defense, counterclaim, recharacterization, subordination or avoidance, and (z) the obligations under the Pre-Petition Credit Agreements and the liens of the Pre-Petition Collateral Agents on the Pre-Petition Collateral shall not be subject to any other or further challenge by any party in interest; *provided*, *however*, in the event these Cases are converted into cases under chapter 7 or a chapter 7 or chapter 11 trustee is appointed within the Challenge Period, (I) the applicable trustee may commence a Challenge Proceeding at any time prior to the later of the date that is sixty (60) days after the date of appointment of such trustee or the date that is seventy-five (75) days after the date of conversion, and (II) if such trustee does not commence a Challenge Proceeding during such period, the Debtors' Stipulation shall be binding on such trustee in accordance with the terms of this paragraph. If any Challenge Proceeding is timely commenced, the stipulations and admissions contained in paragraph 3 of this Interim Order shall nonetheless remain binding and preclusive (as provided in this paragraph) on the Debtors, any committee, and any other person or entity, except as to any such findings and admissions that were expressly and successfully

challenged in such Challenge Proceeding.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, claims and defenses with respect to the Pre-Petition Credit Agreements or the liens of the Pre-Petition Collateral Agents on the Pre-Petition Collateral.

20.     Limitation on Use of Financing Proceeds and Collateral.     Notwithstanding anything contained herein to the contrary, without the prior written consent, as applicable, of the DIP Lenders or the Pre-Petition Agents, none of the DIP Loans, the Cash Collateral, the Collateral, or the Carve Out may be used:  (a) to challenge or investigate the validity, perfection, priority, extent or enforceability of the DIP Credit Agreement, the Pre-Petition Credit Agreements, or the liens or security interest securing the obligations under any of the foregoing or to pursue any causes of action of any kind against the Pre-Petition Secured Parties or the DIP Lenders (except that, if a Committee is appointed, up to $50,000 of the DIP Facility and the Cash Collateral may be used by such Committee for purposes of such investigation); (b) to object to, contest, or interfere with the exercise of rights and remedies by the DIP Lenders once an Event of Default (as defined in the DIP Credit Agreement) has occurred and any applicable cure period has expired; or (c) to make any payment of professional fees for any other constituent group, including, but not limited to, the Committee, other than in accordance with the Budget, the DIP Credit Agreement, and this Interim Order.

21.     Priorities Among Pre-Petition Secured Lenders.  Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Pre-Petition Secured Parties, such priorities and rights shall continue to be governed by the Pre-Petition Credit Agreements and the Intercreditor Agreement.

22.     <u>Access to the Debtors; Subordination of Intercompany Indebtedness</u>.     In accordance with the terms of the DIP Documents, the DIP Lenders and their professionals shall be afforded continued reporting as to Collateral amounts and reasonable access to the Collateral and the Debtors' business premises, during normal business hours and upon reasonable advance notice, for purposes of verifying the Debtors' compliance with the terms of this Interim Order. To the extent any Credit Party owes any Indebtedness (as defined in the DIP Credit Agreement) to any Debtor or any subsidiary of any Debtor, such Indebtedness shall be subordinated to DIP Loans, and the guarantees thereof, until the DIP Loans are indefeasibly repaid in full.

23.     <u>Modifications of DIP Documents</u>.  The Debtors and the DIP Lenders are hereby authorized to implement, in accordance with the terms of the respective DIP Documents, any non-material modifications of the respective DIP Documents without further order of this Court, or any other modifications to the respective DIP Documents; *provided*, *however*, that notice of any material modification or amendment to the respective DIP Documents shall be provided to counsel to the Committee (to the extent one has been appointed), the Pre-Petition Agents, and the U.S. Trustee, each of whom shall have five (5) Business Days from the date of such notice within which to object in writing to such modification or amendment.  If the Committee (to the extent one has been appointed), the Pre-Petition Agents, or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.  The Debtors shall provide notice to the U.S. Trustee and any Committee (if appointed) within five (5) Business Days following the execution of any non-material modifications to the DIP Documents.

