# EXHIBIT B

**DIP Credit Agreement**

**$45,000,000 DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Dated as of May 4, 2014**

**by and among**

**GSE ENVIRONMENTAL, INC.,**

**as the Borrower,**

**GSE HOLDING, INC., GSE ENVIRONMENTAL, LLC, and SYNTEC LLC,**

**as Guarantors,**

**Cantor Fitzgerald Securities
as Agent for the Lenders,**

**and**

**THE LENDERS PARTY HERETO**

**TABLE OF CONTENTS**

ARTICLE I THE CREDITS .................................................................................................... 1
   1.1    Amounts and Terms of Commitments ..................................................................... 1
   1.2    Notes ....................................................................................................................... 2
   1.3    Interest .................................................................................................................... 2
   1.4    Loan Accounts ........................................................................................................ 3
   1.5    Procedure for Borrowings ...................................................................................... 4
   1.6    Conversion and Continuation Elections .................................................................. 4
   1.7    Optional Prepayments of Loans and Commitment Reductions ................................ 5
   1.8    Mandatory Prepayments of Loans and Commitment Reductions ............................ 5
   1.9    Fees ........................................................................................................................ 5
   1.10   Payments by the Borrower ...................................................................................... 6
   1.11   Payments by the Lenders to Agent; Settlement ...................................................... 8
ARTICLE II CONDITIONS PRECEDENT ........................................................................ 11
   2.1    Conditions of Initial Loans ................................................................................... 11
   2.2    Conditions to All Borrowings ............................................................................... 14
ARTICLE III REPRESENTATIONS AND WARRANTIES ............................................. 14
   3.1    Corporate Existence and Power ............................................................................ 14
   3.2    Corporate Authorization; No Contravention ........................................................ 15
   3.3    Governmental Authorization ................................................................................. 15
   3.4    Binding Effect ...................................................................................................... 16
   3.5    Litigation .............................................................................................................. 16
   3.6    No Default ............................................................................................................ 16
   3.7    ERISA Compliance .............................................................................................. 16
   3.8    Use of Proceeds; Margin Regulations ................................................................... 16
   3.9    Title to Properties ................................................................................................. 17
   3.10   Taxes .................................................................................................................... 17
   3.11   Financial Condition .............................................................................................. 17
   3.12   Environmental Matters ......................................................................................... 18
   3.13   Regulated Entities ................................................................................................ 19
   3.14   [Intentionally Omitted] ........................................................................................ 19
   3.15   Labor Relations .................................................................................................... 19
   3.16   Intellectual Property ............................................................................................. 19
   3.17   Brokers' Fees; Transaction Fees ........................................................................... 19
   3.18   Insurance .............................................................................................................. 20
   3.19   Ventures, Subsidiaries and Affiliates; Outstanding Stock ..................................... 20
   3.20   Jurisdiction of Organization; Chief Executive Office ........................................... 20
   3.21   Deposit Accounts and Other Accounts ................................................................. 20
   3.22   Status of Holdings ................................................................................................ 20
   3.23   Collateral .............................................................................................................. 21
   3.24   Full Disclosure .................................................................................................... 21
   3.25   Foreign Assets Control Regulations and Anti-Money Laundering ......................... 21
   3.26   Patriot Act ............................................................................................................ 21

ARTICLE IV AFFIRMATIVE COVENANTS ................................................................ 22

4.1     Financial Statements ................................................................................ 22
4.2     Certificates; Other Information ................................................................ 23
4.3     Notices ...................................................................................................... 25
4.4     Preservation of Corporate Existence, Etc. ............................................... 27
4.5     Maintenance of Property .......................................................................... 27
4.6     Insurance ................................................................................................... 27
4.7     Payment of Obligations ............................................................................ 29
4.8     Compliance with Laws ............................................................................. 29
4.9     Inspection of Property and Books and Records; Annual Meetings ........... 29
4.10    Use of Proceeds ........................................................................................ 30
4.11    Landlord Agreements ................................................................................ 30
4.12    Further Assurances .................................................................................... 30
4.13    Environmental Matters .............................................................................. 32
4.14    Intentionally Omitted ................................................................................ 32
4.15    Intentionally Omitted ................................................................................ 32
4.16    Cash Management Systems ....................................................................... 33
4.17    Milestones ................................................................................................. 33

ARTICLE V NEGATIVE COVENANTS .......................................................................... 33

5.1     Limitation on Liens ................................................................................... 33
5.2     Disposition of Assets ................................................................................ 36
5.3     Consolidations and Mergers ..................................................................... 37
5.4     Loans and Investments .............................................................................. 37
5.5     Limitation on Indebtedness ....................................................................... 38
5.6     Transactions with Affiliates ...................................................................... 39
5.7     Use of Proceeds ........................................................................................ 40
5.8     Contingent Obligations ............................................................................. 40
5.9     Restricted Payments .................................................................................. 41
5.10    Limitations on Payments on Existing Indebtedness and Subordinated
        Indebtedness .............................................................................................. 42
5.11    Change in Business ................................................................................... 42
5.12    Change in Structure ................................................................................... 42
5.13    Changes in Accounting, Name and Jurisdiction of Organization ............. 42
5.14    Amendments to Existing Indebtedness ..................................................... 42
5.15    No Negative Pledges ................................................................................. 42
5.16    OFAC; Patriot Act .................................................................................... 43
5.17    DIP Financing.. ......................................................................................... 43
5.18    Alteration of Rights of Lenders.. .............................................................. 43
5.19    Claims.. ..................................................................................................... 43
5.20    Bankruptcy Matters................................................................................... 44

ARTICLE VI FINANCIAL COVENANTS........................................................................ 44

6.1     Capital Expenditures ................................................................................. 44
6.2     Minimum Liquidity ................................................................................... 44
6.3     Budget.   .................................................................................................... 45

ARTICLE VII EVENTS OF DEFAULT ........................................................................... 45

7.1     Event of Default ........................................................................................ 45

| 7.2 | Remedies | 48 |
| 7.3 | Rights Not Exclusive | 49 |
| 7.4 | Termination of Use of Cash Collateral; Vacation of Automatic Stay | 49 |

ARTICLE VIII AGENT ........................................................................ 49

| 8.1 | Appointment and Duties | 49 |
| 8.2 | Binding Effect | 50 |
| 8.3 | Use of Discretion | 51 |
| 8.4 | Delegation of Rights and Duties | 51 |
| 8.5 | Reliance and Liability | 51 |
| 8.6 | Agent Individually | 53 |
| 8.7 | Lender Credit Decision | 53 |
| 8.8 | Expenses; Indemnities | 54 |
| 8.9 | Resignation of Agent | 55 |
| 8.10 | Release of Collateral or Guarantors | 56 |
| 8.11 | Additional Secured Parties | 57 |

ARTICLE IX MISCELLANEOUS ........................................................ 57

| 9.1 | Amendments and Waivers. | 57 |
| 9.2 | Notices | 58 |
| 9.3 | Electronic Transmissions | 59 |
| 9.4 | No Waiver; Cumulative Remedies | 60 |
| 9.5 | Costs and Expenses | 60 |
| 9.6 | Indemnity | 61 |
| 9.7 | Marshaling; Payments Set Aside | 62 |
| 9.8 | Successors and Assigns | 63 |
| 9.9 | Assignments and Participations; Binding Effect | 63 |
| 9.10 | Non-Public Information; Confidentiality | 66 |
| 9.11 | Set-off; Sharing of Payments | 67 |
| 9.12 | Counterparts; Facsimile Signature | 68 |
| 9.13 | Severability | 69 |
| 9.14 | Captions | 69 |
| 9.15 | Independence of Provisions | 69 |
| 9.16 | Interpretation | 69 |
| 9.17 | No Third Parties Benefited | 69 |
| 9.18 | Governing Law and Jurisdiction | 69 |
| 9.19 | Waiver of Jury Trial | 70 |
| 9.20 | Entire Agreement; Release; Survival | 70 |
| 9.21 | Patriot Act | 71 |
| 9.22 | Replacement of Lender | 71 |
| 9.23 | Joint and Several | 72 |
| 9.24 | Creditor-Debtor Relationship | 72 |
| 9.25 | OTHER LIENS ON COLLATERAL; TERMS OF INTERCREDITOR AGREEMENT; ETC. | 72 |

ARTICLE X TAXES, YIELD PROTECTION AND ILLEGALITY ......................................... 73

| 10.1 | Taxes | 73 |
| 10.2 | Illegality | 76 |
| 10.3 | Increased Costs and Reduction of Return | 76 |

| 10.4 | Funding Losses | 77 |
| 10.5 | Inability to Determine Rates | 78 |
| 10.6 | Certificates of Lenders | 78 |
| ARTICLE XI DEFINITIONS | | 78 |
| 11.1 | Defined Terms | 78 |
| 11.2 | Other Interpretive Provisions | 99 |
| 11.3 | Accounting Terms and Principles | 100 |
| 11.4 | Payments | 101 |

## SCHEDULES

| Schedule 1.1(b) | Loan Commitments |
| Schedule 3.8 | Margin Stock |
| Schedule 3.9 | Real Estate |
| Schedule 3.15 | Labor Relations |
| Schedule 3.19 | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 3.20 | Jurisdiction of Organization; Chief Executive Office |
| Schedule 3.21 | Deposit Accounts and Other Accounts |
| Schedule 5.1 | Liens |
| Schedule 5.2 | Dispositions |
| Schedule 5.4 | Investments |
| Schedule 5.5 | Indebtedness |
| Schedule 5.8 | Contingent Obligations |

## EXHIBITS

| Exhibit 1.6 | Form of Notice of Continuation |
| Exhibit 11.1(a) | Form of Assignment |
| Exhibit 11.1(b) | Guaranty and Security Agreement |
| Exhibit 11.1(c) | Form of Interim Order |
| Exhibit 11.1(d) | Form of Note |
| Exhibit 11.1(e) | Form of Notice of Borrowing |

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, supplemented, modified and/or restated from time to time, this "**Agreement**") is entered into as of May __, 2014, by and among GSE Environmental, Inc., a Delaware corporation, as Borrower, GSE Environmental, LLC and SynTec LLC, as Subsidiary Guarantors, and GSE Holding, Inc., as Holdings, Cantor Fitzgerald Securities, as Agent for the several financial institutions from time to time party to this Agreement (collectively, the "**Lenders**" and individually each a "**Lender**").

W I T N E S S E T H:

WHEREAS, on May 4, 2014 (the "**Petition Date**"), the Borrower and each Guarantor (as defined below) (collectively, and individually, the "**Debtors**", a "**Debtor**", the "**Credit Parties**" and a "**Credit Party**") commenced Chapter 11 Cases Nos. [_____] through [_____][1] (each a "**Case**" and collectively, the "**Cases**") by filing voluntary petitions for reorganization under the Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court of the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, the Borrower has requested that the Lenders, from time to time after the Effective Date and prior to the Commitment Termination Date, make Loans to the Borrower in an aggregate principal amount not to exceed the amount of the Commitments, which on the date of this Agreement is $45,000,000;

WHEREAS, each Credit Party desires to guarantee the Obligations of the Borrower under the Loan Documents and, as security therefor, to grant to Agent, for the benefit of the Secured Parties, a valid, binding, enforceable and perfected security interest in and lien upon substantially all of its Property;

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

ARTICLE I

THE CREDITS

1.1     Amounts and Terms of Commitments.

(a)     [Intentionally Omitted].

(b)     The Loans and the Commitments.  Subject to the terms and conditions of this Agreement, including, without limitation, compliance by the Borrower with the Budget, and in reliance upon the representations and warranties of the Credit Parties contained herein, each Lender severally and not jointly agrees to make Loans to the Borrower from time to time on any Business Day during the period from the Effective Date through the Commitment Termination Date, in an aggregate amount not to exceed at any time outstanding the amount set forth opposite

---

[1] NTD:  To come.

such Lender's name in Schedule 1.1(b) under the heading "Loan Commitments" (such amount, as the same may be reduced or increased from time to time in accordance with this Agreement, being referred to herein as such Lender's "Loan Commitment"); provided, however, that, after giving effect to any Borrowing of Loans, the aggregate principal amount of all outstanding Loans shall not exceed the Maximum Loan Balance. Subject to the other terms and conditions hereof, amounts borrowed under this subsection 1.1(b) may be repaid (without premium or penalty except as, and to the extent, set forth in Section 10.4), but once repaid, may not be reborrowed. The "**Maximum Loan Balance**" from time to time will equal the Aggregate Loan Commitment then in effect (or, if prior to entry of the Final Order, thirty-five million dollars ($35,000,000)) less the Interest Reserve (after giving effect to any reduction thereof to the extent a requested Loan shall be utilized to pay interest for which the Interest Reserve has been established) and less the Liquidity Reserve (as defined below). If at any time the then outstanding principal balance of Loans exceeds the Maximum Loan Balance, then the Borrower shall immediately prepay outstanding Loans in an amount sufficient to eliminate such excess.

   (c) [Intentionally Omitted].

   (d) [Intentionally Omitted].

  1.2 Notes.

   (a) The Loans made by each Lender shall be evidenced by this Agreement and, if requested by such Lender, a Note payable to such Lender in an amount equal to such Lender's Loan Commitment. In the event of a conflict between a Lender's Note and the Register, the Register shall control.

  1.3 Interest.

   (a) Subject to subsections 1.3(c) and 1.3(d), each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to the LIBOR plus the Applicable Margin. Each determination of an interest rate by Agent shall be conclusive and binding on the Borrower and the Lenders in the absence of demonstrable error. All computations of fees and interest payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to, but excluding, the last day thereof.

   (b) Interest on each Loan shall be paid in arrears on each Interest Payment Date. Interest shall also be paid on the Commitment Termination Date.

   (c) Automatically while any Event of Default exists, the Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Loans until such Event of Default has been cured or waived in accordance with the terms of this Agreement, at a rate per annum which is determined by adding two percent (2.0%) per annum to rate otherwise in effect. All such interest shall be payable on demand of Agent or the Required Lenders. The Borrower shall notify the Agent and the Lenders within three (3) Business Days after a Responsible Officer becoming aware of an Event of Default and the requirement of paying interest at a rate as required under this Section 1.3(c).

(d)     Anything herein to the contrary notwithstanding, the obligations of the Borrower hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event the Borrower shall pay such Lender interest at the highest rate permitted by applicable law ("**Maximum Lawful Rate**"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Effective Date as otherwise provided in this Agreement.

1.4     Loan Accounts.

(a)     Agent, on behalf of the Lenders, shall record on its books and records the amount of each Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.  Agent shall deliver to the Borrower on a quarterly basis a loan statement setting forth such record for the immediately preceding calendar quarter.  Such record shall, absent demonstrable error, be presumptive evidence of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of the Borrower hereunder (and under any Note) to pay any amount owing with respect to the Loans or provide the basis for any claim against Agent.

(b)     Agent, acting as a non-fiduciary agent of the Borrower solely for U.S. Federal income tax purposes and solely with respect to the actions described in this subsection 1.4(b), shall establish and maintain at its address referred to in Section 9.2 (or at such other address as Agent may notify the Borrower) (A) a record of ownership (the "**Register**") in which Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of Agent, each Lender in the Loans, each of their obligations under this Agreement to participate in each Loan, and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Lenders (and each change thereto pursuant to Sections 9.9 and 9.22), (2) the Commitments of each Lender, (3) the amount of each Loan and each funding of any participation described in clause (A) above, and for LIBOR Rate Loans, the Interest Period applicable thereto, (4) the amount of any principal or interest due and payable or paid, (5) [intentionally omitted]  and (6) any other payment received by Agent from the Borrower and its application to the Obligations.

(c)     Notwithstanding anything to the contrary contained in this Agreement, the Loans (including any Notes evidencing such Loans) are registered obligations and the right, title and interest of the Lenders and their assignees in and to such Loans shall be transferable only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein.  This Section 1.4 and Section 9.9 shall be construed so that the Loans are at all

times maintained in "registered form" within the meaning of sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (and any successor provisions).

(d)     The Credit Parties, Agent, and the Lenders shall treat each Person whose name is recorded in the Register as a Lender for all purposes of this Agreement.  The entries in the Register shall be conclusive in the absence of manifest error and the Borrower, Agents and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Information contained in the Register with respect to any Lender shall be available for access by the Borrower, Agent, or such Lender during normal business hours and from time to time upon at least one (1) Business Day's prior notice.  No Lender shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender unless otherwise agreed by Agent.

1.5     Procedure for Borrowings.

(a)     Each Borrowing of Loans shall be made upon the Borrower's irrevocable (subject to Section 10.5) written notice delivered to Agent substantially in the form of a Notice of Borrowing, which notice (i) with respect to the initial Borrowing of Loans on the Effective Date or the Business Day after the Effective Date, must be received by Agent prior to 10:00 a.m. (Chicago time) on the Effective Date for a Borrowing on such date or 10:00 a.m. (Chicago time) on the Business Day after the Effective Date for a Borrowing on such date, and (ii) with respect to any other Borrowing, must be received by Agent prior to 1:00 p.m. (Chicago time) on the date which is three (3) Business Day prior to the requested Borrowing.  Such Notice of Borrowing shall specify:

(i)     the amount of the Borrowing (which shall be in an aggregate minimum principal amount of at least $1,000,000;

(ii)     the requested Borrowing date, which shall be a Business Day; and

(iii)   the Interest Period applicable to such Loans.

(b)     Upon receipt of a Notice of Borrowing, Agent will promptly notify each Lender of such Notice of Borrowing and of the amount of such Lender's Commitment Percentage of the Borrowing.

(c)     Unless Agent is otherwise directed in writing by the Borrower, the proceeds of each requested Borrowing after the Effective Date will be made available to the Borrower by Agent by wire transfer of such amount to the Borrower pursuant to the wire transfer instructions specified on the signature page hereto, as such wire transfer instructions may be updated from time to time by written notice from the Borrower to Agent.

1.6     Continuation Elections.

(a)     Upon the expiration of the applicable Interest Period, the Borrower shall have the option to continue all or any portion of any Loan as a LIBOR Rate Loan of the same

Interest Period.  Any such election must be made by the Borrower by 1:00 p.m. (Chicago time) on the 3rd Business Day prior to the end of such Interest Period.  If no election is received with respect to a LIBOR Rate Loan by such time, that LIBOR Rate Loan shall be continued as a LIBOR Rate Loan with the same Interest Period.  The Borrower must make such election by notice to Agent in writing, including by Electronic Transmission.  Such election must be made pursuant to a written notice (a "**Notice of Continuation**") substantially in the form of <u>Exhibit 1.6</u>.

(b)     Upon receipt of a Notice of Continuation, Agent will promptly notify each Lender thereof.  In addition, Agent will, with reasonable promptness, notify the Borrower and the Lenders of each determination of LIBOR; <u>provided</u> that any failure to do so shall not relieve the Borrower of any liability hereunder or provide the basis for any claim against Agent.  All continuations shall be made pro rata according to the respective outstanding principal amounts of the Loans held by each Lender with respect to which the notice was given.

(c)     Notwithstanding any other provision contained in this Agreement, after giving effect to any Borrowing, or to any continuation of any Loans, there shall not be more than five (5) different Interest Periods in effect at any one time.

1.7     <u>Optional Prepayments of Loans and Commitment Reductions</u>.

(a)     The Borrower may at any time upon at least one (1) Business Day's (or such shorter period as is acceptable to Agent) prior written notice by the Borrower to Agent, prepay the Loans in whole or in part, in each instance, without penalty or premium except as provided in <u>Section 10.4,</u> whereupon, the Loan Commitment of each Lender shall automatically and permanently be reduced by an amount equal to such Lender's ratable share of the aggregate of principal repaid.

(b)     The notice of any prepayment once received by the Agent shall not thereafter be revocable by the Borrower (unless the making of such prepayment is conditioned upon the occurrence of an event) and Agent will promptly notify each Lender thereof and of such Lender's Commitment Percentage of such prepayment.  The payment amount specified in such notice shall be due and payable on the date specified therein.  Together with each prepayment under this <u>Section 1.7</u>, the Borrower shall pay any amounts required pursuant to <u>Section 10.4</u>.

1.8     <u>Mandatory Prepayments of Loans and Commitment Reductions</u>. The Borrower shall repay to the Lenders in full on the Commitment Termination Date the aggregate principal amount of the Loans outstanding, together with all interest, fees, charges and other amounts payable hereunder, whereupon, the Loan Commitment of each Lender shall automatically and permanently be reduced by an amount equal to such Lender's ratable share of the aggregate of principal repaid. Together with each prepayment under this <u>Section 1.8</u>, the Borrower shall pay any amounts required pursuant to <u>Section 10.4</u>.

1.9     <u>Fees</u>.

(a)     <u>Upfront Fee</u>.   The Borrower shall pay to the Agent on the Effective Date a fee (the "**Upfront Fee**") for the account of each Lender in an amount equal to two percent

5

(2.00%) of such Lender's Loan Commitment. The Upfront Fee shall be fully earned and immediately due and payable upon entry of the Interim Order and non-refundable once paid.

(b)     Unused Commitment Fee.  The Borrower shall pay to Agent a fee (the "**Unused Commitment Fee**") for the account of each Lender in an amount equal to:

(i)     the average daily balance of the Loan Commitment of such Lender during the preceding calendar month, less

(ii)     the average daily balance of all Loans held by such Lender during the preceding calendar month,

(iii)     multiplied by three-quarters of one percent (0.75%) per annum.

The total Unused Commitment Fee paid by the Borrower will be equal to the sum of all of the Unused Commitment Fees due to the Lenders, subject to subsection 1.11(e)(vi).  Such fee shall be payable monthly in arrears on the last day of the each month ending after the Effective Date.  The Unused Commitment Fee provided in this subsection 1.9(b) shall accrue at all times from and after the Closing Date.  The Agent shall have no duty to verify the Borrower's calculation of the Unused Commitment Fee.

(c)     Fees of Counsel.  On the Effective Date and promptly from time to time thereafter, the Borrower shall pay all reasonable and documented fees and expenses of (i) Wachtell, Lipton, Rosen & Katz, counsel to certain Lenders, and Richards, Layton & Finger, P.A. as local Delaware counsel to certain Lenders, and (ii) Shipman & Goodwin, LLP, as counsel the Agent, no later than (5) Business Days after an invoice for such fees and expenses is delivered to the Borrower.  If the Borrower fails to pay any fees and expenses under clause (i) of the preceding sentence when due, the Lenders may elect to pay such fees on behalf of the Borrower and such fees paid shall thereafter constitute Loans made as of the date of such payment.

(d)     Agent's Fees.  The Borrower shall pay to the Agent on the Effective Date a fee (the "**Agent Fee**") in accordance with that certain letter of even date herewith between the Borrower, the Credit Parties and the Agent (the "**Agent Fee Letter**"). The Agent Fee shall be fully earned and immediately due and payable upon the execution of the Agent Fee letter and non-refundable once paid.

1.10     Payments by the Borrower.

(a)     All payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to Agent (for the ratable account of the Persons entitled thereto) at the address for payment specified in the signature page hereof in relation to Agent (or such other address as Agent may from time to time specify in accordance with Section 9.2), including payments utilizing the ACH system, and shall be made in Dollars and by wire transfer or ACH transfer in immediately available funds (which shall be the exclusive means of payment

hereunder), no later than noon (Chicago time) on the date due. Any payment which is received by Agent later than noon (Chicago time) may in Agent's discretion be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue. The Borrower hereby authorizes Agent and each Lender (but each Party shall not be so obligated) to make a Loan (which shall be a LIBOR Rate Loan with an Interest Period of one month) to pay (i) interest, principal, agent fees, Upfront Fees, and Unused Commitment Fees, in each instance, if not paid by the Borrower on the date due, or (ii) after five (5) days' prior notice to the Borrower, other reasonable and documented fees, costs or expenses payable by the Borrower or any of its Subsidiaries hereunder or under the other Loan Documents; provided, that nothing in this subsection 1.10(a) shall be deemed to limit or impair the Borrower's rights to dispute the Borrower's or such Subsidiary's obligation to pay fees, costs or expenses pursuant to this Agreement or the other Loan Documents.

(b)     Subject to the provisions set forth in the definition of "**Interest Period**" herein, if any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(c)     During the continuance of an Event of Default and if either Agent or the Required Lenders are exercising any of their remedies under the terms of this Agreement or any of the Collateral Documents or any of the Obligations have been declared (or otherwise have become) due and payable as provided in Section 7.2, Agent shall apply any and all payments received by Agent in respect of any Obligation in accordance with clause first, subpart (i) below, and, if directed by the Required Lenders, in respect of any Obligation in accordance with clauses first, subpart (ii) through sixth below. Notwithstanding any provision herein to the contrary, all payments made by the Credit Parties to Agent after any or all of the Obligations have been accelerated (so long as such acceleration has not been rescinded), including proceeds of Collateral, shall be applied as follows:

first, to payment of reasonable and documented costs and expenses, including Attorney Costs, of (i) Agent and then (ii) the Lenders payable or reimbursable by the Credit Parties under the Loan Documents;

second, to payment of all accrued unpaid interest on the Obligations and fees owed to Agent and the Lenders;

third, to payment of principal of the Obligations;

fourth, to payment of any other amounts owing constituting Obligations; and

fifth, any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of the Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to clauses second, third and fourth above.

1.11    Payments by the Lenders to Agent; Settlement.

(a)    Each Lender will remit to Agent its Commitment Percentage of any Loan before Agent disburses same to the Borrower.  Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of any Loan requested by the Borrower as soon as practicable but in no event later than 10:00 a.m. (Chicago time) on the scheduled Business Day prior to the Borrowing date applicable thereto, and each such Lender shall pay Agent such Lender's Commitment Percentage of such requested Loan, in same day funds, by wire transfer to Agent's account, as set forth on Agent's signature page hereto, no later than noon (Chicago time) on such scheduled Borrowing date.  Nothing in this subsection 1.11(a) or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of Section 1.11, shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Agent any Lender or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(b)    Upon each optional or mandatory prepayment pursuant to Section 1.7 or 1.8 hereof, and prior to the payment by the Agent of principal, interest or fees hereunder (each, a "**Settlement Date**"), Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment Percentage of principal, interest and fees paid for the benefit of Lenders with respect to each applicable Loan.  Agent shall pay to each Lender such Lender's Commitment Percentage (except as otherwise provided in subsection 1.1(c)(vi) and subsection 1.11(e)(iv)) of principal, interest and fees paid by the Borrower since the previous Settlement Date for the benefit of such Lender on the Loans held by it.  Such payments shall be made by wire transfer to such Lender (in accordance with such Lender's standing wire instructions on file with Agent) not later than 1:00 p.m. (Chicago time) on the next Business Day following each Settlement Date.

(c)    Availability of Lender's Commitment Percentage.  Agent may assume that each Lender will make its Commitment Percentage of each Loan available to Agent on each Borrowing date.  If such Commitment Percentage is not, in fact, paid to Agent by such Lender when due, Agent will be entitled to recover such amount on demand from such Lender without setoff, counterclaim or deduction of any kind.  If any Lender fails to pay the amount of its Commitment Percentage forthwith upon Agent's demand, Agent shall promptly notify the Borrower and the Borrower shall immediately repay such amount to Agent.  Nothing in this subsection 1.11(c) or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder.  Without limiting the provisions of subsection 1.11(b), to the extent that Agent advances funds to the Borrower on behalf of any Lender and is not reimbursed therefor on the same Business Day as such advance is made, Agent shall be entitled to retain for its account all interest accrued on such advance from the date such advance was made until reimbursed by the applicable Lender.

(d)    Return of Payments.

(i)     If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from the Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)    If Agent determines at any time that any amount received by Agent under this Agreement or any other Loan Document must be returned to any Credit Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to the Borrower or such other Person, without setoff, counterclaim or deduction of any kind, and Agent will be entitled to set-off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

(e)     Non-Funding Lenders.

(i)     Responsibility.  The failure of any Non-Funding Lender to make any Loan, to fund any purchase of any participation to be made or funded by it, or to make any payment required by it hereunder on the date specified therefor shall not relieve any other Lender of its obligations to make such loan, fund the purchase of any such participation, or make any other payment required hereunder on such date, and neither Agent nor, other than as expressly set forth herein, any other Lender shall be responsible for the failure of any Non-Funding Lender to make a loan, fund the purchase of a participation or make any other payment required hereunder.

(ii)    [Intentionally Omitted].

(iii)   Voting Rights.  Notwithstanding anything set forth herein to the contrary, including Section 9.1, a Non-Funding Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" (or be, or have its Loans and Commitments, included in the determination of "Required Lenders" or "Lenders directly affected" pursuant to Section 9.1) for any voting or consent rights under or with respect to any Loan Document, provided that (A) the Commitment of a Non-Funding Lender may not be increased, extended or reinstated, (B) the principal of a Non-Funding Lender's Loans may not be reduced or forgiven, and (C) the interest rate applicable to Obligations owing to a Non-Funding Lender may not be

reduced, in each case, without the consent of such Non-Funding Lender. Moreover, for the purposes of determining Required Lenders, the Loans and Commitments held by Non-Funding Lenders shall be excluded from the total Loans and Commitments outstanding.

(iv) <u>Borrower Payments to a Non-Funding Lender</u>. Agent shall be authorized to use all portions of any payments received by Agent for the benefit of any Non-Funding Lender pursuant to this Agreement to pay in full the Aggregate Excess Funding Amount to the appropriate Secured Parties thereof. Agent shall be entitled to hold as cash collateral in a non-interest bearing account up to an amount equal to such Non-Funding Lender's pro rata share of the Aggregate Loan Commitments until the Obligations are paid in full (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) in cash and all Commitments have been terminated. Upon any such unfunded obligations owing by a Non-Funding Lender becoming due and payable, Agent shall be authorized to use such cash collateral to make such payment on behalf of such Non-Funding Lender. With respect to such Non-Funding Lender's failure to fund Loans, any amounts applied by Agent to satisfy such funding shortfalls shall be deemed to constitute a Loan and, if necessary to effectuate the foregoing, the other Lenders shall be deemed to have sold, and such Non-Funding Lender shall be deemed to have purchased, Loans from the other Lenders until such time as the aggregate amount of the Loans are held by the Lenders in accordance with their Commitment Percentages of the Aggregate Loan Commitment. Any amounts owing by a Non-Funding Lender to Agent which are not paid when due shall accrue interest at the interest rate applicable during such period to Loans that are LIBOR Rate Loans with an Interest Period of one month. In the event that Agent is holding cash collateral of a Non-Funding Lender that cures pursuant to clause (v) below or ceases to be a Non-Funding Lender pursuant to the definition of Non-Funding Lender, Agent shall return the unused portion of such cash collateral to such Lender. The "**Aggregate Excess Funding Amount**" of a Non-Funding Lender shall be the aggregate amount of (A) all unpaid obligations owing by such Lender to the Agent and the Lenders under the Loan Documents, including such Lender's pro rata share of all Loans .

(v) <u>Cure</u>. A Lender may cure its status as a Non-Funding Lender under clause (a) of the definition of Non-Funding Lender if such Lender fully pays to Agent, on behalf of the applicable Secured Parties, the Aggregate Excess Funding Amount, plus all interest due thereon. Any such cure shall not relieve any Lender from liability for breaching its contractual obligations hereunder.

(vi) <u>Fees</u>. A Lender that is a Non-Funding Lender pursuant to clause (a) of the definition of Non-Funding Lender shall not earn and

shall not be entitled to receive, and the Borrower shall not be required to pay, such Lender's portion of the Unused Commitment Fee during the time such Lender is a Non-Funding Lender pursuant to clause (a) thereof.

(f)     Procedures.  Agent is hereby authorized by each Credit Party and each other Secured Party to establish procedures and to amend such procedures from time to time, in each case in consultation with the Lenders, to facilitate administration and servicing of the Loans and other matters incidental thereto.  Without limiting the generality of the foregoing, Agent is hereby authorized to establish procedures to make available or deliver, or to accept, notices, documents and similar items on, by posting to or submitting and/or completion, on E-Systems.

## ARTICLE II

## CONDITIONS PRECEDENT

2.1     Conditions of Initial Loans.  The obligation of each Lender to make its initial Loans hereunder is subject to satisfaction of the following conditions (unless otherwise waived by the Lenders) (the date such conditions are satisfied, the "**Effective Date**"):

(a)     Credit Agreement.  On the Effective Date, the Borrower and each other Credit Party shall have duly authorized, executed and delivered this Agreement, and this Agreement shall be in full force and effect.

(b)     Intercompany Subordination Agreement.  On the Effective Date, any intercompany Indebtedness owed by any Credit Party to Holdings or any of its Subsidiaries shall be duly subordinated, pursuant to the Interim Order or in a manner otherwise reasonably satisfactory to the Required Lenders, to the Obligations or the guarantee thereof, as applicable, until the indefeasible payment in full of the Obligations.

(c)     Notes.  On or prior to the Closing Date, there shall have been delivered to Agent for the account of each of the Lenders that has requested same, the appropriate Note executed by the Borrower in each case in the amount, maturity and as otherwise provided herein.

(d)     Corporate Documents.  Agent shall have received a certificate of the secretary or assistant secretary of each Credit Party dated the Effective Date, certifying (A) that attached thereto is a true and complete copy of each Organization Document of such Credit Party certified (to the extent applicable) as of a recent date by the Secretary of State of the state of its organization, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors of such Credit Party authorizing the execution, delivery and performance of the Loan Documents to which such Credit Party is a party and, in the case of Borrower, the extensions of credit hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Credit Party (together with a certificate of another officer as to

the incumbency and specimen signature of the secretary or assistant secretary executing the certificate required by this clause (i)).

(e) <u>Officers' Certificate</u>. Agent shall have received a certificate, dated the Effective Date and signed by a Responsible Officer of the Borrower, certifying that after giving effect to the funding of any initial Loan on the Effective Date (and also immediately prior thereto in the case of clause (iii) below), (i) no Default or Event of Default exists, (ii) all representations and warranties of each Credit Party set forth in the Loan Documents are true and correct in all material respects (without duplication of any materially qualifier contained therein) and (iii) each of the conditions set forth in this <u>Sections 2.1</u> have been satisfied.

(f) <u>Payoff of Priming Facility</u>. All obligations and other amounts due under Priming Facility shall have been, or substantially simultaneously with the Effective Date shall be, repaid in full in cash with the proceeds of the Loans.

(g) <u>Initial Budget</u>. Agent shall have received an initial 13-week cash flow forecast setting forth all forecasted receipts, professional fees and disbursements on a weekly basis for the 13-week period beginning the week of the Closing Date, broken down by week, including the anticipated weekly uses of the proceeds of the Loans for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to this Agreement and the transactions contemplated hereby fees and expenses related thereto, professional fees and working capital and other general corporate needs, which forecast shall be (i) certified by the Chief Financial Officer or any chief restructuring officer of the Borrower, and (ii) certified by Dean Swick in his capacity as Vice President, Finance, of the Borrower pursuant to the terms of the A&M Engagement Letter, stating (A) that nothing has come to his attention that would lead him to believe that (1) the estimates, information and assumptions provided on the Initial Budget are based on unreasonable information or assumptions, and (2) the Initial Budget is incorrect or misleading in any material respect, and (B) that in making the certifications set forth above, he has considered and relied solely upon (1) statements and information provided by the Borrower's management and advisors of which he has participated in developing and (2) such other investigations and inquiries as he has in good faith deemed appropriate (the "**Initial Budget**") (it being understood that the Initial Budget delivered to the Agent on the Closing Date shall satisfy this condition).

(h) [Intentionally Omitted].

(i) <u>Adverse Change, Approvals</u>. (a) Since December 31, 2012, nothing shall have occurred which, either individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect. On or prior to the Effective Date, all necessary governmental (domestic and foreign) and material third party approvals and/or consents in connection with the Transactions, the other transactions contemplated hereby and the granting of Liens under the Loan Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or

imposes materially adverse conditions upon the consummation of the Transactions or the other transactions contemplated by the Loan Documents or otherwise referred to herein or therein. On the Effective Date, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the Transactions or the other transactions contemplated by the Loan Documents or otherwise referred to herein or therein.

(j)     <u>Litigation</u>.   On the Effective Date, there shall be no actions, suits, investigations or proceedings pending or threatened which has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(k)     <u>Guaranty and Security Agreement</u>.   On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Guaranty and Security Agreement covering all of such Credit Party's Collateral and, pursuant to the Interim Order or the Final Order, as applicable, the Liens created by each Collateral Document constitute fully perfected first-priority Liens on, and security interests in, all right, title and interest of the Credit Parties thereunder in the Collateral, in each case subject to no Liens other than Permitted Liens.

(l)     <u>Intercreditor Agreement</u>.   On the Closing Date, the Intercreditor Agreement shall be in full force and effect and the debtor-in-possession credit facilities provided hereunder shall constitute the "DIP Financing" for purposes thereof.

(m)     <u>Insurance</u>.   Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by <u>Section 4.6</u> and the applicable provisions of the Collateral Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and shall name Agent, on behalf of the Secured Parties, as additional insured, in form and substance reasonable satisfactory to Agent.

