**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GSE ENVIRONMENTAL, INC., *et al.*,[1] | ) | Case No. 14-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF ADAM WALDMAN IN SUPPORT OF THE
DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY,
(III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Adam Waldman, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion"), filed contemporaneously herewith by the above-captioned debtors and debtors in possession (collectively, the "Debtors"), which seeks approval of the Debtors' $45,000,000 senior secured priming credit facility (the "DIP Facility") and the use of cash collateral ("Cash Collateral").[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: GSE Environmental, Inc. (1074); GSE Environmental, LLC (1539); GSE Holding, Inc. (9069); and SynTec, LLC (2133). The location of the Debtors' service address is: 19103 Gundle Road, Houston, Texas 77073.

[2] The significant terms of the DIP Facility are set forth in greater detail in the DIP Motion. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Motion.

2. The statements in this Declaration are, except where specifically noted, based on either my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors, or employees of Moelis & Company LLC ("Moelis") working directly with me or under my supervision, direction, or control, or from the Debtors' records maintained in the ordinary course of their business. I am not being specifically compensated for this testimony other than through payments received by Moelis as a professional to be retained by the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

**Professional Background and Qualifications**

3. I am a Vice President of Moelis, an investment banking firm founded in 2007 with its principal office located at 399 Park Avenue, 5th Floor, New York, NY 10022. Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation. Moelis, together with its investment banking advisory affiliates has over 500 employees located in New York, Los Angeles, Boston, Chicago, Houston, Palo Alto, London, Frankfurt, Sydney, Hong Kong, Beijing, and Dubai. Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

4. I have more than 8 years of investment banking and asset management experience. Since joining Moelis in July 2010, I have provided restructuring advice to companies, creditors, shareholders, and other interested parties on restructuring transactions both in chapter 11 and out-of-court. Prior to joining Moelis, I was an analyst with Wexford Capital LLC where my primary responsibilities included investing in high yield bonds, leveraged loans,

work-out, and special situations. I began my career in the Leveraged Finance Capital Markets Group at Citigroup.

**Moelis Retention**

5. In August 2013, the Debtors engaged Moelis under a prior engagement letter, and in December 2013, the Debtors engaged Moelis to act as their exclusive financial advisor and investment banker in connection with the Debtors' restructuring initiatives. Since our engagement, Moelis has rendered financial advisory and investment banking services to the Debtors in connection with the evaluation of strategic alternatives for restructuring their debt obligations, and improving their liquidity and overall financial condition. Additionally, Moelis has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to these chapter 11 cases and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

**The Debtors' Liquidity Needs**

6. The Debtors are in need of an immediate infusion of liquidity. As of the date hereof (the "Petition Date"), the Debtors have extremely limited cash on hand with which to operate their businesses and fund these chapter 11 cases. Together with the Debtors' management, Moelis and the Debtors' other advisors analyzed the incremental liquidity that would be necessary to maintain operations in connection with the filing of these chapter 11 cases. Among other things, the DIP Facility proceeds will be used to honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund certain operational expenses as set forth in the Budget, maintain ordinary course relationships with vendors, suppliers, and customers, and satisfy working capital needs in the ordinary course.

7. As part of this process, Moelis and the Debtors' other advisors reviewed and analyzed the 13-week cash flow forecast that the Debtors created with the assistance of the

Debtors' advisors. The Debtors' 13-week cash flow forecast takes into account anticipated cash receipts and disbursements during the projected period and considers a number of factors, including the effect of the chapter 11 filing on the operations of the business, fees, and interest expense associated with DIP financing, professional fees, and required vendor payments.

### **The Debtors' Efforts to Obtain Postpetition Financing**

8. I do not believe that alternative sources of financing are readily available to the Debtors. Additionally, I do not believe it would prudent, or even possible, to administer the Debtors' chapter 11 estates on a "cash collateral" basis. Without access to the DIP Facility, the Debtors have extremely limited cash on hand, and I do not expect the Debtors to be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases. In addition, substantially all the Debtors' assets are encumbered by liens arising under their Pre-Petition First-Lien Credit Agreement. As a result, I do not believe that third-party debtor-in-possession financing would be reasonably available given the realities imposed by the Debtors' existing capital structure.

9. Indeed, Moelis reached out to approximately seven potential sources of financing (outside of the Debtors' prepetition lenders) that routinely provide debtor-in-possession financing to gauge their interest in providing postpetition financing. All but one declined interest in providing indicative financial proposals due to the evident necessity to prime the Pre-Petition Secured Parties. The Debtors and their advisors carefully considered the merits of the alternative proposal. The alternative proposal, however, was not a feasible financing option in my opinion because it was predicated upon the nonconsensual priming of the Pre-Petition Liens and what I understand would likely be a costly, extended, and contested hearing, including a demonstration of adequate protection. Moreover, I believe that the alternative proposal would expose the

Debtors to the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees.

10. In contrast, the proposed DIP Facility offered by the Pre-Petition First-Lien Lenders (i.e., the DIP Lenders) will allow the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases. Accordingly, I believe that the DIP Facility provides, on balance, a more attractive postpetition financing proposal than the alternative DIP proposal.

### The Debtors Select the Proposed DIP Financing

11. Based on the foregoing, it is my belief that the DIP Facility represents the best option available to address the Debtors' immediate liquidity needs, and that the terms and conditions of the DIP Documents, including the upfront fee and unused commitment, are reasonable and appropriate under the circumstances. The DIP Facility is the product of extensive good faith, arms'-length negotiations with the DIP Lenders and is an essential component of a broader restructuring transaction contemplated by the Restructuring Support Agreement and the Plan, which were themselves heavily negotiated over the course of several weeks before the Petition Date. The repayment in full of the Pre-Petition Priming Indebtedness on the Effective Date is both a reasonable and bargained-for term under the DIP Facility, without which I believe the Debtors would have been unable to obtain the Financing. Moreover, I believe that the DIP Facility represents the only viable financing available that would not require the Debtors to seek to prime the Pre-Petition Liens on a nonconsensual basis.

12. The proposed DIP Facility will provide the Debtors with immediate access to liquidity that is necessary to ensure that the Debtors' businesses are stabilized and value is maximized. Accordingly, I believe that the DIP Facility is in the best interests of the Debtors' estates and should be approved on the terms and conditions described in the DIP Motion.

## **Conclusion**

13.      I believe that given the circumstances, the process to obtain DIP financing produced the best available financing option available, and the terms of the DIP Facility are reasonable and appropriate. I also believe that, based on the Debtors' projections and assuming these chapter 11 cases are completed within six months, the proposed DIP Facility will provide the Debtors with the necessary liquidity to effectively run their chapter 11 process.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 4, 2014

*signature*

Adam Waldman
Vice President
Moelis & Company LLC

*Proposed Financial Advisor and
Investment Banker to the Debtors*