24.     <u>Interim Order Governs</u>.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

25.     Binding Effect; Successors and Assigns.  The DIP Documents and the provisions

of this Interim Order, including all findings herein, shall be binding upon all parties in interest

in these Cases, including, without limitation, the DIP Lenders, the Pre-Petition Secured Parties,

any Committee appointed in these Cases, and the Debtors and their respective successors and

assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the

estate of any of the Debtors) and shall inure to the benefit of the DIP Lenders, the Pre-Petition

Secured Parties, and the Debtors and their respective successors and assigns; *provided*,

*however*, that the DIP Lenders shall have no obligation to extend any financing to any chapter 7

trustee or similar responsible person appointed for the estates of the Debtors.  In determining to

make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and

when permitted pursuant to this Interim Order or the DIP Documents, the DIP Lenders shall not

be deemed to be in control of the operations of the Debtors or to be acting as a "responsible

person" or "owner or operator" with respect to the operation or management of the Debtors (as

such terms, or any similar terms, are used in the United States Comprehensive Environmental

Response, Compensation and Liability Act, 29 U.S.C. § 9601 et seq., as amended, or any

similar federal or state statute).

26.     Effectiveness.  This Interim Order shall constitute findings of fact and conclusions

of law and shall take effect immediately upon execution hereof, and there shall be no stay of

execution of effectiveness of this Interim Order.

27.     Final Hearing.  The Final Hearing is scheduled for _____, 2014 at [_]:[_]0

[_].m. (ET) before this Court. The Debtors shall promptly mail copies of this Interim Order

(which shall constitute adequate notice of the Final Hearing) to the parties having been given

notice of the Interim Hearing, and to any other party that has filed a request for notices with this

Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served (with a copy to the Court's chambers) no later than [_____], 2014 at [_]:[_]0 [_].m. (ET) upon: (a) Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Tiiara N.A. Patton, Esq.); (b)(i) the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654 (Attn: Patrick J. Nash, Jr., Esq., Jeffrey D. Pawlitz, Esq., and Bradley T. Giordano, Esq.), and (ii) Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19899, (Attn: Laura Davis Jones, Esq.); (c)(i) counsel to the DIP Lenders, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019 (Attn: Scott K. Charles, Esq., Emily D. Johnson, Esq. and Neil K. Chatani, Esq.), and (ii) local Delaware counsel to the DIP Lenders and the DIP Agent, Richards, Layton & Finger, P.A., 920 North King Street., Wilmington, DE 19801 (Attn: Russell C. Silberglied, Esq.), (d) counsel to the DIP Agent, Shipman & Goodwin, LLP, One Constitution Plaza, Hartford, CT 06103 (Attn: Nathan Z. Plotkin, Esq.); and (e) counsel to any official committee then appointed in these Cases.