(n)     <u>Fees, etc.</u>   The Borrower shall have paid all fees then due and payable under this Agreement on or prior to the Effective Date.

(o)     <u>Patriot Act</u>.   On or prior to the Closing Date, Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, in each case to the extent requested in writing at least five (5) Business Days prior to the Closing Date.

(p)     <u>Restructuring Support Agreement</u>.   The   Restructuring   Support Agreement shall have been duly authorized, executed and delivered by each party thereto.

(q)     <u>Interim Order</u>.   On the Effective Date, the Interim Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended.

(r)     Lender Information.  The Agent shall have received from each Lender administrative details and a W-8 or W-9 tax form applicable to such Lender.

2.2     Conditions to All Borrowings.  Except as otherwise expressly provided herein, the obligation of each Lender to make Loans (including Loans made on the Effective Date) are subject, at the time of the making of such Loans to the satisfaction of the following conditions:

(a)     all representations and warranties by any Credit Party contained herein or in any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such date and also after giving effect to the making of such Loans, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date);

(b)     no Default or Event of Default shall have occurred and be continuing or would exist after giving effect to the proposed Loan;

(c)     prior to the making of each Loan, Agent shall have received a Notice of Borrowing meeting the requirements of subsection 1.5(a);

(d)     after giving effect to any Loan and the contemporaneous uses of the proceeds thereof, the Credit Parties' cash and Cash Equivalents shall not exceed $15,000,000; and

(e)     the proceeds of such Loans shall be used as set forth in and in accordance with the Budget.

The request by the Borrower and acceptance by the Borrower of the proceeds of any Loan shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by the Borrower that the conditions in this Section 2.2 have been satisfied and (ii) a reaffirmation by each Credit Party of the granting and continuance of Agent's Liens, on behalf of itself and the Secured Parties, pursuant to the Collateral Documents.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to Agent and each Lender that the following are, and after giving effect to the Transactions will be, true, correct and complete:

3.1     Corporate Existence and Power.  Each Credit Party and each of their respective Subsidiaries:

(a)     is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b)     has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under, the Loan Documents to which it is a party;

(c)     is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and in good standing (to the extent applicable with respect to the subject jurisdiction), under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license; and

(d)     is in compliance with all Requirements of Law;

except, in each case referred to in clause (b) (other than as it relates to the execution, delivery and performance of the Loan Documents), (c) or (d) above, to the extent that the failure to do so could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.2     <u>Corporate Authorization; No Contravention</u>.     The execution, delivery and performance by each of the Credit Parties of this Agreement and by each Credit Party and each Subsidiary thereof of any other Loan Document to which such Credit Party or Subsidiary is party have been duly authorized by all necessary action, and do not and will not:

(a)     contravene the terms of any of that Person's Organization Documents;

(b)     conflict with or result in any breach or contravention of, or result in the creation of any Lien (other than the obligation to create and maintain Liens on the Collateral pursuant to the Existing Indebtedness Documents) under, any document evidencing any material Contractual Obligation to which such Person is a party or any material order, injunction, writ or decree of any Governmental Authority to which such Person or its Property is subject; or

(c)     violate any material Requirement of Law in any material respect.

3.3     <u>Governmental Authorization</u>.     Other than any required approval of the Bankruptcy Court to be obtained pursuant to the Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party of this Agreement or any other Loan Document to which such Credit Party or any Subsidiary thereof is a party except (a) for recordings and filings in connection with the Liens granted to Agent under the Collateral Documents and the release of existing Liens, (b) those obtained or made on or prior to the Closing Date or in the Ordinary Course of Business thereafter as may be necessary to comply with such Credit Party's or Subsidiary's obligations under <u>Sections 4.8</u> and <u>4.13</u>, and (c) as may be required in connection with the disposition of any portion of the Pledged Collateral (as defined in the Guaranty and Security Agreement) by laws affecting the offering and sale of securities (including, but not limited to, membership interests in a limited liability company) generally.

3.4    Binding Effect.  This Agreement and each other Loan Document to which any Credit Party or any Subsidiary thereof is a party constitute the legal, valid and binding obligations of each such Credit Party or Subsidiary which is a party thereto, enforceable against such Credit Party or Subsidiary in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

3.5    Litigation.  Except for the motion(s) brought by the Credit Parties seeking entry of the Orders by the Bankruptcy Court, there are no actions, suits, proceedings, claims or disputes pending, or to the best knowledge of each Credit Party, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

(a)    purport to pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby or thereby; or

(b)    could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement or any other Loan Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided.

3.6    No Default.  No Default or Event of Default exists or would result from the incurring of any Obligations by any Credit Party or the grant or perfection of Agent's Liens on the Collateral.

3.7    ERISA Compliance.  Except as could not reasonably be expected to, either individually or in the aggregate, have a Material Adverse Effect, each Benefit Plan, and each trust thereunder, intended to qualify for tax exempt status under section 401 or 501 of the Code so qualifies.  Except as could not reasonably be expected to, either individually or in the aggregate, have a Material Adverse Effect:  (i) each Benefit Plan is in compliance with applicable provisions of ERISA, the Code and other Requirements of Law; (ii) there are no existing or pending (or to the knowledge of any Credit Party, threatened) claims (other than routine claims for benefits in the normal course), sanctions, actions, lawsuits or other proceedings or investigation involving any Benefit Plan to which any Credit Party incurs or otherwise has or could reasonably be expected to have an obligation or any Liability and (iii) no ERISA Event has occurred or is reasonably expected to occur.  There exists no Unfunded Pension Liability with respect to any Title IV Plan, except as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.8    Use of Proceeds; Margin Regulations.  The proceeds of the Loans are intended to be and shall be used solely for the purposes set forth in and permitted by Section 4.10, and are intended to be and shall be used in compliance with Section 5.7.  No Credit Party and no Subsidiary of any Credit Party is generally engaged in the business of purchasing or selling

Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock. The proceeds of the Loans shall not be used for the purpose of purchasing or carrying Margin Stock. As of the Effective Date, except as set forth on Schedule 3.8, no Credit Party and no Subsidiary of any Credit Party owns any Margin Stock.

3.9     Title to Properties.  As of the Effective Date, the Real Estate listed in Schedule 3.9 constitutes all of the Real Estate of each Credit Party and each of their respective Subsidiaries. Each of the Credit Parties and each of their respective Subsidiaries has good and marketable title in fee simple to, or valid leasehold interests in, all material Real Estate, and good and valid title to all material owned personal property and valid leasehold interests in all material leased personal property, in each instance, necessary or used in the ordinary conduct of their respective businesses and where the failure to have such title or other interest would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  None of the Property of any Credit Party or any Subsidiary of any Credit Party is subject to any Liens other than Permitted Liens.  All material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect.

3.10     Taxes.  All federal and material state, local and foreign income and franchise and other material tax returns, reports and statements (collectively, the "**Tax Returns**") required to be filed by any Tax Affiliate have been filed with the appropriate Governmental Authorities, all such Tax Returns are true and correct in all material respects, and all material taxes, assessments and other governmental charges and impositions reflected therein or otherwise due and payable have been paid prior to the date on which any Liability may be added thereto for non-payment thereof except for those contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Tax Affiliate in accordance with GAAP.  As of the Effective Date, no Tax Return is under audit or examination by any Governmental Authority and, except as set forth on Schedule 3.10, no notice of any audit or examination or any assertion of any material claim for Taxes has been given or made by any Governmental Authority.

3.11     Financial Condition.

(a)     The audited consolidated balance sheet of Holdings and its Subsidiaries dated December 31, 2013, and the related audited consolidated statements of income or operations, shareholders' equity and cash flows for the Fiscal Year ended on that date:

(i)     were prepared in accordance with GAAP consistently applied throughout the respective periods covered thereby, except as otherwise expressly noted therein, subject to, in the case of the unaudited interim financial statements, normal year-end adjustments and the lack of footnote disclosures; and

(ii)     present fairly in all material respects the consolidated financial condition of Holdings and its Subsidiaries as of the dates thereof and results of operations for the periods covered thereby.

(b)     [Intentionally Omitted].

(c)     Since December 31, 2013, there has been no Material Adverse Effect.

(d)     The Credit Parties and their Subsidiaries have no Indebtedness other than Indebtedness permitted pursuant to <u>Section 5.5</u> and have no Contingent Obligations other than Contingent Obligations permitted pursuant to <u>Section 5.8</u>.

(e)     All financial performance projections delivered to Agent, including the financial performance projections delivered prior to the Effective Date, represent Holdings' and the Borrower's best good faith estimate of future financial performance and are based on assumptions believed by Holdings and the Borrower to be fair and reasonable in light of current market conditions, it being acknowledged and agreed by Agent and Lenders that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by such projections may differ from the projected results and that such differences may be material.

(f)     The Initial Budget has been prepared by Holdings and the Borrower in light of the past operations of the business of Holdings and its Subsidiaries. As of the Effective Date, the Initial Budget is based upon estimates and assumptions stated therein, all of which Holdings and the Borrower believe to be reasonable and fair in light of conditions and facts known to Holdings and the Borrower as of the Effective Date and reflect the good faith, reasonable and fair estimates by Holdings and the Borrower of the future consolidated financial performance of Holdings and the Borrower and the other information projected therein for the period set forth therein.

3.12     <u>Environmental Matters</u>. Except as could not reasonably be expected to result in, either individually or in the aggregate, a Material Adverse Effect, (a) the operations of each Credit Party and each Subsidiary of each Credit Party are and have been in compliance with all applicable Environmental Laws, including obtaining, maintaining and complying with all Permits required by any applicable Environmental Law, (b) no Credit Party and no Subsidiary of any Credit Party is party to, and no Credit Party and no Subsidiary of any Credit Party and no Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of, any Contractual Obligation or any pending (or, to the knowledge of any Credit Party, threatened) order, action, investigation, suit, proceeding, audit, claim, demand, dispute or notice of violation or of potential liability or similar notice relating in any manner to any Environmental Law, (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any Real Estate of any Credit Party or any Subsidiary of any Credit Party and, to the knowledge of any Credit Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such Real Estate, (d) no Credit Party and no Subsidiary of any Credit Party has caused or suffered to occur a Release of Hazardous Materials at, to or from any Real Estate, (e) all Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Credit Party and each Subsidiary of each Credit Party is free of contamination by any Hazardous Materials and (f) no Credit Party and no Subsidiary of any Credit Party (i) is or has been engaged in, or has permitted any current or

former tenant to engage in, operations in violation of any Environmental Law or (ii) knows of any facts, circumstances or conditions reasonably constituting notice of a violation of any Environmental Law, including receipt of any information request or notice of potential responsibility under the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601 et seq.) or similar Environmental Laws. The representations and warranties contained in this <u>Section 3.12</u> are the sole and exclusive representations and warranties of each Credit Party and each Subsidiary with respect to any Environmental Laws and Hazardous Materials.

3.13    <u>Regulated Entities</u>.  None of any Credit Party, any Person controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other Federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its Obligations under the Loan Documents.

3.14    <u>[Intentionally Omitted]</u>.

3.15    <u>Labor Relations</u>.  There are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened in writing) against or involving any Credit Party or any Subsidiary of any Credit Party, except for those that could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 3.15, as of the Effective Date, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party, (b) to the knowledge of any Credit Party, no petition for certification or election of any such representative is existing or pending with respect to any employee of any Credit Party or any Subsidiary of any Credit Party and (c) to the knowledge of any Credit Party, no such representative has sought certification or recognition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party.

3.16    <u>Intellectual Property</u>.  Each Credit Party and each Subsidiary of each Credit Party owns, or is licensed to use, all Intellectual Property used in the conduct of its business as currently conducted except for such Intellectual Property the failure of which to own or license would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  To the knowledge of each Credit Party, (a) the conduct and operations of the businesses of each Credit Party and each Subsidiary of each Credit Party does not infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and (b) no other Person has contested any right, title or interest of any Credit Party or any Subsidiary of any Credit Party in, or relating to, any Intellectual Property owned or otherwise used by any Credit Party or any Subsidiary of any Credit Party, other than, in each case, as cannot reasonably be expected to affect the Loan Documents and the transactions contemplated therein and would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.17    <u>Brokers' Fees; Transaction Fees</u>.  Except for fees payable to Agent and the Lenders, none of the Credit Parties or any of their respective Subsidiaries has any obligation to

any Person in respect of any finder's, broker's or investment banker's or restructuring financial advisor's fee in connection with the transactions contemplated hereby.

3.18     Insurance.  Each of the Credit Parties and each of their respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar Properties in localities where such Person operates.  A true and complete listing of such insurance, including issuers, coverages and deductibles, has been provided to Agent.

3.19     Ventures, Subsidiaries and Affiliates; Outstanding Stock.  Except as set forth in Schedule 3.19, as of the Effective Date, no Credit Party and no Subsidiary of any Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person (it being understood that the Credit Parties shall be permitted to enter into such joint ventures or partnerships after the Effective Date as permitted under Section 5.4).  All issued and outstanding Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than, with respect to the Stock and Stock Equivalents of the Borrower and Subsidiaries of the Borrower, those (x) in favor of Agent, for the benefit of the Secured Parties and (y) subject to the terms of the Intercreditor Agreement, in favor of Existing Agent for the benefit of itself and the Existing Lenders.  All of the issued and outstanding Stock of each Credit Party (other than Holdings), each Subsidiary of each Credit Party and, as of the Effective Date, Holdings is owned by each of the Persons and in the amounts set forth in Schedule 3.19.  Except as set forth in Schedule 3.19 and for rights, options, warrants or similar rights to purchase shares of Stock and Stock Equivalents of Holdings permitted to be issued by Holdings hereunder, there are no pre-emptive or other outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party or any Subsidiary thereof may be required to issue, sell, repurchase or redeem any of its Stock or Stock Equivalents.  Set forth in Schedule 3.19 is a true and complete organizational chart of Holdings and all of its Subsidiaries as of the Effective Date.

3.20     Jurisdiction of Organization; Chief Executive Office.  Schedule 3.20 lists each Effective Party's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Credit Party's chief executive office or sole place of business, in each case as of the Effective Date.

3.21     Deposit Accounts and Other Accounts.  Schedule 3.21 lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts as of the Effective Date, and such Schedule correctly identifies the name and address of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

3.22     Status of Holdings.  Holdings has not engaged (and does not engage) in any business activities and does not own any Property other than (i) ownership of the Stock and Stock Equivalents of the Borrower, (ii) activities and contractual rights incidental to maintenance of its corporate existence and (iii) performance of its obligations under the Loan Documents and the Existing Indebtedness Documents to which it is a party.

3.23     Collateral.  Each Collateral Document is effective to create in favor of Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Collateral and, pursuant to the Interim Order or the Final Order, as applicable, the Liens created by each Collateral Document constitute fully perfected Liens on, and security interests in, all right, title and interest of the Credit Parties thereunder in the Collateral, in each case subject to no Liens other than Permitted Liens.

3.24     Full Disclosure.  None of the representations or warranties made by any Credit Party or any of their Subsidiaries in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate (other than any statement which constitutes projections, forward looking statements, budgets, estimates or general market data) furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the Loan Documents (including the offering and disclosure materials, if any, delivered by or on behalf of any Credit Party to Agent prior to the Effective Date, and, in such case, as supplemented prior to the Closing Date and excluding information of a general or industry specific nature), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not materially misleading as of the time when made or delivered, it being acknowledged and agreed by Agent and the Lenders that, to the extent included in any of the foregoing, projections, budgets, forward looking statements or estimates as to future events are inherently uncertain and are not to be viewed as facts and that the actual results during the period or periods covered by such projections, budgets, forward looking statements or estimates may materially differ from the projected results.

3.25     Foreign Assets Control Regulations and Anti-Money Laundering.  Each Credit Party and each Subsidiary of each Credit Party is and will remain in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  No Credit Party and no Subsidiary or Affiliate of a Credit Party (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "**SDN List**") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

3.26     Patriot Act.  The Credit Parties, each of their Subsidiaries and each of their Affiliates are in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "*know your customer*"

and anti-money laundering rules and regulations. No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

ARTICLE IV

AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied, unless the Required Lenders waive compliance in writing:

4.1     <u>Financial Statements</u>.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (<u>provided</u> that monthly and quarterly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments).  The Borrower shall deliver to Agent by Electronic Transmission:

(a)     as soon as available, but not later than ninety (90) days after the end of each Fiscal Year, a copy of the audited consolidated balance sheet of Holdings and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, and accompanied by the report of any "**Big Four**" or other nationally-recognized independent public accounting firm reasonably acceptable to Agent or any other independent public accounting firm (if not a "Big Four" or other nationally-recognized independent public accounting firm) acceptable to Agent in its sole discretion (it being agreed that, as of the Closing Date, BDO Seidman, LLP is acceptable to Agent) which report shall contain an unqualified opinion, stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except for such year to year inconsistencies as may arise due to a change in GAAP permitted hereunder));

(b)     as soon as available, but not later than forty-five (45) days after the end of each Fiscal Quarter in each Fiscal Year, a copy of the unaudited consolidated balance sheet of Holdings and its Subsidiaries, and the related consolidated statements of income, shareholders' equity and cash flows as of the end of such Fiscal Quarter and for the portion of the Fiscal Year then ended, all certified on behalf of the Borrower by an appropriate Responsible Officer of the Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures; and

(c)     as soon as available, but not later than thirty (30) days after the end of each fiscal month; a copy of the unaudited consolidated balance sheet of Holdings and its Subsidiaries, and the related consolidated statements of income, shareholders' equity and cash flows as of the end of such fiscal month and for the portion of the Fiscal Year then ended, all certified on behalf of the Borrower by an appropriate Responsible Officer of the Borrower as being complete and correct and fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures; and

(d)     on the 30th day following the Closing Date and each 30th day thereafter, a forecast, in a format reasonably satisfactory to the Required Lenders, of the receipts and disbursements of the Credit Parties and their respective domestic and foreign Subsidiaries for the next thirteen (13) weeks, together with a reconciliation in respect of actual receipts and disbursements in comparison to the Budget for the immediately preceding week.

4.2     Certificates; Other Information.     The Borrower shall furnish to Agent by Electronic Transmission and the Agent shall use commercially reasonable efforts to promptly deliver to the Lenders:

(a)     (together with each delivery of financial statements pursuant to (i) subsections 4.1(a) and 4.1(b), a management discussion and analysis report, in reasonable detail, signed by a Responsible Officer of the Borrower, describing the operations and financial condition of the Credit Parties and their Subsidiaries for the Fiscal Quarter and the portion of the Fiscal Year then ended (or for the Fiscal Year then ended in the case of annual financial statements), and (ii) subsections 4.1(a), 4.1(b) and 4.1(c), a report setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent projections for the current Fiscal Year delivered pursuant to subsection 4.2(d) and discussing the reasons for any significant variations;

(b)     concurrently with the delivery of the financial statements referred to in subsections 4.1(a), 4.1(b) and, solely to the extent necessary to calculate the Minimum Liquidity as and to the extent required by Section 6.2, 4.1(c), a fully and properly completed Compliance Certificate in form and substance reasonably acceptable to the Required Lenders, certified on behalf of the Borrower by a Responsible Officer of the Borrower;

(c)     as soon as available and in any event no later than forty-five (45) days after the first day of each Fiscal Year, projections of the Credit Parties (and their Subsidiaries') consolidated financial performance for such Fiscal Year on a month by month basis (it being understood by Agent and the Lenders that the results of such projections are inherently uncertain and are not to be viewed as facts and that the actual results may be materially different from the projected results);

(d)     promptly upon receipt thereof, copies of any reports submitted by the certified public accountants in connection with each annual, interim or special audit or review of any type of the financial statements or internal control systems of any Credit Party made by such accountants, including any comment letters submitted by such accountants to management of any Credit Party in connection with their services;

(e)     from time to time, if Agent determines in its reasonable discretion, or is directed by the Required Lenders, that obtaining appraisals is necessary in order for Agent or any Lender to comply with applicable laws or regulations (including any appraisals required to comply with FIRREA), and at any time if an Event of Default shall have occurred and be continuing, Agent may, or may require the Borrower to, in either case at the Borrower's expense, obtain appraisals in form and from appraisers reasonably satisfactory to Agent and the Required Lenders stating the then current fair market value of all or any portion of the personal property of any Credit Party or any Subsidiary of any Credit Party and the fair market value or such other value as reasonably determined by Agent (for example, replacement cost for purposes of Flood Insurance) of any Real Estate of any Credit Party or any Subsidiary of any Credit Party;

(f)     promptly following Agent's or any Lender's request therefor, all documentation and other information that Agent or such Lender reasonably requests in order to comply with its ongoing obligations under the applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act;

(g)     promptly, such additional business, financial, corporate affairs and other information with regards to Holdings and its Subsidiaries (excluding confidential information that is subject to a binding confidentiality agreement with a third party that is neither an Affiliate of Holdings nor a Secured Party, in its capacity as such, and which is in effect as of the Closing Date) as Agent may from time to time request on its own behalf or on behalf of the request of any Lender;

(h)     [Intentionally Omitted;]

(i)     all of the following documents, agreements, reports and other information:

(1)     on or before the Closing Date:

(i)     [intentionally omitted];

(ii)     [intentionally omitted];

(iii)     [intentionally omitted]; and

(iv)     the liquidity projections prepared by the Credit Parties, for both global and North American operations, on a monthly basis, through the fourth fiscal quarter of 2014, in the same format provided pursuant to the Initial Priming Loan Agreement; and

(2)     promptly upon receipt by any Credit Party or Subsidiary of a Credit Party, any supplement, amendment, update, replacement, modification or superseding document in respect of any of the items described in foregoing clauses (1) or (2);

(j)     any other information (excluding confidential information that is subject to a binding confidentiality agreement with a third party that is neither an Affiliate of Holdings nor a Secured Party, in its capacity as such, and which is in effect as of the Closing Date) promptly upon request by the Agent or the Required Lenders; and

(k)     on the 30th day following the Closing Date and each 30th day thereafter, an updated budget, in each case, in form and substance satisfactory to, and subject to the review and approval of, the Agent and the Required Lenders in their sole discretion (the "Updated Budget") consistent with the form of the Initial Budget; and (ii) on the Tuesday of every week beginning with the Tuesday of the first week following the Closing Date, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Borrower and the Guarantors for the prior week and setting forth all the variances, on a cumulative basis from the Closing Date and (if delivered during or after the fourth week after the Closing Date) on a rolling four week basis, from the amounts set forth for each line item for such periods as compared to the Initial Budget and the most recent Updated Budget (as applicable) delivered by the Borrower (and each such Variance Report shall include explanations for all material variances and shall be (i) certified by the Chief Financial Officer or any chief restructuring officer of the Borrower and (ii) certified by Dean Swick in his capacity as Vice President, Finance, of the Borrower pursuant to the terms of the A&M Engagement Letter, stating (A) that nothing has come to his attention that would lead him to believe that (1) the estimates, information and assumptions provided on the Updated Budget and Variance Report are based on unreasonable estimates, information and assumptions and (2) the Updated Budget and Variance Report are incorrect or misleading in any material respect, and (B) that in making the certifications set forth above, he has considered and relied solely upon (1) statements and information provided by the Borrower's management and advisors of which he has participated in developing and (2) such other investigations and inquiries as he has in good faith deemed appropriate.

4.3     Notices.  The Borrower shall notify promptly Agent of each of the following (and in no event later than three (3) Business Days after a Responsible Officer becoming aware thereof):

(a)     the occurrence or existence of any Default or Event of Default;

(b)     any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Credit Party or any Subsidiary of any Credit Party and any Governmental Authority which could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect;

(c)     the commencement of, or any material development in, any litigation or proceeding affecting any Credit Party or any Subsidiary of any Credit Party (i) which, if

adversely determined, could reasonably be expected to, either individually or in the aggregate, have a Material Adverse Effect, or (ii) in which the relief sought is an injunction or other stay of the performance of this Agreement or any other Loan Document;

(d)     (i) the receipt by any Credit Party or any Subsidiary thereof of any notice of violation of or potential liability or similar notice under Environmental Law, (ii)(A) unpermitted Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or Liabilities under, any Environmental Law or (C) the commencement of, or any change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or Liability under any Environmental Law which in the case of clauses (i) and (ii) (A), (B) and (C) above, either individually or in the aggregate for all such clauses, could reasonably be expected to result in a Material Adverse Effect, (iii) the receipt by any Credit Party of notification that any Real Estate of any Credit Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities and (iv) any proposed acquisition or lease of Real Estate, if such acquisition or lease could reasonably be expected to result in a Material Adverse Effect;

(e)     (i) any filing by any ERISA Affiliate of any notice of any reportable event under section 4043 of ERISA or intent to terminate any Title IV Plan if a Responsible Officer knows of such filing or intent and a material liability to a Credit Party could reasonably be expected to result, (ii) the filing of a request for a minimum funding waiver under section 412 of the Code by an ERISA Affiliate with respect to any Title IV Plan if a Responsible Officer knows of such filing and a material liability to a Credit Party could reasonably be expected to result, (iii) the occurrence of an ERISA Event and any action that any ERISA Affiliate proposes to take with respect thereto, together with a copy of any notices received from or filed with the PBGC, IRS, Multiemployer Plan or other Benefit Plan pertaining thereto if a Responsible Officer knows of the occurrence of such ERISA Event and a material liability to a Credit Party could reasonably be expected to result, and (iv) promptly, and in any event within thirty (30) days, after there has been a material increase in Unfunded Pension Liabilities (taking into account only Title IV Plans with positive Unfunded Pension Liabilities) since the date the representations hereunder are given or deemed given, or from any prior notice, as applicable, if a Responsible Officer knows of such increase and a material liability to a Credit Party could reasonably be expected to result;

(f)     any Material Adverse Effect subsequent to December 31, 2010;

(g)     any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party;

(h)     any labor controversy resulting in or threatening to result in any strike, work stoppage, boycott, shutdown or other labor disruption against or involving any Credit Party or any Subsidiary of any Credit Party if the same could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(i)     the creation, establishment or acquisition of any Subsidiary or the issuance by or to any Credit Party of any Stock or Stock Equivalent (other than issuances by Holdings of Stock or Stock Equivalents not requiring a mandatory prepayment hereunder).

Each notice pursuant to this Section shall be in electronic form accompanied by a statement by a Responsible Officer on behalf of the Borrower, setting forth reasonable details of the occurrence referred to therein, and stating what action the Borrower or other Person proposes to take with respect thereto and at what time. Each notice under subsection 4.3(a) shall describe with particularity the condition causing such Default or Event of Default.

4.4     Preservation of Corporate Existence, Etc.  Each Credit Party shall, and shall cause each of its Subsidiaries to:

(a)     preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except, with respect to the Borrower's Subsidiaries, in connection with transactions permitted by Section 5.3;

(b)     preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except in connection with transactions permitted by Section 5.3 and sales of assets permitted by Section 5.2 and except as could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(c)     preserve or renew all of its registered Trademarks and all other Intellectual Property, the non-preservation of which in the reasonable business judgment of such Credit Party could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

(d)     conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect and shall comply in all material respects with the terms of its IP Licenses.

4.5     Maintenance of Property.  Except for Intellectual Property owned by any Credit Party or any of its Subsidiaries, each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or useful in its business in good working order and condition, ordinary wear and tear, casualty and condemnation (subject to the applicable Credit Party's obligation to repair or restore the asset) excepted and shall make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.6     Insurance.

(a)     Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the property and businesses of the Credit Parties and such Subsidiaries (including

policies of life, fire, theft, product liability, public liability, Flood Insurance, property damage, other casualty, employee fidelity, workers' compensation, business interruption and employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Borrower) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties and (ii) cause all such insurance relating to any property or business of any Credit Party to name Agent as additional insured or loss payee, as appropriate. All policies of insurance on real and personal property of the Credit Parties will contain an endorsement, in form and substance reasonably acceptable to Agent, showing loss payable to Agent (Form CP 1218 or equivalent) and extra expense and business interruption endorsements. Unless otherwise agreed to by Agent (such agreement not to be unreasonably withheld or delayed), with respect to such endorsement, or an independent instrument furnished to Agent, the Credit Parties will use commercially reasonable efforts to cause insurers to give Agent at least thirty (30) days' prior written notice before any such policy or policies of insurance shall be altered or canceled and that no act or default of the Credit Parties or any other Person shall affect the right of Agent to recover under such policy or policies of insurance in case of loss or damage. Each Credit Party shall direct all present and future insurers under its "**All Risk**" policies of property insurance to pay all proceeds payable thereunder directly to Agent (and Agent agrees that, if no Event of Default shall have then occurred and be continuing, it shall provide any necessary endorsement to any check or other instrument representing payment of insurance proceeds such that the Borrower may reinvest the proceeds thereof). If any insurance proceeds are paid by check, draft or other instrument payable to any Credit Party and Agent jointly, Agent may endorse such Credit Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash (and Agent agrees that, if no Event of Default shall have then occurred and be continuing, it shall provide any necessary endorsement to any check or other instrument representing payment of insurance proceeds such that Borrower may reinvest the proceeds thereof). Agent reserves the right at any time, upon review of each Credit Party's risk profile and at the direction of the Required Lenders, to require additional forms and limits of insurance. Notwithstanding the requirement in underline(subsection (i)) above, Federal Flood Insurance shall not be required for (x) Real Estate not located in a Special Flood Hazard Area, or (y) Real Estate located in a Special Flood Hazard Area in a community that does not participate in the National Flood Insurance Program.

(b)     Unless the Credit Parties provide Agent with evidence of the insurance coverage required by this Agreement, Agent may (at the direction of the Required Lenders and upon receipt by the Agent of any amounts due from the Lenders in connection therewith), upon one (1) Business Day's prior notice to the Borrower, purchase insurance at the Credit Parties' expense to protect Agent's and Lenders' interests, including interests in the Credit Parties' and their Subsidiaries' properties.  This insurance may, but need not, protect the Credit Parties' and their Subsidiaries' interests.  The coverage that Agent purchases may not pay any claim that any Credit Party or any Subsidiary of any Credit Party makes or any claim that is made against such Credit Party or any Subsidiary in connection with said Property.  The Borrower may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that there has been obtained insurance as required by this Agreement (and, to the extent the Borrower has complied with the provisions of this sentence and are entitled to cancel any such insurance obtained by Agent, Agent agrees, to the extent necessary, to promptly cancel such insurance at the written direction of the Borrower).  If Agent purchases insurance, the Credit Parties will be

responsible for the costs of that insurance, including interest and any other charges Agent may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance shall be added to the Obligations. The costs of the insurance may be more than the cost of insurance the Borrower may be able to obtain on its own.

4.7    Payment of Obligations. Each Credit Party shall, and shall cause each of its Subsidiaries to, pay, discharge and perform as the same shall become due and payable or required to be performed:

(a)    all material tax liabilities, assessments and governmental charges or levies upon it or its Property, unless the same are immaterial or are being contested in good faith by appropriate proceedings diligently prosecuted which stay the enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(b)    all material lawful claims which, if unpaid, would by law become a Lien (other than a Permitted Lien) upon its Property unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the imposition or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person; and

(c)    payments to the extent necessary to avoid the imposition of a Lien with respect to, or the involuntary termination of, any underfunded Benefit Plan.

4.8    Compliance with Laws. Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

4.9    Inspection of Property and Books and Records; Annual Meetings.

(a)    Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person. Each Credit Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled property, during normal business hours and upon reasonable advance notice from Agent (unless an Event of Default shall have occurred and be continuing, in which event no notice shall be required and Agent shall have access at any and all times during the continuance thereof) permit officers and designated representatives of Agent, at the Borrower's expense, to visit and inspect, under guidance of officers of such Credit Party or such Subsidiary, any of the properties of such Credit Party or such Subsidiary, and to examine the books of account of such Credit Party or such Subsidiary and discuss the affairs, finances and accounts of such Credit Party or such Subsidiary with, and be advised as to the same by, its and their officers and independent accountants (provided that the Borrower shall have an opportunity to be present for any discussions with its independent accountants), all upon reasonable prior notice and at such reasonable times and

intervals and to such reasonable extent as Agent may reasonably request; provided, the Borrower shall only be obligated to reimburse Agent for reasonable and documented expenses incurred by Agent in connection with one (1) such visit, inspection, examination and discussion by Agent in any Fiscal Year or more frequently if an Event of Default has occurred and is continuing. Any Lender may accompany Agent or its Related Persons (or if permitted by Agent, in lieu of the Agent or its Related Persons) in connection with any such visit, inspection, examination and discussion at such Lender's expense.

       (b)     [Intentionally omitted].

       (c)     Whenever requested by the Agent (acting at the direction of the Required Lenders), upon one (1) Business Day's notice, the Borrower and Alvarez & Marsal shall hold a conference call with the Agent and the Lenders and their respective counsel to discuss current liquidity levels and the most recently delivered Variance Report.

       4.10   Use of Proceeds. The proceeds of the Loans shall be used on the date of the initial Borrowing (whether on the Effective Date or the Business Day following the Effective Date) to repay all amounts outstanding pursuant to the Priming Facility, and the proceeds of the Loans shall otherwise be used solely for (a) working capital (excluding capital expenditures) of the Credit Parties to the extent set forth in the Budget, subject to Permitted Variances, (b) capital expenditures to the extent set forth in the Budget and permitted by Section 6.1, and (c) for payment of (i) costs of administration of the Cases, to the extent set forth in the Budget, (ii) fees and expenses under Section 1.9 and (iii) such pre-petition obligations as the Court shall approve, in each case in a manner consistent with the terms and conditions of this Agreement.

       4.11   Landlord Agreements. Each Credit Party shall use commercially reasonable efforts to obtain a landlord agreement or bailee waivers, as applicable, from the lessor of each leased property or bailee in possession of any Collateral with respect to each location (if any) where any Collateral with a Fair Market Value of $1,000,000 or more is stored or located, which agreement(s) or waiver(s) (if any) shall be reasonably satisfactory in form and substance to Agent and the Required Lenders.

       4.12   Further Assurances.

       (a)     Each Credit Party shall ensure that all written information, exhibits and reports furnished to Agent or the Lenders (excluding information of a general or industry specific nature) do not and will not contain any untrue statement of a material fact (provided, to the extent any such information, exhibits or reports contain projections, budgets, forward looking statements or estimates Agent and the Lenders acknowledge and agree that projections, budgets, forward looking statements or estimates as to future events are inherently uncertain and are not to be viewed as facts and that the actual results during the period or periods covered by such projections, budgets, forward looking statements or estimates may materially differ from the projected results) and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein taken as a whole not materially misleading in light of the circumstances in which made, and will promptly disclose to Agent and the Lenders and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof.

(b)     Promptly upon written request by Agent, the Credit Parties shall (and, subject to the limitations hereinafter set forth, shall cause each of their Subsidiaries (other than Excluded Subsidiaries) to) take such additional actions and execute such documents as Agent (acting at the direction of the Required Lenders) may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject to the Liens created by any of the Collateral Documents any of the Properties, rights or interests covered by any of the Collateral Documents (subject to any limitations in the Collateral Documents), (iii) to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents (subject to any limitations in the Collateral Documents) and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document (subject to any limitations in the Loan Documents).  Without limiting the generality of the foregoing and except as otherwise approved in writing by the Required Lenders, the Credit Parties shall cause each of their Wholly-Owned Domestic Subsidiaries (other than Excluded Subsidiaries) to guaranty the Obligations and to cause each such Wholly-Owned Domestic Subsidiary to grant to Agent, for the benefit of the Secured Parties, a security interest in, subject to the limitations hereinafter set forth and in the Guarantee and Security Agreement, all of such Wholly-Owned Domestic Subsidiary's Property to secure such guaranty (it being understood that no CFC shall be required to guaranty the Obligations or grant a security interest in its Property).  Furthermore and except as otherwise approved in writing by the Required Lenders, each Credit Party shall, and shall cause each of its Wholly-Owned Domestic Subsidiaries (other than Excluded Subsidiaries) to, (x) pledge all of the Stock and Stock Equivalents of each of its Domestic Subsidiaries (other than Excluded Subsidiaries of the type described in clause (v) of the definition thereof) and (y) (I) pledge sixty-five percent (65%) of the outstanding voting Stock and Stock Equivalents of each First-Tier Foreign Subsidiary that is a direct Subsidiary of a Credit Party and each Excluded Subsidiary of the type described in clause (v) of the definition thereof and (II) one hundred percent (100%) of the outstanding non-voting Stock and Stock Equivalents of each First-Tier Foreign Subsidiary and each Excluded Subsidiary of the type described in clause (v) of the definition thereof, in each instance, to Agent, for the benefit of the Secured Parties, to secure the Obligations.  In connection with each pledge of Stock and Stock Equivalents, the Credit Parties shall deliver, or cause to be delivered, to Agent, irrevocable proxies and stock powers and/or assignments, as applicable, duly executed in blank.  In the event (i) any Credit Party acquires any Real Estate (other than (x) owned Real Estate with a Fair Market Value of less than $2,000,000 and (y) Real Estate that is a leasehold interest unless, in either case, a security interest in such Real Estate is granted or required to be granted pursuant to the Existing Indebtedness Documents) or (ii) any owned Real Estate of any Credit Party on the Closing Date which is not otherwise required to be subject to a Mortgage increases in value to have a Fair Market Value of $2,000,000 or more, then the Borrower shall give Agent prompt notice thereof and within ninety (90) days after such acquisition or other event (as such date may be extended by Agent at the direction of the Required Lenders), such Credit Party shall execute and/or deliver, or cause to be executed and/or delivered, to Agent, (v) if requested by Agent, an appraisal complying with FIRREA, (w) a fully executed Mortgage, in form and substance reasonably satisfactory to Agent and the Borrower together with a Mortgage Policy issued by a title insurer reasonably satisfactory to Agent, in form and substance and in an amount reasonably satisfactory to Agent insuring that the Mortgage is a valid and enforceable first priority Lien on the respective

property, free and clear of all defects, encumbrances and Liens (other than Permitted Liens related thereto), (x) then current A.L.T.A. surveys, certified to Agent by a licensed surveyor sufficient to allow the issuer of the lender's title insurance policy to issue such policy without a survey exception, (y) to the extent that such Real Estate is located in a Special Flood Hazard Area, Federal Flood Insurance as required by subsection 4.6(a), (z) if reasonably requested by Agent, a "Phase I" environmental site assessment prepared by a qualified firm reasonably acceptable to Agent and (aa) opinions of counsel for the Credit Parties in form and substance reasonably satisfactory to Agent. In addition to the obligations set forth in subsections 4.6(a) and 4.12(b)(y), within forty-five (45) days after written notice from Agent to the Credit Parties that any Real Estate is located in a Special Flood Hazard Area, the Credit Parties shall satisfy the Federal Flood Insurance requirements of subsection 4.6(a). Holdings and the Borrower hereby agree that, upon any Subsidiary of the Borrower ceasing to constitute an Excluded Subsidiary, Holdings and the Borrower shall take, or shall cause the other Credit Parties to take, all such actions that would otherwise have been required to be taken by, or with respect to, such Subsidiary pursuant to the provisions of this Section 4.12. Notwithstanding anything herein to the contrary, in the event that any subsidiary of Holdings guarantees the obligations under the Existing Credit Agreement, such subsidiary shall also guarantee the Obligations hereunder.