Dated: _____, 2014

Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Budget**

**GSE - Cash Flow Projections**
*North America*
($'s in '000)

| Forecast Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 -Wk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 5/9 | 5/16 | 5/23 | 5/30 | 6/6 | 6/13 | 6/20 | 6/27 | 7/4 | 7/11 | 7/18 | 7/25 | 8/1 | Total |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Beginning Cash Balance** | 3,279 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 3,346 | 4,147 | 3,279 |
| **Receipts** | | | | | | | | | | | | | | |
| Customer Receipts | 2,008 | 2,294 | 2,868 | 3,728 | 2,614 | 2,614 | 3,485 | 4,066 | 2,884 | 2,563 | 3,845 | 4,486 | 2,934 | 40,389 |
| Receipts from Affiliates | 100 | 100 | 100 | 100 | 650 | 650 | 650 | 650 | 650 | 650 | 700 | 700 | 700 | 6,400 |
| Other Receipts / Credits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 2,108 | 2,394 | 2,968 | 3,828 | 3,264 | 3,264 | 4,135 | 4,716 | 3,534 | 3,213 | 4,545 | 5,186 | 3,634 | 46,789 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Total Resin / Fiber | (2,493) | (2,312) | (2,312) | (2,312) | (2,725) | (2,377) | (2,377) | (2,377) | (1,632) | (1,632) | (1,632) | (1,632) | (1,632) | (27,444) |
| Materials & Other Opex | (300) | (500) | (300) | (300) | (300) | (300) | (500) | (300) | (300) | (300) | (500) | (300) | (300) | (4,500) |
| Freight | (313) | (313) | (313) | (313) | (313) | (313) | (313) | (313) | (313) | (313) | (313) | (313) | (313) | (4,069) |
| Material Operating Disbursements   [1] | (3,106) | (3,125) | (2,925) | (2,925) | (3,338) | (2,990) | (3,190) | (2,990) | (2,245) | (2,245) | (2,445) | (2,245) | (2,245) | (36,013) |
| Gross Payroll (inc. co expense) | (80) | (780) | (130) | (780) | (130) | (780) | (130) | (992) | (130) | (780) | (130) | (1,017) | (130) | (5,993) |
| Repair & Maintenance | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (650) |
| Payments to Affiliates | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Disbursements** | (3,236) | (3,956) | (3,106) | (3,756) | (3,519) | (3,820) | (3,370) | (4,032) | (2,425) | (3,075) | (2,625) | (3,312) | (2,425) | (42,656) |
| **Corporate Disbursements** | | | | | | | | | | | | | | |
| Ordinary Course Professionals | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (200) | (50) | (50) | (50) | (50) | (50) | (800) |
| Moelis | - | - | - | - | (138) | - | - | - | (138) | - | - | - | (650) | (925) |
| Alvarez & Marsal | - | - | - | - | (385) | - | - | - | (330) | - | - | - | (330) | (1,045) |
| Pachulski  - (Local) | - | - | - | - | (55) | - | - | - | (55) | - | - | - | (55) | (165) |
| Kirkland & Ellis | - | - | - | - | (385) | - | - | - | (385) | - | - | - | - | (1,155) |
| Total Prof Fees - Company | (50) | (50) | (50) | (50) | (1,013) | (50) | (50) | (200) | (958) | (50) | (50) | (50) | (1,470) | (4,090) |
| Prof Fees - Lender | - | - | - | - | (267) | - | - | - | (267) | - | - | - | (267) | (800) |
| Prof Fees - UCC / Bankruptcy Fees | (140) | - | - | - | (157) | - | - | - | (157) | - | - | - | (107) | (561) |
| Corp Tax | - | (150) | (150) | - | - | - | (150) | (150) | - | - | (150) | (150) | - | (900) |
| Corp Insurance | - | - | (300) | - | - | - | - | (300) | - | - | - | - | - | (600) |
| Corp Other | (235) | (40) | (235) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | (40) | (910) |
| **Total Corporate Disbursements** | (425) | (240) | (735) | (90) | (1,476) | (90) | (240) | (690) | (1,421) | (90) | (240) | (240) | (1,884) | (7,861) |
| **Pre-Petition Payments** | - | (1,028) | (2,850) | (1,779) | (1,364) | (1,364) | (1,364) | (797) | (797) | (797) | (797) | (797) | (1,797) | (15,530) |
| **KEIP / KERP** | - | - | - | - | - | - | - | - | - | - | - | - | (1,400) | (1,400) |
| **CAPEX Disbursements** | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (37) | (475) |
| **Finance Payments / Borrowings** | | | | | | | | | | | | | | |
| Priming Facility Payments/Fees | (18,137) | - | - | - | - | - | - | - | - | - | - | - | - | (18,137) |
| DIP Interest Payments/Fees | (900) | - | - | (237) | - | - | - | - | (307) | - | - | - | (362) | (1,806) |
| All Other Principle/Interest/Fees | - | - | - | (113) | - | - | - | - | (113) | - | - | - | (113) | (339) |
| Revolver Advance (Paydown) | 19,848 | 2,866 | 3,759 | 2,184 | 3,131 | 2,047 | 875 | 839 | 1,565 | 785 | - | - | 2,687 | 40,588 |
| **Total Finance Payments / Borrowings** | 811 | 2,866 | 3,759 | 1,833 | 3,131 | 2,047 | 875 | 839 | 1,146 | 785 | - | - | 2,212 | 20,306 |
| **Ending Cash Balance** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **2,500** | **3,346** | **4,147** | **2,451** | **2,451** |
| DIP [2] | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 |
| Interest Reserve Block | (413) | (413) | (413) | (413) | (413) | (413) | (413) | (413) | (413) | (413) | (413) | (413) | (413) | (413) |
| Min Availability Requirement (DIP) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) | (3,500) |
| Professional Fee Carve Out   [3] | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) |
| Revolver Availability | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 | 40,588 |
| Revolver Balance | 19,848 | 22,714 | 26,473 | 28,657 | 31,788 | 33,835 | 34,710 | 35,550 | 37,115 | 37,900 | 37,900 | 37,900 | 40,588 | 40,588 |
| **Revolver Availability - NA** | **20,740** | **17,873** | **14,114** | **11,930** | **8,799** | **6,752** | **5,877** | **5,038** | **3,472** | **2,687** | **2,687** | **2,687** | **-** | **-** |
| **Availability Including Cash - NA** | **23,240** | **20,373** | **16,614** | **14,430** | **11,299** | **9,252** | **8,377** | **7,538** | **5,972** | **5,187** | **6,034** | **6,834** | **2,451** | **2,451** |

[1] Line items labeled Total Resin / Fiber, Materials & Other Opex, and Freight shall be considered together as if they were set forth on a single line.

[2] N/A

[3] Carve Out of $0.5mm is in addition to all accrued fees up to the date of conversion.