4.13   Environmental Matters.   Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its Real Estate, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve such compliance or that is required by orders and directives of any Governmental Authority issued pursuant to any applicable Environmental Laws), in each case except where the failure to comply could not reasonably be expected to, either individually or in the aggregate, result in a Material Adverse Effect. Without limiting the foregoing, if an Event of Default is continuing or if Agent at any time reasonably believes that with respect to such Real Estate there exist violations of Environmental Laws by any Credit Party or any Subsidiary of any Credit Party or that there exist any Environmental Liabilities, in each case that could reasonably be expected to, either individually or in the aggregate, result in a Material Adverse Effect, then each Credit Party shall, within ninety (90) days after receipt of a reasonable written request from Agent, cause the performance of such environmental audits and assessments regarding the matters which are the subject of such Event of Default, violation or material Environmental Liabilities, including (where and as appropriate) subsurface sampling of soil and groundwater, and cause the preparation of such reports, in each case as Agent may from time to time reasonably request. Such audits, assessments and reports shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to Agent and the Required Lenders and shall be in form and substance reasonably acceptable to Agent and the Required Lenders. To the extent a Credit Party does not diligently pursue its obligation to provide any such audit or assessment within such ninety (90) day period, such Credit Party shall allow Agent and its Related Persons (at the expense of such Credit Party) reasonable access to the relevant Real Estate for the purpose of conducting such environmental audits and assessments.

4.14   Intentionally Omitted.

4.15   Intentionally Omitted.

4.16    <u>Cash Management Systems</u>.  Cause each depository, securities intermediary or commodities intermediary to enter into (and thereafter maintain), Control Agreements with respect to each deposit, securities, commodity or similar account maintained by such Person (other than any Excluded Accounts) as of or after the Closing Date.

4.17    <u>Milestones</u>.

(a)    The Credit Parties shall use their best efforts to pursue and implement the Reorganization Plan.

(b)    The Borrower shall achieve each of the following milestones:

(i) the Interim Order shall be entered within three (3) Business Days of the Petition Date;

(ii) the Reorganization Plan and related disclosure statement shall be filed with the Bankruptcy Court within three (3) days of the Petition Date;

(iii) the Final DIP Order shall be entered within twenty-eight (28) days after the entry of the Interim Order;

(iv) the Bankruptcy Court's order (the "**Solicitation Order**") approving the disclosure statement and solicitation materials related thereto and setting a hearing to confirm the Reorganization Plan shall be entered by the Bankruptcy Court within forty-five (45) days of the Petition Date and such Solicitation Order is in form and substance satisfactory to the Required Lenders in their sole discretion;

(v) the Bankruptcy Court's order (the "**Confirmation Order**") confirming the Reorganization Plan shall be entered by the Bankruptcy Court within forty-five (45) days of the Bankruptcy Court's entry of the Solicitation Order and such Confirmation Order is in form and substance satisfactory to the Administrative Agent in its sole discretion; and

(vi) on or prior to the twenty-first (21st) day after entry of the Confirmation Order, the effective date of the Reorganization Plan shall have occurred.

ARTICLE V

NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than (i) contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied, unless the Required Lenders waive compliance in writing:

5.1    <u>Limitation on Liens</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to

exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("**Permitted Liens**"):

(a) any Lien existing on the Property of a Credit Party or a Subsidiary of a Credit Party on the Closing Date and set forth in Schedule 5.1 securing Indebtedness outstanding on such date and permitted by subsection 5.5(c), including replacement Liens on the Property currently subject to such Liens securing Indebtedness permitted by subsection 5.5(c);

(b) any Lien created under any Loan Document;

(c) Liens for taxes, fees, assessments or other governmental charges (i) which are not past due or remain payable without penalty, or (ii) the non-payment of which is permitted by Section 4.7;

(d) carriers', warehousemen's, suppliers', mechanics', landlords', materialmen's, repairmen's or other similar Liens arising in the Ordinary Course of Business which are not delinquent for more than ninety (90) days or remain payable without penalty or which are being contested in good faith and by appropriate proceedings diligently prosecuted, which proceedings have the effect of preventing the forfeiture or sale of the Property subject thereto and for which adequate reserves in accordance with GAAP are being maintained;

(e) Liens (other than any Lien imposed by ERISA) consisting of pledges or deposits or bonds required in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation or to secure the performance of tenders, statutory, regulatory, contractual or warranty obligations, surety, stay, customs and appeals bonds, bids, leases, governmental contract, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money) or to secure liability to insurance carriers;

(f) Liens consisting of judgment or judicial attachment liens (other than for payment of taxes, assessments or other governmental charges), which do not constitute an Event of Default under subsection 7.1(h) or (i); provided that the enforcement of such Liens is effectively stayed;

(g) easements, rights-of-way, covenants, conditions, zoning and other restrictions, building codes, minor defects or other irregularities in title, and other similar encumbrances incurred in the Ordinary Course of Business or imposed by law which, either individually or in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the Property subject thereto or interfere in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party;

(h) Liens on any Property acquired or held by any Credit Party or any Subsidiary of any Credit Party securing Indebtedness incurred or assumed for the purpose of financing (or refinancing) all or any part of the cost of acquiring such Property and

permitted under subsection 5.5(d); provided that (i) with respect to the initial financing of such Property, any such Lien attaches to such Property concurrently with or within ninety (90) days after the acquisition thereof, (ii) such Lien attaches solely to the Property so acquired in such transaction and the proceeds thereof, and (iii) the principal amount of the debt secured thereby does not exceed 100% of the cost (including any reasonable out-of-pocket expenses associated with acquisition) of such Property;

(i)        [intentionally omitted];

(j)        any interest or title of a lessor or sublessor, licensor or sublicensor under any operating lease or license permitted by this Agreement;

(k)        Liens arising from precautionary uniform commercial code financing statements filed under any operating lease permitted by this Agreement;

(l)        [intentionally omitted];

(m)        Liens in favor of collecting banks arising under section 4-210 of the Uniform Commercial Code or, with respect to collecting banks located in the State of New York, under section 4-208 of the Uniform Commercial Code;

(n)        Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits;

(o)        Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Borrower or any Subsidiary of the Borrower in the Ordinary Course of Business;

(p)        Liens in favor of customs and revenue authorities arising as a matter of law which secure payment of customs duties in connection with the importation of goods in the Ordinary Course of Business;

(q)        Existing Indebtedness Liens;

(r)        [intentionally omitted];

(s)        Liens incurred in the Ordinary Course of Business in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets, or in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such goods or assets;

(t)        deposits in the Ordinary Course of Business securing liability for reimbursement obligations of insurance carriers providing insurance to the Borrower or any of its Subsidiaries;

(u)      Liens in favor of a financial institution arising as a matter of law encumbering financial assets on deposit in securities accounts (including the right of set-off) and which are within the general parameters customary to the securities industry;

(v)      Liens that are contractual rights of set-off relating to the establishment of depository and cash management relations with banks not given in connection with the issuance of Indebtedness for borrowed money and which are within the general parameters customary to the banking industry;

(w)      Liens consisting of prepayments and security deposits in connection with leases, utility services and similar transactions entered into by the applicable Credit Party or Subsidiary of a Credit Party in the Ordinary Course of Business and not required as a result of any breach of any agreement or default in payment of any obligation;

(x)      [Intentionally Omitted];

(y)      Liens arising by operation of law or contract on insurance policies and proceeds thereof to secure premiums payable thereunder;

(z)      additional Liens of the Borrower or any Subsidiary of the Borrower not otherwise permitted by this Section 5.1 that do not secure Indebtedness for borrowed money, Capital Lease Obligations, Indebtedness of the type described in clause (g) of the definition thereof or letters of credit (or similar instruments) and do not otherwise secure obligations in excess of $100,000 in the aggregate for all such Liens at any time; and

(aa)      Liens securing Indebtedness permitted under subsection 5.5(k); provided such Liens encumber only the assets of the Foreign Subsidiaries obligated in respect of such Indebtedness.

5.2      Disposition of Assets.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including the Stock of any Subsidiary of any Credit Party, whether in a public or private offering or otherwise, and accounts and notes receivable, with or without recourse), or enter into any sale-leaseback transaction, or enter into any agreement to do any of the foregoing, except:

(a)      dispositions of inventory in the Ordinary Course of Business;

(b)      dispositions of Cash Equivalents for cash and at Fair Market Value;

(c)      [intentionally omitted];

(d)      (i) any Subsidiary of the Borrower may transfer any of its Property to the Borrower or any Subsidiary Guarantor and (ii) the Borrower may transfer any of its Property to any Subsidiary Guarantor so long as the Borrower does not transfer all or any material portion of its Property pursuant to this clause (e)(ii);

(e)      [intentionally omitted];

(f)     [intentionally omitted];

(g)     sales or discount, in each case without recourse and in the Ordinary Course of Business, of Accounts arising in the Ordinary Course of Business, but only in connection with the collection or compromise thereof and not as part of any financing transaction;

(h)     [intentionally omitted];

(i)     dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any Property of any Credit Party or any Subsidiary thereof provided the net proceeds thereof are applied (and/or reinvested) in accordance with subsection 1.8(c);

(j)     [intentionally omitted];

(k)     Liens permitted under Section 5.1 (to the extent constituting a transfer of Property).

5.3     Consolidations and Mergers.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, liquidate or dissolve its affairs, merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person (other than in connection with a Reorganization Plan).

5.4     Loans and Investments.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, including the establishment or creation of a Subsidiary, or (ii) make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including without limitation, by way of merger, consolidation or other combination or (iii) make or purchase any advance, loan, extension of credit or capital contribution to or any other investment in, any Person including the Borrower, any Affiliate of the Borrower or any Subsidiary of the Borrower (the items described in clauses (i), (ii) and (iii) are referred to as "**Investments**"), except for the following to the extent in accordance with the Budget:

(a)     Investments in cash and Cash Equivalents;

(b)     extensions of credit or any other Investment by (i) any Credit Party (other than Holdings) to any other Credit Party (other than Holdings), provided that the Borrower may not transfer all or any material portion of its property pursuant to this clause (b), (ii) [intentionally omitted]; and (iii) by any Credit Party in any subsidiary of a Credit Party that is not a Credit Party if approved in writing by the Required Lenders;

(c)     [intentionally omitted];

(d)     Investments received as the non-cash portion of consideration received in connection with transactions permitted pursuant to subsection 5.2(b);

(e)     Investments acquired in connection with the settlement of delinquent Accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers;

(f)     [intentionally omitted];

(g)     Investments existing on the Closing Date and set forth on Schedule 5.4;

(h)     Investments comprised of Contingent Obligations permitted by Section 5.8;

(i)     transactions permitted under Section 5.3;

(j)     Accounts (including extensions of trade credit) owing to the Borrower or any Subsidiary of the Borrower, if created or acquired in the Ordinary Course of Business and payable or dischargeable in accordance with customary trade terms of the Borrower or such Subsidiary;

(k)     [intentionally omitted];

(l)     [intentionally omitted];

(m)     [intentionally omitted];

(n)     to the extent constituting an Investment, Capital Expenditures permitted hereunder;

(o)     to the extent constituting Investments, pledges and deposits in the Ordinary Course of Business to the extent permitted by subsection 5.1(e) or 5.1(w);

(p)     [intentionally omitted]; and

(q)     to the extent constituting an Investment, prepayments and deposits to suppliers made in the Ordinary Course of Business.

5.5     Limitation on Indebtedness.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except for the following to the extent in accordance with the Budget:

(a)     the Obligations;

(b)     Indebtedness consisting of Contingent Obligations described in clause (j) of the definition of Indebtedness and permitted pursuant to Section 5.8;

(c)     Indebtedness existing on the Closing Date and set forth in Schedule 5.5 (excluding Indebtedness of Foreign Subsidiaries under local lines of credit) (plus any accrued but unpaid interest, redemption premium and reasonable and documents fees and expenses, which may be converted to principal);

(d)　Indebtedness consisting of Capital Lease Obligations or secured by Liens permitted by <u>subsection 5.1(h)</u>, in each case, outstanding as of the Closing Date;

(e)　unsecured intercompany Indebtedness permitted pursuant to subsection 5.4(b);

(f)　[intentionally omitted];

(g)　[intentionally omitted];

(h)　Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within four Business Days of its incurrence;

(i)　customary obligations of the Borrower and its Subsidiaries to banks in respect of netting services, overdraft protections and similar arrangements in each case in connection with maintaining deposit accounts in the ordinary course of business;

(j)　Indebtedness consisting of the financing of insurance premiums in the Ordinary Course of Business;

(k)　Indebtedness of Foreign Subsidiaries of the Borrower under local lines of credit (inclusive of any local lines of credit existing on the Closing Date) for the working capital and general corporate purposes of such Foreign Subsidiaries in an aggregate principal amount not to exceed $32,000,000 at any time outstanding; and

(l)　unsecured Indebtedness of the Foreign Subsidiaries of Holdings not exceeding $7,500,000 in the aggregate at any time outstanding.

5.6　_Transactions with Affiliates_.　No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of Borrower or of any such Subsidiary, except for the following to the extent in accordance with the Budget:

(a)　as expressly permitted by this Agreement and the Loan Documents;

(b)　upon fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of the Borrower or such Subsidiary;

(c)　customary fees, expense reimbursement and indemnification may be paid and provided to directors of Holdings and its Subsidiaries;

(d)　Holdings and its Subsidiaries may enter into, and may make payments under, employment agreements, employee benefits plans, stock option plans, indemnification provisions and other similar compensatory arrangements with officers, employees and directors of the Borrower and its Subsidiaries in the Ordinary Course of

Business (including, but not limited to, compensation or any employee benefit allowance paid or provided to officers, directors and employees for actual services rendered to the Credit Parties and their Subsidiaries, including severance and the maintenance of benefit programs or arrangements for employees, officers or directors, including, without limitation, bonus payments, vacation plans, health and life insurance plans, deferred compensation plans, and retirement or savings plans and similar plans and indemnification of officers and employees);

(e)     Subsidiaries of the Borrower may pay management fees, licensing fees and similar fees and payments for cross-region shipments to the Borrower or to any Subsidiary Guarantor;

(f)     [Intentionally Omitted];

(g)     [Intentionally Omitted];

(h)     [Intentionally Omitted]; and

(i)     [Intentionally Omitted].

Notwithstanding anything to the contrary contained above in this Section 5.6, in no event shall Holdings or any of its Subsidiaries pay any management, consulting or similar fee to any of their respective Affiliates except as specifically provided in clauses (c) through (i) of this Section 5.6.

5.7     Use of Proceeds.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, use any portion of the Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of any Credit Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of this Agreement.

5.8     Contingent Obligations.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except in respect of the Obligations and except for the following to the extent in accordance with the Budget:

(a)     endorsements for collection or deposit in the Ordinary Course of Business;

(b)     Rate Contracts entered into in the Ordinary Course of Business for bona fide hedging purposes and not for speculation;

(c)     Contingent Obligations of the Credit Parties and their Subsidiaries existing as of the Closing Date and listed in Schedule 5.8, including extension and renewals thereof which do not increase the amount of such Contingent Obligations or impose materially more restrictive or adverse terms on the Credit Parties or their Subsidiaries as compared to the terms of the Contingent Obligation being renewed or extended;

(d)     Contingent Obligations arising under indemnity agreements to title insurers to cause such title insurers to issue to Agent title insurance policies;

(e)     Contingent Obligations arising with respect to customary indemnification obligations in favor of (i) sellers in connection with Acquisitions permitted hereunder and (ii) purchasers in connection with dispositions permitted under subsection 5.2(b);

(f)     (i) Contingent Obligations of a Credit Party arising under guarantees made by each Credit Party in the Ordinary Course of Business of obligations of any Credit Party (other than Holdings, except in the case of the Existing Indebtedness), which obligations are otherwise permitted hereunder (including guaranties in respect of the Existing Indebtedness), (ii) Contingent Obligations of a Credit Party arising under guarantees made by each Credit Party in the Ordinary Course of Business of obligations of any Foreign Subsidiary of the Borrower, which obligations are otherwise permitted hereunder and the Investment represented by such guarantees is otherwise permitted by Section 5.4, and (iii) Contingent Obligations of a Foreign Subsidiary of the Borrower arising under guarantees made by each Foreign Subsidiary of the Borrower in the Ordinary Course of Business of obligations of any other Foreign Subsidiary of the Borrower permitted hereunder and the Investment represented by such guarantees is otherwise permitted by Section 5.4; provided that, in the case of preceding clauses (i) and (ii), if such obligation is subordinated to the Obligations, such guarantee shall be subordinated to the same extent;

(g)     Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeals bonds, performance bonds and other similar obligations;

(h)     Contingent Obligations arising under Letters of Credit;

(i)     product warranties provided by a Credit Party or Subsidiary of a Credit Party in the Ordinary Course of Business;

(j)     Contingent Obligations arising under other customary indemnities incurred in the Ordinary Course of Business and otherwise permitted hereunder (including indemnities permitted by Section 5.6); and

(k)     other Contingent Obligations not exceeding $100,000 in the aggregate at any time outstanding.

5.9     Restricted Payments.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock Equivalent, or (ii) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent now or hereafter outstanding (the items described in clauses (i) and (ii) above are referred to as "**Restricted Payments**"); except that any Wholly-Owned Subsidiary of the Borrower may declare and pay dividends to the Borrower or any Wholly-Owned Subsidiary of the Borrower, and except that, to the extent in accordance with the Budget:

(c)     [intentionally omitted];

(d)     [intentionally omitted];

(e)     [intentionally omitted];

(f)     the Borrower may pay cash distributions to Holdings in aggregate amount since the Closing Date not to exceed $100,000 so long as the proceeds thereof are promptly used in accordance with the Budget by Holdings to pay operating expenses incurred in the Ordinary Course of Business (including, without limitation, outside directors and professional fees, expenses and indemnities, but excluding any management or similar fees payable to the Sponsor or any of its Affiliates) and other similar corporate overhead costs and expenses.

5.10    <u>Limitations on Payments on Existing Indebtedness and Subordinated Indebtedness</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, make (or give any notice in respect of) (x) any voluntary or optional payment or prepayment on or redemption, repurchase or acquisition for value of, any Existing Indebtedness or any other Indebtedness existing on the Closing Date, or (y) any payment in respect of any earn-out obligations except to the extent expressly permitted pursuant to the terms of such earn-out obligations but subject to the subordination provisions applicable thereto.

5.11    <u>Change in Business</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any line of business substantially different from those lines of business carried on by it on the date hereof and other businesses that are reasonably related or complimentary thereto. Holdings shall not engage in any business activities or own any Property other than (i) ownership of the Stock and Stock Equivalents of the Borrower, (ii) activities and contractual rights incidental to maintenance of its corporate existence (including the incurrence of any corporate overhead), (iii) the hiring and employment of members of the management of the Borrower and activities reasonably related thereto, (iv) performance of its obligations under the Loan Documents and Existing Indebtedness Documents to which it is a party, and (v) other activities of Holdings expressly permitted hereunder.

5.12    <u>Change in Structure</u>.  Except as expressly permitted under <u>Section 5.3</u>, no Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, amend any of its Organization Documents in any manner.

5.13    <u>Changes in Accounting, Name and Jurisdiction of Organization</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP, (ii) change the Fiscal Year or method for determining Fiscal Quarters of any Credit Party or of any consolidated Subsidiary of any Credit Party, (iii) change its name as it appears in official filings in its jurisdiction of organization or (iv) change its jurisdiction of organization.

5.14    <u>Amendments to Existing Indebtedness</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries directly or indirectly to, change or amend the terms of any Existing Indebtedness Documents except as permitted by the Intercreditor Agreement.

5.15    <u>No Negative Pledges</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become

effective any encumbrance or restriction on the ability of any such Credit Party or Subsidiary to (a) pay dividends or make any other distributions on its Stock or Stock Equivalents or participation in its profits owned by Holdings or any of its Subsidiaries, or pay any Indebtedness owed to Holdings or any of its Subsidiaries, (b) make loans or advances to Holdings or any of its Subsidiaries or (c) transfer any of its properties or assets to Holdings or any of its Subsidiaries, except for such encumbrances or restrictions existing by reason of (i) applicable law, (ii) this Agreement and the other Loan Documents, (iii) the Existing Indebtedness Documents, (iv) customary provisions restricting subletting or assignment of any lease governing any leasehold interest of Holdings or any of its Subsidiaries, (v) customary provisions restricting assignment of any licensing agreement (in which Holdings or any of its Subsidiaries is the licensee) or other contract entered into by Holdings or any of its Subsidiaries in the Ordinary Course of Business, (vi) restrictions on the transfer of any asset pending the close of the sale of such asset, (vii) restrictions with respect to a Subsidiary of the Borrower and imposed pursuant to an agreement that has been entered into for the sale or disposition of 100% of the outstanding Stock or all or substantially all of the assets of such Subsidiary in compliance with the other provisions of this Agreement, (viii) [Intentionally Omitted], (ix) customary provisions in joint venture agreements and other similar agreements in each case relating solely to the applicable joint venture or similar entity or the Stock or Stock Equivalents therein entered into in the Ordinary Course of Business prior to the Closing Date, (x) restrictions contained in the terms of purchase money obligations or Capitalized Lease Obligations not incurred in violation of this Agreement, provided that such restrictions relate only to the Property financed with such Indebtedness (and the proceeds thereof), and (xi) any other customary provisions arising or agreed to in the Ordinary Course of Business not relating to Indebtedness or Stock or Stock Equivalents that do not individually or in the aggregate (x) detract in any material respect from the value of the assets of Holdings or any of its Subsidiaries or (y) otherwise impair the ability of Holdings or any of its Subsidiaries to perform their obligations under the Loan Documents.

5.16    <u>OFAC; Patriot Act</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, fail to comply with the laws, regulations and executive orders referred to in <u>Sections 3.23</u> and <u>3.24</u>.

5.17    <u>DIP Financing</u>.   The Credit Parties shall not, and shall not permit their Subsidiaries to, incur or apply to the Bankruptcy Court for authority to incur, or suffer to exist, any (i) indebtedness having the priority afforded by section 364(c) or (d) of the Bankruptcy Code (including any Superpriority Claims) other than the financing provided for under this Agreement and the other Loan Documents or as authorized pursuant to the Orders or (ii) obligation to make adequate protection payments, or otherwise provide adequate protection, other than (A) as contemplated by the Orders or (B) as approved by the Required Lenders.

5.18    <u>Alteration of Rights of Lenders</u>.  The Credit Parties shall not, and shall not permit their Subsidiaries to, limit, affect or modify, or apply to the Bankruptcy Court to limit, affect or modify Agent or any Lender's rights with respect to the Obligations, including rights with respect to Post-Petition Collateral (as defined in the Orders) and the priority thereof and payment of various amounts, pursuant to any Reorganization Plan or otherwise.

5.19    <u>Claims</u>.  Except for the Carve Out (as defined in the Interim Order or the Final Order, as applicable), the Credit Parties shall not, and shall not permit their Subsidiaries to, apply

to the Bankruptcy Court for the authority to incur, create, assume, suffer or permit any claim, Lien or encumbrance (other than Permitted Liens) against any of the Credit Parties or any of their respective Subsidiaries or any of their respective assets in the Cases to be pari passu with, or senior to, the Liens and claims of the Lender granted and arising hereunder and under the Orders.

5.20    Bankruptcy Matters.  The Credit Parties shall not, and shall not permit any of their Subsidiaries to, (i) pay or otherwise satisfy any pre-petition claims of any Debtor (other than claims paid pursuant to any order approved by the Required Lenders and entered by the Bankruptcy Court), including, without limitation, any pre-petition claims of any vendors or supplier unless such vendor or supplier has signed a vendor support agreement, in form and substance acceptable to the Required Lenders (provided, that nothing in this Section 5.20 shall be construed to prohibit any Subsidiary that is not a Credit Party from paying or otherwise satisfying any pre-petition claim of such Subsidiary), (ii) except as set forth in the motions filed on the Petition Date, seek to reject or terminate, or permit the rejection or termination of, any material license agreement, lease agreement in respect of material real property or material contract, in each case without the prior written consent of the Required Lenders, (iii) assume any material contract or employment agreement without the consent of the Required Lenders, (iv) amend, waive, forgive, modify, discharge or compromise any claim between or among the Credit Parties and their respective Subsidiaries, in each case without the prior written consent of the Required Lenders, (v) amend the Reorganization Plan in a manner that is adverse to Agent or the Lenders without the consent of Agent or the Required Lenders, as applicable, or (vii) without the prior written consent of the Required Lenders: (x) enter into any contract, term sheet, letter of intent or similar agreement for the actual or proposed sale, lease or disposition of any material assets outside the ordinary course of business, (y) enter into any material contract with any third party or (z) file any pleading with the Bankruptcy Court seeking authority to do any of the foregoing, unless, in each case, such transaction, if consummated, would result in all Obligations being indefeasibly paid in full in cash on or before consummation.

## ARTICLE VI

## FINANCIAL COVENANTS

Each Credit Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation (other than (i) contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied, unless the Required Lenders waive compliance in writing:

6.1    Capital Expenditures.  The Credit Parties shall not make or commit to make any Capital Expenditures, except Capital Expenditures of no more than $950,000 in the aggregate between the Closing Date and September 30, 2014, and thereafter, shall not make or commit to make any Capital Expenditures except as approved in writing by the Required Lenders.

6.2    Minimum Liquidity.  The Credit Parties shall not permit on any date the sum of (i) Availability plus (ii) North American book cash (exclusive of cash in respect of the Interest Reserve) of the Credit Parties which is subject to a Control Agreement, to be less than $3,500,000 (the "Liquidity Reserve") at any time.

6.3    Budget.  (a)   The Credit Parties shall not permit the aggregate amount paid by the Debtors in respect of any Disbursement Item to exceed the amount set forth for such line item in the Budget by more than 20%, on a cumulative basis from the Closing Date and (starting four weeks after the Closing Date) on a rolling four week basis, excluding amounts payable to the DIP Lenders under this Agreement (each, a "Permitted Disbursement Variance"); provided, however, that notwithstanding the foregoing, if a Disbursement Item exceeds the Permitted Disbursement Variance for such Disbursement Item, it shall not constitute a default or Event of Default unless the total amount by which all Disbursement Items exceed all Permitted Disbursement Variances exceeds $200,000, on a cumulative basis from the Closing Date or (starting four weeks after the Closing Date) on a rolling four week basis.

(b)      The Credit Parties shall not permit the aggregate amount paid by the Debtors in respect of any Professional Fees to exceed the amount set forth for such line item in the Budget by more than 10%, on a cumulative basis from the Closing Date and (starting four weeks after the Closing Date) on a rolling four week basis (each, a "Permitted Fee Variance", and together with the Permitted Disbursement Variances, the "Permitted Variances").

## ARTICLE VII

## EVENTS OF DEFAULT

7.1    Event of Default.  Any of the following shall constitute an "**Event of Default**":

(a)      Non-Payment.  Any Credit Party fails (i) to pay when and as required to be paid herein, any amount of principal of any Loan, including after maturity of the Loans, or (ii) to pay within three (3) Business Days after the same shall become due, interest on any Loan, any fee or any other amount payable hereunder or pursuant to any other Loan Document; or

(b)      Representation or Warranty.  Any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or financial or other written statement by any such Person, or their respective Responsible Officers, or required to be furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made; or

(c)      Certain Defaults.  Any Credit Party or Subsidiary of any Credit Party fails to perform or observe any term, covenant or agreement contained in Sections 5.7, 5.14, 5.17, 5.18, 5.19, 5.20, 6.1, 6.2, or 6.3 of this Agreement;

(d)      Other Defaults.  Any Credit Party or Subsidiary of any Credit Party fails to perform or observe any term, covenant or agreement contained in this Agreement or any other Loan Document and such default shall continue unremedied for a period of three (3) days after the earlier to occur of (i) the date upon which  a Responsible Officer of any

Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Borrower by Agent or the Required Lenders; or

(e)    [Intentionally Omitted].

(f)    [Intentionally Omitted].

(g)    [Intentionally Omitted].

(h)    Monetary Judgments.  One or more judgments, non-interlocutory orders, decrees or arbitration awards shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability of $2,500,000 or more (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has not denied coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of forty-five (45) days after the entry thereof; or

(i)    Non-Monetary Judgments. One or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries which has or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(j)    Collateral.  Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party or any Subsidiary of any Credit Party party thereto or any Credit Party or any Subsidiary of any Credit Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document shall for any reason (other than pursuant to the terms hereof or thereof) cease to create a valid security interest in the Collateral (other than an immaterial portion thereof) purported to be covered thereby or such security interest shall for any reason cease to be a perfected and first priority security interest subject only to Permitted Liens; or

(k)    [Intentionally Omitted].

(l)    Invalidity of Intercreditor or Subordination Provisions.  (x) The intercreditor provisions of the Intercreditor Agreement or any agreement or instrument governing the Existing Indebtedness or (y) the subordination provisions governing any Subordinated Indebtedness shall, in either case, for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or any Person shall contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations, for any reason shall not have the priority contemplated by this Agreement or such subordination provisions; or

(m)    ERISA.  (i) (A) One or more ERISA Events shall have occurred, (B) there is or arises an Unfunded Pension Liability (taking into account only Title IV Plans with positive Unfunded Pension Liability), or (C) there is or arises any potential withdrawal

liability under section 4201 of ERISA, if any ERISA Affiliate were to withdraw completely from any and all Multiemployer Plans, (ii) there shall result from any such event or events described in clauses (i)(A), (B) or (C) the imposition of a Lien on the assets of a Credit Party, the granting of a security interest in the assets of a Credit Party, or the incurrence of a liability by a Credit Party or a material risk of incurring a liability by a Credit Party, and (iii) such Lien, security interest or liability, either individually, or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.

(n)     <u>Compliance with Budget</u>.  The Borrower's use of Loans for any item other than those set forth in, and in accordance with, this Agreement and the Budget; or

(o)     <u>Permitted Variances</u>.  Permitted Variances under the Budget are exceeded for any period of time (subject to the proviso in Section 6.3(a)); or

(p)     <u>Dismissal or Conversion</u>.  The Bankruptcy Court shall enter an order dismissing the Cases or converting them to cases under Chapter 7 of the Bankruptcy Code, or appointing a trustee or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the business of any of the Credit Parties or any of their respective Subsidiaries (beyond those set forth in Bankruptcy Code sections 1106(a)(3) or (4)) under section 1106(b) of the Bankruptcy Code; or

(q)     <u>Relief from Automatic Stay</u>.  Other than the Orders, the Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder(s) of any Liens other than Liens in favor of a Lender in any assets or assets of any of the Credit Parties or any of their respective Subsidiaries having an aggregate value in excess of $250,000 for all such relief under this clause (q); or

(r)     <u>Modification of Orders</u>.  An order of the Bankruptcy Court shall be entered in the Cases amending, supplementing, staying for a period in excess of ten (10) Business Days, vacating or otherwise modifying any of the Orders, or any of the Credit Parties or any of their respective Subsidiaries shall apply for authority to do so; or

(s)     <u>Objection to Claims</u>.  Any of the Credit Parties or any of their respective Subsidiaries shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of any of the Credit Parties or any of their respective Subsidiaries) any other Person's opposition of, any motion made in the Bankruptcy Court by any Lender seeking confirmation of the amount of the Lender's claim or the validity and enforceability of the Liens in favor of the Lender;

(t)     <u>Competing Plan; Withdrawal of Plan</u>.  A reorganization plan shall be confirmed in the Cases which is inconsistent in any material respect with the Reorganization Plan or the Restructuring Support Agreement, or the Credit Parties shall take any action, including, without limitation, the filing of an application, in support of any plan that is inconsistent with the Reorganization Plan or the Restructuring Support

Agreement, or any person other than the Credit Parties shall do so and such application is not promptly contested in good faith by the Credit Parties, or any Credit Party shall apply to withdraw the Reorganization Plan or to modify or supplement the Reorganization Plan other than in accordance with the Restructuring Support Agreement and the terms hereof; or

(u)     <u>Effectiveness of Orders</u>.  From and after the date of entry thereof, the Interim Order shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case without the consent of the Required Lenders, and the Final Order shall not have been entered prior to such cessation (or vacatur, stay, reversal, modification or amendment), or from and after the date of entry thereof, the Final Order shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case without the consent of the Lender; or any of the Credit Party or any of their respective Subsidiaries shall fail to comply with the terms of the Orders in any material respect; or

(v)     <u>Validity of Loan Documents</u>.  Any Loan Document shall cease, for any reason, to be in full force and effect or any of the Credit Parties or any of their respective Subsidiaries shall so assert in writing, or any Loan Document shall cease to be effective to grant a perfected Lien on any material item of collateral described therein with the priority purported to be created thereby, or an official committee, if any, or any other party files an action asserting the same; or

(w)     <u>Departure of Officers</u>.  At any time, (i) any of the persons holding the positions of (w) President, (x) Chief Operating Officer, or (y) Chief Restructuring Officer in each case, as of the Effective Date, shall cease to hold such position and (ii) such person's replacement shall not be acceptable to the Required Lender, in their sole discretion; or

(x)     <u>Status of Obligations</u>.  At any time, the Obligations cease to constitute legal, valid and binding Superpriority Claims against the Credit Parties or to be secured by legal, valid, binding and perfected first priority Liens on the Collateral enforceable against each Credit Party that owns an interest in such Collateral, or an official committee, if any, or any other party files an action asserting the same.

7.2     <u>Remedies</u>.  Upon the occurrence and during the continuance of any Event of Default, the Agent, upon the direction of the Required Lenders, shall:

(a)     declare all or any portion of the Commitment of each Lender to make Loans terminated, whereupon such Commitments shall forthwith be terminated;

(b)     declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Credit Party; and/or

(c)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law.

In addition, upon the occurrence and during the continuance of any Event of Default, the Agent, upon the direction of the Required Lenders, shall have the right to utilize, at no cost or expense, any Intellectual Property of the Credit Parties to the extent necessary or appropriate in order to sell, lease or otherwise dispose of the Collateral.

7.3     <u>Rights Not Exclusive</u>.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

7.4     <u>Termination of Use of Cash Collateral; Vacation of Automatic Stay</u>.  The Borrower's rights to use Cash Collateral (including, without limitation, making withdrawals from the DIP Cash Collateral Account) as provided in the Orders shall terminate upon (i) repayment of the Obligations indefeasibly in full in cash or (ii) three (3) Business Days' written notice by the Agent (acting upon the instructions of the Required Lenders) to the Borrower or by the Borrower to the Agent of the occurrence and continuance of any Event of Default. Notwithstanding the foregoing, the Borrower's right to use Cash Collateral shall terminate immediately and without notice from the Administrative Agent at such time that any Credit Party has actual knowledge of an Event of Default if such Credit Party fails to promptly notify the Agent thereof.  Upon the occurrence of an Event of Default and following three (3) Business Days' notice thereof by the Agent (acting upon the instructions of the Required Lenders) to Borrower, (i) the automatic stay provided in section 362 of the Bankruptcy Code and the Loan Documents, as the case may be, shall be deemed automatically vacated without further action or order of the Bankruptcy Court and (ii)  the Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents, including, without limitation, all rights and remedies with respect to the Collateral and the Guarantors. In addition to the remedies set forth above, the Agent, at the written request of the Required Lenders, shall exercise any remedies provided for by the Security Documents in accordance with the terms thereof or any other remedies provided by applicable law or in equity.

ARTICLE VIII

AGENT

8.1     <u>Appointment and Duties</u>.

(a)     <u>Appointment of Agent</u>.  Each Lender hereby appoints Cantor Fitzgerald Securities (together with any successor Agent pursuant to <u>Section 8.9</u>) as Agent hereunder and authorizes Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto.

(b)     Duties as Collateral and Disbursing Agent.  Without limiting the generality of clause (a) above, Agent shall have the right (but not the obligation), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents, and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to Agent, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as fiduciary of any Lender or any other Person, regardless whether a Default or Event of Default shall have occurred and is continuing and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document,  Agent shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  Agent shall not be responsible to any of the Secured Parties for any recitals, statements, representations or warranties contained herein, or in any document referred to or provided for herein, or received by any of them hereunder, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of the Collateral or any document referred to or provided for herein or for any failure by the Borrower, the Credit Parties or any other Person to perform any of its obligations hereunder or thereunder.  In no event shall Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; *it being understood* that Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.  Each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in this Section 8.1(c).

(c)     Limited Duties. Under the Loan Documents, Agent (i) is acting solely on behalf of the Lenders (except to the limited extent provided in subsection 1.4(b) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "**agent**", "**Agent**" and "**collateral agent**" and similar terms in any Loan Document to refer to Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2     Binding Effect.  Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by Agent in reliance upon the instructions of the Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by Agent or the

Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3    Use of Discretion.

(a)    No Action without Instructions.  Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except any action it is expressly required to take or omit to take (i) under any Loan Document or (ii) pursuant to instructions from the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders).

(b)    Right Not to Follow Certain Instructions.  Notwithstanding clause (a) above, Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to Agent, any other Person) against all Liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against Agent or any Related Person thereof or (ii) that is, in the reasonable opinion of Agent or its counsel, contrary to any Loan Document or applicable Requirement of Law.

(c)    Exclusive Right to Enforce Rights and Remedies.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Agent in accordance with the Loan Documents for the benefit of all the Lenders; provided that the foregoing shall not prohibit (a) the Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (b) [intentionally omitted], (c) any Lender from exercising setoff rights in accordance with Section 9.11 or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any bankruptcy or other debtor relief law; and provided further that if at any time there is no Person acting as Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Agent pursuant to Section 7.2 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 9.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

8.4    Delegation of Rights and Duties.  Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).  Any such Person shall benefit from this Article VIII to the extent provided by Agent.

8.5    Reliance and Liability.

(a)     Agent may, without incurring any liability hereunder, (i) treat the payee of any Note as its holder until such Note has been assigned in accordance with Section 9.9, (ii) rely on the Register to the extent set forth in Section 1.4, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(b)     None of Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party, Holdings, the Borrower and each other Credit Party hereby waive and shall not assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence, bad faith or willful misconduct of Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein. Without limiting the foregoing, Agent:

(i)     shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of Agent, when acting on behalf of Agent);

(ii)     shall not be responsible to any Lender or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)     makes no warranty or representation, and shall not be responsible, to any Lender or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Loan Documents;

(iv)     shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or

waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Borrower, any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Lenders);

(v)    shall not be required to take any action that it reasonably believes to be contrary to Applicable Law or any Loan Document to which it is a party or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or thereunder or in the exercise of any of its rights or powers;

(vi)    shall not be required to keep itself informed as to the performance or observance by the Borrower or the Credit Parties of this Agreement or any Loan Document or any other document referred to or provided for herein or therein or to inspect the Collateral or books of the Borrower or the Credit Parties;

and, for each of the items set forth in clauses (i) through (iv) above, each Secured Party, Lender, Holdings and the Borrower hereby waives and agrees not to assert (and each of Holdings and the Borrower shall cause each other Credit Party to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

8.6    <u>Agent Individually</u>.  Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor.  To the extent Agent or any of its Affiliates makes any Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Required Lender", and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, Agent or such Affiliate, as the case may be, in its individual capacity as Lender, or as one of the Required Lenders, respectively.

8.7    <u>Lender Credit Decision</u>.

(a)    Each Lender acknowledges that it shall, independently and without reliance upon Agent, any Lender or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Loans) solely or in part because such document was transmitted by Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.  Except for documents expressly required by any Loan Document to be

transmitted by Agent to the Lenders, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of Agent or any of its Related Persons.

(b)     If any Lender has elected to abstain from receiving MNPI concerning the Credit Parties or their Affiliates, such Lender acknowledges that, notwithstanding such election, Agent and/or the Credit Parties will, from time to time, make available syndicate-information (which may contain MNPI) as required by the terms of, or in the course of administering the Loans to the credit contact(s) identified for receipt of such information on the Lender's administrative questionnaire who are able to receive and use all syndicate-level information (which may contain MNPI) in accordance with such Lender's compliance policies and contractual obligations and applicable law, including federal and state securities laws; provided, that if such contact is not so identified in such questionnaire, the relevant Lender hereby agrees to promptly (and in any event within one (1) Business Day) provide such a contact to Agent and the Credit Parties upon request therefor by Agent or the Credit Parties. Notwithstanding such Lender's election to abstain from receiving MNPI, such Lender acknowledges that if such Lender chooses to communicate with Agent, it assumes the risk of receiving MNPI concerning the Credit Parties or their Affiliates.

8.8     Expenses; Indemnities.

(a)     Each Lender agrees to reimburse Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party) promptly upon demand, severally and ratably, for any reasonable and documented costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Credit Party) that may be incurred by Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding or otherwise) of, or legal advice in respect of its rights or responsibilities under, any Loan Document, in each case to the extent not otherwise reimbursed by the Credit Parties.

(b)     Each Lender further agrees to indemnify Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party), severally and ratably, from and against Liabilities (including taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any Lender) that may be imposed on, incurred by or asserted against Agent or any of its Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document, any Related Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by Agent or any of its Related Persons under or with respect to any of the foregoing; provided, however, that no Lender shall be liable to Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(c)     To the extent required by any applicable law, Agent may withhold from any payment to any Lender under a Loan Document an amount equal to the applicable withholding tax.  If the IRS or any other Governmental Authority asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction of, withholding tax with respect to a particular type of payment, or because such Lender failed to notify Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), or Agent reasonably determines that it was required to withhold taxes from a prior payment but failed to do so, such Lender shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by Agent as tax or otherwise, including penalties and interest, and together with all expenses incurred by Agent, including legal expenses, allocated internal costs and out-of-pocket expenses.  Agent may offset against any payment to any Lender under a Loan Document, any applicable withholding tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Lender under this <u>subsection 8.8(c).</u>

(d)     The obligations set forth in this <u>Section 8.8</u> shall survive the termination of this Agreement, the discharge of the Loans and Notes and any resignation or removal of Agent hereunder.

8.9     <u>Resignation of Agent</u>.

(a)     Agent may resign upon ten (10) Business Days' written notice to the Lenders and the Borrower by delivering written notice of such resignation to the Lenders and the Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective.  If Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Agent with the consent of the Borrower if required pursuant to the last sentence of this <u>subsection 8.9(a)</u>.  If, within 30 days after the retiring Agent having given notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders.  Each appointment under this clause (a) shall be subject to the prior consent of the Borrower, which may not be unreasonably withheld but shall not be required during the continuance of an Event of Default.

(b)     Effective immediately upon its resignation, (i) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents and (iv) subject to its rights under <u>Section 8.3</u>, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents.  Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

(c)    Any Person: (i) into which any Agent may be merged or consolidated or to which Agent transfers all or substantially all of its administrative agency business or (ii) that may result from any merger, conversion, transfer or consolidation to which Agent shall be a party, shall (if such Agent is not the surviving entity) be the successor of such Agent without the execution or filing of any instrument or any further act on the part of any of the parties hereto.

8.10    <u>Release of Collateral or Guarantors</u>.  Each Lender hereby consents to the release and hereby directs Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a)    any Subsidiary of the Borrower from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Credit Party are sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to <u>Section 4.12</u>; and

(b)    any Lien held by Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in a transaction permitted by the Loan Documents (including pursuant to a valid waiver or consent), to the extent all Liens required to be granted in such Collateral pursuant to <u>Section 4.12</u> after giving effect to such transaction have been granted, (ii) any property subject to a Lien permitted hereunder in reliance upon either of <u>subsection 5.1(h)</u> or (i) and (iii) all of the Collateral and all Credit Parties, upon (A) termination of the Loan Commitments, (B) payment and satisfaction in full of all Loans and all other Obligations (other than unasserted contingent indemnification obligations) under the Loan Documents, that Agent has theretofore been notified in writing by the holder of such Obligation are then due and payable, (C) deposit of cash collateral with respect to all contingent Obligations in amounts and on terms and conditions and with parties satisfactory to Agent and each Indemnitee that is, or may be, owed such Obligations (excluding unasserted contingent indemnification obligations) and (D) to the extent requested by Agent, receipt by Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance reasonably acceptable to Agent.

In addition, the Lenders hereby authorize Agent, at its option and its discretion, to subordinate or release any Lien granted to or held by Agent upon any Collateral to any Lien on such asset permitted pursuant to <u>subsection 5.1(h)</u>.  Upon request by Agent at any time, the Lenders will confirm in writing Agent's authority to release particular types or items of Collateral, or subordinate its Lien, pursuant to this <u>Section 8.10</u>.

Each Lender hereby directs Agent, and Agent hereby agrees, upon receipt of reasonable advance notice from the Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this <u>Section 8.10</u>.

8.11    <u>Additional Secured Parties</u>.  The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender party hereto as long as, by accepting such benefits, such Secured Party agrees, as among Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance acceptable to Agent) this Article VIII, <u>Section 9.3</u>, <u>Section 9.9</u>, <u>Section 9.10</u>, <u>Section 9.11</u>, <u>Section 9.17</u>, <u>Section 9.24</u> and <u>Section 10.1</u> and the decisions and actions of Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by <u>Section 8.8</u> only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (b) each of Agent and the Lenders party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

ARTICLE IX

MISCELLANEOUS

9.1    <u>Amendments and Waivers</u>.

(a)    No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Credit Party therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent with the consent of the Required Lenders) and the Borrower and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such waiver, amendment, or consent shall, unless in writing and signed by all the Lenders directly and adversely affected thereby (or by Agent with the consent of all the Lenders directly affected thereby), in addition to the Required Lenders (or by Agent with the consent of the Required Lenders) and the Borrower, do any of the following:

(i)    increase or extend the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 1.8</u> or <u>subsection 7.2(a))</u> (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of any mandatory reductions of Commitments in accordance with this Agreement shall not constitute an increase in the Commitment of any such Lender);

(ii) postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to the Lenders (or any of them) hereunder or under any other Loan Document;

(iii) reduce the principal of, or the rate of interest specified herein (it being agreed that waiver of the default interest margin shall only require the consent of the Required Lenders) or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document;

(iv) amend or modify subsection 1.10(c) or 9.11(b);

(v) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans which shall be required for the Lenders or any of them to take any action hereunder;

(vi) amend this Section 9.1 or the definition of the Required Lenders or any provision providing for consent or other action by all Lenders;

(vii) consent to the assignment or transfer by, or discharge of, Holdings or the Borrower of any of their respective rights or obligations under the Loan Documents; or

(viii) discharge all or substantially all of the Subsidiary Guarantors from their respective Obligations or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents;

it being agreed that all Lenders shall be deemed to be directly and adversely affected by an amendment or waiver of the type described in preceding clauses (v), (vi), (vii) and (viii).

(b)     [Intentionally Omitted].

(c)     [Intentionally Omitted].

(d)     Notwithstanding anything to the contrary contained in this Section 9.1, (x) Agent may amend Schedule 1.1(b) to reflect Sales entered into pursuant to Section 9.9, and (y) Agent and the Borrower may amend or modify this Agreement and any other Loan Document to (1) cure any ambiguity, omission, defect or inconsistency therein, or (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional property for the benefit of the Secured Parties or join additional Persons as Credit Parties.

9.2     Notices.

(a)     Addresses.  All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly

specified herein, and (i) addressed to the address set forth on the applicable signature page hereto, (ii) posted to Intralinks® (to the extent such system is available and set up by or at the direction of Agent prior to posting) in an appropriate location by uploading such notice, demand, request, direction or other communication to www.intralinks.com, faxing it to 866-545-6600 with an appropriate bar-code fax coversheet or using such other means of posting to Intralinks® as may be available and reasonably acceptable to Agent prior to such posting, (iii) posted to any other E-System approved by or set up by or at the direction of Agent or (iv) addressed to such other address as shall be notified in writing (A) in the case of the Borrower, Agent and the Swingline Lender, to the other parties hereto and (B) in the case of all other parties, to the Borrower and Agent. Transmissions made by electronic mail or E-Fax to Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of Agent applicable at the time and previously communicated to Borrower, and (z) if receipt of such transmission is acknowledged by Agent.

(b)     Effectiveness.  All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, (iv) if delivered by facsimile (other than to post to an E-System pursuant to clause (a)(ii) or (a)(iii) above), upon sender's receipt of confirmation of proper transmission, and (v) if delivered by posting to any E-System, on the later of the Business Day of such posting and the Business Day access to such posting is given to the recipient thereof in accordance with the standard procedures applicable to such E-System; provided, however, that no communications to Agent shall be effective until received by Agent.

(c)     Each Lender shall notify Agent in writing of any changes in the address to which notices to such Lender should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as Agent shall reasonably request.

9.3     Electronic Transmissions.

(a)     Authorization.  Subject to the provisions of subsection 9.2(a), each of Agent, the Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein. Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)     Signatures.  Subject to the provisions of subsection 9.2(a), (i)(A) no posting to any E-System shall be denied legal effect merely because it is made electronically, (B) each E-Signature on any such posting shall be deemed sufficient to satisfy any requirement for a "signature" and (C) each such posting shall be deemed sufficient to satisfy any requirement for a

"writing", in each case including pursuant to any Loan Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Requirement of Law governing such subject matter, (ii) each such posting that is not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such posting, an E-Signature, upon which Agent, each other Secured Party and each Credit Party may rely and assume the authenticity thereof, (iii) each such posting containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original and (iv) each party hereto or beneficiary hereto agrees not to contest the validity or enforceability of any posting on any E-System or E-Signature on any such posting under the provisions of any applicable Requirement of Law requiring certain documents to be in writing or signed; provided, however, that nothing herein shall limit such party's or beneficiary's right to contest whether any posting to any E-System or E-Signature has been altered after transmission.

(c)    Separate Agreements.  All uses of an E-System shall be governed by and subject to, in addition to Section 9.2 and this Section 9.3, the separate terms, conditions and privacy policy posted or referenced in such E-System (or such terms, conditions and privacy policy as may be updated from time to time, including on such E-System) and related Contractual Obligations executed by Agent and Credit Parties in connection with the use of such E-System.

(d)    LIMITATION OF LIABILITY.  ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE". NONE OF AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY E-SYSTEMS OR ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN. NO WARRANTY OF ANY KIND IS MADE BY AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS OR ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS. Each of the Borrower, each other Credit Party executing this Agreement and each Secured Party agrees that Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission or otherwise required for any E-System.

9.4    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. No course of dealing between any Credit Party, any Affiliate of any Credit Party, Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

9.5    Costs and Expenses.  Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of Agent or

the Required Lenders, shall be at the expense of such Credit Party, and neither Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein. In addition, the Borrower agrees to pay or reimburse within five (5) Business Days after demand (or on the Closing Date in respect of amounts incurred through such date) (a) Agent for all reasonable and documented out-of-pocket costs and expenses incurred by it or any of its Related Persons, in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs of one primary counsel for each of Agent and if necessary, one local counsel for Agent in any relevant jurisdiction, the cost of environmental audits, Collateral audits and appraisals, background checks and similar expenses, in each case to the extent permitted hereunder, (b) Agent and its respective Related Persons for all reasonable and documented out-of-pocket costs and expenses incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document, Obligation or Related Transaction (or the response to and preparation for any subpoena or request for document production relating thereto) and (c) fees and disbursements of consultants, appraisers, and other similar advisors of the Lenders, and (d) Attorney Costs of (w)(i) Wachtell, Lipton, Rosen & Katz as counsel to certain Lenders, and (ii) Richards, Layton & Finger, P.A., as local Delaware counsel to certain Lenders, (x) one primary law firm (selected by Agent) on behalf of Agent and the Lenders (taken as a group), which shall initially be Shipman & Goodwin LLP, (y) if necessary, one local counsel (selected by Agent) in any relevant jurisdiction of Agent and the Lenders (taken as a group) and (z) if necessary, solely in the case of a perceived or actual conflict of interest, one additional primary law firm and local counsel for all similarly situated affected parties on behalf of Agent or such Lenders, in each case incurred in connection with any of the matters referred to in clause (c) above.

9.6     Indemnity.

(a)     Each Credit Party agrees to indemnify, hold harmless and defend Agent each Lender and each of their respective Related Persons (each such Person being an "**Indemnitee**") from and against all Liabilities (including brokerage commissions, fees and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee in any matter relating to or arising out of, in connection with or as a result of (i) the Transactions, any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan or any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any E-Systems or other Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other

proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including attorneys' fees in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "**Indemnified Matters**"); provided, however, that no Credit Party shall have any liability under this Section 9.6(i) to the extent arising from a dispute solely among Indemnitees other than claims against Agent or its respective Related Persons in its capacity or in fulfilling its role as Agent and other than any claims arising out of any act or omission on the part of Holdings or any of its Subsidiaries or Affiliates or (ii) to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its officers, directors or employees, as determined by a court of competent jurisdiction in a final non-appealable judgment or order or (y) a material breach of its material obligations under the Loan Documents by such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee as determined by the final non-appealable judgment of a court of competent jurisdiction. Furthermore, each of the Borrower and each other Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person of such Indemnitee to the extent that such Liabilities did not result from the gross negligence, bad faith or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(b)    Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities imposed on, incurred by or asserted against any Indemnitee, including those arising from, or otherwise involving, any property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such property or natural resource or any property on or contiguous to any Real Estate of any Credit Party or any Related Person of any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) have resulted from the gross negligence, bad faith or willful misconduct of any such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee as determined by the final non-appealable judgment of a court of competent jurisdiction, or (ii)(A) are incurred solely following foreclosure by Agent or following Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (B) are attributable solely to acts of such Indemnitee.

9.7    Marshaling; Payments Set Aside.  No Secured Party shall be under any obligation to marshal any property in favor of any Credit Party or any other Person or against or in payment of any Obligation.  To the extent that any Secured Party receives a payment from the Borrower,

from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8     Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that any assignment by any Lender shall be subject to the provisions of Section 9.9, and provided further that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

9.9     Assignments and Participations; Binding Effect.

(a)     Binding Effect.  This Agreement shall become effective when it shall have been executed by Holdings, the Borrower, the other Credit Parties signatory hereto and Agent and when Agent shall have been notified by each Lender that such Lender has executed it. Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, Holdings, the Borrower, the other Credit Parties hereto (in each case except for Article VIII), Agent and each Lender receiving the benefits of the Loan Documents and, to the extent provided in Section 8.11, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any Loan Document (including in Section 8.9), none of Holdings, the Borrower, any other Credit Party, or Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)     Right to Assign.  Each Lender may sell, transfer, negotiate or assign (a "**Sale**") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Loans) to (I) any existing Lender (other than a Non-Funding Lender or an Impacted Lender), (II) any Affiliate or Approved Fund of any existing Lender (other than a Non- Funding Lender or an Impacted Lender) or (III) any other Person acceptable (which acceptance shall not be unreasonably withheld or delayed) to Agent; provided, however, that (v) no Sales may be made to Holdings or any of its Subsidiaries or Affiliates, (w) such Sales must be ratable among the obligations owing to and owed by such Lender with respect to the Loans, (x) for each Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the Loans and Commitments subject to any such Sale shall be in a minimum amount of $2,500,000 in the case of a Sale of Loans and Loan Commitments, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility or is made with the prior consent of the Borrower (to the extent the Borrower's consent is otherwise required) and Agent, (y) interest accrued prior to and through the date of any such Sale may not be assigned, and (z) such Sales by Lenders who are Non-Funding Lenders due to clause (a) of the definition of Non- Funding Lender shall be subject to Agent's prior written consent in all instances, unless in connection with such sale, such Non- Funding Lender cures, or causes the cure of, its Non- Funding Lender status as contemplated in subsection 1.11(e)(v).  Agent's refusal to accept a Sale to a Person that would be a Non-Funding Lender or an Impacted Lender, or the imposition of

conditions or limitations (including limitations on voting) upon Sales to such Persons, shall not be deemed to be unreasonable.

(c)    Procedure.  The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to Agent an Assignment via an electronic settlement system designated by Agent (or, if previously agreed with Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing Note subject to such Sale (or any affidavit of loss therefor reasonably acceptable to Agent), any tax forms required to be delivered pursuant to Section 10.1 and payment of an assignment fee in the amount of $3,500 to Agent, unless waived or reduced by Agent; provided that if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale.  Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with clause (iii) of subsection 9.9(b), upon Agent (and the Borrower, if applicable) consenting to such Assignment (if such Person's consent is so required), from and after the effective date specified in such Assignment, Agent shall record or cause to be recorded in the Register as required under Section 1.4 the information contained in such Assignment.

(d)    Effectiveness.  Subject to the recording of an Assignment by Agent in the Register pursuant to subsection 1.4(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, (ii) any applicable Note shall be transferred to such assignee through such entry and (iii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e)    Grant of Security Interests.  In addition to the other rights provided in this Section 9.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, by notice to Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f)    Participants and SPVs.  In addition to the other rights provided in this Section 9.9, each Lender may (x) with notice to Agent, grant to an SPV the option to make all or any part of any Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Loans pursuant thereto shall satisfy the obligation of such Lender to make such Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or

consent from Agent or the Borrower, sell participations to one or more Persons (other than to Holdings or any of its Subsidiaries or Affiliates) in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Loans and Letters of Credit); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefits of Article X, but, with respect to Section 10.1, only to the extent such participant or SPV delivers the tax forms such Lender is required to collect pursuant to subsection 10.1(f) and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to Agent by such SPV and such Lender, provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in clauses (ii) and (iii) of subsection 9.1(a) with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in clause (vi) of subsection 9.1(a). Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register meeting the requirements of section §5f.103-1(c) of the United States Treasury Regulations on which it enters in book entry form the name and address of each participant and SPV and the principal amounts (and stated interest) of each participant's and SPV's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or SPV or any information relating to a Participant's or SPV's interest in any Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered form under section5f.103-1(c) of the United States Treasury Regulations. Unless otherwise required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of the Loan Documents notwithstanding any notice to the contrary. No party hereto shall institute (and the Borrower and Holdings shall cause each other Credit Party not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all

outstanding commercial paper of such SPV; provided, however, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to get reimbursed by such SPV for any such Liability). The agreement in the preceding sentence shall survive the termination of the Commitments and the payment in full of the Obligations.

9.10    Non-Public Information; Confidentiality.

(a)    Non-Public Information. Agent and each Lender acknowledges and agrees that it may receive material non-public information ("**MNPI**") hereunder concerning the Credit Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Laws (including United States federal and state securities laws and regulations).

(b)    Confidential Information. Each Lender and Agent agrees to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document and designated by any Credit Party as confidential (and use only with respect to obligations under the Loan Documents), except that such information may be disclosed (i) with the Borrower's consent, (ii) to Related Persons of such Lender or Agent, as the case may be, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 9.10 or (B) available to such Lender or Agent or any of their Related Persons, as the case may be, on a non-confidential basis from a source (other than any Credit Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority (and, in any such case, the Person disclosing such information shall use commercially reasonable efforts to promptly notify the Borrower prior to any disclosure, to the extent same would not be prohibited by applicable law or order), (v) to the extent necessary or customary for inclusion in league table measurements (but limited to only such customary information as required for such league tables), (vi) (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Credit Parties, (vii) to current or prospective assignees, SPVs (including the investors or prospective investors therein) or participants and to their respective Related Persons, in each case to the extent such assignees, investors, participants, counterparties or Related Persons agree to be bound by provisions substantially similar to the provisions of this Section 9.10 (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above), (viii) to any other party hereto, and (ix) in connection with the exercise or enforcement of any right or remedy under any Loan Document, in connection with any litigation or other proceeding to which such Lender or Agent or any of their Related Persons is a party or bound, or to the extent necessary to respond to public statements or disclosures by Credit Parties or their Related Persons referring to a Lender or Agent or any of their Related Persons.

(c)    Tombstones. Each Credit Party consents to the publication by Agent or any Lender of advertising material relating to the financing transactions contemplated by this

Agreement using Borrower's or any other Credit Party's name, product photographs, logo or trademark. Agent or such Lender shall provide a draft of any advertising material to Borrower for review and comment prior to the publication thereof.

(d)     Press Release and Related Matters. No Credit Party shall, and no Credit Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Credit Party) using the name, logo or otherwise referring to Agent, any Lender or of any of their Affiliates, the Loan Documents or any transaction contemplated therein without the prior consent of Agent and the Required Lenders except to the extent required to do so under applicable Requirements of Law and then, only after consulting with Agent or the Lenders.

(e)     Distribution of Materials to Lenders. The Credit Parties acknowledge and agree that the Loan Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Credit Parties hereunder (collectively, the "**Borrower Materials**") may be disseminated by, or on behalf of, Agent, and made available, to the Lenders by posting such Borrower Materials on an E-System. The Credit Parties authorize Agent to download copies of their logos from its website and post copies thereof on an E-System.

(f)     Material Non-Public Information. The Credit Parties hereby agree that if either they, any parent company or any Subsidiary of the Credit Parties has publicly traded equity or debt securities in the United States after the Closing Date, they shall (and shall cause such parent company or Subsidiary, as the case may be, to) (i) identify in writing, and (ii) to the extent reasonably practicable, clearly and conspicuously mark such Borrower Materials that contain only information that is publicly available or that is not material for purposes of United States federal and state securities laws as "**PUBLIC**". The Credit Parties agree that by identifying such Borrower Materials as "PUBLIC" or publicly filing such Borrower Materials with the Securities and Exchange Commission, then Agent and the Lenders shall be entitled to treat such Borrower Materials as not containing any MNPI for purposes of United States federal and state securities laws. The Credit Parties further represent, warrant, acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any MNPI: (A) the Loan Documents, including the schedules and exhibits attached thereto, and (B) administrative materials of a customary nature prepared by the Credit Parties or Agent (including, Notices of Borrowing, Notices of Continuation,  and any similar requests or notices posted on or through an E-System). Before distribution of any Borrower Materials, the Credit Parties agree to execute and deliver to Agent a letter authorizing distribution of the evaluation materials to prospective Lenders and their employees willing to receive MNPI, and a separate letter authorizing distribution of evaluation materials that do not contain MNPI and represent that no MNPI is contained therein.

9.11     Set-off; Sharing of Payments.

(a)     Right of Setoff. Each of Agent, each Lender, and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Credit Party), at any time and from time to time during the

continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final, but excluding trust accounts, withholding accounts, fiduciary accounts and payroll accounts so long as, with respect to payroll accounts, the amount on deposit therein is not in excess of amounts necessary for purposes of funding current payroll liabilities and amounts necessary to meet minimum balance requirements applicable to such account) at any time held and other Indebtedness, claims or other obligations at any time owing by Agent, such Lender or any of their respective Affiliates to or for the credit or the account of the Borrower or any other Credit Party against any Obligation of any Credit Party now or hereafter existing which is not paid when due.  No Lender shall exercise any such right of setoff without the prior consent of Agent or the Required Lenders.  Each of Agent, each Lender agrees promptly to notify the Borrower and Agent after any such setoff and application made by such Lender or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights under this Section 9.11 are in addition to any other rights and remedies (including other rights of setoff) that Agent, the Lenders, their Affiliates and the other Secured Parties may have.

(b)     Sharing of Payments, Etc.  Except to the extent otherwise provided in this Agreement, if any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "**proceeds**" (as defined under the applicable UCC) of Collateral) other than pursuant to Section 9.9 or Article X and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Borrower, applied to repay the Obligations in accordance herewith); provided, however, that (a) if such payment is rescinded or otherwise recovered from such Lender in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender without interest and (b) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation.  If a Non-Funding Lender receives any such payment as described in the previous sentence, such Lender shall turn over such payments to Agent in an amount that would satisfy the cash collateral requirements set forth in subsection 1.11(e).

9.12     Counterparts; Facsimile Signature.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13    Severability.    The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.14    Captions.    The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15    Independence of Provisions.    The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16    Interpretation.    This Agreement is the result of negotiations among and has been reviewed by counsel to Credit Parties, Agent, each Lender and other parties hereto, and is the product of all parties hereto.    Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or Agent merely because of Agent's or Lenders' involvement in the preparation of such documents and agreements.    Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 9.18 and 9.19.

9.17    No Third Parties Benefited.    This Agreement is made and entered into for the sole protection and legal benefit of the Borrower, the Lenders, Agent and, subject to the provisions of Section 8.11, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.    Neither Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.18    Governing Law and Jurisdiction.

(a)    Governing Law.    The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest) (without regard to conflicts of law principles (other than sections 5-1401 and 5-1402 of the New York General Obligations Law)), except to the extent superseded by the Bankruptcy Code.

(a)    Submission to Jurisdiction.    PRIOR TO THE CLOSING OR DISMISSAL OF THE CASES, THE CREDIT PARTIES SHALL SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT OVER ANY LEGAL ACTIONS OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.    FOLLOWING THE CLOSING OR DISMISSAL OF A CASE OF ANY CREDIT PARTY, ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR

INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE BORROWER, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.  THE BORROWER, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

(b)     Service of Process.  Each party hereto hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of the Borrower specified herein (and shall be effective when such mailing shall be effective, as provided therein).  Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)     Non-Exclusive Jurisdiction.  Nothing contained in this Section 9.18 shall affect the right of Agent, or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Credit Party in any other jurisdiction.

9.19    Waiver of Jury Trial.    THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.   THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20    Entire Agreement; Release; Survival.

(a)     THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY CREDIT PARTY AND ANY LENDER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY

SIMILAR FORM, PURPOSE OR EFFECT. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER LOAN DOCUMENTS OR SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)     In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  Each party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor except, in the case of the Credit Parties, to the extent that such damages would otherwise be subject to indemnification in favor of the Indemnitees pursuant to the Loan Documents.

(c)     (i) Any indemnification or other protection provided to any Indemnitee pursuant to this Section 9.20, Sections 9.5 (Costs and Expenses), and 9.6 (Indemnity), and Articles (VIII) Agent and X (Taxes, Yield Protection and Illegality), and (ii) the provisions of Section 8.1 of the Guaranty and Security Agreement, in each case, shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) with respect to clause (i) above, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21    Patriot Act.  Each Lender and Agent that is subject to the Patriot Act hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender and Agent to identify each Credit Party in accordance with the Patriot Act.

9.22    Replacement of Lender. Within one hundred eighty (180) days after: (i) receipt by the Borrower of written notice and demand from any Lender (an "**Affected Lender**") for payment of additional costs as provided in Sections 10.1, 10.3 and/or 10.6; or (ii) any failure by any Lender (other than Agent or an Affiliate of Agent) to consent to a requested amendment, waiver or modification to any Loan Document in which the Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender (or each Lender directly affected thereby, as applicable) is required with respect thereto, the Borrower may, at its option, notify Agent and such Affected Lender (or such non-consenting Lender) of the Borrower's intention to obtain, at the Borrower's expense, a replacement Lender ("**Replacement Lender**") for such Affected Lender (or such non-consenting Lender), which Replacement Lender shall be reasonably satisfactory to Agent and shall be subject to any other consents that may be required in connection with a Sale pursuant to subsection 9.9(b)(A) (it being understood that no Person shall be eligible as a Replacement Lender pursuant to this Section 9.22 unless such Person also was eligible to be an assignee Lender under subsection 9.9(b)).  In the event the Borrower obtains a Replacement Lender within one hundred eighty (180) days following notice of its intention to do so, the Affected Lender (or such non-

consenting Lender) shall sell and assign its Loans and Commitments to such Replacement Lender, at par, _provided_ that the Borrower has reimbursed such Affected Lender for its increased costs for which it is entitled to reimbursement under this Agreement through the date of such sale and assignment. In the event that a replaced Lender does not execute an Assignment pursuant to Section 9.9 within five (5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section 9.22 and presentation to such replaced Lender of an Assignment evidencing an assignment pursuant to this Section 9.22, the Borrower shall be entitled (but not obligated) to execute such an Assignment on behalf of such replaced Lender, and any such Assignment so executed by the Borrower, the Replacement Lender and Agent, shall be effective for purposes of this Section 9.22 and Section 9.9. Notwithstanding the foregoing, with respect to a Lender that is a Non-Funding Lender or an Impacted Lender, Agent may, but shall not be obligated to, obtain a Replacement Lender and execute an Assignment on behalf of such Non-Funding Lender or Impacted Lender at any time with three (3) Business Days prior notice to such Lender (unless notice is not practicable under the circumstances) and cause such Lender's Loans and Commitments to be sold and assigned, in whole or in part, at par. Upon any such assignment and payment and compliance with the other provisions of Section 9.9, such replaced Lender shall no longer constitute a "Lender" for purposes hereof; _provided_, any rights of such replaced Lender to indemnification hereunder shall survive.

9.23    Joint and Several.  The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several. Without limiting the generality of the foregoing, reference is hereby made to Article II of the Guaranty and Security Agreement, to which the obligations of Borrower and the other Credit Parties are subject.

9.24    Creditor-Debtor Relationship.  The relationship between Agent and each Lender on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor. No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

9.25    OTHER LIENS ON COLLATERAL; TERMS OF INTERCREDITOR AGREEMENT; ETC.

(I) EACH SECURED PARTY UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT LIENS SHALL BE CREATED ON THE COLLATERAL PURSUANT TO THE EXISTING INDEBTEDNESS DOCUMENTS, WHICH LIENS SHALL BE REQUIRED TO BE SUBORDINATED AND JUNIOR TO THE LIENS CREATED PURSUANT TO THE LOAN DOCUMENTS IN ACCORDANCE WITH THE TERMS OF THE INTERCREDITOR AGREEMENT. PURSUANT TO THE EXPRESS TERMS OF THE INTERCREDITOR AGREEMENT, IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THE INTERCREDITOR AGREEMENT AND ANY OF THE LOAN DOCUMENTS, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL.

(II) EACH SECURED PARTY (I) AUTHORIZES AND INSTRUCTS AGENT TO ENTER INTO THE INTERCREDITOR AGREEMENT ON BEHALF OF THE SECURED

PARTIES, AND TO TAKE ALL ACTIONS (AND EXECUTE ALL DOCUMENTS) REQUIRED (OR DEEMED ADVISABLE) BY IT IN ACCORDANCE WITH THE TERMS OF THE INTERCREDITOR AGREEMENT, AND (II) AGREES TO BE BOUND BY THE TERMS OF THE INTERCREDITOR AGREEMENT.

## ARTICLE X

## TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    Taxes.

(a)    Except as otherwise provided in this Section 10.1, each payment by any Credit Party under any Loan Document shall be made free and clear of all present or future taxes, levies, imposts, deductions, charges or withholdings and all liabilities with respect thereto (and without deduction for any of them) (collectively, but excluding Excluded Taxes, the "**Taxes**").

(b)    If any Taxes shall be required by law to be deducted from or in respect of any amount payable under any Loan Document to any Secured Party (i) such amount shall be increased as necessary to ensure that, after all required deductions for Taxes are made (including deductions applicable to any increases to any amount under this Section 10.1), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant Credit Party shall make such deductions, (iii) the relevant Credit Party shall timely pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Requirements of Law and (iv) within 30 days after such payment is made, the relevant Credit Party shall deliver to Agent an original or certified copy of a receipt evidencing such payment or other evidence of payment reasonably satisfactory to Agent.

(c)    In addition, the Borrower agrees to pay any stamp, documentary, excise or property tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery or registration of, or otherwise with respect to, any Loan Document or any transaction contemplated therein (collectively, "**Other Taxes**"). Within 30 days after the date of any payment of Taxes or Other Taxes by any Credit Party, the Borrower shall furnish to Agent, at its address referred to in Section 9.2, the original or a certified copy of a receipt or other evidence of payment thereof.

(d)    The Borrower shall reimburse and indemnify, within 30 days after receipt of demand therefor (with copy to Agent), each Secured Party for all Taxes and Other Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 10.1) paid by such Secured Party that relate to the payment by or on behalf of the Borrower under a Loan Document and any Liabilities arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted; provided, however, that the Borrower shall not be required to compensate a Secured Party pursuant to this Section 10.1(d) for any amounts incurred more than six (6) months prior to the date such Secured Party notifies the Borrower of such Secured Party's intention to claim compensation therefor; provided, further, that if the circumstances giving rise to such claim have a retroactive effect, then such six (6) month period shall be extended by such period of retroactive effect. A

certificate of the Secured Party (or of Agent on behalf of such Secured Party) claiming any compensation under this clause (d), setting forth the amounts to be paid thereunder and delivered to the Borrower with copy to Agent, shall be conclusive, binding and final for all purposes, absent manifest error. In determining such amount, Agent and such Secured Party may use any reasonable averaging and attribution methods.

(e) Any Lender claiming any additional amounts payable pursuant to this Section 10.1 shall use its reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its lending office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, be otherwise disadvantageous to such Lender.

(f) Each Non-U.S. Lender Party that, at any of the following times, is entitled to an exemption from United States withholding tax or, after a change in any Requirement of Law, is subject to such withholding tax at a reduced rate under an applicable tax treaty, shall (w) on or prior to the date such Non-U.S. Lender Party becomes a "**Non-U.S. Lender Party**" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (f) and (z) from time to time if requested by the Borrower or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of each of the following, as applicable: (A) Forms W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business), W-8BEN (claiming exemption from, or a reduction of, U.S. withholding tax under an income tax treaty) and/or W-8IMY (along with any underlying forms) or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN (claiming exemption from U.S. withholding tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to Agent that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding tax or reduced rate with respect to all payments of interest to be made to such Non-U.S. Lender Party under the Loan Documents. Unless the Borrower and Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Credit Parties and Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate. Notwithstanding the foregoing, if, as a result of either (i) a change in any Requirement of Law or (ii) a change in circumstances with respect to a Credit Party, a non-U.S. Lender Party is unable to supply the forms or other documents required by this paragraph such Non-U.S. Lender Party shall notify the Borrower and Agent of its inability and be treated as having complied with all of the requirements of this paragraph.

(i)    Each U.S. Lender Party shall provide Agent and the Borrower (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of Form W-9 (certifying that such U.S. Lender Party is entitled to an exemption from U.S. backup withholding tax) or any successor form (A) on or prior to the date such U.S. Lender Party becomes a "**U.S. Lender Party**" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete and (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this clause (f). Notwithstanding the foregoing, a U.S. Lender Party need not provide such forms if such U.S. Lender Party is an exempt recipient under the United States Treasury Regulation Section 1.6049-4(c)(1)(ii).

(ii)    If a payment made to a Non-U.S. Lender Party would be subject to United States federal withholding tax imposed by FATCA if such Non-U.S. Lender Party fails to comply with the applicable reporting requirements of FATCA, such Non-U.S. Lender Party shall deliver to Agent and Borrower documentation, at the time or times prescribed by law, prescribed by the IRS to demonstrate that such Non-U.S. Lender has complied with applicable reporting requirements of FATCA so that payments made to such Non-U.S. Lender hereunder would not be subject to U.S. federal withholding taxes under FATCA, or if necessary, to determine the amount to deduct and withhold from such payment.

(g)    If a Secured Party determines, in its sole discretion, that it has received a refund, whether in the form of a payment, credit or offset (but only to the extent such credit or offset is actually utilized), of any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 10.1, it shall promptly pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 10.1 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of such Secured Party and without interest (other than any interest paid, credited or allowed as an offset, by the relevant Governmental Authority with respect to such refund, which interest shall be paid to the Borrower); provided, that (i) a Secured Party may determine in its sole discretion consistent with the policies of such Secured Party, whether to file a claim for a refund, (ii) no Secured Party shall be required to pay any amounts pursuant to this Section 10.1(g) at any time which a Default or Event of Default exists and (iii) the Borrower, upon the request of such Secured Party, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Secured Party in the event the Secured Party is required to repay such refund to such Governmental Authority. Nothing in this subsection 10.1(g) shall be construed to require any Lender to make available its tax returns (or any other information which it deems confidential) to the Borrower or any other Person.

10.2 <u>Illegality</u>. If after the date hereof any Lender shall determine that the introduction of any Requirement of Law, or any change in any Requirement of Law or in the interpretation or administration thereof, has made it unlawful, or that any central bank or other Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make LIBOR Rate Loans, then, on notice thereof by such Lender to the Borrower through Agent, the obligation of that Lender to make LIBOR Rate Loans shall be suspended until such Lender shall have notified Agent and the Borrower that the circumstances giving rise to such determination no longer exists.

(a) Subject to clause (c) below, if any Lender shall determine that it is unlawful to maintain any LIBOR Rate Loan, the Borrower shall prepay in full all LIBOR Rate Loans of such Lender then outstanding, together with interest accrued thereon, either on the last day of the Interest Period thereof if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans, together with any amounts required to be paid in connection therewith pursuant to <u>Section 10.4</u>.

(b) [Intentionally omitted].

(c) Before giving any notice to Agent pursuant to this <u>Section 10.2</u>, the affected Lender shall designate a different Lending Office with respect to its LIBOR Rate Loans if such designation will avoid the need for giving such notice or making such demand and will not, in the judgment of the Lender, be illegal or otherwise disadvantageous to the Lender.

10.3 <u>Increased Costs and Reduction of Return</u>.

(a) If any Lender shall determine that, due to either (i) the introduction of, or any change in, or in the interpretation of, any Requirement of Law or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in the case of either clause (i) or (ii) subsequent to the date hereof, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any LIBOR Rate Loans (other than any Excluded Taxes or any Taxes that are otherwise provided for in <u>Section 10.1</u>), then the Borrower shall be liable for, and shall from time to time, within thirty (30) days of demand therefor by such Lender (with a copy of such demand to Agent), pay to Agent for the account of such Lender, additional amounts as are sufficient to compensate such Lender for such increased costs; <u>provided</u>, that the Borrower shall not be required to compensate any Lender pursuant to this <u>subsection 10.3(a)</u> for any increased costs incurred more than 180 days prior to the date that such Lender notifies the Borrower, in writing of the increased costs and of such Lender's intention to claim compensation thereof; <u>provided</u>, <u>further</u>, that if the circumstance giving rise to such increased costs is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b) If any Lender shall have determined that:

(i) the introduction of any Capital Adequacy Regulation;

(ii) any change in any Capital Adequacy Regulation;

(iii) any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

(iv) compliance by such Lender (or its Lending Office) or any entity controlling the Lender, with any Capital Adequacy Regulation;

affects the amount of capital required or expected to be maintained by such Lender or any entity controlling such Lender and (taking into consideration such Lender's or such entities' policies with respect to capital adequacy and such Lender's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment(s), loans, credits or obligations under this Agreement, then, within thirty (30) days of demand of such Lender (with a copy to Agent), the Borrower shall pay to such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender (or the entity controlling the Lender) for such increase; provided, that the Borrower shall not be required to compensate any Lender pursuant to this subsection 10.3(b) for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrower, in writing of the amounts and of such Lender's intention to claim compensation thereof; provided, further, that if the event giving rise to such increase is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(c) Notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change in a Requirement of Law under subsection (a) above and/or a change in a Capital Adequacy Regulation under subsection (b) above, as applicable, regardless of the date enacted, adopted or issued.

10.4    Funding Losses.  The Borrower agrees to reimburse each Lender and to hold each Lender harmless from any loss or expense (other than any anticipated lost profits) which such Lender may sustain or incur as a consequence of:

(a) the failure of the Borrower to make any payment or mandatory prepayment of principal of any LIBOR Rate Loan (including payments made after any acceleration thereof);

(b) the failure of the Borrower to borrow or continue a Loan after the Borrower has given (or is deemed to have given) a Notice of Borrowing or a Notice of Continuation;

(c) the failure of the Borrower to make any prepayment after the Borrower has given a notice in accordance with Section 1.7; or

(d) the prepayment (including pursuant to Section 1.8) of a LIBOR Rate Loan on a day which is not the last day of the Interest Period with respect thereto;

including any such loss or expense (other than any anticipated lost profits) arising from the liquidation or reemployment of funds obtained by it to maintain its LIBOR Rate Loans hereunder or from fees payable to terminate the deposits from which such funds were obtained; provided that, with respect to the expenses described in clauses (d) and (e) above, such Lender shall have notified Agent of any such expense within two (2) Business Days of the date on which such expense was incurred; provided, however, that the Borrower shall not be required to compensate any Lender pursuant to this Section 10.4 for any amounts incurred more than six (6) months prior to the date such Lender notifies the Borrower of such Lender's intention to claim compensation therefor.  Solely for purposes of calculating amounts payable by the Borrower to the Lenders under this Section 10.4 and under subsection 10.3(a):  each LIBOR Rate Loan made by a Lender (and each related reserve, special deposit or similar requirement) shall be conclusively deemed to have been funded at the LIBOR used in determining the interest rate for such LIBOR Rate Loan by a matching deposit or other borrowing in the interbank Eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan is in fact so funded.

10.5   Inability to Determine Rates.  If Agent shall have determined in good faith that for any reason adequate and reasonable means do not exist for ascertaining the LIBOR for any requested Interest Period with respect to a proposed LIBOR Rate Loan or that the LIBOR applicable pursuant to subsection 1.3(a) for any requested Interest Period with respect to a proposed LIBOR Rate Loan does not adequately and fairly reflect the cost to the Lenders of funding or maintaining such LIBOR Rate Loan, Agent will forthwith give notice of such determination to the Borrower and each Lender.  Thereafter, "LIBOR" shall be deemed to be 1.5% per annum until Agent revokes such notice in writing.  Upon receipt of such notice, the Borrower may revoke any Notice of Borrowing or Notice of Continuation then submitted by it.  If the Borrower does not revoke such notice, the Lenders shall make, continue the Loans, as proposed by the Borrower, in the amount specified in the applicable notice submitted by the Borrower.

10.6   Certificates of Lenders.  Any Lender claiming reimbursement or compensation pursuant to this Article X shall deliver to the Borrower (with a copy to Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on the Borrower in the absence of manifest error.

## ARTICLE XI

## DEFINITIONS

11.1   Defined Terms.  The following terms are defined in the Sections or subsections referenced opposite such terms:

| | |
|---|---|
| "Affected Lender" | 9.22 |
| "Aggregate Excess Funding Amount" | 1.11(e) |
| "Agreement" | Preamble |
| "Bankruptcy Code" | Recitals |
| "Bankruptcy Court" | Recitals |
| "Borrower" | Preamble |

| | |
|---|---|
| "Borrower Materials" | 9.10(e) |
| "Budget" | 4.2(j) |
| "Cases" | Recitals |
| "Confirmation Order" | 4.17 |
| "Debtors" | Recitals |
| "Effective Date" | 2.1 |
| "Event of Default" | 7.1 |
| "Holdings" | Recitals |
| "Indemnified Matters" | 9.6 |
| "Indemnitee" | 9.6 |
| "Initial Budget" | 2.1(g) |
| "Investment Banker" | 4.17 |
| "Investments" | 5.4 |
| "Lender" | Preamble |
| "Liquidating Person" | 5.3 |
| "Liquidity Reserve" | 6.2 |
| "List of Identified Disqualified Institutions" | 9.9(b) |
| "Maximum Lawful Rate" | 1.3(d) |
| "Maximum Loan Balance" | 1.1(b) |
| "MNPI" | 9.10(a) |
| "Notice of Continuation" | 1.6(a) |
| "OFAC" | 3.25 |
| "Other Taxes" | 10.1(c) |
| "Permitted Liens" | 5.1 |
| "Permitted Disbursement Variance" | 6.3(a) |
| "Permitted Fee Variance" | 6.3(b) |
| "Permitted Variance" | 6.3(b) |
| "Petition Date" | Recitals |
| "Register" | 1.4(b) |
| "Replacement Lender" | 9.22 |
| "Restricted Payments" | 5.9 |
| "Loan" | 1.1(b) |
| "Loan Commitment" | 1.1(b) |
| "Sale" | 9.9(b) |
| "SDN List" | 3.25 |
| "Settlement Date" | 1.11(b) |
| "Solicitation Order" | 4.17 |
| "Tax Return" | 3.10 |
| "Taxes" | 10.1(a) |
| "Unused Commitment Fee" | 1.9(b) |
| "Updated Budget" | 4.2(j) |
| "Upfront Fee" | 1.9(a) |
| "Variance Report" | 4.2(j) |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"**Account**" means, as at any date of determination, all "accounts" (as such term is defined in the UCC) of the Borrower and its Subsidiaries, including, without limitation, the unpaid portion of the obligation of a customer of the Borrower or any of its Subsidiaries in respect of inventory purchased by and shipped to such customer and/or the rendition of services by the Borrower or such Subsidiary, as stated on the respective invoice of the Borrower or such Subsidiary, net of any credits, rebates or offsets owed to such customer.

"**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of one hundred percent (100%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Wholly-Owned Subsidiary of the Borrower, or (c) a merger or consolidation or any other combination with another Person.

"**Affiliate**" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract or otherwise. Without limitation, any director, executive officer or beneficial owner of ten percent (10%) or more of the Stock (either directly or through ownership of Stock Equivalents) of a Person shall for the purposes of this Agreement, be deemed to be an Affiliate of such Person. Notwithstanding the foregoing, neither Agent nor any Lender nor any Affiliate thereof shall be deemed an "Affiliate" of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Loan Documents.

"**Agent**" means Cantor Fitzgerald Securities in its capacity as administrative agent for the Lenders hereunder, and any successor administrative agent.

"**Aggregate Loan Commitment**" means the combined Loan Commitments of the Lenders, which shall, as of the Closing Date, be in the amount of $45,000,000, as such amount shall be reduced from time to time pursuant to this Agreement.

"**Applicable Margin**" means nine and a half percent (9.50%) per annum;

"**Approved Fund**" means, with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"**Assignment**" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms and provisions of <u>Section 9.9</u> (with the consent of any party whose consent is required by <u>Section 9.9</u>), accepted by Agent, substantially in the form of Exhibit 11.1(a) or any other form approved by Agent.

"**Attorney Costs**" means and includes all reasonable fees and disbursements of any law firm or other external counsel.

"**Availability**" means, as of any date of determination, the amount by which (a) the Maximum Loan Balance, exceeds (b) the aggregate outstanding principal balance of Loans.

"**Bailee Letter**" shall have the meaning assigned to such term in the Guaranty and Security Agreement.

"**Benefit Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA (and governed by the laws of the United States ), other than a Multiemployer Plan or Title IV Plan, to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Borrowing**" means a borrowing hereunder consisting of Loans made to or for the benefit of the Borrower on the same day by the Lenders pursuant to Article I.

"**Budget**" means the Initial Budget or the Updated Budget, as applicable.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which federal reserve banks or Agent are authorized or required by law to close and, if the applicable Business Day relates to any LIBOR Rate Loan, a day on which dealings are carried on in the London interbank market.

"**Capital Adequacy Regulation**" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any Lender or of any corporation controlling a Lender.

"**Capital Expenditures**" means, with respect to any Person, all expenditures by such Person which should be capitalized in accordance with GAAP and, without duplication, the amount of Capital Lease Obligations incurred by such Person; provided, that for purposes of Section 6.1, "Capital Expenditures" shall not include (i) Capital Lease Obligatiosn incurred before the Effective Date and (ii) Capital Lease Obligatiosn incurred by Subsidiaries that are not Credit Parties.

"**Capital Lease**" means any leasing or similar arrangement which, in accordance with GAAP, is classified as a capital lease.

"**Capital Lease Obligations**" means all monetary obligations of any Credit Party or any Subsidiary of any Credit Party under any Capital Leases.

"**Cash Equivalents**" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any

public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000, (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clause (a), (b), (c) or (d) above shall not exceed 365 days, and (f) in the case of Foreign Subsidiaries of the Borrower only (in addition to instruments referred to in clauses (a) through (e) above), instruments equivalent to those referred to in clauses (a) through (e) above denominated in a foreign currency, which are substantially equivalent in credit quality and tenor to those referred to above and customarily used by businesses for short term cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Foreign Subsidiary of the Borrower organized in such jurisdiction.

"**CFC**" means any Foreign Subsidiary that is a "controlled foreign corporation" within the meaning of section 957 of the Code.

"**Closing Date**" means May [__], 2014, the date of this Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means all Property and interests in Property and proceeds thereof now owned or hereafter acquired by any Credit Party and any other Person who has granted a Lien to Agent, in or upon which a Lien is granted or purported to be granted now or hereafter exists in favor of any Lender or Agent for the benefit of Agent, Lenders and other Secured Parties, whether under this Agreement, under any Collateral Document or under any other documents executed by any such Persons and delivered to Agent. Notwithstanding anything to the contrary contained above, "Collateral" shall not include any "**Excluded Collateral**" (as such term is defined in the Guaranty and Security Agreement).

"**Collateral Documents**" means, collectively, the Guaranty and Security Agreement, the Mortgages, each Control Agreement and all other security agreements, pledge agreements, patent and trademark security agreements, guarantees and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Credit Party or any other Person pledging or granting a lien on Collateral or guaranteeing the payment and performance of the Obligations, and any Lender or Agent for the benefit of Agent, the Lenders and other Secured Parties now or hereafter delivered to the Lenders or Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the

UCC or comparable law) against any such Person as debtor in favor of any Lender or Agent for the benefit of Agent, the Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"**Commitment**" means, for each Lender, its Loan Commitment.

"**Commitment Percentage**" means, as to any Lender, the percentage equivalent of such Lender's Loan Commitment, divided by the Aggregate Loan Commitment, as applicable; provided, that, that following acceleration of the Loans, such term means, as to any Lender, the percentage equivalent of the principal amount of the Loans held by such Lender divided by the aggregate principal amount of the Loans held by all Lenders.

"**Commitment Termination Date**" means the earliest to occur of: (a) the Initial Termination Date; (b) the date on which the Aggregate Loan Commitment shall terminate in accordance with the provisions of this Agreement; (c) the Effective Date of the Reorganization Plan; and (d) the date a sale of all or substantially all of the Credit Parties' assets is consummated under Section 363 of the Bankruptcy Code.

"**Consolidated Indebtedness**" means, at any time, the sum of (without duplication) (i) all Indebtedness of Holdings and its Subsidiaries (on a consolidated basis) as would be required to be reflected as debt or Capital Lease Obligations on the liability side of a consolidated balance sheet of Holdings and its Subsidiaries in accordance with GAAP, (ii) all Indebtedness of Holdings and its Subsidiaries of the type described in clauses (c) and (d) of the definition of Indebtedness, (iii) all Contingent Obligations of Holdings and its Subsidiaries in respect of Indebtedness of any third Person of the type referred to in preceding clauses (i) through (iii) inclusive; provided that the aggregate amount available to be drawn (i.e., unfunded amounts) under all letters of credit, bankers' acceptances, bank guaranties, surety bonds and similar obligations issued for the account of Holdings or any of its Subsidiaries (but excluding, for avoidance of doubt, all unpaid drawings or other matured monetary obligations owing in respect of such letters of credit, bankers' acceptances, bank guaranties, surety bonds and similar obligations) shall not be included in any determination of "Consolidated Indebtedness", and shall not be included in any calculation of "Consolidated Indebtedness". Notwithstanding the foregoing, Consolidated Indebtedness shall not include Indebtedness arising as a result of any changes in GAAP which would classify any operating leases so characterized in accordance with GAAP (as GAAP is in effect as of the date hereof) as Capital Lease Obligations (or the equivalent) required to be reflected on a consolidated balance sheet of the issuer in accordance with GAAP.

"**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person: (a) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (c) under any Rate Contracts; (d) to make take-or-pay or similar payments if required regardless of nonperformance

by any other party or parties to an agreement; or (e) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed or supported.

"**Contractual Obligations**" means, as to any Person, any provision of any security issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement to which such Person is a party or by which it or any of its Property is bound.

"**Control Agreement**" means a quad-party deposit account, securities account or commodities account control agreement by and among the applicable Credit Party, Agent, the Existing Agent and the depository, securities intermediary or commodities intermediary, and each in form and substance reasonably satisfactory to Agent and the Existing Agent and in any event providing to Agent and the Existing Agent "control" of such deposit account, securities or commodities account within the meaning of Articles 8 and 9 of the UCC.

"**Copyrights**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"**Credit Parties**" means Holdings, the Borrower and each Subsidiary Guarantor.

"**Default**" means any event or circumstance which, with the giving of notice, the lapse of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"**Designated Reporting Items**" means the "Designated Reporting Items" as defined in that certain Notice of Reservation of Rights Letter dated as of November 25, 2013 delivered by Agent to the Borrower, including reporting with respect to same for the periods ending September 30, 2013, October 31, 2013 and November 30, 2013.

"**Disbursement Item**" means any line item relating to disbursements as presented in the Initial Budget (including but not limited to any line item under the headings "Operating Disbursements", "Corporate Disbursements", "KEIP / KERP" "CAPEX Disbursements", or "Finance Payments/Borrowings"), other than the line item with the heading "Pre-petition Payments"; provided, that for purposes of Section 6.3(a), the line items labeled "Total Resin/Fiber", "Materials & Other Opex", and "Freight" shall be considered together as if they were set forth on a single line.

"**Dollars**", "**dollars**" and "**$**" each mean lawful money of the United States of America. "Domestic Subsidiary" means any Subsidiary incorporated, organized or otherwise formed under the laws of the United States, any state thereof or the District of Columbia.

"**E-Fax**" means any system used to receive or transmit faxes electronically.

"**Electronic Transmission**" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E-Fax, or otherwise to or from an E-System or other equivalent service.

"**Environmental Laws**" means all present and future Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health and safety from exposure to Hazardous Materials, workplace health and safety, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

"**Environmental Liabilities**" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and Attorneys' Costs) that may be imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any Credit Party, or any Lender, as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any Release, and resulting from the ownership, lease, sublease or other operation or occupation of Real Estate by any Credit Party or any Subsidiary of any Credit Party, in each case whether on, prior or after the date hereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means, collectively, any Credit Party and any Person under common control or treated as a single employer with, any Credit Party, within the meaning of Section 414(b) or (c) of the Code and for purposes of Section 302 of ERISA and Section 412 of the Code, under Section 414(b), (c), (m) or (o) of the Code, or under Section 4001 of ERISA.

"**ERISA Event**" means any of the following: (a) a reportable event described in Section 4043(b) of ERISA (or, unless the 30-day notice requirement has been duly waived under the applicable regulations) with respect to a Title IV Plan; (b) the withdrawal of any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any ERISA Affiliate from any Multiemployer Plan; (d) with respect to any Multiemployer Plan, the filing of a notice of reorganization, insolvency or termination (or treatment of a plan amendment as termination) under Section 4041A of ERISA; (e) the filing of a notice of intent to terminate a Title IV Plan (or treatment of a plan amendment as termination) under Section 4041 of ERISA; (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (g) the failure to make any required contribution to any Title IV Plan or Multiemployer Plan when due; (h) the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of any ERISA Affiliate; (i) the failure of a Benefit Plan or any trust thereunder intended to qualify for tax exempt status under Section 401 or 501 of the Code to qualify thereunder; (j) a Title IV plan is in "at risk" status within the meaning of Code Section

430(i); (k) a Multiemployer Plan is in "endangered status" or "critical status" within the meaning of Section 432(b) of the Code; and (l) any other event or condition that could reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of any material liability upon any ERISA Affiliate under Title IV of ERISA other than for PBGC premiums due but not delinquent.

"**E-Signature**" means the process of attaching to or logically associating with an Electronic Transmission an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Electronic Transmission) with the intent to sign, authenticate or accept such Electronic Transmission.

"**E-System**" means any electronic system approved by Agent, including Intralinks® and ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"**Event of Loss**" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; (b) any pending or threatened institution of any proceedings for the condemnation or seizure of such Property or for the exercise of any right of eminent domain; or (c) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Existing Agent**" means Cantor Fitzgerald Securities, in its capacity as agent for the Existing Lenders pursuant to the Existing Credit Agreement, together with its successors and assigns in such capacity.

"**Existing Credit Agreement**" means that certain First Lien Credit Agreement, dated as of May 27, 2011, as amended as of the date hereof, by and among Holdings, Borrower, the Subsidiary Guarantors, Existing Agent and the Existing Lenders.

"**Existing Indebtedness**" means Indebtedness of the Borrower, which is guaranteed by the other Credit Parties, to the Existing Lenders pursuant to the Existing Credit Agreement in an aggregate principal amount of approximately $172,000,000, together with fees, costs and other amounts, in each case, incurred pursuant to the terms of the Existing Indebtedness Documents.

"**Existing Indebtedness Documents**" means the Existing Credit Agreement, the notes and guarantees issued pursuant thereto, and the collateral documents executed and delivered in connection therewith.

"**Existing Indebtedness Liens**" means Liens in favor of Existing Agent second in priority to the Liens granted to Agent under the Loan Documents, for the benefit of the Existing Agent and the Existing Lenders on the Collateral with respect to which Agent shall have a prior perfected Lien and subject at all times to the Intercreditor Agreement.

"**Existing Lenders**" means the lenders from time to time party to the Existing Credit Agreement.

"**Excluded Accounts**" shall have the meaning assigned to such term in the Guaranty and Security Agreement.

"**Excluded Subsidiaries**" means (i) Immaterial Wholly-Owned Domestic Subsidiaries, (ii) any Wholly-Owned Domestic Subsidiary that is a direct or indirect Subsidiary of a CFC, (iii) any Subsidiary that is a CFC, (iv) any Wholly-Owned Domestic Subsidiary created or organized after the Closing Date which would require the consent, approval, license or authorization of any Governmental Authority to enter into the Guarantee and Security Agreement unless such consent, approval, license or authorization has been obtained, and (v) any Wholly-Owned Domestic Subsidiary substantially all of whose Property are (and continue to be) only the Stock of CFC's and, to the extent not prohibited by this Agreement, cash and cash equivalents and intercompany receivables and loans.

"**Excluded Tax**" means with respect to any Secured Party (a) taxes measured by net income (including branch profit taxes) and franchise taxes imposed in lieu of net income taxes, in each case imposed on any Secured Party as a result of a present or former connection between such Secured Party and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than such connection arising solely from any Secured Party having executed, delivered, became a party to, received or perfected a security interest under or performed its obligations or received a payment under, or engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan Document); (b) withholding taxes to the extent that the obligation to withhold amounts existed on the date that such Person became a "Secured Party" under this Agreement or designates a new Lending Office, except in each case to the extent that such Secured Party (or its assignor, if any) was entitled, at the time of designation of new Lending Office or assignment, to receive additional amounts under Section 10.1(b); (c) taxes that are directly attributable to the failure (other than as a result of a change in any Requirement of Law) by any Secured Party to deliver the documentation required to be delivered pursuant to Section 10.1(f); and (d) in the case of a Non-U.S. Lender Party, any United States federal withholding taxes imposed on amounts payable to such Non-U.S. Lender Party as a result of such Non-U.S. Lender Party's failure to comply with FATCA.

"**Fair Market Value**" means, with respect to any asset (including any Stock or Stock Equivalents of any Person), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior executive officer, of Holdings, or the Subsidiary of Holdings selling such asset.

"**FATCA**" means sections 1471, 1472, 1473 and 1474 of the Code as enacted on the Closing Date, the United States Treasury Regulations promulgated thereunder and published guidance with respect thereto, or any amended or successor version that is substantively comparable; provided that any such amended or successor version imposes criteria that are not materially more onerous than those contained in such sections as enacted on the Closing Date.

"**Federal Flood Insurance**" means Federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided that if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent in a commercially reasonable manner.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"**FEMA**" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"**Final Availability Date**" means the earlier of the Commitment Termination Date and one (1) Business Day prior to the date specified in clause (a) of the definition of Commitment Termination Date.

"**Final Order**":  a final order of the Bankruptcy Court containing substantially the same provisions as the Interim Order except as otherwise agreed by the Required Lender.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Tier Foreign Subsidiary**" means a Foreign Subsidiary held directly by a Credit Party or indirectly by a Credit Party.

"**Fiscal Quarter**" means any of the quarterly accounting periods of the Credit Parties ending on March 31, June 30, September 30 and December 31 of each year.

"**Fiscal Year**" means any of the annual accounting periods of the Credit Parties ending on December 31 of each year.

"**Flood Insurance**" means, for any Real Estate located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that meets the requirements set forth by FEMA in its *Mandatory Purchase of Flood Insurance Guidelines*. Flood Insurance shall be in an amount equal to the full, unpaid balance of the Loans and any prior liens on the Real Estate up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Agent, with deductibles not to exceed $50,000.

"**Foreign Subsidiary**" means, with respect to any Person, a Subsidiary of such Person, which Subsidiary is not a Domestic Subsidiary.

"**GAAP**" means generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), including, without limitation, the FASB Accounting Standards Codification™, which are applicable to the circumstances as of the date of determination, subject to Section 11.3.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"**Guaranty and Security Agreement**" means that certain Guaranty and Security Agreement, dated as of even date herewith, substantially in the form of Exhibit 11.1(b), made by the Credit Parties in favor of Agent, for the benefit of the Secured Parties, as the same may be amended, restated and/or modified from time to time.

"**Hazardous Materials**" means any substance, material or waste that is regulated (due to its toxic, ignitable, reactive, corrosive, caustic or dangerous properties or characteristics) or otherwise gives rise to liability under any Environmental Law, including but not limited to any "Hazardous Waste" as defined by the Resource Conservation and Recovery Act (RCRA) (42 U.S.C. § 6901 et seq. (1976)), any "Hazardous Substance" as defined under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. §9601 et seq. (1980)), any contaminant, pollutant, petroleum or any fraction thereof, asbestos, asbestos containing material, polychlorinated biphenyls, toxic mold, and radioactive substances or any other substance that is toxic, ignitable, reactive, corrosive, caustic, or dangerous.

"**Immaterial Wholly-Owned Domestic Subsidiary**" means any Wholly-Owned Domestic Subsidiary of the Borrower designated in writing by the Borrower to Agent as an Immaterial Wholly-Owned Domestic Subsidiary that is not already a Subsidiary Guarantor and that does not, as of the last day of the most recently completed Fiscal Quarter, have assets with a value in excess of three percent (3%) of the consolidated total assets of the Borrower and its Wholly- Owned Subsidiaries and did not, as of the Test Period ending on the last day of such Fiscal Quarter, have revenues exceeding three percent (3%)% of the consolidated revenues of the Borrower and its Wholly-Owned Subsidiaries; provided that if (a) such Wholly-Owned Domestic Subsidiary shall have been designated in writing by the Borrower to Agent as an Immaterial Wholly-Owned Domestic Subsidiary, and (b) if (i) the aggregate assets then owned by all Wholly-Owned Domestic Subsidiaries of the Borrower that would otherwise constitute Immaterial Wholly-Owned Domestic Subsidiaries shall have a value in excess of five percent (5%) of the consolidated total assets of the Borrower and its Wholly-Owned Subsidiaries as of the last day of such Fiscal Quarter or (ii) the combined revenues of all Wholly-Owned Domestic Subsidiaries of the Borrower that would otherwise constitute Immaterial Wholly- Owned Domestic Subsidiaries shall exceed five percent (5%) of the consolidated revenues of the Borrower and its Wholly-Owned Subsidiaries for such Test Period, the Borrower shall redesignate one or more of such Wholly-Owned Domestic Subsidiaries to not be Immaterial

Wholly-Owned Domestic Subsidiaries within ten (10) Business Days after delivery of the Compliance Certificate for such Fiscal Quarter such that only those such Wholly-Owned Domestic Subsidiaries as shall then have aggregate assets of less than five percent (5%) of the consolidated total assets of the Borrower and its Wholly-Owned Subsidiaries and combined revenues of less than five percent (5%) of the consolidated revenues of the Borrower and its Wholly-Owned Subsidiaries shall constitute Immaterial Wholly-Owned Domestic Subsidiaries.

"**Impacted Lender**" means any Lender that fails to provide Agent, within three (3) Business Days following Agent's written request, satisfactory assurance that such Lender will not become a Non-Funding Lender, or any Lender that has a Person that directly or indirectly controls such Lender and such Person (a) becomes subject to a voluntary or involuntary case under the Bankruptcy Code or any similar bankruptcy laws, (b) has appointed a custodian, conservator, receiver or similar official for such Person or any substantial part of such Person's assets, or (c) makes a general assignment for the benefit of creditors, is liquidated, or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or bankrupt, and for each of clauses (a) through (c), Agent has determined that such Lender is reasonably likely to become a Non-Funding Lender. For purposes of this definition, control of a Person shall have the same meaning as in the second sentence of the definition of Affiliate.

"**Indebtedness**" of any Person means, without duplication:  (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services, including earnouts (other than trade payables entered into in the Ordinary Course of Business); (c) the face amount of all letters of credit issued for the account of such Person and without duplication, all drafts drawn thereunder and all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations, whether or not contingent, to purchase, redeem, retire, defease or otherwise acquire for value any of its own Stock or Stock Equivalents (or any Stock or Stock Equivalent of a direct or indirect parent entity thereof) prior to the date that is 180 days after the Commitment Termination Date, valued at, in the case of redeemable preferred Stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such Stock plus accrued and unpaid dividends; (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; and (j) all Contingent Obligations described in clause (a) of the definition thereof in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above; provided that, except to the extent set forth in clause (h) above, any liability required to be classified as indebtedness pursuant to FASB 150 shall not be deemed to be Indebtedness. Notwithstanding the

foregoing, Indebtedness shall not include Indebtedness arising as a result of any changes in GAAP which would classify any operating leases so characterized in accordance with GAAP (as GAAP is in effect as of the date hereof) as Capital Lease Obligations, (or the equivalent) required to be reflected on a consolidated balance sheet of the Issuer in accordance with GAAP.

"**Interim Order**" means an order of the Bankruptcy Court in the form of Exhibit 11.1(c) attached hereto with only such modifications thereto as are acceptable to the Required Lenders in their sole discretion.

"**Initial Termination Date**" means the date that is six months after the Petition Date.

"**Intellectual Property**" means all rights, title and interests in or relating to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Trademarks, Internet Domain Names, Trade Secrets and IP Licenses.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of January 10, 2014, by and among the Credit Parties and the agents party thereto as the same may be amended, restated and/or modified from time to time subject to the terms thereof.

"**Interest Payment Date**" means, with respect to any LIBOR Rate Loan, the last day of each Interest Period applicable to such LIBOR Rate Loan.

"**Interest Period**" means, with respect to any LIBOR Rate Loan, the period commencing on the Business Day such LIBOR Rate Loan is disbursed or continued and ending on the date one (1) month thereafter, as selected by the Borrower in its Notice of Borrowing or Notice of Continuation; provided that:

> (a)    if any Interest Period pertaining to a LIBOR Rate Loan would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day;

> (b)    any Interest Period pertaining to a LIBOR Rate Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

> (c)    no Interest Period for any Loan shall extend beyond the Commitment Termination Date.

"**Interest Reserve**" means a reserve against the Aggregate Loan Commitment established by the Agent on the first day of each month in an amount equal to the aggregate amount of interest in respect of the Loans accrued, or to be accrued, in respect of such month, but, in any event, not to exceed $412,500, as such reserve may be reduced during any such month by the amount of Loans, if any, funded specifically for the purpose of paying the interest for which such reserve was established.

"**Internet Domain Name**" means all rights, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to internet domain names.

"**IP Ancillary Rights**" means, with respect to any other Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"**IP License**" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in any Intellectual Property.

"**IRS**" means the Internal Revenue Service of the United States and any successor thereto.

"**Lending Office**" means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" beneath its name on the applicable signature page hereto, or such other office or offices of such Lender as it may from time to time notify the Borrower and Agent.

"**Liabilities**" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"**LIBOR**" means, for each Interest Period, the highest of (a) 1.5% per annum and (b) (x) the offered rate per annum for deposits of Dollars for the applicable Interest Period that appears on Reuters Screen LIBOR01 Page (or such other comparable page as may, in the opinion of Agent, replace such page for the purpose of displaying such rates) as of 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period, divided by (y) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves required by applicable law) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency funding or liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D). If no such offered rate exists, such rate determined pursuant to preceding clause (b)(x) will be the rate of interest per annum, as determined by Agent at which deposits of Dollars in immediately available funds are offered at 11:00 A.M. (London, England time) two (2) Business Days prior to the first day in such Interest Period by major financial institutions reasonably satisfactory to Agent in the London interbank market for such Interest Period for the applicable principal amount on such date of determination.

"**LIBOR Rate Loan**" means a Loan that bears interest based on LIBOR.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge or deposit arrangement, encumbrance, lien (statutory or otherwise) or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of any financing statement (without the consent of, or authorization by, Holdings or any of its Subsidiaries) naming the owner of the asset to which such lien relates as debtor, under the UCC or any comparable law) and any contingent or other agreement to provide any of the foregoing, but not including the interest of a lessor under a lease which is not a Capital Lease.

"**Loan**" means an extension of credit by a Lender to the Borrower pursuant to Article I.

"**Loan Documents**" means this Agreement, the Notes, the Collateral Documents, the Intercreditor Agreement, and Agent Fee Letter and all documents delivered to Agent and/or any Lender in connection with any of the foregoing.

"**Margin Stock**" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"**Material Adverse Effect**" means  (a) a material adverse change in, or a material adverse effect upon, the operations, business, Properties, liabilities or financial condition of Holdings and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Credit Party to perform in any material respect its obligations under any Loan Document; or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability of any Loan Document, or (ii) the perfection or priority of any Lien granted to the Lenders or to Agent for the benefit of the Secured Parties under any of the Collateral Documents (other than a perfected Lien on an immaterial portion of the Collateral) or the Orders.

"**Mortgage**" means any deed of trust, leasehold deed of trust, mortgage, deed to secure debt or other document creating a Lien on Real Estate located in the United States or any interest in Real Estate located in the United States.

"**Mortgage Policy**" means a Lender's title insurance policy (Form 2006).

"**Mortgaged Property**" means (a) each owned parcel of Real Estate identified on Schedule 9.26(a) hereto and (b) each other owned parcel of Real Estate, if any, which shall be required to be subject to a Mortgage pursuant to this Agreement.

"**Multiemployer Plan**" means any multiemployer plan, as defined in Section 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"**National Flood Insurance Program**" means the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood

Hazard Areas in participating communities and provides protection to property owners through a Federal insurance program.

"**Net Issuance Proceeds**" means, in respect of any issuance of Indebtedness or Stock or Stock Equivalents, the cash proceeds received by Holdings or any of its Subsidiaries therefrom, net of underwriting discounts, transaction taxes paid or payable as a result thereof and out-of-pocket costs, fees, and expenses (including commissions, professional and transaction fees) paid or incurred in connection therewith in favor of any Person.

"**Non-Funding Lender**" means any Lender that has (a) failed to fund any payments required to be made by it under the Loan Documents within two (2) Business Days after any such payment is due (excluding expense and similar reimbursements that are subject to good faith disputes), (b) given written notice (and Agent has not received a revocation in writing), to the Borrower, Agent or any Lender or has otherwise publicly announced (and Agent has not received notice of a public retraction) that such Lender believes it will fail to fund payments or purchases of participations required to be funded by it under the Loan Documents or one or more other syndicated credit facilities, (c) failed to fund, and not cured, loans, participations, advances, or reimbursement obligations under one or more other syndicated credit facilities, unless subject to a good faith dispute, or (d) any Lender that has (i) become subject to a voluntary or involuntary case under the Bankruptcy Code or any similar bankruptcy laws, (ii) a custodian, conservator, receiver or similar official appointed for it or any substantial part of such Person's assets, or (iii) made a general assignment for the benefit of creditors, been liquidated, or otherwise been adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or bankrupt, and for clause (d), and Agent has determined that such Lender is reasonably likely to fail to fund any payments required to be made by it under the Loan Documents; provided that, as of any date of determination, the determination of whether any Lender is a Non-Funding Lender hereunder shall not take into account, and shall not otherwise impair, any amounts funded by such Lender which have been assigned by such Lender to an SPV pursuant to subsection 9.9(f).

"**Non-U.S. Lender Party**" means each of Agent, each Lender, each SPV and each participant, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

"**Note**" means a promissory note of the Borrower payable to a Lender in substantially the form of Exhibit 11.1(d) hereto, evidencing Indebtedness of the Borrower under the Loan Commitment of such Lender and "Notes" means all such Notes.

"**Notice of Borrowing**" means a notice given by the Borrower to Agent pursuant to Section 1.5, in substantially the form of Exhibit 11.1(e) hereto.

"**Obligations**" means all Loans, and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to any Lender, Agent or any other Person required to be indemnified, that arises under any Loan Document whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and

however acquired (including any interest, fees or expenses accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in this Agreement, whether or not such interest, fee or expense is an allowed claim under any such proceeding or under applicable state, federal or foreign law).

"**Ordinary Course of Business**" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"**Orders**" means, collectively, the Interim Order and the Final Order.

"**Organization Documents**" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"**Patents**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, as amended.

"**PBGC**" means the United States Pension Benefit Guaranty Corporation any successor thereto.

"**Permits**" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Person**" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture or Governmental Authority.

"**Pledged Collateral**" has the meaning specified in the Guaranty and Security Agreement and shall include any other Collateral required to be delivered to Agent pursuant to the terms of any Collateral Document.

"**Priming Facility**" means the credit facilities provided under the Initial Priming Loan Agreement (as defined in the Intercreditor Agreement).

"**Professional Fees**" means professional fees as presented in the Initial Budget.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible. For the avoidance of doubt, Property includes Software.

"**Rate Contracts**" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) and any other agreements or arrangements designed to provide protection against fluctuations in interest or currency exchange rates.

"**Real Estate**" means any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party.

"**Regulation D**" means Regulation D of the Federal Reserve Board as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"**Related Persons**" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, shareholder, trustee, representative, attorney, attorney in fact, accountant and each insurance, environmental, legal, financial and other advisor (including those retained in connection with the satisfaction or attempted satisfaction of any condition set forth in Article II) and other consultants and agents of or to such Person or any of its Affiliates.

"**Release**" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"**Remedial Action**" means all actions required under Environmental Laws to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"**Reorganization Plan**" means  a plan of reorganization for the Credit Parties pursuant to the Bankruptcy Code in the form attached as Exhibit A to the Restructuring Support Agreement or otherwise in form and substance satisfactory to the Required Lenders in their sole discretion.

"**Required Lenders**" means at any time (a) Lenders then holding more than fifty percent (50%) of the sum of the Aggregate Loan Commitment then in effect, or (b) if the Aggregate Loan Commitments have terminated, Lenders then holding more than fifty percent (50%) of the sum of the aggregate unpaid principal amount of Loans then outstanding; provided that if at any time there are 3 or more unaffiliated Lenders, Required Lenders shall be at least 2 unaffiliated Lenders.

"**Requirement of Law**" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Responsible Officer**" means the chief executive officer or the president of the Borrower or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants or delivery of financial information, the chief financial officer or the treasurer of the Borrower or any other officer having substantially the same authority and responsibility.

"**Restricted**" means, when referring to cash or Cash Equivalents of Holdings or any of its Subsidiaries, that such cash or Cash Equivalents (i) appear (or would be required to appear) as "restricted" on a consolidated balance sheet of Holdings or of any such Subsidiary (unless such appearance is related to (x) the Loan Documents or Liens created thereunder or (y) the Existing Indebtedness Documents or the Existing Indebtedness Liens created thereunder), (ii) are subject to any Lien in favor of any Person other than (x) Agent for the benefit of the Secured Parties or (y) Existing Agent for the benefit of the Existing Secured Parties or (iii) are not otherwise generally available for use by Holdings or such Subsidiary.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of May 4, 2014, among the Debtors and certain other parties thereto, as amended, supplemented or otherwise modified.

"**Secured Party**" means Agent, each Lender, each other Indemnitee and each other holder of any Obligation of a Credit Party.

"**Software**" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"**Special Flood Hazard Area**" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"**Sponsor**" means CHS Capital LLC and its majority owned and controlled Affiliates.

"**SPV**" means any special purpose funding vehicle identified as such in a writing by any Lender to Agent.

"**Stock**" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"**Stock Equivalents**" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"**Subordinated Indebtedness**" means Indebtedness of any Credit Party or any Subsidiary of any Credit Party which is subordinated to the Obligations as to right and time of

payment and as to other rights and remedies thereunder and having such other terms as are, in each case, reasonably satisfactory to Agent.

"**Subsidiary**" of a Person means any corporation, association, limited liability company, partnership, joint venture or other business entity of which more than 50% of the voting Stock, is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof.

"**Subsidiary Guarantor**" means each Wholly-Owned Domestic Subsidiary of the Borrower (other than an Excluded Subsidiary) that has guaranteed the Obligations and granted Liens as security therefore and the Stock and Stock Equivalents of which have been pledged in favor of Agent as security for the Obligations, in each case, pursuant to and in accordance with subsection 2.1(l) or 4.12(b).

"**Superpriority Claims**" means Indebtedness or other claims arising out of credit obtained or debt incurred by any Loan Party having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"**Tax Affiliate**" means, (a) Holdings and its Subsidiaries and (b) any Affiliate of Holdings with which Holdings files or is required to file tax returns on a consolidated, combined, unitary or similar group basis.

"**Test Period**" means each period of four consecutive Fiscal Quarters then ended (taken as one accounting period.

"**Title IV Plan**" means a pension plan subject to Title IV of ERISA, other than a Multiemployer Plan, to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Trade Secrets**" means all rights, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trade secrets.

"**Trademark**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"**Transactions**" means, collectively, (i) the entering into of the Loan Documents on the Closing Date, (ii) the incurrence of Loans on the Effective Date and (iii) the payment of all fees and expenses in connection with the foregoing.

"**Transaction Expenses**" means all fees and expenses incurred in connection with, and payable prior to or in connection with the closing of, the Transactions.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"**Unfunded Pension Liability**" of any Title IV Plan means the amount, if any, by which the value of the accumulated plan benefits under the Title IV Plan, determined on an ongoing basis in accordance with actuarial assumptions utilized in the Plan's most recent actuarial report, exceeds the fair market value of all plan assets allocable to such liabilities as set forth in such actuarial report).

"**United States**" and "**U.S.**" each means the United States of America.

"**U.S. Lender Party**" means each of Agent, each Lender, each SPV and each participant, in each case that is a United States person as defined in Section 7701(a)(30) of the Code.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**Wholly-Owned Domestic Subsidiary**" means, as to any Person, any Wholly-Owned Subsidiary of such Person which is also a Domestic Subsidiary of such Person.

"**Wholly-Owned Foreign Subsidiary**" means, as to any Person, any Wholly-Owned Subsidiary of such Person which is also a Foreign Subsidiary of such Person.

"**Wholly-Owned Subsidiary**" means any Subsidiary in which (other than directors' qualifying shares required by law and, in the case of a Foreign Subsidiary, nominal amount of shares held by local nationals to the extent required by law) 100% of the Stock and Stock Equivalents, at the time as of which any determination is being made, is owned, beneficially and of record, by any Credit Party, or by one or more of the other Wholly-Owned Subsidiaries, or both.

11.2     Other Interpretive Provisions.

(a)     Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms. Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)     The Agreement. The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)    Certain Common Terms.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced. The term "including" is not limiting and means "including without limitation."

(d)    Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e)    Contracts.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f)    Laws.  References to any statute or regulation are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

11.3    Accounting Terms and Principles.  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP. If any change in GAAP results in a change in the calculation of the financial covenants or interpretation of related provisions of this Agreement or any other Loan Document, then the Borrower, Agent and the Required Lenders agree to amend such provisions of this Agreement so as to equitably reflect such changes in GAAP with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such change in GAAP as if such change had not been made; provided that no change in the accounting principles used in the preparation of any financial statement hereafter adopted by Holdings or the Borrower shall be given effect for purposes of measuring compliance with any provision of Article V or VI unless (and until) the Borrower, Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless (and until) such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article V and Article VI shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value." A breach of a financial covenant contained in Article VI shall be deemed to have

occurred as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to Agent.

      11.4   <u>Payments</u>.   Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party. Any such determination or redetermination by Agent shall be presumptive and binding for all purposes, absent manifest error.   No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted. Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable de minimis payment thresholds.

[Signature pages follow.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

<u>BORROWER</u>:

GSE ENVIRONMENTAL, INC.

By: _____
Name:
Title:

FEIN:  22-2731074

Address for notices:
Gundle/SLT Environmental, Inc.
19103 Gundle Road,
Houston, Texas  77073

Attn:  General Counsel
Facsimile:  _____

With copy to:

_____
_____
Attn:  _____
Facsimile:  _____

and

Kirkland & Ellis, LLP
300 North LaSalle Street
Chicago, IL  60654
Attn:  Christopher Butler, Esq.
Facsimile:  312-862-2200

Address for wire transfer:
_____
_____
_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

GSE HOLDING, INC.

By: _____
Name:
Title:

FEIN:  77-0619096

Address for notices:
GSE Holdings Inc.
10 South Wacker Drive, Suite 3175,
Chicago, IL  60606

Attn:  General Counsel
Facsimile:  _____

With copy to:
_____
_____
_____
Attn:  _____
Facsimile:  _____

And

Kirkland & Ellis, LLP
300 North LaSalle Street
Chicago, IL  60654
Attn:  Christopher Butler, Esq.
Facsimile:  312-862-2200

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

GSE ENVIRONMENTAL, INC.

By: _____
Name:
Title:

FEIN:  76-0101539

Address for notices:
Gundle/SLT Environmental, Inc.
19103 Gundle Road,
Houston, Texas  77073

Attn:  General Counsel
Facsimile:  _____

With copy to:
_____
_____
_____
Attn: _____
Facsimile:  _____

And

Kirkland & Ellis, LLP
300 North LaSalle Street
Chicago, IL  60654
Attn:  Christopher Butler, Esq.
Facsimile:  312-862-2200

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

SYNTEC LLC

By GSE Environmental, LLC, its Sole Member

By: _____
Name:
Title:

FEIN:_____

Address for notices:
Gundle/SLT Environmental, Inc.
19103 Gundle Road,
Houston, Texas  77073

Attn:  General Counsel
Facsimile:  _____

With copy to:

_____
_____
_____
Attn:  _____
Facsimile:  _____

And

Kirkland & Ellis, LLP
300 North LaSalle Street
Chicago, IL  60654
Attn:  Christopher Butler, Esq.
Facsimile:  312-862-2200

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

Cantor Fitzgerald Securities, as Agent


By: _____
Name:    James Bond
Title:      Chief Operating Officer

FEIN:13-3680187

Address for notices:
Cantor Fitzgerald Securities
110 East 59th Street - 7th Floor
New York, NY 10022
Attn:  Nils Horning
Facsimile:    (646) 219-1180

With copy (which shall not constitute notice) to:
Cantor Fitzgerald Securities
900 West Trade - Suite 725
Charlotte, NC 28202
Attn:  Bobbie Young
Facsimile:    (646) 390-1764

And

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Attn:  Nathan Plotkin
Facsimile:    (860) 251-5212


Address for payments:

Bank: Bank of New York Mellon
ABA No.: 021-000-018
Account Number:  8900730501
Account Name: Cantor Fitzgerald Securities -- Bank Loan Agency
Attention: Louis Pagnotta
Reference: Agency - GSE Environmental DIP

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

[_____], as a Lender

By: _____
Name:
Title:

FEIN:_____

Address for notices:
[_____]
[_____]
[_____]

Attn:  [_____]
Facsimile:  [_____]

With copy (which shall not constitute notice) to:
_____
_____
_____
Attn:  _____
Facsimile:  _____

And

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attn:  Scott K. Charles, Emily, D. Johnson, and Neil K. Chatani
Facsimile:   212-403-2040

Address for payments:

ABA No. [_____]
Account Number [_____]
[_____]
Account Name: [_____]
Reference: [_____]

EXHIBIT 1.6
TO
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

FORM OF

NOTICE OF CONTINUATION

CANTOR FITZGERALD SECURITIES
as Agent under the Credit Agreement referred to below
110 East 59th Street - 7th Floor
New York, New York 10022
Attention: Nils Horning
Facsimile: (646) 219-1188

_____ __, 2014

Re:     GSE Environmental, Inc., a Delaware corporation (the "**Borrower**")

Reference is made to the Debtor-in-Possession Credit Agreement, dated as of May [4], 2014 (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among the Borrower, the other entities party thereto designated as "Credit Parties," the financial institutions party thereto designated as "Lenders" and Cantor Fitzgerald Securities, as agent for the Lenders. Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Credit Agreement.

The Borrower hereby gives you notice, pursuant to Section 1.6 of the Credit Agreement of its request for a continuation, on _____, ____, as LIBOR Rate Loans having an Interest Period of 1 month, of Loans in an aggregate outstanding principal amount of $_____ having an Interest Period ending on the proposed date for such continuation.

In connection herewith, the undersigned hereby certifies on behalf of the Borrower and not in an individual capacity that no Default or Event of Default has occurred and is continuing on the date hereof, both before and after giving effect to any Loan to be made or continued on or before any date for any proposed continuation set forth above.

[Signature page follows.]

GSE ENVIRONMENTAL, INC.

By: _____

Name:

Title:

**[SIGNATURE PAGE TO NOTICE OF CONTINUATION]**

EXHIBIT 11.1(a)
TO
DEBTOR IN POSSESSION CREDIT AGREEMENT

FORM OF ASSIGNMENT

This ASSIGNMENT, dated as of the Effective Date, is entered into between _____ ("**the Assignor**") and _____ ("**the Assignee**").

The parties hereto hereby agree as follows:

| | |
|---|---|
| Borrower: | GSE Environmental, Inc., a Delaware corporation (the "**Borrower**") |
| Agent: | Cantor Fitzgerald Securities, as agent for the Lenders (in such capacity and together with its successors and permitted assigns, the "**Agent**") |
| Debtor in Possession Credit Agreement: | Debtor-in-Possession Credit Agreement, dated as of May [4], 2014, among the Borrower, the other entities party thereto designated as "Credit Parties," the financial institutions party thereto designated as "Lenders," and the Agent (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; capitalized terms used herein without definition are used as defined in the Credit Agreement) |
| [**Trade Date:** | _____**, 2014**][1] |
| Effective Date: | _____, 2014 [2] |

---

[1] Insert for informational purposes only if needed to determine other arrangements between the assignor and the assignee.

[2] To be filled out by Agent upon entry in the Register.

| Loan/ Commitment Assigned[3] | Aggregate amount of Commitments or principal amount of Loans for all Lenders[4] | Aggregate amount of Commitments[5] or principal amount of Loans Assigned | Percentage Assigned[6] |
|---|---|---|---|
| | $_____ | $_____ | ___.____% |
| | $_____ | $_____ | ___.____% |
| | $_____ | $_____ | ___.____% |

**[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]**

---

[3]     Fill in the appropriate defined term for the type of Loans and/or Commitments under the Credit Agreement that are being assigned under this Assignment. (e.g., "**Commitment**", "**Loan**", etc.)

[4]     In the case of the Commitment, including Loans and interests.

[5]     Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date. The aggregate amounts are inserted for informational purposes only to help in calculating the percentages assigned which, themselves, are for informational purposes only.

[6]     Set forth, to at least 9 decimals, the Assigned Interest as a percentage of the aggregate Commitment or Loans in the Facility. This percentage is set forth for informational purposes only and is not intended to be binding. The assignments are based on the amounts assigned not on the percentages listed in this column.

ASSIGNMENT FOR
GSE ENVIRONMENTAL, INC.'S DEBTOR IN POSSESSION CREDIT AGREEMENT

Section 1.    <u>Assignment</u>.  Assignor hereby sells and assigns to Assignee, and Assignee hereby purchases and assumes from Assignor, Assignor's rights and obligations in its capacity as Lender under the Credit Agreement (including Liabilities owing to or by Assignor thereunder) and the other Loan Documents, in each case to the extent related to the amounts identified above (the "**Assigned Interest**").

Section 2.    <u>Representations, Warranties and Covenants of Assignors</u>.    Assignor (a) represents and warrants to Assignee and Agent that (i) it has full power and authority, and has taken all actions necessary for it, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and (ii) it is the legal and beneficial owner of its Assigned Interest and that such Assigned Interest is free and clear of any Lien and other adverse claims, (b) makes no other representation or warranty and assumes no responsibility, including with respect to the aggregate amount of the Loans and Commitments, the percentage of the Loans and Commitments represented by the amounts assigned, any statements, representations and warranties made in or in connection with any Loan Document or any other document or information furnished pursuant thereto, the execution, legality, validity, enforceability or genuineness of any Loan Document or any document or information provided in connection therewith and the existence, nature or value of any Collateral, (c) assumes no responsibility (and makes no representation or warranty) with respect to the financial condition of any Credit Party or any Subsidiary thereof or the performance or nonperformance by any Credit Party of any obligation under any Loan Document or any document provided in connection therewith and (d) attaches any Notes held by it evidencing at least in part the Assigned Interest of such Assignor (or, if applicable, an affidavit of loss or similar affidavit therefor) and requests that Agent exchange such Notes for new Notes in accordance with <u>Section 1.2</u> of the Credit Agreement.

Section 3.    <u>Representations, Warranties and Covenants of Assignees</u>.    Assignee (a) represents and warrants to Assignor and Agent that (i) it has full power and authority, and has taken all actions necessary for Assignee, to execute and deliver this Assignment and to consummate the transactions contemplated hereby, (ii) it is **[not]** an Affiliate or an Approved Fund of _____, a Lender, (iii) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest assigned to it hereunder and either Assignee or the Person exercising discretion in making the decision for such assignment is experienced in acquiring assets of such type, and (iv) it is not (A) one of the Persons named on the List of Identified Disqualified Financial Institutions described in <u>Section 9.9(b)(A)</u> of the Credit Agreement (any such Person, an "**Identified Person**"), (B) a Person who owns, directly or indirectly, a majority of the equity securities of an Identified Person (such Person, an "**Identified Person Owner**"), (C) a Person who is controlled by an Identified Person Owner (for purposes hereof, "control" being the power to direct or cause the direction of management and policies of a Person, whether by contract or otherwise), (D) a direct or indirect Subsidiary of an Identified Person, (b) appoints and authorizes Agent to take such action as administrative agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto, (c) shall perform in accordance with their terms all obligations that, by the terms of the Loan Documents, are required to be performed by it as a Lender, (d) confirms it has received such documents and

3

information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and shall continue to make its own credit decisions in taking or not taking any action under any Loan Document independently and without reliance upon Agent, any Lender or any other Indemnitee and based on such documents and information as it shall deem appropriate at the time, (e) acknowledges and agrees that, as a Lender, it may receive material non-public information and confidential information concerning the Credit Parties and their Affiliates and their Stock and agrees to use such information in accordance with <u>Section 9.10</u> of the Credit Agreement, (f) specifies as its applicable lending offices (and addresses for notices) the offices at the addresses set forth beneath its name on the signature pages hereof, and (g) to the extent required pursuant to <u>Section 10.1(f)</u> of the Credit Agreement, attaches two completed originals of Forms W-8ECI, W-8BEN, W-8IMY or W-9 and, if applicable, a portfolio interest exemption certificate.

Section 4.    <u>Determination of Effective Date; Register</u>.  Following the due execution and delivery of this Assignment by Assignor, Assignee and, to the extent required by <u>Section 9.9</u> of the Credit Agreement, the Borrower, this Assignment (including its attachments) will be delivered to Agent for its acceptance and recording in the Register.  The effective date of this Assignment (the "**Effective Date**") shall be the later of (i) the acceptance of this Assignment by Agent and (ii) the recording of this Assignment in the Register.  Agent shall insert the Effective Date when known in the space provided therefor at the beginning of this Assignment.

Section 5.    <u>Effect</u>.  As of the Effective Date, (a) Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment, have the rights and obligations of a Lender under the Credit Agreement and (b) Assignor shall, to the extent provided in this Assignment, relinquish its rights (except those surviving the termination of the Commitments and payment in full of the Obligations) and be released from its obligations under the Loan Documents other than those obligations relating to events and circumstances occurring prior to the Effective Date.

Section 6.    <u>Distribution of Payments</u>.  On and after the Effective Date, Agent shall make all payments under the Loan Documents in respect of each Assigned Interest (a) in the case of amounts accrued to but excluding the Effective Date, to Assignor and (b) otherwise, to Assignee.

Section 7.    <u>Miscellaneous</u>.  (a) The parties hereto, to the extent permitted by law, waive all right to trial by jury in any action, suit, or proceeding arising out of, in connection with or relating to, this Assignment and any other transaction contemplated hereby.  This waiver applies to any action, suit or proceeding whether sounding in tort, contract or otherwise.

(b)    On and after the Effective Date, this Assignment shall be binding upon, and inure to the benefit of, the Assignor, Assignee, Agent and their Related Persons and their successors and assigns.

(c)    This Assignment shall be governed by, and be construed and interpreted in accordance with, the law of the State of New York.

(d)     This Assignment may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(e)     Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Assignment by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart of this Assignment.

Section 8.     <u>Third Party Beneficiary</u>.  The Borrower shall be a third party beneficiary of the representations and warranties of the Assignee contained in clause (a)(iv) of <u>Section 3</u> of this Assignment.   Until the repayment in full in cash (other than asserted contingent indemnification obligations) of the Obligations, any modification of clause (a)(iv) of <u>Section 3</u> of this Assignment shall require the consent of the Borrower and any remedial actions in connection with the breach by the Assignee under clause (a)(iv) of such <u>Section 3</u> may be enforced directly by the Borrower.

**[SIGNATURE PAGES FOLLOW]**

ASSIGNMENT FOR
GSE ENVIRONMENTAL, INC.'S DEBTOR IN POSSESSION CREDIT AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**[NAME OF ASSIGNOR]**
    as Assignor

By: _____
    Name:
    Title:

**[NAME OF ASSIGNEE]**
    as Assignee

By: _____
    Name:
    Title:

<u>Lending Office for LIBOR Rate Loans</u>:

**[Insert Address (including contact name, fax number and e-mail address)]**

<u>Lending Office (and address for notices) for
    any other purpose</u>:

**[Insert Address (including contact name, fax number and e-mail address)]**

ACCEPTED and AGREED
this __ day of _____ _____:

CANTOR FITZGERALD SECURITIES
as Agent

By: _____
    Name:
    Title:

GSE ENVIRONMENTAL, INC.[7]

By: _____
    Name:
    Title:

---

[7]    Include only if required pursuant to <u>Section 9.9</u> of the Credit Agreement.

**[SIGNATURE PAGE FOR ASSIGNMENT FOR GSE ENVIRONMENTAL, INC.'S DEBTOR IN POSSESSION CREDIT AGREEMENT]**

EXHIBIT 11.1(b)
TO
DEBTOR IN POSSESSION CREDIT AGREEMENT

GUARANTY AND SECURITY AGREEMENT


See attached.

EXHIBIT 11.1(c)
TO
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

FORM OF NOTE

Lender:  **[NAME OF LENDER]**                                        New York, New York
Principal Amount:  $_____                                        _____, 2014

FOR VALUE RECEIVED, the undersigned, GSE Environmental, Inc., a Delaware corporation (the "**Borrower**"), hereby promises to pay to the order of the Lender set forth above (the "**Lender**") the Principal Amount set forth above, or, if less, the aggregate unpaid principal amount of all Loans (as defined in the Credit Agreement referred to below) of the Lender to the Borrower, payable at such times and in such amounts as are specified in the Credit Agreement.

The Borrower promises to pay interest on the unpaid principal amount of the Loans from the date made until such principal amount is paid in full, payable at such times and at such interest rates as are specified in the Credit Agreement.  To the fullest extent permitted by applicable law, demand, diligence, presentment, protest and notice of non-payment and protest are hereby waived by the Borrower.

Both principal and interest are payable in Dollars to Cantor Fitzgerald Securities, as Agent, at the address set forth in the Credit Agreement, in immediately available funds.

This Note (this "**Note**") is one of the Notes referred to in, and is entitled to the benefits of, the Debtor-in-Possession Credit Agreement, dated as of May [4], 2014 (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among the Borrower, the other entities party thereto designated as "Credit Parties," the financial institutions party thereto designated as "Lenders," and Cantor Fitzgerald Securities, as agent for the Lenders.  Capitalized terms used herein without definition are used as defined in the Credit Agreement.

The Credit Agreement, among other things, (a) provides for the making of Loans by the Lender to the Borrower in an aggregate amount not to exceed at any time outstanding the Principal Amount set forth above, the indebtedness of the Borrower resulting from such Loans being evidenced by this Note and (b) contains provisions for acceleration of the maturity of the unpaid principal amount of this Note upon the happening of certain stated events and also for prepayments on account of the principal hereof prior to the maturity hereof upon the terms and conditions specified therein.

This Note is a Loan Document, is entitled to the benefits of the Loan Documents and is subject to certain provisions of the Credit Agreement, including Sections 9.18(b) (Submission to Jurisdiction), 9.19 (Waiver of Jury Trial) and 11.2 (Other Interpretive Provisions) thereof.

This Note is a registered obligation, transferable only upon notation in the Register, and no assignment hereof shall be effective until recorded therein.

This Note shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place set forth above.

GSE ENVIRONMENTAL, INC.

By: _____
      Name:
      Title:

**[SIGNATURE PAGE TO NOTE]**

EXHIBIT 11.1(h)
TO
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

FORM OF NOTICE OF BORROWING

CANTOR FITZGERALD SECURITIES
as Agent under the Credit Agreement referred to below
110 East 59th Street
New York, New York 10022
Attention:  Nils Horning/Bobbie Young
Facsimile:  (646) 390-1764

_____ __, 2014

> Re:    GSE Environmental, Inc., a Delaware corporation (the "**Borrower**")

Reference is made to the Debtor-in-Possession Credit Agreement, dated as of May [4], 2014 (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among the Borrower, the other entities party thereto designated as "Credit Parties," the financial institutions party thereto designated as "Lenders," and Cantor Fitzgerald Securities, as agent for the Lenders.  Capitalized terms used herein without definition are used as defined in the Credit Agreement.

The Borrower hereby gives you notice, pursuant to Section 1.5 of the Credit Agreement of its request of a Borrowing (the "**Proposed Borrowing**") under the Credit Agreement and, in that connection, sets forth the following information:

A.    The date of the Proposed Borrowing is _____, ____ (the "**Funding Date**").

B.    The aggregate principal amount of requested Loans is $_____, consisting of LIBOR Rate Loans having an initial Interest Period of 1 month.

The undersigned hereby certifies on behalf of the Borrower and not in an individual capacity that the following statements are true on the date hereof and will be true on the Funding Date, both before and after giving effect to the Proposed Borrowing and any other Loan to be made or continued on or before the Funding Date:

(i)    the representations and warranties set forth in Article III of the Credit Agreement and elsewhere in the Loan Documents are true and correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date;

(ii)    no Default or Event of Default has occurred and is continuing; and

(iii)     the aggregate outstanding amount of Loans does not exceed the Maximum Loan Balance.

[Signature page follows.]

GSE ENVIRONMENTAL, INC.

By: _____
     Name:
     Title:

GUARANTY AND SECURITY AGREEMENT

Dated as of May [__], 2014

among

GSE ENVIRONMENTAL, INC. and

Each Other Grantor
From Time to Time Party Hereto

and

CANTOR FITZGERALD SECURITIES,
as Agent

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINED TERMS ........................................................................ 1

    Section 1.1    Definitions.............................................................................1

    Section 1.2    Certain Other Terms ..............................................................5

ARTICLE II GUARANTY................................................................................ 6

    Section 2.1    Guaranty................................................................................6

    Section 2.2    Limitation of Guaranty .........................................................6

    Section 2.3    Contribution ..........................................................................6

    Section 2.4    Authorization; Other Agreements..........................................6

    Section 2.5    Guaranty Absolute and Unconditional...................................7

    Section 2.6    Waivers .................................................................................8

    Section 2.7    Reliance.................................................................................8

ARTICLE III GRANT OF SECURITY INTEREST ........................................ 9

    Section 3.1    Collateral...............................................................................9

    Section 3.2    Grant of Security Interest in Collateral.................................9

ARTICLE IV REPRESENTATIONS AND WARRANTIES ........................... 10

    Section 4.1    Title; No Other Liens............................................................10

    Section 4.2    Perfection and Priority ..........................................................10

    Section 4.3    Jurisdiction of Organization; Chief Executive Office ...............................11

    Section 4.4    Locations of Inventory, Equipment and Books and Records ...................11

    Section 4.5    Pledged Collateral................................................................11

    Section 4.6    Instruments and Tangible Chattel Paper Formerly Accounts...................12

    Section 4.7    Intellectual Property.............................................................12

    Section 4.8    Commercial Tort Claims.......................................................12

Section 4.9     Specific Collateral ......................................................................................13

Section 4.10   Enforcement ................................................................................................13

ARTICLE V COVENANTS ........................................................................................... 13

Section 5.1     Maintenance of Perfected Security Interest; Further Documentation and Consents ...............................................................................................13

Section 5.2     Changes in Locations, Name, Etc ...............................................................14

Section 5.3     Pledged Collateral ......................................................................................15

Section 5.4     Accounts ......................................................................................................15

Section 5.5     Commodity Contracts .................................................................................16

Section 5.6     Delivery of Instruments and Tangible Chattel Paper and Control of Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper ...........................................................................................................16

Section 5.7     Intellectual Property ...................................................................................17

Section 5.8     Notices ........................................................................................................18

Section 5.9     Notice of Commercial Tort Claims.............................................................18

Section 5.10   Controlled Securities Account ...................................................................18

Section 5.11   Controlled Deposit Accounts .....................................................................18

ARTICLE VI REMEDIAL PROVISIONS ......................................................................... 19

Section 6.1     Code and Other Remedies .........................................................................19

Section 6.2     Accounts and Payments in Respect of General Intangibles......................22

Section 6.3     Pledged Collateral ......................................................................................23

Section 6.4     Proceeds to be Turned over to and Held by Agent .....................................24

Section 6.5     Sale of Pledged Collateral ..........................................................................24

Section 6.6     Deficiency ...................................................................................................25

ARTICLE VII THE AGENT .......................................................................................... 25

Section 7.1     Agent's Appointment as Attorney-in-Fact.................................................25

Section 7.2    Authorization to File Financing Statements ...............................................26

Section 7.3    Authority of Agent......................................................................................27

Section 7.4    Duty; Obligations and Liabilities.................................................................27

ARTICLE VIII MISCELLANEOUS ...................................................................................... 29

Section 8.1    Reinstatement..............................................................................................29

Section 8.2    Release of Collateral ...................................................................................29

Section 8.3    Independent Obligations .............................................................................30

Section 8.4    No Waiver by Course of Conduct................................................................30

Section 8.5    Amendments in Writing...............................................................................30

Section 8.6    Additional Grantors; Additional Pledged Collateral...................................30

Section 8.7    Notices ........................................................................................................30

Section 8.8    Successors and Assigns................................................................................31

Section 8.9    Counterparts ................................................................................................31

Section 8.10   Severability .................................................................................................31

Section 8.11   Governing Law ............................................................................................31

Section 8.12   Waiver of Jury Trial.....................................................................................31

Section 8.13   Perfection; Effect of Orders.........................................................................31

ANNEXES AND SCHEDULES

Annex 1          Form of Pledge Amendment
Annex 2          Form of Joinder Agreement
Annex 3          Form of Intellectual Property Security Agreement


Schedule 1          Commercial Tort Claims
Schedule 2          Filings
Schedule 3          Jurisdiction of Organization; Chief Executive Office
Schedule 4          Location of Inventory and Equipment
Schedule 5          Pledged Collateral
Schedule 6          Intellectual Property

GUARANTY AND SECURITY AGREEMENT, dated as of May [__], 2014 (this "**Agreement**"), by GSE Environmental, Inc., a Delaware corporation (the "**Borrower**"), and each of the other entities listed on the signature pages hereof or that becomes a party hereto pursuant to Section 8.6 (such entities, together with the Borrower, the "**Grantors**"), in favor of Cantor Fitzgerald Securities, as administrative agent (in such capacity, together with its successors and permitted assigns, the "**Agent**") for the Lenders and each other Secured Party (each as defined in the Credit Agreement referred to below).

W I T N E S S E T H:

WHEREAS, pursuant to the Debtor in Possession Credit Agreement dated as of the date hereof (as the same may be amended, restated, supplemented and/or modified from time to time, the "**Credit Agreement**") among the Borrower, Holdings, the other Persons party thereto as Credit Parties, the Lenders from time to time party thereto and Cantor Fitzgerald Securities, as Agent for the Lenders and each other Secured Party, the Lenders have severally agreed to make extensions of credit to the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, each Grantor (other than the Borrower) has agreed to guaranty the Obligations (as defined in the Credit Agreement) of the Borrower;

WHEREAS, each Grantor will derive substantial direct and indirect benefits from the making of the extensions of credit under the Credit Agreement; and

WHEREAS, it is a condition precedent to the obligation of the Lenders to make their respective extensions of credit to the Borrower under the Credit Agreement that the Grantors shall have executed and delivered this Agreement to the Agent;

NOW, THEREFORE, in consideration of the premises and to induce the Lenders and the Agent to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the Agent as follows:

ARTICLE I

DEFINED TERMS

Section 1.1    Definitions.  (a) Capital terms used herein without definition are used as defined in the Credit Agreement.

(b)    The following terms have the meanings given to them in the UCC and terms used herein without definition that are defined in the UCC have the meanings given to them in the UCC (such meanings to be equally applicable to both the singular and plural forms of the terms defined): "**account**", "**account debtor**", "**as-extracted collateral**", "**certificated security**", "**chattel paper**", "**commercial tort claim**", "**commodity contract**", "**deposit account**", "**electronic chattel paper**", "**equipment**", "**farm products**", "**fixture**", "**general intangible**", "**goods**", "**health-care-insurance receivable**", "**instruments**", "**inventory**", "**investment property**", "**letter-of-credit

**right**", "**proceeds**", "**record**", "**securities account**", "**security**", "**supporting obligation**" and "**tangible chattel paper**".

(c)     The following terms shall have the following meanings:

"**Agreement**" means this Guaranty and Security Agreement.

"**Applicable IP Office**" means the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency within or outside the United States.

"**Cash Collateral Account**" means a deposit account or securities account subject, in each instance, to a Control Agreement.

"**Collateral**" has the meaning specified in Section 3.1.

"**Controlled Securities Account**" means each securities account (including all financial assets held therein and all certificates and instruments, if any, representing or evidencing such financial assets) that is the subject of an effective Control Agreement.

"**Excluded Accounts**" means (i) any payroll account so long as amounts on deposit therein do not exceed the reasonably estimated payroll obligations of such Person, (ii) any withholding tax and fiduciary accounts and (iii) any petty cash deposit accounts maintained at a financial institution for which a Control Agreement has not otherwise been obtained, so long as, with respect to this clause (iii), the aggregate amount on deposit in each such petty cash account does not exceed $25,000 at any one time and the aggregate amount on deposit in all such petty cash accounts does not exceed $250,000 at any one time.

"**Excluded Equity**" means (a) any voting stock in excess of 65% of the outstanding voting stock of any First-Tier Foreign Subsidiary and any Excluded Subsidiary of the type described in clause (v) of the definition thereof, which, pursuant to the terms of the Credit Agreement, is not required to guaranty the Obligations and (b) any equity interests in partnerships and joint ventures and other entities that, in each case, are not Subsidiaries of the Borrower to the extent that such equity interests may not be pledged without the consent of one or more third parties (other than Holdings or any of its Subsidiaries or Affiliates) after giving effect to the applicable anti-assignment provisions of the UCC or any other Requirement of Law. For the purposes of this definition, "**voting stock**" means, with respect to any issuer, the issued and outstanding shares of each class of Stock of such issuer entitled to vote (within the meaning of Treasury Regulations § 1.956-2(c)(2)).

"**Excluded Property**" means, collectively, (i) Excluded Equity, (ii) any permit, license, any Contractual Obligation or other general intangible, Intellectual Property or franchise in connection with which any Grantor has any right, title to or interest (A) that prohibits or requires the consent of any Person other than a Grantor or any of its Subsidiaries or Affiliates which has not been obtained as a condition to the creation by such Grantor of a Lien on any right, title or interest in such permit, license or any Contractual Obligation or other general intangible, Intellectual Property or franchise or any Stock or Stock Equivalent related thereto, (B) to the extent that any Requirement of Law applicable thereto prohibits the creation of a Lien thereon, or

2

(C) the grant of a security interest in such permit, license, Contractual Obligation, general intangible, Intellectual Property or franchise would result in the loss of rights thereon or create a default thereunder, but only, with respect to (A), (B) and (C), to the extent, and for as long as, such prohibition or loss of rights or default is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC, the Bankruptcy Code, the Interim Order or Final Order (including Paragraph 17(d) of the Interim Order and the corresponding paragraph of the Final Order) or any other Requirement of Law (iii) Property owned by any Grantor that is subject to a purchase money Lien or a Capital Lease permitted under the Credit Agreement if the Contractual Obligation pursuant to which such Lien is granted (or in the document providing for such Capital Lease) prohibits or requires the consent of any Person other than a Grantor or any of its Subsidiaries or Affiliates which has not been obtained as a condition to the creation of any other Lien on such equipment, and (iv) any "intent to use" Trademark applications for which a statement of use has not been filed (but only until such statement is filed); <u>provided</u>, <u>however</u>, "**Excluded Property**" shall not include any proceeds, products, substitutions or replacements of Excluded Property (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Property).

"**Fraudulent Transfer Laws**" has the meaning set forth in <u>Section 2.2</u>.

"**Guaranteed Obligations**" has the meaning set forth in <u>Section 2.1</u>.

"**Guarantor**" means each Grantor other than the Borrower.

"**Guaranty**" means the guaranty of the Guaranteed Obligations made by the Guarantors as set forth in this Agreement.

"**Internet Domain Name**" means all right, title and interest (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to Internet domain names.

"**In-Transit Collateral**" has the meaning set forth in <u>Section 4.4</u>.

"**Loan Documents**" means, collectively, the Loan Documents (as defined in the Credit Agreement).

"**Material Intellectual Property**" means Intellectual Property that is owned by or licensed to a Grantor and material to the conduct of any Grantor's business.

"**Pledge Amendment**" has the meaning set forth in <u>Section 8.6(b)</u>.

"**Pledged Certificated Stock**" means all certificated securities and any other Stock or Stock Equivalent of any Person evidenced by a certificate, instrument or other similar document (as defined in the UCC), in each case owned by any Grantor, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including all Stock and Stock Equivalents listed on <u>Schedule 5</u>. Pledged Certificated Stock excludes any Excluded Property and any Cash Equivalents that are not held in Controlled Securities Accounts to the extent permitted by <u>Section 5.10</u>.

"**Pledged Collateral**" means, collectively, the Pledged Stock and the Pledged Debt Instruments.

"**Pledged Debt Instruments**" means all right, title and interest of any Grantor in instruments evidencing any Indebtedness owed to such Grantor or other obligations, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including all Indebtedness described on <u>Schedule 5</u>, issued by the obligors named therein. Pledged Debt Instruments excludes any Cash Equivalents that are not held in Controlled Securities Accounts to the extent permitted by <u>Section 5.10</u>.

"**Pledged Investment Property**" means any investment property of any Grantor, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, other than any Pledged Stock or Pledged Debt Instruments. Pledged Investment Property excludes Excluded Equity and any Cash Equivalents that are not held in Controlled Securities Accounts to the extent permitted by <u>Section 5.10</u>.

"**Pledged Stock**" means all Pledged Certificated Stock and all Pledged Uncertificated Stock.

"**Pledged Uncertificated Stock**" means any Stock or Stock Equivalent of any Person that is not Pledged Certificated Stock, including all right, title and interest of any Grantor as a limited or general partner in any partnership not constituting Pledged Certificated Stock or as a member of any limited liability company, all right, title and interest of any Grantor in, to and under any Organization Document of any partnership or limited liability company to which it is a party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including in each case those interests set forth on <u>Schedule 5</u>, to the extent such interests are not certificated. Pledged Uncertificated Stock excludes any Excluded Property and any Cash Equivalents that are not held in Controlled Securities Accounts to the extent permitted by <u>Section 5.10</u>.

"**Secured Obligations**" has the meaning set forth in <u>Section 3.2</u>.

"**Software**" means (a) all computer programs, including source code and object code versions, (b) all data, databases and compilations of data, whether machine readable or otherwise, and (c) all documentation, training materials and configurations related to any of the foregoing.

"**transferable records**" has the meaning set forth in <u>Section 5.6(c)</u>.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York; <u>provided</u>, <u>however</u>, that, in the event that, by reason of mandatory provisions of any applicable Requirement of Law, any of the attachment, perfection or priority of the Agent's or any other Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code of a jurisdiction other than the State of New York, "<u>UCC</u>" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of the definitions related to or otherwise used in such provisions.

Section 1.2     Certain Other Terms.

(a)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.  The terms "herein", "hereof" and similar terms refer to this Agreement as a whole and not to any particular Article, Section or clause in this Agreement.  References herein to an Annex, Schedule, Article, Section or clause refer to the appropriate Annex or Schedule to, or Article, Section or clause in this Agreement.  Where the context requires, provisions relating to any Collateral when used in relation to a Grantor shall refer to such Grantor's Collateral or any relevant part thereof.

(b)     Other Interpretive Provisions.

(i)     Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.

(ii)     The Agreement.  The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(iii)     Certain Common Terms.  The term "including" is not limiting and means "including without limitation."

(iv)     Performance; Time.    Whenever any performance obligation hereunder (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." If any provision of this Agreement refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(v)     Contracts.  Unless otherwise expressly provided herein, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(vi)     Laws.  References to any statute or regulation are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

## ARTICLE II

## GUARANTY

Section 2.1    Guaranty.    To induce the Lenders to make the Loans and each other Secured Party to make credit available to or for the benefit of one or more Grantors, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Loan Document, of all the Obligations of the Borrower whether existing on the date hereof or hereinafter incurred or created (the "**Guaranteed Obligations**").    This Guaranty by each Guarantor hereunder constitutes a guaranty of payment and not of collection.

Section 2.2    Limitation of Guaranty.    Any term or provision of this Guaranty or any other Loan Document to the contrary notwithstanding, the maximum aggregate amount for which any Guarantor shall be liable hereunder shall not exceed the maximum amount for which such Guarantor can be liable without rendering this Guaranty or any other Loan Document, as it relates to such Guarantor, subject to avoidance under applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and Section 548 of the Bankruptcy Code or any applicable provisions of comparable Requirements of Law) (collectively, "**Fraudulent Transfer Laws**").    Any analysis of the provisions of this Guaranty for purposes of Fraudulent Transfer Laws shall take into account the right of contribution established in Section 2.3 and, for purposes of such analysis, give effect to any discharge of intercompany debt as a result of any payment made under the Guaranty.

Section 2.3    Contribution.    To the extent that any Guarantor shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the value actually received by such Guarantor and its Subsidiaries from the Loans and other Obligations and (b) the amount such Guarantor would otherwise have paid if such Guarantor had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by the Borrower and Holdings) in the same proportion as such Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all the Guarantors on such date, then such Guarantor shall be reimbursed by such other Guarantors for the amount of such excess, pro rata, based on the respective net worth of such other Guarantors on such date.

Section 2.4    Authorization; Other Agreements.    The Secured Parties are hereby authorized, without notice to or demand upon any Guarantor and without discharging or otherwise affecting the obligations of any Guarantor hereunder and without incurring any liability hereunder, from time to time, to do each of the following:

(a)    (i) modify, amend, supplement or otherwise change, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with, any Guaranteed Obligation or any Loan Document;

(b)     apply to the Guaranteed Obligations any sums by whomever paid or however realized to any Guaranteed Obligation in such order as provided in the Loan Documents;

(c)     refund at any time any payment received by any Secured Party in respect of any Guaranteed Obligation;

(d)     (i) sell, exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release any Collateral for any Guaranteed Obligation or any other guaranty therefor in any manner, (ii) receive, take and hold additional Collateral to secure any Guaranteed Obligation, (iii) add, release or substitute any one or more other Guarantors, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner with the Borrower and any other Guarantor, maker or endorser of any Guaranteed Obligation or any part thereof; and

(e)     settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations.

Section 2.5     <u>Guaranty Absolute and Unconditional</u>.  Each Guarantor hereby waives to the fullest extent permitted by law, and agrees not to assert, any defense (other than a defense of payment), whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its obligations under this Guaranty are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Guaranty, in each case except as otherwise agreed in writing by the Agent):

(a)     the invalidity or unenforceability of any obligation of the Borrower or any other Guarantor under any Loan Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(b)     the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from the Borrower or any other Guarantor or other action to enforce the same or (ii) any action to enforce any Loan Document or any Lien thereunder;

(c)     the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any Collateral;

(d)     any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against the Borrower, any other Guarantor or any of the Borrower's other Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)     any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any Collateral or any election following the occurrence and during the continuance of an Event of Default by any Secured Party to proceed separately against any Collateral in accordance with such Secured Party's rights under any applicable Requirement of Law; or

(f)     any other defense (other than payment), setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of the Borrower, any other Guarantor or any other Subsidiary of the Borrower, in each case other than the payment in full of the Guaranteed Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted).

Section 2.6     Waivers.  Each Guarantor hereby unconditionally and irrevocably waives, to the fullest extent permitted by law, and agrees not to assert, any claim, defense (other than payment), setoff or counterclaim based on diligence, promptness, presentment, requirements for any demand or notice hereunder including any of the following:  (a) any demand for payment or performance and protest and notice of protest; (b) any notice of acceptance; (c) any presentment, demand, protest or further notice or other requirements of any kind with respect to any Guaranteed Obligation (including any accrued but unpaid interest thereon) becoming immediately due and payable; and (d) any other notice in respect of any Guaranteed Obligation or any part thereof, and any defense arising by reason of any disability or other defense of the Borrower or any other Guarantor.  Each Guarantor further unconditionally and irrevocably agrees, so long as any Commitment or Obligations remain outstanding not to (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against the Borrower or any other Guarantor by reason of any Loan Document or any payment made thereunder or (y) assert any claim, defense (other than payment), setoff or counterclaim it may have against any other Credit Party or set off any of its obligations to such other Credit Party against obligations of such Credit Party to such Guarantor.  No obligation of any Guarantor hereunder shall be discharged in full other than by complete performance.

Section 2.7     Reliance.  Each Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of the Borrower, each other Guarantor and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, and of all other circumstances bearing upon the risk of nonpayment of any Guaranteed Obligation or any part thereof that diligent inquiry would reveal, and each Guarantor hereby agrees that no Secured Party shall have any duty to advise any Guarantor of information known to it regarding such condition or any such circumstances.  In the event any Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Guarantor, such Secured Party shall be under no obligation to (a) undertake any investigation not a part of its regular business routine, (b) disclose any information that such Secured Party, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) make any future disclosures of such information or any other information to any Guarantor.

## ARTICLE III

## GRANT OF SECURITY INTEREST

Section 3.1    Collateral.  For the purposes of this Agreement, all of the following property now owned or at any time hereafter acquired by a Grantor or in which a Grantor now has or at any time in the future may acquire any right, title or interests is collectively referred to as the "Collateral":

(a)    all accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, inventory, investment property, letter of credit rights and any supporting obligations (in each case, as defined in the UCC) related to any of the foregoing, including, for the avoidance of doubt, all Intellectual Property of any Grantor listed on Schedule 6 hereto;

(b)    the commercial tort claims described on Schedule 1 and on any supplement thereto received by the Agent pursuant to Section 5.9;

(c)    all books and records pertaining to the other property described in this Section 3.1;

(d)    all property of such Grantor held by any Secured Party, including all property of every description, in the custody of or in transit to such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Grantor or as to which such Grantor may have any right or power, including but not limited to cash;

(e)    all cash, Cash Equivalents and other items deposited in, or credited to, any deposit account or securities account;

(f)    all other goods (including but not limited to fixtures) and personal property of such Grantor, whether tangible or intangible and wherever located; and

(g)    to the extent not otherwise included, all proceeds of the foregoing; provided, that "Collateral" shall not include any Excluded Property (other than proceeds thereof unless such proceeds independently constitute Excluded Property).

Section 3.2    Grant of Security Interest in Collateral.  Each Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations of such Grantor in accordance with the terms of the Loan Documents (the "**Secured Obligations**"), hereby mortgages, pledges and hypothecates to the Agent for the benefit of the Secured Parties, and grants to the Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of such Grantor; provided, however, notwithstanding the foregoing, no Lien or security interest is hereby granted on any Excluded Property; provided, further, that if and when any property shall cease to be Excluded Property, a Lien on and security in such property shall be deemed granted therein.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

To induce the Lenders and the Agent to enter into the Loan Documents, each Grantor hereby represents and warrants each of the following to the Agent, the Lenders and the other Secured Parties:

Section 4.1    Title; No Other Liens.  Except for the Lien granted to the Agent pursuant to this Agreement and other Permitted Liens under any Loan Document (including Section 4.2), such Grantor owns each item of the Collateral free and clear of any and all Liens.  Such Grantor (a) is the record and beneficial owner of the Collateral pledged by it hereunder constituting instruments or certificates and (b) has rights in or the power to grant a security interest in such rights in each other item of Collateral in which a Lien is granted by it hereunder, free and clear of any other Lien other than Permitted Liens under any Loan Document.

Section 4.2    Perfection and Priority.  The security interest granted pursuant to this Agreement, to the extent a security interest can be granted by a security agreement governed by New York law, constitutes a valid and continuing perfected security interest in favor of the Agent in all Collateral subject, for the following Collateral (to the extent any such item is Collateral and such steps are required herein), to the occurrence of the following:  (A) entry of the Orders; or (B)(i) in the case of all Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the filings and other actions specified on Schedule 2 (which, in the case of all filings and other documents referred to on such schedule, have been delivered to the Agent in completed and duly authorized form), (ii) with respect to any deposit account or securities account or commodities account (other than Excluded Accounts), the execution of Control Agreements, (iii) in the case of all U.S. registered Copyrights, U.S. registered Trademarks and U.S. issued Patents owned by a Grantor for which UCC filings are insufficient, all appropriate filings having been made with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, (iv) in the case of letter-of-credit rights that are not supporting obligations of Collateral, the execution of a Contractual Obligation granting control to the Agent over such letter-of-credit rights to the extent required under Section 5.6, (v) in the case of electronic chattel paper, the completion of all steps necessary to grant control to the Agent over such electronic chattel paper to the extent required under Section 5.6, and (vi) in the case of commercial tort claims, the notice of such commercial tort claims pursuant to Section 5.9; provided however that no Grantor is making any representation or warranty as to the perfection of a security interest in unregistered Copyrights or other unregistered Intellectual Property or any "intent to use" Trademark applications for which a statement of use has not been filed.  Such security interest shall be prior to all other Liens on the Collateral described in the following clauses (i), (ii) and (iii), except for Permitted Liens having priority over the Agent's Lien by operation of law or express written agreement of the Agent upon (i) in the case of all Pledged Certificated Stock, Pledged Debt Instruments and Pledged Investment Property, the delivery thereof to the Agent of such Pledged Certificated Stock, Pledged Debt Instruments and Pledged Investment Property to the extent required under Section 5.3 consisting of instruments and certificates, in each case properly endorsed for transfer to the Agent or in blank, (ii) in the case of all Pledged Investment Property not in certificated form, the execution of Control Agreements with respect to such investment property to the extent

required under <u>Section 5.3</u> and (iii) in the case of all other instruments and tangible chattel paper that are not Pledged Certificated Stock, Pledged Debt Instruments or Pledged Investment Property, the delivery thereof to the Agent of such instruments and tangible chattel paper. Except as set forth in this <u>Section 4.2</u>, all actions by each Grantor necessary or desirable to protect and perfect the Lien granted hereunder on the Collateral have been duly taken.

Section 4.3   <u>Jurisdiction of Organization; Chief Executive Office</u>.   Such Grantor's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Grantor's chief executive office or sole place of business, in each case as of the date hereof, is specified on <u>Schedule 3</u> and such <u>Schedule 3</u> also lists all jurisdictions of incorporation, legal names and locations of such Grantor's chief executive office or sole place of business for the five years preceding the date hereof.

Section 4.4   <u>Locations of Inventory, Equipment and Books and Records</u>.   On the date hereof, such Grantor's inventory and equipment (other than inventory or equipment in transit or on consignment in the Ordinary Course of Business, items out for repair, samples provided to customers or prospective customers in the Ordinary Course of Business), items out for repair, equipment in the possession of an employee or a processor in the Ordinary Course of Business and equipment in an aggregate amount not to exceed $2,000,000 (collectively, the "**In-Transit Collateral**")) and books and records concerning the Collateral are kept at the locations listed on <u>Schedule 4</u>.

Section 4.5   <u>Pledged Collateral</u>.   (a) The Pledged Stock pledged by such Grantor hereunder (i) is listed on <u>Schedule 5</u> (as such Schedule is deemed updated by each Pledge Amendment delivered hereunder) and constitutes that percentage of the issued and outstanding equity of all classes of each issuer thereof as set forth on <u>Schedule 5</u> and (ii) has been duly authorized, validly issued and is fully paid and nonassessable (other than Pledged Stock in limited liability companies, partnerships and, if such concepts are not applicable in the jurisdiction of organization of such Person, Foreign Subsidiaries).

(b)   As of the Closing Date, all Pledged Collateral (other than Pledged Uncertificated Stock) and all Pledged Investment Property consisting of instruments and certificates has been delivered to the Agent to the extent required by and in accordance with <u>Section 5.3(a)</u>.

(c)   Upon the occurrence and during the continuance of an Event of Default, the Agent shall be entitled to exercise all of the rights of the Grantor granting the security interest in any Pledged Stock, and a transferee or assignee of such Pledged Stock shall become a holder of such Pledged Stock to the same extent as such Grantor and be entitled to participate in the management of the issuer of such Pledged Stock and, upon the transfer of the entire interest of such Grantor, such Grantor shall, by operation of law, cease to be a holder of such Pledged Stock; <u>provided</u> that the Agent may elect at its sole and absolute discretion to permit such Grantor to continue voting such Pledged Stock.

(d)   After all Events of Default have been cured or waived, each Grantor will have the right to exercise the voting and consensual rights and powers that it would otherwise be entitled to exercise pursuant to the terms of paragraph (c) above.

Section 4.6    Instruments and Tangible Chattel Paper Formerly Accounts.  No amount payable to such Grantor under or in connection with any account is evidenced by any instrument or tangible chattel paper that has not been delivered to the Agent, properly endorsed in blank for transfer, to the extent delivery is required by Section 5.6(a).

Section 4.7    Intellectual Property.

(a)    Schedule 6, as updated from time to time in accordance with the terms of this Agreement, sets forth a true and complete list of the following Intellectual Property such Grantor owns:  (i) Intellectual Property that is registered or subject to applications for registration, and (ii) Internet Domain Names, including for each of the foregoing items (1) the owner, (2) the title, (3) the jurisdiction in which such item has been registered or patented or otherwise arises or in which an application for registration or patent has been filed, (4) as applicable, the registration or application number and registration or application date and (5) any IP Licenses or other rights (including franchises) granted by the Grantor with respect thereto.  Schedule 6, as updated from time to time in accordance with the terms of this Agreement, sets forth a true and complete list of all IP Licenses pursuant to which a Grantor is licensed Intellectual Property from a third party, other than licenses for commercially available off the shelf software which has not been substantially customized.

(b)    On the Closing Date, all registered Material Intellectual Property owned by such Grantor is valid, in full force and effect, subsisting, unexpired and to the Knowledge of each such Grantor, valid and enforceable (subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights, generally, and general equitable principles (whether considered in a proceeding in equity or at law)), and no such registered Material Intellectual Property owned by such Grantor as set forth on Schedule 6 has been abandoned, except to the extent such abandonment will not and could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  Except as set forth on Schedule 6, the consummation of the transactions contemplated by the Loan Documents shall not cause any breach or default of any material IP License or limit or impair the ownership, use, validity or enforceability of, or any rights of such Grantor in, any Material Intellectual Property.  There are no pending (or, to the knowledge of such Grantor, threatened) actions, investigations, suits, proceedings, audits, claims, demands, orders or disputes challenging the ownership, use, validity, enforceability of, or such Grantor's rights in, any Material Intellectual Property of such Grantor (other than office actions issued in the ordinary course of prosecution of any pending application for patents or applications for registration of other Intellectual Property), except as could not reasonably be expected to have a Material Adverse Effect.  To such Grantor's knowledge, no Person has been or is infringing, misappropriating, diluting, violating or otherwise materially impairing any Intellectual Property of such Grantor.  Such Grantor, and to such Grantor's knowledge each other party thereto, is not in material breach or default of any material IP License.

Section 4.8    Commercial Tort Claims.  The only commercial tort claims of any Grantor existing on the date hereof (regardless of whether the amount, defendant or other material facts

can be determined and regardless of whether such commercial tort claim has been asserted or threatened or whether litigation has been commenced for such claims) where such Grantor's claim is in excess of $100,000 or its recovery thereunder could reasonably be expected to be greater than $100,000, are those listed on <u>Schedule 1</u>, which sets forth such information separately for each Grantor.

Section 4.9 <u>Specific Collateral</u>. None of the Collateral is or is proceeds or products of farm products, as-extracted collateral, health-care-insurance receivables or timber to be cut.

Section 4.10 <u>Enforcement</u>. No Permit, notice to or filing with any Governmental Authority or any notice to or consent from any other Person is required (except for Permits or consents which have been obtained and notices or filings which have been made) for the exercise by the Agent of its rights (including voting rights) provided for in this Agreement or the enforcement of remedies in respect of the Collateral pursuant to this Agreement, including the transfer of any Collateral, except as may be required in connection with the disposition of any portion of the Pledged Collateral by laws affecting the offering and sale of securities (including, but not limited to, membership interests in a limited liability company) generally or any approvals that may be required to be obtained from any bailees or landlords to collect the Collateral.

ARTICLE V

COVENANTS

Each Grantor agrees with the Agent to the following, as long as any Obligation or Commitment remains outstanding (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted):

Section 5.1 <u>Maintenance of Perfected Security Interest; Further Documentation and Consents</u>. (a) <u>Generally</u>. Such Grantor shall (i) not use or permit any Collateral to be used unlawfully or in violation of any provision of any Loan Document, any Requirement of Law or any policy of insurance covering the Collateral and (ii) not enter into any Contractual Obligation or undertaking restricting the right or ability of such Grantor or the Agent to sell, assign, convey or transfer any Collateral, except in each case if such violation or restriction could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(b) Except as otherwise permitted in the Loan Documents, such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in <u>Section 4.2</u> and shall defend such security interest and such priority against the claims and demands of all Persons.

(c) In addition to any statements, schedules or reports the Agent may request from time to time pursuant to the Credit Agreement, each Grantor shall, upon the reasonable request by the Agent, furnish to the Agent from time to time statements and schedules further identifying and describing the Collateral and such other documents in connection with the Collateral as the Agent may reasonably request in order to maintain and protect its interest hereunder.

13

(d)     At any time and from time to time, upon the reasonable written request of the Agent, such Grantor shall, for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, (i) promptly and duly execute and deliver, and have recorded, such further documents, including an authorization to file (or, as applicable, the filing) of any financing statement or amendment under the UCC (or other filings under similar Requirements of Law) in effect in any jurisdiction with respect to the security interest created hereby and (ii) take such further action as may be necessary or as the Agent may reasonably request, including (A) using its commercially reasonable efforts to secure all approvals necessary or appropriate for the collateral assignment to or for the benefit of the Agent of any Contractual Obligation, including any IP License, held by such Grantor and to enforce the security interests granted hereunder and (B) executing and delivering any Control Agreements with respect to deposit accounts and securities accounts to the extent required hereby or under any other Loan Document.

(e)     If reasonably requested by the Agent upon the occurrence and during the continuance of an Event of Default, the Grantor shall arrange for the Agent's first priority security interest to be noted on the certificate of title of each owned Vehicle and shall file any other necessary documentation in each jurisdiction that is advisable to perfect its security interests in any owned Vehicle.

(f)     Such Grantor shall use its commercially reasonable efforts to obtain any required consents from any Person other than a Grantor or any of its Subsidiaries and its Affiliates with respect to any permit or license or any Contractual Obligation with such Person entered into by such Grantor that requires such consent as a condition to the creation by such Grantor of a Lien on any right, title or interest in such permit, license or Contractual Obligation or any Stock or Stock Equivalent related thereto.

Section 5.2    Changes in Locations, Name, Etc.  Except upon 10 days' prior written notice to the Agent and delivery to the Agent of (a) all documents reasonably requested by the Agent to maintain the validity, perfection and priority of the security interests provided for herein and (b) if applicable, a written supplement to Schedule 4 showing any additional locations at which inventory or equipment shall be kept, such Grantor shall not do any of the following:

(i)     permit any inventory or equipment with a value in excess of $2,000,000 in the aggregate to be kept at a location other than those listed on Schedule 4, except for the In Transit Collateral;

(ii)    change its jurisdiction of organization or its location (as defined in Section 9-307 of the UCC), in each case from that referred to in Section 4.3; or

(iii)   change its legal name or organizational identification number, if any, or corporation, limited liability company, partnership or other organizational structure to such an extent that any financing statement filed in connection with this Agreement would become misleading.

Section 5.3    Pledged Collateral.  (a) <u>Closing Date Delivery of Pledged Collateral</u>.  On the Closing Date, such Grantor shall (i) deliver to the Agent, in suitable form for transfer and in form and substance reasonably satisfactory to the Agent, (A) all Pledged Certificated Stock, (B) all Pledged Debt Instruments and (C) all certificates and instruments evidencing Pledged Investment Property and (ii) maintain all other Pledged Investment Property in a Controlled Securities Account.

(b)    <u>Post-Closing Delivery of Pledged Collateral</u>.  After the Closing Date, if any Grantor acquires any Pledged Debt Instruments or certificates and instruments evidencing Pledged Investment Property having a value in excess of $100,000 individually or $250,000 in the aggregate, such Grantor shall promptly, and in any event within five (5) Business Days after acquiring such Collateral, deliver to the Agent, in suitable form for transfer, all such Collateral; <u>provided</u>, that each Grantor shall deliver to the Agent all securities, in suitable form for transfer and in form and substance reasonably satisfactory to the Agent, to the extent the issuer of such securities is a Subsidiary of such Grantor.  After the Closing Date, each Grantor shall maintain all other Pledged Investment Property in a Controlled Securities Account.

(c)    <u>Event of Default</u>.  During the continuance of an Event of Default, the Agent shall have the right, at any time in its discretion and without notice to the Grantor, to (i) transfer to or to register in its name or in the name of its nominees any Pledged Collateral or any Pledged Investment Property and (ii) exchange any certificate or instrument representing or evidencing any Pledged Collateral or any Pledged Investment Property for certificates or instruments of smaller or larger denominations.

(d)    <u>Cash Distributions with respect to Pledged Collateral</u>.  Except as provided in <u>Article VI</u> and subject to the limitations set forth in the Credit Agreement, such Grantor shall be entitled to receive all cash distributions paid in respect of the Pledged Collateral.

(e)    <u>Voting Rights</u>.  Except as provided in Article VI, such Grantor shall be entitled to exercise all voting, consent and corporate, partnership, limited liability company and similar rights with respect to the Pledged Collateral; <u>provided</u>, <u>however</u>, that no vote shall be cast, consent given or right exercised or other action taken by such Grantor that would impair the Collateral in any material respect or be inconsistent with or result in any violation of any provision of any Loan Document.

Section 5.4    <u>Accounts</u>.

(a)    Such Grantor shall not, other than in the ordinary course of business, (i) grant any extension of the time of payment of any account, (ii) compromise or settle any account for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any account, (iv) allow any credit or discount on any account or (v) amend, supplement or modify any account in any manner that could adversely affect the value thereof.

(b)     So long as an Event of Default is continuing, the Agent shall have the right to make or permit its designees to make test verifications of the accounts in any manner and through any medium that it reasonably considers advisable, and such Grantor shall furnish all such assistance and information as the Agent may reasonably require in connection therewith.

Section 5.5     <u>Commodity Contracts</u>.     Such Grantor shall not have any commodity contract unless such commodity contract is subject to a Control Agreement.

Section 5.6     <u>Delivery of Instruments and Tangible Chattel Paper and Control of Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper</u>.  (a) If any amount in excess of $100,000 individually or $250,000 in the aggregate payable under or in connection with any Collateral owned by such Grantor shall be or become evidenced by an instrument or tangible chattel paper other than such instrument delivered in accordance with <u>Section 5.3(a)</u> and in the possession of the Agent and other than items deposited for collection, such Grantor shall mark all such instruments and tangible chattel paper with the following legend:  "This writing and the obligations evidenced or secured hereby are subject to the security interest of Cantor Fitzgerald Securities, as Agent" and, at the request of the Agent, shall immediately deliver such instrument or tangible chattel paper to the Agent, duly indorsed in a manner satisfactory to the Agent.

(b)     Such Grantor shall not grant "control" (within the meaning of such term under Article 9-106 of the UCC) over any investment property to any Person other than the Agent.

(c)     If such Grantor is or becomes the beneficiary of a letter of credit that is (i) not a supporting obligation of any Collateral and (ii) in excess of $100,000 individually or $250,000 in the aggregate, such Grantor shall promptly, and in any event within five (5) Business Days after becoming a beneficiary, notify the Agent thereof and use commercially reasonable efforts to enter into a Contractual Obligation with the Agent, the issuer of such letter of credit or any nominated person with respect to an assignment of proceeds of such letter of credit.  Such Contractual Obligation shall collaterally assign the proceeds of such letter of credit to the Agent and such collateral assignment shall be sufficient to grant control for the purposes of Section 9-107 of the UCC (or any similar section under any equivalent UCC).  Such Contractual Obligation shall also direct all payments thereunder to a Cash Collateral Account.  The provisions of the Contractual Obligation shall be in form and substance reasonably satisfactory to the Agent.

(d)     If any Collateral owned by such Grantor shall be or become evidenced by electronic chattel paper, such Grantor shall, at the request of the Agent (at the instruction of the Required Lenders), take all steps necessary to grant the Agent control of all such electronic chattel paper for the purposes of Section 9-105 of the UCC (or any similar section under any equivalent UCC) and all "**transferable records**" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

Section 5.7    Intellectual Property.  (a) Not less frequently than quarterly (as of the last day of each calendar quarter), each Grantor shall provide the Agent written notification of any change to Schedule 6 and the short-form intellectual property agreements and assignments as described in this Section 5.7 and other documents that the Agent reasonably requests with respect thereto.

(b)    Such Grantor shall, in its reasonable business judgment, (i) (A) continue to use each Trademark included in the Material Intellectual Property to maintain such Trademark in full force and effect with respect to each class of goods for which such Trademark is currently used, free from any claim of abandonment for non-use, (B) maintain at least substantially the same standards of quality of products and services offered under such Trademark as are currently maintained, (C) use such Trademark with the appropriate notice of registration and all other notices and legends required by applicable Requirements of Law to the extent necessary to maintain such Trademark, (D) not adopt or use any other Trademark that is confusingly similar or a colorable imitation of such Trademark unless the Agent shall obtain a perfected security interest in such other Trademark pursuant to this Agreement (subject to the qualifications set forth in Section 4.7) and (ii) not knowingly do any act or knowingly omit to do any act whereby (w) such Trademark (or any goodwill associated therewith) may be invalidated, impaired or abandoned in any way, (x) any Patent included in the Material Intellectual Property may become invalidated, impaired, abandoned or dedicated to the public, (y) any portion of the registered Copyrights included in the Material Intellectual Property may become invalidated, impaired, abandoned or dedicated to the public domain or (z) any Trade Secret that is Material Intellectual Property may become publicly available or otherwise unprotectable.

(c)    Such Grantor shall notify the Agent promptly if it has actual knowledge that any application or registration relating to any Material Intellectual Property owned by such Grantor will be abandoned or dedicated to the public, or of any material adverse determination or development regarding the validity or enforceability or such Grantor's ownership of, interest in, right to use, register, own or maintain any Material Intellectual Property (including the institution of, or any such determination or development in, any proceeding relating to the foregoing in any Applicable IP Office).  Unless no longer deemed Material Intellectual Property in such Grantor's reasonable business judgment, such Grantor shall take all actions that are necessary or reasonably requested by the Agent to maintain and pursue each application (and to obtain the relevant registration or recordation) and to maintain each registration and recordation for Material Intellectual Property owned by such Grantor.

(d)    Such Grantor shall not knowingly do any act or knowingly omit to do any act to infringe, misappropriate, dilute, violate or otherwise impair the Intellectual Property of any other Person to the extent such act could reasonably be expected to result in a Material Adverse Effect.  In the event that, after the date hereof, any Material Intellectual Property owned by such Grantor, to the knowledge of such Grantor is or has been infringed, misappropriated or diluted by a third party, such Grantor shall take such action as it reasonably deems appropriate under the circumstances in response thereto,

including, if appropriate in the exercise of its reasonable business judgment, promptly bringing suit and recovering all damages therefor.

(e)     Promptly upon request by the Agent (at the direction of the Required Lenders), such Grantor shall execute and deliver to the Agent in form and substance reasonably acceptable to the Agent and suitable for (i) filing in the Applicable IP Office the short-form intellectual property security agreements in the form attached hereto as Annex 3 for all U.S. registered Copyrights, U.S. registered Trademarks and U.S. issued Patents and IP Licenses of such Grantor and (ii) recording with the appropriate Internet domain name registrar, a duly executed form of assignment for all Internet Domain Names of such Grantor (together with appropriate supporting documentation as may be requested by the Agent).

Section 5.8     Notices.  Except as otherwise provided in this Agreement, such Grantor shall promptly notify the Agent in writing of its acquisition of any interest hereafter in property with a value in excess of $1,000,000 in the aggregate for all Grantors that is of a type where a security interest or Lien must be or may be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation.

Section 5.9     Notice of Commercial Tort Claims.  Such Grantor agrees that, if it shall acquire any interest in any commercial tort claim where such Grantor's claim is in excess of $100,000 or its recovery thereunder could reasonably be expected to be greater than $100,000 (whether from another Person or because such commercial tort claim shall have come into existence) and upon a Responsible Office becoming aware thereof, (i) such Grantor shall, promptly upon such acquisition, deliver to the Agent a notice of the existence and nature of such commercial tort claim and a supplement to Schedule 1 containing a specific description of such commercial tort claim, (ii) Section 3.1 shall apply to such commercial tort claim and (iii) such Grantor shall execute and deliver to the Agent, in each case in form and substance reasonably satisfactory to the Agent, any document, and take all other action, deemed by the Agent to be reasonably necessary to create, perfect and protect Agent's Lien, on behalf of the Secured Parties, a perfected security interest having at least the priority set forth in Section 4.2 in all such commercial tort claims.  Any supplement Schedule 1 delivered pursuant to this Section 5.9 shall, after the receipt thereof by the Agent, become part of Schedule 1 for all purposes hereunder other than in respect of representations and warranties made prior to the date of such receipt.

Section 5.10     Controlled Securities Account.  Each Grantor shall deposit all of its Cash Equivalents, if any, in securities accounts that are Controlled Securities Accounts except for Cash Equivalents the aggregate value of which does not exceed $250,000 at any time.

Section 5.11     Controlled Deposit Accounts.  Except for Excluded Accounts, each Grantor shall enter into (and thereafter maintain) Control Agreements with respect to each Deposit Account.

## ARTICLE VI

## REMEDIAL PROVISIONS

Section 6.1    Code and Other Remedies.  (a) UCC Remedies.  During the continuance of an Event of Default, the Agent may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation, all rights and remedies of a secured party under the UCC or any other applicable law.

(b)    Disposition of Collateral.  Without limiting the generality of the foregoing, the Agent may (but shall not be obligated to), without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), during the continuance of any Event of Default (personally or through its agents or attorneys), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving any Grantor or any other Person notice or opportunity for a hearing on the Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral and (iii) sell, assign, convey, transfer, grant option or options to purchase and deliver any Collateral (enter into Contractual Obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Agent shall have the right, upon any such public sale or sales and, to the extent permitted by the UCC and other applicable Requirements of Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of any Grantor, which right or equity is hereby waived and released.

(c)    Management of the Collateral.  Each Grantor further agrees, that, during the continuance of any Event of Default, (i) at the Agent's request, it shall assemble the Collateral and make it available to the Agent at places that the Agent shall reasonably select, whether at such Grantor's premises or elsewhere, (ii) without limiting the foregoing, the Agent also has the right to require that each Grantor store and keep any Collateral pending further action by the Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Agent is able to sell, assign, convey or transfer any Collateral, the Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Agent and (iv) the Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Agent's remedies (for the benefit of the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.  The Agent shall not have any obligation to any Grantor

to maintain or preserve the rights of any Grantor as against third parties with respect to any Collateral while such Collateral is in the possession of the Agent.

(d)　　Application of Proceeds.  The Agent shall apply the cash proceeds of any action taken by it pursuant to this Section 6.1 in such order as specified in Section 1.10(c) of the Credit Agreement to the payment in whole or in part of the Secured Obligations, as set forth in the Credit Agreement, and only after such application and after the payment by the Agent of any other amount required by the Intercreditor Agreement or any Requirement of Law, need the Agent account for the surplus, if any, to any Grantor.

(e)　　Direct Obligation.  Neither the Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Grantor, any other Credit Party or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Requirement of Law.  To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Agent or any Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.

(f)　　Commercially Reasonable.  To the extent that applicable Requirements of Law impose duties on the Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is not commercially unreasonable for the Agent to do any of the following:

(i)　　fail to incur significant costs, expenses or other Liabilities reasonably deemed as such by the Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)　　unless required by Requirements of Law, fail to obtain Permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, for the collection or disposition of any Collateral;

(iii)　　fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)　　advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized

nature, or to contact other Persons, whether or not in the same business as any Grantor, for expressions of interest in acquiring any such Collateral;

(v)     exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature, or, to the extent deemed appropriate by the Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)     dispose of assets in wholesale rather than retail markets;

(vii)     disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)     purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of any Collateral or to provide to the Agent a guaranteed return from the collection or disposition of any Collateral.

Each Grantor acknowledges that the purpose of this Section 6.1 is to provide a non-exhaustive any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 6.1.  Without limitation upon the foregoing, nothing contained in this Section 6.1 shall be construed to grant any rights to any Grantor or to impose any duties on the Agent that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section 6.1.

(g)     IP Licenses.  For the purpose of enabling the Agent to exercise rights and remedies under this Section 6.1 (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, sell, assign, convey, transfer or grant options to purchase any Collateral) at such time as the Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Agent, for the benefit of the Secured Parties, (i) an irrevocable, nonexclusive, worldwide license (exercisable without payment of royalty or other compensation to such Grantor), including in such license the right to sublicense, use and practice any Intellectual Property (with respect to Trademarks, subject to reasonable quality control in favor of such Grantor) now owned or hereafter acquired by such Grantor and access to all media in which any of the licensed items may be recorded or stored and to all Software, in each case to the extent permitted by any applicable licenses covering such Software, used for the compilation or printout thereof and (ii) an irrevocable license (without payment of rent or other compensation to such Grantor) to use, operate and occupy all real Property owned, operated, leased, subleased or otherwise occupied by such Grantor.

Section 6.2    Accounts and Payments in Respect of General Intangibles.  (a) In addition to, and not in substitution for, any similar requirement in the Credit Agreement, if required by the Agent at any time during the continuance of an Event of Default, any payment of accounts or payment in respect of general intangibles, when collected by any Grantor, shall be promptly (and, in any event, within two (2) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Agent, in a Cash Collateral Account, subject to withdrawal by the Agent as provided in Section 6.4.  Until so turned over, such payment shall be held by such Grantor in trust for the Agent, segregated from other funds of such Grantor.  Each such deposit of proceeds of accounts and payments in respect of general intangibles shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(b)    At any time during the continuance of an Event of Default:

(i)    each Grantor shall, upon the Agent's request, deliver to the Agent all original and other documents evidencing, and relating to, the Contractual Obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all original orders, invoices and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Agent and that payments in respect thereof shall be made directly to the Agent;

(ii)    the Agent may, without notice, at any time during the continuance of an Event of Default, limit or terminate the authority of a Grantor to collect its accounts or amounts due under general intangibles or any thereof and, in its own name or in the satisfaction the existence, amount and terms of any account or amounts due under any general intangible.  In addition, the Agent may at any time enforce such Grantor's rights against such account debtors and obligors of general intangibles; and

(iii)    each Grantor shall take all actions, deliver all documents and provide all information necessary or reasonably requested by the Agent to ensure any Internet Domain Name is registered.

(c)    Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  No Secured Party shall have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Loan Document or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any obligation of any Grantor under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to

enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

Section 6.3    Pledged Collateral.    (a) Voting Rights.    During the continuance of an Event of Default, upon notice by the Agent to the relevant Grantor or Grantors, the Agent or its nominee may exercise (i) any voting, consent, corporate and other right pertaining to the Pledged Collateral at any meeting of shareholders, partners or members, as the case may be, of the relevant issuer or issuers of Pledged Collateral or otherwise and (ii) any right of conversion, exchange and subscription and any other right, privilege or option pertaining to the Pledged Collateral as if it were the absolute owner thereof (including the right to exchange at its discretion any Pledged Collateral upon the merger, amalgamation, consolidation, reorganization, recapitalization or other fundamental change in the corporate or equivalent structure of any issuer of Pledged Stock, the right to deposit and deliver any Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Agent may determine), all without liability except to account for property actually received by it and except for any act constituting gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision; provided, however, that the Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing; provided, further, that if and when any such Event of Default shall have been cured or waived, (i) such voting rights shall automatically revert to the applicable Grantor and (ii) the Agent, at the expense of the Grantors, shall execute such documents reasonably requested by Grantors to allow the owner of any equity interest to exercise any rights associated with such equity interest.

(b)    Proxies.    In order to permit the Agent to exercise the voting and other consensual rights that it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions that it may be entitled to receive hereunder, (i) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Agent all such proxies, dividend payment orders and other instruments as the Agent may from time to time reasonably request and (ii) without limiting the effect of clause (i) above, such Grantor hereby grants to the Agent an irrevocable proxy to vote all or any part of the Pledged Collateral and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Collateral would be entitled (including giving or withholding written consents of shareholders, partners or members, as the case may be, calling special meetings of shareholders, partners or members, as the case may be, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Collateral on the record books of the issuer thereof) by any other person (including the issuer of such Pledged Collateral or any officer or agent thereof) during the continuance of an Event of Default and which proxy shall only terminate upon the payment in full of the Secured Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted).

(c)    Authorization of Issuers.    Each Grantor hereby expressly irrevocably authorizes and instructs, without any further instructions from such Grantor, each issuer of any Pledged Collateral pledged hereunder by such Grantor to (i) comply with any instruction received by it from the Agent in writing that states that an Event of Default is

continuing and is otherwise in accordance with the terms of this Agreement and each Grantor agrees that such issuer shall be fully protected from Liabilities to such Grantor in so complying and (ii) unless otherwise expressly permitted hereby or the Credit Agreement, pay any dividend or make any other payment with respect to the Pledged Collateral directly to the Agent. The Agent hereby agrees that it shall not give any such instructions unless an Event of Default has occurred and is continuing.

Section 6.4 <u>Proceeds to be Turned over to and Held by Agent</u>. Unless otherwise expressly provided in the Credit Agreement or this Agreement, all proceeds of any Collateral received by any Grantor hereunder in cash or Cash Equivalents shall be held by such Grantor in trust for the Agent and the other Secured Parties, segregated from other funds of such Grantor, and to the extent required by the Credit Agreement or this Agreement shall, promptly upon receipt by any Grantor, be turned over to the Agent in the exact form received (with any necessary endorsement). All such proceeds of Collateral and any other proceeds of any Collateral received by the Agent in cash or Cash Equivalents shall be held by the Agent in a Cash Collateral Account. All proceeds being held by the Agent in a Cash Collateral Account (or by such Grantor in trust for the Agent) shall continue to be held as collateral security for the Secured Obligations and shall not constitute payment thereof until applied as provided in the Credit Agreement.

Section 6.5 <u>Sale of Pledged Collateral</u>. (a) Each Grantor recognizes that the Agent may be unable to effect a public sale of any Pledged Collateral by reason of certain prohibitions contained in the Securities Act and applicable state or foreign securities laws or otherwise or may determine that a public sale is impracticable, not desirable or not commercially reasonable and, accordingly, may resort to one or more private sales thereof to a restricted group of purchasers that shall be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. The Agent shall be under no obligation to delay a sale of any Pledged Collateral for the period of time necessary to permit the issuer thereof to register such securities for public sale under the Securities Act or under applicable state securities laws even if such issuer would agree to do so.

(b) Each Grantor agrees to use its commercially reasonable efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of any portion of the Pledged Collateral pursuant to <u>Section 6.1</u> and this <u>Section 6.5</u> valid and binding and in compliance with all applicable Requirements of Law. Each Grantor further agrees that a breach of any covenant contained herein will cause irreparable injury to the Agent and other Secured Parties, that the Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained herein shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defense against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Credit Agreement or a defense of payment. Each Grantor waives any

and all rights of contribution or rights to exercise any subrogation rights upon the sale or disposition of all or any portion of the Pledged Collateral by Agent.

Section 6.6    <u>Deficiency</u>.  Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Secured Obligations and the fees and disbursements of any attorney employed by the Agent or any other Secured Party to collect such deficiency.

<u>ARTICLE VII</u>

<u>THE AGENT</u>

Section 7.1    <u>Agent's Appointment as Attorney-in-Fact</u>.    (a) Each Grantor hereby irrevocably constitutes and appoints the Agent and any Related Person thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, upon the occurrence and during the continuance of any Event of Default, for the purpose of carrying out the terms of the Loan Documents, to take any appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of the Loan Documents, and, without limiting the generality of the foregoing, each Grantor hereby gives the Agent and its Related Persons the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any of the following when an Event of Default shall be continuing:

(i)    in the name of such Grantor, in its own name or otherwise, take possession of and indorse and collect any check, draft, note, acceptance or other instrument for the payment of moneys due under any account or general intangible or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Agent for the purpose of collecting any such moneys due under any account or general intangible or with respect to any other Collateral whenever payable;

(ii)    in the case of any Intellectual Property owned by or licensed to the Grantors, execute, deliver and have recorded any document that the Agent may request to evidence, effect, publicize or record the Agent's security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii)    pay or discharge taxes and Liens levied or placed on or threatened against any Collateral, effect any repair or pay any insurance called for by the terms of the Credit Agreement (including all or any part of the premiums therefor and the costs thereof);

(iv)    execute, in connection with any sale provided for in <u>Section 6.1</u> or <u>Section 6.5</u>, any document to effect or otherwise necessary or appropriate in relation to evidence the sale of any Collateral; or

(v)     (A) direct any party liable for any payment under any Collateral to make payment of any moneys due or to become due thereunder directly to the Agent or as the Agent shall direct, (B) ask or demand for, and collect and receive payment of and receipt for, any moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral, (C) sign and indorse any invoice, freight or express bill, bill of lading, storage or warehouse receipt, draft against debtors, assignment, verification, notice and other document in connection with any Collateral, (D) commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect any Collateral and to enforce any other right in respect of any Collateral, (E) defend any actions, suits, proceedings, audits, claims, demands, orders or disputes brought against such Grantor with respect to any Collateral, (F) settle, compromise or adjust any such actions, suits, proceedings, audits, claims, demands, orders or disputes and, in connection therewith, give such discharges or releases as the Agent may deem appropriate, (G) assign any Intellectual Property owned by the Grantors or any IP Licenses of the Grantors throughout the world on such terms and conditions and in such manner as the Agent shall in its sole discretion determine, including the execution and filing of any document necessary to effectuate or record such assignment and (H) generally, sell, assign, convey, transfer or grant a Lien on, make any Contractual Obligation with respect to and otherwise deal with, any Collateral as fully and completely as though the Agent were the absolute owner thereof for all purposes and do, at the Agent's option, at any time or from time to time, all acts and things that the Agent (at the instruction of the Required Lenders) deems necessary to protect, preserve or realize upon any Collateral and the Secured Parties' security interests therein and to effect the intent of the Loan Documents, all as fully and effectively as such Grantor might do.

(vi)     If any Grantor fails to perform or comply with any Contractual Obligation contained herein, the Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such Contractual Obligation.

(b)     The expenses of the Agent incurred in connection with actions undertaken as provided in this Section 7.1, together with interest thereon at a rate set forth in subsection 1.3(c) of the Credit Agreement, from the date of payment by the Agent to the date reimbursed by the relevant Grantor, shall be payable by such Grantor to the Agent within five (5) Business Days after demand.

(c)     Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue of this Section 7.1 and in accordance with the terms herein. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

Section 7.2     Authorization to File Financing Statements.  During the effectiveness of this Agreement, each Grantor authorizes the Agent and its Related Persons, at any time and from

time to time, to file or record financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral in such form and in such offices as the Agent reasonably determines appropriate to perfect the security interests of the Agent under this Agreement, and such financing statements and amendments may described the Collateral covered thereby as "**all assets of the debtor, whether now existing or hereafter arising or acquired, including all proceeds thereof**"; provided that, so long as no Event of Default has occurred and is continuing, prior to any filing or recordation of documents or instruments with respect to any Intellectual Property, Agent shall provide a copy of such proposed filing or recordation to the Borrower at least five (5) Business Days prior to such filing or recordation. A photographic or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction. Each Grantor also hereby ratifies its authorization for the Agent to have filed any initial financing statement or amendment thereto under the UCC (or other similar laws) in effect in any jurisdiction if filed prior to the date hereof.

Section 7.3    Authority of Agent.    Each Grantor acknowledges that the rights and responsibilities of the Agent under this Agreement with respect to any action taken by the Agent or the exercise or non-exercise by the Agent of any option, voting right, request, judgment, discretion or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Agent and the other Secured Parties, be governed by the Credit Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Agent and the Grantors, the Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation or entitlement to make any inquiry respecting such authority. It is understood that Cantor Fitzgerald Securities is entering into this Agreement solely in its capacity as Agent under the Credit Agreement and in so acting under this Agreement shall be entitled to all of the rights, privileges, immunities and protections under provided in the Credit Agreement to the Agent. It is further expressly understood that in exercising any right, remedy, power or discretion under this Agreement, the Agent shall be entitled to direction of the Required Lenders in accordance with the Credit Agreement.

Section 7.4    Duty; Obligations and Liabilities.    (a) The Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as the Agent deals with similar property for its own account. The powers conferred on the Agent hereunder are solely to protect the Agent's interest in the Collateral and shall not impose any duty upon the Agent to exercise any such powers. The Agent shall have no other duties or responsibilities except those expressly set forth herein and in the other agreements to which it is a party and shall not by reason of any such agreement be a fiduciary for the Credit Parties or any Secured Party. The Agent shall not be required to initiate or conduct any litigation or collection proceedings. The Agent shall not be responsible to any of the Secured Parties for any recitals, statements, representations or warranties contained herein, or in any document referred to or provided for herein, or received by any of them hereunder, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of the Collateral or any document referred to or provided for herein or for any failure by the Credit Parties or any other Person to perform any of its obligations hereunder or thereunder. The Agent shall not be responsible for making any filings to perfect or maintain the perfection of the Lien on the Collateral. The Agent shall be accountable only for amounts that it receives as a result of the

exercise of such powers, and neither it nor any of its Related Persons shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligenceor willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision. In addition, the Agent shall not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other bailee if such Person has been selected by the Agent in good faith.

(b) No Secured Party and no Related Person thereof shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to any Collateral. The powers conferred on the Agent hereunder shall not impose any duty upon any other Secured Party to exercise any such powers. The other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their respective officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision.

(c) Before the Agent acts or refrains from acting, it may request a certificate from any Person reasonably satisfactory to the Agent with respect to the proposed action or inaction. The Agent shall not be liable for any action it takes or omits to take in good faith in reliance upon such certificate. Whenever in the administration of the Collateral the Agent shall deem it necessary or desirable that a matter be provided or established before taking or suffering or omitting to take any act with respect to the Collateral, such matter (unless other evidence in respect thereof is herein specifically prescribed) may, in the absence of gross negligence or willful misconduct on the part of the Agent as determined by a final non-appealable order of a court of competent jurisdiction, be deemed to be conclusively proved and established by an officers' certificate delivered to the Agent, and such certificate, in the absence of gross negligence or willful misconduct on the part of the U.S. Collateral Agent as determined by a final non-appealable order of a court of competent jurisdiction, shall be full warrant to the Agent for any action taken, suffered or omitted to be taken by it upon the faith thereof.

(d) Any Person: (i) into which the Agent may be merged or consolidated or to which the Agent transfers all or substantially all of its administrative agency business or (ii) that may result from any merger, conversion, transfer or consolidation to which the Agent shall be a party shall (if the Agent is not the surviving entity) be the successor of the Agent without the execution or filing of any document or any further act on the part of any of the parties hereto or any Secured Party.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1    Reinstatement.  Each Grantor agrees that, if any payment made by any Credit Party or other Person and applied to the Secured Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by any Secured Party to such Credit Party, its estate, trustee, receiver or any other party, including any Grantor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made.  If, prior to any of the foregoing, (a) any Lien or other Collateral securing such Grantor's liability hereunder shall have been released or terminated by virtue of the foregoing or (b) any provision of the Guaranty hereunder shall have been terminated, cancelled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Grantor in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

Section 8.2    Release of Collateral.  (a) At the time provided in subsection 8.10(b)(iii) of the Credit Agreement, the Collateral shall automatically be released from the Lien created hereby and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Agent and each Grantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Grantors.  Each Grantor (or such Grantor's designee) is hereby authorized to file UCC-3 amendments, termination statements and other documents, such as releases of security interest with the Applicable IP Office, at such time evidencing the termination of the Liens so released; provided, however, that in no event is any Grantor authorized to execute any instrument, agreement or document on behalf of Agent or any Lender to evidence such release pursuant to this Section 8.2.  At the request of any Grantor following any such termination, the Agent shall deliver to such Grantor any Collateral of such Grantor held by the Agent hereunder and execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

(b)    If the Agent shall be directed or permitted pursuant to subsection 8.10(b) of the Credit Agreement to release any Lien or any Collateral, such Collateral shall be released from the Lien created hereby to the extent provided under, and subject to the terms and conditions set forth in, such subsection.  In connection therewith, the Agent, at the request of any Grantor, shall execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such release.

(c)    At the time provided in subsection 8.10(b) of the Credit Agreement, then, upon the request of the Borrower, unless as a condition to the consent of Agent and Lenders to such sale, if applicable, such Grantor is required to remain subject to this Agreement, a Grantor shall be released from its obligations hereunder in the event that all the Stock and Stock Equivalents of such Grantor shall be sold to any Person that is not a

Credit Party, the Borrower and the Subsidiaries of the Borrower in a transaction permitted by the Loan Documents.

Section 8.3    Independent Obligations.  The obligations of each Grantor hereunder are independent of and separate from the Secured Obligations and the Guaranteed Obligations.  If any Secured Obligation or Guaranteed Obligation is not paid when due, or during the continuance of any Event of Default, the Agent may, at its sole election, proceed directly and at once, without notice, against any Grantor and any Collateral to collect and recover the full amount of any Secured Obligation or Guaranteed Obligation then due, without first proceeding against any other Grantor, any other Credit Party or any other Collateral and without first joining any other Grantor or any other Credit Party in any proceeding.

Section 8.4    No Waiver by Course of Conduct.  No Secured Party shall by any act (except by a written instrument pursuant to Section 8.5), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of any Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by any Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that such Secured Party would otherwise have on any future occasion.

Section 8.5    Amendments in Writing.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 9.1 of the Credit Agreement; provided, however, that annexes to this Agreement may be supplemented (but no existing provisions may be modified and no Collateral may be released) through Pledge Amendments and Joinder Agreements, in substantially the form of Annex 1 and Annex 2, respectively, in each case duly executed by the Agent and each Grantor directly affected thereby.

Section 8.6    Additional Grantors; Additional Pledged Collateral.  (a) Joinder Agreements.  If, at the option of the Borrower or as required pursuant to Section 4.12 of the Credit Agreement, the Borrower shall cause any Subsidiary that is not a Grantor to become a Grantor hereunder, such Subsidiary shall promptly execute and deliver to the Agent a Joinder Agreement substantially in the form of Annex 2 and shall thereafter for all purposes be a party hereto and have the same rights, benefits and obligations as a Grantor party hereto on the Closing Date.

(b)    Pledge Amendments.  To the extent any Pledged Collateral which is otherwise required to be delivered hereunder and has not been delivered as of the Closing Date, such Grantor shall deliver a pledge amendment duly executed by the Grantor in substantially the form of Annex 1 (each, a "**Pledge Amendment**").  Such Grantor authorizes the Agent to attach each Pledge Amendment to this Agreement.

Section 8.7    Notices.  All notices, requests and demands to or upon the Agent or any Grantor hereunder shall be effected in the manner provided for in Section 9.2 of the Credit Agreement; provided, however, that any such notice, request or demand to or upon any Grantor

shall be addressed to the Borrower's notice address set forth in <u>Section 9.2</u> of the Credit Agreement.

Section 8.8   <u>Successors and Assigns</u>.   This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of each Secured Party and their successors and assigns; <u>provided</u>, <u>however</u>, that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Agent.

Section 8.9   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.   Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.   Delivery of an executed signature page of this Agreement by facsimile transmission or by Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

Section 8.10   <u>Severability</u>.   Any provision of this Agreement being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of this Agreement or any part of such provision in any other jurisdiction.

Section 8.11   <u>Governing Law</u>.   The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement (without regard to conflicts of law principles).

Section 8.12   <u>Waiver of Jury Trial</u>.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO, OR DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREIN OR RELATED THERETO (WHETHER FOUNDED IN CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY AND NO RELATED PERSON OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.12</u>.   EACH GRANTOR AGREES TO BE BOUND BY THE PROVISIONS OF <u>SUBSECTIONS 9.18(b)</u>, <u>(c)</u> AND <u>(d)</u> OF THE CREDIT AGREEMENT.

Section 8.13   <u>Perfection; Effect of Orders</u>.   The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agent and the Lenders pursuant to this Agreement, the Interim Order and/or the Final Order (specifically, including, but not limited to, the existence, perfection and priority of the Liens provided herein and therein and the superpriority status provided herein and therein) shall not be modified, altered or impaired in any

manner by any other financing or extension of credit or incurrence of Indebtedness by any of the Credit Parties (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except for the Carve Out (as defined in the Interim Order or the Final Order, as applicable), no costs or expenses of administration which have been or may be incurred in any of the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lenders against the Credit Parties in respect of any Obligation;

(ii)     the Liens and security interests granted herein shall constitute valid and perfected first priority liens and security interests (subject only to (i) to any valid, perfected and unavoidable interests and liens of other parties existing as of the Petition Date to which the Pre-Petition Liens (as defined in the applicable Order) were subject on the Petition Date or become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (ii) the Carve Out), and shall be prior to all other liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(iii)     notwithstanding anything to the contrary herein or in any other Loan Document, the Liens and security interests granted hereunder shall continue valid and perfected without the necessity that financing statements be filed or that any other action be taken under applicable nonbankruptcy law.

(b)     Notwithstanding any failure on the part of any Credit Party, the Agent or any Lender to take any action to perfect, maintain, protect or enforce the Liens and security interests in the Collateral granted hereunder and the Interim Order or the Final Order, as applicable, shall automatically, and without further action by any Person, perfect such liens and security interests against the Collateral.

In the event of any inconsistency between the terms of this Agreement and the terms of the Interim Order or the Final Order, the terms of the Interim Order or the Final Order, as applicable, shall govern.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, each of the undersigned has caused this Guaranty and Security Agreement to be duly executed and delivered as of the date first above written.

GSE HOLDING, INC.,
a Delaware corporation, as a
Grantor

By: _____
Name: _____
Title: _____

GSE ENVIRONMENTAL, INC.,
a Delaware corporation, as a
Grantor

By: _____
Name: _____
Title: _____

GSE ENVIRONMENTAL, LLC,
a Delaware limited liability company, as a
Grantor

By: _____
Name: _____
Title: _____

SYNTEC, LLC, a Delaware limited liability
company, as a Grantor

By: _____
Name: _____
Title: _____

ACCEPTED AND AGREED
as of the date first above written:

CANTOR FITZGERALD SECURITIES,
not in its individual capacity but solely as Agent

By: _____
Name: _____
Title: _____

FORM OF PLEDGE AMENDMENT

This Pledge Amendment, dated as of _____ __, 20__, is delivered pursuant to Section 8.6 of the Guaranty and Security Agreement, dated as of May [__], 2014, by GSE Environmental, Inc., a Delaware corporation (the "**Borrower**"), the undersigned Grantor and the other Affiliates of the Borrower from time to time party thereto as Grantors in favor of Cantor Fitzgerald Securities, as Agent for the Secured Parties referred to therein (as the same may be modified from time to time, the "**Guaranty and Security Agreement**").  Capitalized terms used herein without definition are used as defined in the Guaranty and Security Agreement.

The undersigned hereby agrees that this Pledge Amendment may be attached to the Guaranty and Security Agreement and that the Pledged Collateral listed on Annex 1-A to this Pledge Amendment shall be and become part of the Collateral referred to in the Guaranty and Security Agreement and shall secure all Obligations of the undersigned.

The undersigned hereby represents and warrants that, with respect to the Pledged Collateral listed on Annex 1–A to this Pledge Amendment, each of the representations and warranties contained in Sections 4.1, 4.2, 4.5 and 4.10 of the Guaranty and Security Agreement is true and correct in all material respects and as of the date hereof as if made on and as of such date.

**[GRANTOR]**

By: _____
      Name: Title:

PLEDGED STOCK

| ISSUER | CLASS | CERTIFICATE NO(S). | PAR VALUE | NUMBER OF SHARES, UNITS OR INTERESTS |
|--------|-------|--------------------|-----------|--------------------------------------|
|        |       |                    |           |                                      |

PLEDGED DEBT INSTRUMENTS

| ISSUER | DESCRIPTION OF DEBT | CERTIFICATE NO(S) | FINAL MATURITY | PRINCIPAL AMOUNT |
|--------|---------------------|-------------------|----------------|------------------|
|        |                     |                   |                |                  |

ACKNOWLEDGED AND AGREED
as of the date first above written:

CANTOR FITZGERALD SECURITIES
    not in its individual capacity but solely as Agent

By: _____
    Name:
    Title:

ANNEX 2
TO
GUARANTY AND SECURITY AGREEMENT

FORM OF JOINDER AGREEMENT

This JOINDER AGREEMENT, dated as of _____ __, 20__, is delivered pursuant to Section 8.6 of the Guaranty and Security Agreement, dated as of May [__], 2014, by GSE Environmental, Inc., a Delaware corporation (the "**Borrower**") and the Affiliates of the Borrower from time to time party thereto as Grantors in favor of the Cantor Fitzgerald Securities, as Agent for the Secured Parties referred to therein (the "**Guaranty and Security Agreement**"). Capitalized terms used herein without definition are used as defined in the Guaranty and Security Agreement.

By executing and delivering this Joinder Agreement, the undersigned, as provided in Section 8.6 of the Guaranty and Security Agreement, hereby becomes a party to the Guaranty and Security Agreement as a Grantor thereunder with the same force and effect as if originally named as a Grantor therein and, without limiting the generality of the foregoing, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations of the undersigned, hereby mortgages, pledges and hypothecates to the Agent for the benefit of the Secured Parties, and grants to the Agent for the benefit of the Secured Parties a lien on and security interest in, all of its right, title and interest in, to and under the Collateral of the undersigned and expressly assumes all obligations and liabilities of a Grantor thereunder. The undersigned hereby agrees to be bound as a Grantor for the purposes of the Guaranty and Security Agreement. During the effectiveness of the Guaranty and Security Agreement, each Grantor authorizes the Agent and its Related Persons, at any time and from time to time, to file or record financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral in such form and in such offices as the Agent reasonably determines appropriate to perfect the security interests of the Agent under the Guaranty and Security Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "all assets of the debtor, whether now existing or hereafter arising or acquired, including all proceeds thereof".

The information set forth in Annex 1-A is hereby added to the information set forth in Schedules 1 through 6 to the Guaranty and Security Agreement. By acknowledging and agreeing to this Joinder Agreement, the undersigned hereby agree that this Joinder Agreement may be attached to the Guaranty and Security Agreement and that the Pledged Collateral listed on Annex 1-A to this Joinder Amendment shall be and become part of the Collateral referred to in the Guaranty and Security Agreement and shall secure all Secured Obligations of the undersigned.

The undersigned hereby represents and warrants that each of the representations and warranties contained in Article IV of the Guaranty and Security Agreement applicable to it is true and correct in all material respects on and as the date hereof as if made on and as of such date.

IN WITNESS WHEREOF, THE UNDERSIGNED HAS CAUSED THIS JOINDER AGREEMENT TO BE DULY EXECUTED AND DELIVERED AS OF THE DATE FIRST ABOVE WRITTEN.

**[Additional Grantor]**

By: _____
    Name:
    Title:

ACKNOWLEDGED AND AGREED
as of the date first above written:

**[EACH GRANTOR PLEDGING
ADDITIONAL COLLATERAL]**

By: _____
    Name:
    Title:

CANTOR FITZGERALD SECURITIES
    not in its individual capacity but solely as Agent

By: _____
    Name:
    Title:

ANNEX 3
TO
GUARANTY AND SECURITY AGREEMENT FORM OF INTELLECTUAL PROPERTY
SECURITY AGREEMENT[1]

THIS **[COPYRIGHT] [PATENT] [TRADEMARK]**[2] SECURITY AGREEMENT, dated as of _____ __, 20__ (this "**Agreement**"), is made by each of the entities listed on the signature pages hereof (each a "**Grantor**" and, collectively, the "**Grantors**"), in favor of Cantor Fitzgerald Securities, as administrative agent (in such capacity, together with its successors and permitted assigns, the "**Agent**") for the Lenders (as defined in the Credit Agreement referred to below) and the other Secured Parties.

W I T N E S S E T H :

WHEREAS, pursuant to the Debtor in Possession Credit Agreement, dated as of May [__], 2014 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among GSE Environmental, Inc., a Delaware corporation (the "**Borrower**"), the other Credit Parties, the Lenders from time to time party thereto and Cantor Fitzgerald Securities, as Agent for the Lenders, the Lenders have severally agreed to make extensions of credit to the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, each Grantor has agreed, pursuant to a Guaranty and Security Agreement, dated as of May [__], 2014, in favor of the Agent (as the same may be amended, restated, supplemented or otherwise modified from time to time , the "**Guaranty and Security Agreement**"), to guarantee the Obligations (as defined in the Credit Agreement) of the Borrower; and

WHEREAS, all of the Grantors are party to the Guaranty and Security Agreement pursuant to which the Grantors are required to execute and deliver this Agreement;

NOW, THEREFORE, in consideration of the premises and to induce the Lenders and the Agent to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the Agent as follows:

Section 1.     Defined Terms.  Capitalized terms used herein without definition are used as defined in the Guaranty and Security Agreement.

Section 2.     Grant of Security Interest in **[Copyright] [Trademark] [Patent]** Collateral.  Each Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured

---

[1]     Separate agreements should be executed relating to each Grantor's respective Copyrights, Patents, and Trademarks.

[2]     Select one term as appropriate.

Obligations of such Grantor, hereby mortgages, pledges and hypothecates to the Agent for the benefit of the Secured Parties, and grants to the Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the following Collateral of such Grantor (other than any Excluded Property, but only during such time that such Collateral actually constitutes Excluded Property) (the "**[Copyright] [Patent] [Trademark]** Collateral"):

       (a)    **[all of its registered U.S. Copyrights and all IP Licenses providing for the grant by or to such Grantor of any right under any Copyright, including, without limitation, those referred to on Schedule I hereto;**

       (b)    **all renewals, reversions and extensions of the foregoing; and**

       (c)    **all income, royalties, proceeds and Liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including, without limitation, all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof.]**

or

       (a)    **[all of its issued U.S. Patents and all IP Licenses providing for the grant by or to such Grantor of any right under any Patent, including, without limitation, those referred to on Schedule I hereto;**

       (b)    **all reissues, reexaminations, continuations, continuations-in-part, divisionals, renewals and extensions of the foregoing; and**

       (c)    **all income, royalties, proceeds and Liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including, without limitation, all rights to sue and recover at law or in equity for any past, present and future infringement, misappropriation, dilution, violation or other impairment thereof.]**

or

       (a)    **[all of its registered U.S. Trademarks and all IP Licenses providing for the grant by or to such Grantor of any right under any Trademark, including, without limitation, those referred to on Schedule I hereto;**

       (b)    **all renewals and extensions of the foregoing;**

       (c)    **all goodwill of the business connected with the use of, and symbolized by, each such Trademark; and**

       (d)    **all income, royalties, proceeds and Liabilities at any time due or payable or asserted under and with respect to any of the foregoing, including, without limitation, all rights to sue and recover at law or in equity for any past,**

**present and future infringement, misappropriation, dilution, violation or other impairment thereof.]**

Section 3.    <u>Guaranty and Security Agreement</u>.  The security interest granted pursuant to this Agreement is granted in conjunction with the security interest granted to the Agent pursuant to the Guaranty and Security Agreement and each Grantor hereby acknowledges and agrees that the rights and remedies of the Agent with respect to the security interest in the **[Copyright] [Patent] [Trademark]** Collateral made and granted hereby are more fully set forth in the Guaranty and Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

Section 4.    <u>Grantor Remains Liable</u>.  Each Grantor hereby agrees that, anything herein to the contrary notwithstanding, such Grantor shall assume full and complete responsibility for the prosecution, defense, enforcement or any other necessary or desirable actions in connection with their **[Copyrights] [Patents] [Trademarks]** subject to a security interest hereunder.

Section 5.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

Section 6.    <u>Termination</u>.  This Agreement shall terminate concurrently with the termination of the Guaranty and Security Agreement.

Section 7.    <u>Governing Law</u>.  The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement (without regard to conflicts of law principles).

Section 8.    <u>Conflict with Other Agreements</u>.  In the event of any conflict between this Agreement (or any portion thereof) and the Guaranty and Security Agreement, the Guaranty and Security Agreement shall prevail.

Section 9.    <u>Limited Capacity</u>.  It is expressly understood and agreed that Cantor Fitzgerald Securities is entering into this Agreement solely in its capacity as Agent as appointed pursuant to the Credit Agreement, and shall be entitled to all of the rights, privileges, immunities and protections under the Credit Agreement as if such rights, privileges, immunities and protections were set forth herein.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, each Grantor has caused this **[Copyright] [Patent] [Trademark]** Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

Very truly yours,

**[GRANTOR]**
as Grantor

By: _____
Name:
Title:

ACCEPTED AND AGREED
as of the date first above written:

CANTOR FITZGERALD SECURITIES
not in its individual capacity but solely as Agent

By: _____
Name:
Title:

SCHEDULE I
TO
**[COPYRIGHT] [PATENT] [TRADEMARK]** SECURITY AGREEMENT

**[Copyright] [Patent] [Trademark]** Registrations

1.     REGISTERED **[COPYRIGHTS] [PATENTS] [TRADEMARKS]**

**[Include Registration Number and Date]**

2.     **[COPYRIGHT] [PATENT] [TRADEMARK]** APPLICATIONS

**[Include Application Number and Date]**

3.     IP LICENSES

**[Include complete legal description of agreement (name of agreement, parties and date)]**